**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE UNITED STATES OF AMERICA** | **§** | |
| | **§** | |
| **vs.** | **§** | **CAUSE NO.: 1:22-CR-15** |
| | **§** | |
| **ELMER STEWART RHODES, III** | **§** | |

**MOTION TO JOIN CALDWELL'S MOTION FOR CONTINUANCE AND CHANGE OF VENUE, RHODES ADDENDUM AND SUPPLEMENTAL MOTION FOR CONTINUANCE**

**COMES NOW** BRADFORD L. GEYER, attorney for Kenneth Harrelson in the above referenced case number and join with Caldwell's Motion for Change of Venue and Continuance filed by defendant Thomas Caldwell under Docket # 193 on July 14, 2022, with Linder's Addendum # 194 filed July 16, 2022 and add the following *Supplemental Motion for Continuance*:

1. Counsel for Mr. Harrelson would like to add additional claims as a further basis for this Court to grant the requested Motion for Continuance for a period of six months.

2. The enclosed letter to the United States Department of Justice from the Defense shows the scale and scope of discovery failures and shows that the Defense has been struggling with the Government for many months to receive proper Brady discovery (Attachment A).

3. Under Local Rules there should be no struggle.[1]

[1] https://www.dcd.uscourts.gov/sites/dcd/files/local_rules/Local%20Rules%20May_2022_Final.pdf

4. Since the last status conference when ECF 127-2 was withdrawn based on a misunderstanding, undersigned Counsel did not correct the misunderstanding to demonstrate his preference that discovery matters be addressed out of the public eye

---

LCrR 5.1 DISCLOSURE OF INFORMATION (a) Unless the parties otherwise agree and where not prohibited by law, the government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under Brady v. Maryland, 373 U.S. 83, 87 (1963), and that is known to the government. This requirement applies regardless of whether the information would itself constitute admissible evidence. The information, furthermore, shall be produced in a reasonably usable form unless that is impracticable; in such a circumstance, it shall be made available to the defense for inspection and copying. Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case. (b) The information to be disclosed under (a) includes, but is not limited to: (1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged; (2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty; (3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged; (4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and 132 (5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness. (c) As impeachment information described in (b)(5) and witness-credibility information described in (b)(4) are dependent on which witnesses the government intends to call at trial, this rule does not require the government to disclose such information before a trial date is set. (d) In the event the government believes that a disclosure under this rule would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of the requirements of this rule, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information. (e) For purposes of this rule, the government includes federal, state, and local law enforcement officers and other government officials who have participated in the investigation and prosecution of the offense(s) with which the defendant is charged. The government has an obligation to seek from these sources all information subject to disclosure under this Rule. (f) The Court may set specific timelines for disclosure of any information encompassed by this rule. (g) If the government fails to comply with this rule, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances.

without burdening the court system, but also because Brady evidence is something the defense does not have to request. Acquiescing to the withdrawal was also an expression of good will and intended to project confident reliance and faith in the Government's promises to comply with its discovery obligations.

5. Since that time, undersigned counsel has learned that DOJ prosecutors and assigned case agents have limited control over their own discovery disclosures as it seems that a discovery clearinghouse known as, "Capitol Siege Cases, Global Discovery Production Unit" (Capitol Siege Unit), actually controls production of discovery and has fallen woefully behind in Brady compliance obligations. This appears to be beyond the control of assigned government prosecutors whom undersigned counsel holds in the highest regard and who have, in all respects, acted professionally and in good faith. It is clear the Capitol Siege Unit, which appears to be swamped, needs more time to gather information so that it can be provided to assigned prosecutors so they can turn it over to the Defense.

6. The letter to the Government (Attachment A) strongly suggests that affected investigative agencies may also need more time to make proper disclosures about Confidential Human Sources (CHS) to the Capitol Siege Unit.

7. Undersigned counsel was in the United States Department of Justice in the wake of the US v. Senator Ted Stevens prosecution when an esteemed Judge in this Circuit took necessary action that led to dramatic and beneficial reforms across US Department of Justice in regard to Brady compliance. Undersigned counsel observed devastating fallout that in many respects wrongfully and disproportionately upon career civil servants that made honest mistakes, who were just overwhelmed with workload or who were forced by circumstances to make representations in reliance on others. One of these prosecutors was

Nicholas A. Marsh. Memories of Nicholas A. Marsh haunt the undersigned counsel and anyone who knew him or anyone who knew the devoted professionals around him, would understand my concerns and it is partly in his memory that this filing is made.

8. Of these Suspicious Actors (and/or material witnesses) whom we now can see committing the crimes on video the Oath Keepers are accused of having committed (Attachments B and C), we need more time to receive files such as pre-trial services files, probation files, all investigative memos, and the fruits of any searches or submissions through compulsory or voluntary collections with or without a warrant. It is also possible that investigative agencies need more time to review their files for CHS information to determine whether required disclosures are being made in a timely fashion to the Capitol Siege Unit. To date, the Government has disclosed one (1) confidential human source. From bits and pieces we see in the Discovery that seems to have made it into Relativity, it's reasonable to suspect that the Government has additional CHS to disclose in ours and other matters.

9. Last week we located an off-reference to a FISA warrant[2] that seems to have been issued prior to March 2022. This came as a surprise and raises other questions that need to be resolved.

10. On Friday we learned that the Government had "been told by [Capitol Siege Unit] that the FBI Sentinel files for many of the people … identified as "suspicious actors" should be uploaded to the defense instance of Relativity soon, possibly as early as next week. They are undergoing final review….[T]he prosecutors on this case are not currently aware of any

[2] The reference is in an excel spreadsheet where the government may have inadvertently failed to remove a reference that states: "**Warning: This file contains FISA data so SMP requirements must be met before its use and/or dissemination.**"

information that the people you identified as "suspicious actors" were working as agent provocateurs on behalf of a US law enforcement or intelligence agency on January 6."

But, alas, this information comes too late for this information to be of any use in a September trial and the Government must know that.

11. With Brady, constructive knowledge matters. In Youngblood v. West Virginia, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is *'known only to police investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would have been different",' although a 'showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

12. Sergeant Kenneth Harrelson, Ret. can only now be seen on video, in large part because of a systemic effort to make it so difficult to access and review the video record that unfortunately has only been made possible through delay, logistical hurdles and protective orders. Mr. Harrelson never attacked police or engaged in vandalism-- he actually can now be seen responding to the scene and defending police. He knew nothing of sedition or

insurrection and the record, all his known communications and actions, now seen on video, now confirm this.

13. It was only through having to endure the process of documenting his activities throughout the day—only made possible by the introduction of 23,608 videos on Evidence.Com in March, 2022--that the activities of the Suspicious Actors all around him became evident, glaring and apparent. So glaring and apparent that it seems impossible that these Suspicious Actors could have escaped FBI or investigative attention judging from keyword searches in Relativity that yield almost no meaningful discovery.

14. If defense counsels receive proper discovery there is a high probability that it will change the outcome of future proceedings and, sadly, it likely would have changed the outcome of prior motion practice. United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" under *Bagley* is "a probability sufficient to undermine confidence in the outcome. 472 U.S. at 678, 682. When assessing evidence's materiality, the court must take into account the cumulative effect of the suppressed evidence in the light of the other evidence, not merely the probative value of the suppression of evidence standing alone. See Kyles, 514 U.S. at 436.

15. The legal theory is simple: Others committed the crimes that have been attributed to Mr. Harrelson and these "Suspicious Actors" can be seen on video, most of it under protective order, attacking police and working in coordinated ways to engage in the crimes alleged against the Oath Keepers that they themselves did not commit. Many of these activities occur in two areas where the Capitol inexplicably does not have surveillance video: 1) on any part of the exterior Columbus Doors level—*the main entrance to the Capitol*--and 2)

anywhere around where Mr. Harrelson and other Oath Keepers came to the defense of a US Capitol Police Officer and diffused a dangerous situation.

16. The Defense investigation of information contained in withdrawn ECF 127-2 (Attachment B) has continued against overwhelming odds, however, and we have been able—with almost no Government assistance--to identify some of the ECF 127-2 individuals and to develop compelling exculpatory evidence with almost no directed discovery assistance from the Government.

17. Fortuitously, a high definition video disclosure by the Government in two case filings just in the last 30 days: United States v. HEMPHILL (1:21-cr-00555) and United States v. COOKE (1:22-cr-00052) prompted private citizens to post video and also to locate video that was released by the Government in those cases, but, once again, it was not provided in our Discovery that we can find. These disclosures permitted the Defense to finally identify certain Suspicious Actors, it permitted for the first time the ability to see the sequencing of events and coordination between these Suspicious Actors in the East and West, and it clearly shows police engaging with these Suspicious Actors that had the effect of sowing misinformation and impressing upon segments of the crowd that it had permission to go "up and onto the steps." The Capitol Siege Unit had this information for many months while we burned clocks and budgets trying to hunt it down.

18. We can now see that the timed attack in the East was spearheaded and focused on two areas and, but for the activities of these Suspicious Actors, there would have been no

crossing of boundaries in the East. We are only now beginning to comprehend that those activities in the West dramatically affected events in the East.[3]

19. We are 18 months into having to pry disclosures from the Government resulting in dramatic misunderstanding of events by prosecutors of record and defense counsels alike born of what can only be described systemic failures by this discovery clearing house, the Capitol Siege Unit, to be timely in Brady disclosures to trial staffs that are necessary for defendants to put on defenses. It has been undersigned counsel's observation that assigned Government counsel are always responsive and professional, but proper Brady disclosures can only occur AFTER they first receive the disclosures from the Capitol Siege Unit which must first receive them from investigative and other agencies.

20. It would be impossible to express how prejudicial this situation has been to the Defense. We have had motion practice come and go without the necessary Government Brady disclosures. This has dramatically impacted motions to dismiss, Rule 12 motions, selective prosecution motions, the public authority defense motions for which the Government filed an exclusionary Motion in Limine and even potential entrapment claims depending in substantial part on what long, sought after discovery may show.

21. That the FBI could still be reviewing required discovery and Brady information more than 18 months post arrest and be sitting on evidence of a host of perpetrators who actually engaged in the crimes that Harrelson is accused of committing is shocking and frankly, incomprehensible to undersigned counsel, **since the FBI is the best law enforcement agency, without question, in the world and it is expert in developing CHS assets prior**

---

[3] A recent public presentation of this evidence this perspective can be found here: https://www.theepochtimes.com/the-real-story-of-jan-6-documentary_4596670.html

**to events like January 6.** There simply must be undisclosed CHS among past and present Oath Keepers and the Suspicious Actors we have identified now with specificity and these agencies need time to catch up.

22. Without discovery provided by the Government, the defense investigated approximately 85 subjects or "Suspicious Actors" and/or material witnesses by scouring the public record, in the last few weeks. We developed an additional overlapping list of 43 Suspicious Actors and/or material witnesses, some of whom planned to attack the Capitol, organized and coordinated the attack on the Capitol, and can now actually be seen carrying it out without Mr. Harrelson's knowledge because we can now finally see from surveillance video that he participated in no attacks, took part in no vandalism and came to the assistance of police. We have been provided almost no discovery on these individuals either and when it is understood how these Suspicious Actors planned, behaved, communicated, coordinated, and executed—that can all be seen on video that remains under protective order, the majority of Americans and any jury, and any reviewing court, may not find it credible that law enforcement had such little investigative interest in these individuals.

23. These delays in receiving this crucial evidence has made it immensely difficult to provide experts with the information they need to form well founded expert opinions.

24. The planning executed in the East and the West seems to have included coordination for synchronized actions of individual or small group actions. We now see extensive evidence of coordination and timing. That these individuals are more likely to remain unidentified, are more likely to have their activities documented on video under protective order, are less likely to be charged if they are identified, and, if charged, the charges often involve long delays with undercharging compared to others, are more than indicative of affiliation with

some government agency. Further troubling indications include the inexplicable release of this class of individual pre-trial (sometimes on their own recognizance) when others similarly situated or with no violent acts are jailed after strong unexplainable Government opposition to pretrial release. At a minimum, we don't know what the distinguishing factors are for this broad range of prosecutorial discretion, and we need discovery to determine if there is a violation of procedural due process.

25. For these reasons, undersigned counsel respectfully requests a six month continuance so that these institutions and investigative agencies can regain control of their files and the ethical responsibilities of government assigned to these cases, so that the Defense and the Government can, once again, work these issues out amicably without the necessity of Court intervention or oversight.

26. Sergeant Kenneth Harrelson, retired, waives his Speedy Trial rights.

27. Undersigned Counsel regrets the tone this filing so close to a status conference hearing, but he earnestly believes that it is his duty as the legal representative of Mr. Harrelson, as an Officer of the Court and as an alumnus of the Department of Justice, who treasures these institutions and who will always be a defender of these institutions, their mission and the public servants who serve in them, and undersigned counsel prays that the Court and the Government will take these concerns and the spirit with which they are expressed into consideration.