IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | )<br>)<br>) |
| v. | )<br>) **Criminal No. 1:22-cr-00015-APM** |
| **KENNETH HARRELSON** | )<br>) |
| **Defendant** | )<br>)<br>)<br>) |

**DEFENDANT HARRELSON'S OPPOSITION TO MOTION IN LIMINE (ECF 213 AND 214) REGARDING ANTICIPATED TRIAL EVIDENCE**

Defendant, Kenneth Harrelson, by and through undersigned counsel, and pursuant to this court's Pretrial Order, dated May 12, 2022, (ECF 133), hereby file this Opposition Memorandum to the Government's two (2) Motions in Limine, ECF 213 and 214.

ECF 214 seeks to bar the defendants from submitting evidence during trial to include: (1) the actions or inaction of law enforcement officers at the Capitol on January 6, 2021; (2) the actions of rioters at other, unrelated events, and the status, disposition, and pendency of cases or charges involving those other rioters; and (3) purported diminished mental or physical capacity of any defendants. (ECF 214).

In ECF 213, the government seeks to prohibit not only the public authority defense, but also to preclude the defendants from raising an e*ntrapment-by-estoppel defense* at trial. (ECF 213). These Defendants submit that these motions are too broad and premature.

As the government submitted, Seditious Conspiracy under 18 § U.S.C. 2384 is a specific intent crime, as is obstruction under 18 § U.S.C. 1512(c). *United States v. Rahman*, 189 F.3d 88,

130 (2nd Cir. 1999); *United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990),

At the outset, we should remember that the Honorable Judge Amit Mehta in a motion hearing on April 8, 2022, repeatedly and strenuously emphasized that everything in this case is about the Defendant's intent. Judge Mehta then ruled on that basis upon several motions as to a continuance and accelerated discovery procedures. That is, the idea that this case is about intent was not a random or idle thought but a necessary part of important rulings. Judge Mehta sought to narrow the scope of the trial.

All of the Government's Motions in Limine (MIL) share several serious, major, and insurmountable problems, as well as each having their own individual difficulties.

The Defendants are charged with conspiracies premised on events from November 4, 2020, and supposedly spread all over the country.

The Government's proposed limitations are far too vague and unclear to be granted. They are unworkable. For example, there is no clear objective standard for identifying what activities at different locations are "unrelated." How is the Court to decide – especially in advance of the evidence – what is related and what is unrelated?

One can't establish a category of related or unrelated without knowing the full context in detail. The Defendants don't have the facts and the context yet because their pleas for required discovery have gone ignored for many months. For example, a radio call about shots fired might seem unrelated until knowing the context making it related to an officer's decision to shoot Ashli Babbitt. Is a conversation between George Tenney looking backwards into the center of the building up to the balcony "related" to him apparently opening the East Rotunda Doors from the inside a few seconds later?

The Government's proposed limitations fail because they do not address tangential

issues, but they gut the very core of what appears to be the prosecution's case. The prosecution cannot present only some of the topic of the charges while arbitrarily excluding other aspects of the same criminal charge. Again, the Government errs because these are not tangential matters.

Furthermore, the proposed limitations are simply incompatible with the prosecution case.

Moreover, the motions are premature because the Government has steadfastly refused to specify its prosecution theory or its position on multiple points. Until those points emerge in context on the evidence the Court would be unable to make a reasoned decision and should not do so in violation of Due Process.

For example, it appears that whether accurate or inaccurate, the crowd at the Capitol spread the news that at least one 12 year old girl had been shot inside the Capitol building. In spite of the difficulty of communicating with the Defendants in detention and comparing various recollections, one reason that some Oath Keepers apparently went inside the building was to provide first aid. Thus, it might be lawful for military veterans with first-aid training to enter the building on that rumor as a necessity.

The Government also seeks to exclude entrapment-by-estoppel based on inaction. The Government misunderstands. First, views of the officers caught on video show conduct of affirmative agreement for the entry of demonstrators into the Capitol, not inaction. The evidence shows affirmative welcoming of demonstrators. Second, this destroys the prosecution's necessary task of showing intent. Even if the officers did display merely inaction which might not constitute entrapment, it would nevertheless destroy any charge of intent by the Oath Keepers to knowingly enter a restricted area or to seek to disrupt anything. The question is not whether the demonstrators were correct or incorrect but whether they reasonably believed they were allowed to enter based on the officer's expressions of agreement with them walking in.

None of the Government's cited precedents are remotely relevant to this.

Furthermore, the officers did not mislead as to the state of the law, but allowed demonstrators to enter. The motion is misplaced because implied or apparent authorization to enter can and does render entry into the building lawful. The argument cited from *United States v. Gutierrez-Gonzalez* is that an officer cannot sanction unlawful conduct. But the conduct is not unlawful if it is agreed to. Accepting entry into the building makes the conduct (of entering) lawful. It is not a change of law but of fact.

Next, the Government seems to overlook how the MILs must go both ways. If the MILs were granted, the prosecution's case at trial would be gutted. And that would be fine for the Defendants, but the prosecution does not seem to understand that. At trial, the Court and the U.S. Attorney's Office may be surprised and fight against the consequences of its own MILs. Counsel can foresee the mistake of limiting one side but not the other on the same points.

Therefore short of violating Due Process under the Constitution, the Court cannot exclude only a part of the same topic while allowing the rest of the same topic to be argued as a crime against the Defendants.

To the extent that the Defendants can discern with difficulty what exactly the Government is charging the Defendants with and what its theory of the case might be and what evidentiary themes the USAO will pursue and present, it seems clear that the USAO would be completely disabled from presenting any of the case it intends to press against these Defendants if these MILs were granted and not reversed in the middle of trial. If the MILs were granted, and strictly observed, applying equally to both sides, the trial could be very short indeed.

And again that mistake by the prosecution would be good for the Defendants except that when that comes as a surprise to the prosecution and the Court unexpectedly in the midst of trial,

the risk is very high that the contradiction will be ignored in the press and rush of trial. It will be very difficult to bring the momentum to an abrupt stop and confront the contradiction.

Therefore, the Court must now grant the MILs in both directions or not at all.

In the same vein, the prosecution has vigorously fought against being specific in what the Government is alleging against these Defendants and played every card in the deck to try to prosecute the Defendants by ambush and surprise. Resisting every form of motion, the prosecution has argued that it does not have to tell the Defendants exactly what its case is against the Defendants, such as whom they supposedly aided and abetted, what property they allegedly damaged, maybe they broke windows, how they "breached" (that is, broke into) the 10 ton, 17 feet high Columbus Doors, or else why the doors were left open, how they disrupted an official proceeding before they arrived, who if any police officers they encountered, how they "led" anyone or anything especially before they arrived, whom they talked to other than themselves, etc.

In other words, having resisted precision all along, the prosecution now wishes to impose precision like hammering a nail into a wall of jello.

The Government argues its MIL as if the matters sought to be precluded could be separated from the larger topic and group of facts and allegations charged against the Defendants. But in these cases they cannot be separated.

In the Government's MIL at Dkt. # 214, the Government wishes to "preclude the following evidence during trial: (1) the actions or inaction of law enforcement officers at the Capitol on January 6, 2021;" Yet the Government also seeks to prosecute the Defendants for their supposed interactions with those same law enforcement officers. The Court cannot hear only one side of the same story. Furthermore, the prosecution seeks to smear the Defendants in

guilt by association. The prosecution contends that "a mob needs a leader" which is patently false, and almost the opposite of the definition of a "mob." The prosecution essentially argues that because the Oath Keepers were in Washington, D.C., and some persons brawled, therefore the Oath Keepers must have caused it. The Congress' failure to marshal a significant number of its officers for a very important day may not suggest any fault by officers or excuse for the brawlers. But the actions or omissions of the officers might very well refute the suggestion that the Oath Keepers caused any of it merely by responding to assist or standing idly by.

Furthermore, in the MIL at Dkt. # 214, the Government wishes to "preclude the following evidence during trial: … (2) the actions of rioters at other, unrelated events," However, the prosecution's entire case is of a vast, though nebulous and vague, conspiracy in which nearly 500,000 demonstrators all had the same motivations, the same intent, and the same plan. Thus, the prosecution cannot present its case without the imprecise and unfounded assumption that all of the demonstrators everywhere in D.C. were all part of one big unity.

For example, the fact that Ray Epps ran all over the area urging people to go into the Capitol, but the Oath Keepers did nothing of the kind, proves that the Oath Keepers lacked the necessary intent or agreement on a common plan to be guilty of the charges against them.

There are many examples of the actions of others that go to the circumstances of the entry, as to what did these defendants' hear or know immediately before going on to the Capitol grounds, which includes the circumstances around them, and specifically relates to their intent and knowledge.

For example, the Defendants will show that barricades were moved before these Defendants entered the grounds. This evidence relates to both knowledge and intent. The evidence will show that to have a "Restricted Area" there must be an "area" to which the

restriction applies. An unidentified, indeterminate area cannot be a restricted area. For a person to knowingly enter a restricted area without authorization, there must be both an identifiable area that is restricted and knowledge by the person of a restriction. Defendants intend to show that the only small, flimsy signs (some seen in photographs torn in two as being merely paper) got affixed to light-weight, movable bike racks, appearing at a very low height at about waist-high-level in most places. We anticipate we will have substantial evidence in this regard testified to by eyewitnesses and experts.

The Defendants will further show that there was an announcement made by a megaphone by the lead police officer in the East, whom we are still attempting to identify, who bellowed to the crowd "we understand this is your house" and "we'll push it up to our leadership and see about getting you upstairs."[1] Obtaining information about this event, and the Suspicious Actors that bullhorned this false information throughout the crowd has proved very difficult notwithstanding the fact that under *ex rel Brady*, this should have prompted an immediate letter to all counsel of record. Undersigned counsels have been trying in vain to get the necessary Brady information around this event since On April 7, 2022 when, in a status conference hearing, undersigned counsel explained with as much detail as possible at the time—based only on public information--(Page 31, Line 24 to Page 34, Line 19) this event.[2] Subsequent to that April hearing, the Government also promised investigative files on 600 individuals' for which the defense still seems to still be waiting. ECF 225-2 was originally filed in July in a vain attempt to scope the government around core Brady disclosures that the Siege Unit was obligated to make to all assigned government prosecutors precisely so that disclosures could be made to all defense

---

[1] https://www.dropbox.com/s/un9rpzuspmxfp9u/Public%20Authority.mp4?dl=0  We have been repeatedly asking for any and all information about the many people surrounding this exchange and we laid it out in 225-2 and 225-3 but we still have very little that anyone can locate.

[2] https://www.dropbox.com/s/k9ymne8tpop5n3f/20220407%2022cr15%20Document%2076%20transcript.pdf?dl=0

counsels. To date, although these comments could have been interpreted by the crowd as having given official permission and that could have been distorted by Suspicious Actors that we can see on video bullhorning this throughout the crowd, there is substantial evidence submitted in 225-2 and 225-3 of a coordinated and planned attempt to warp attendees view of the events as they transpired, and this provides an the most reasonable explanation not only for why over 1,000 people would walk to the East steps after a coordinated breach by Suspicious Actors that had a plan, but also why the Oath Keepers might respond to protectees being drawn in by this nefarious effort. Again this goes to both what these Defendant knew, what they believed, why they acted the way they did and for what purpose they acted the way they did and all this speaks to intent.

The evidence will further show, through video produced by the government, that the Columbus doors were opened from the inside, (for the second time) at 2:38 PM, after which an unidentified man, referenced in 225-2 as #JamesDeanWannabe who helped attack James Dolan on the stairs and who was the only man to hold a Confederate Flag for cameras, and that led the attack on police with chemicals while the Oath Keepers were standing on the steps singing the National Anthem and who, to the inside of the door, begins to (frantically) physically pull people inside at a rapid pace, until these Defendants enter nearly four minutes later, almost stumbling as they enter following a line of entry. One person takes a header and is injured. The evidence will show what that looked like from their vantage point, which again goes to knowledge and intent. The actions of others relate to both what notice they had and their intent.

Both ECF 213 and 214 seek to bar the introduction large categories of evidence, that the government has produced regarding officers who were investigated, by way of an example,

> 'That on Wednesday, January 6, 2021, an Unknown Officer• violated
> USCP Directive 2053.013, Rules of Conduct, when they allegedly waived

> unauthorized persons2, into a restricted area secured by bike racks3, toward the US Capitol during an insurrection' or
>
> "While working with MPD at the lower west terrace door, to hold back the mob of rioters, I looked to my right and saw Lt. --- leaning against the wall taking no action… In this video,---you can see Lt. --- in the background doing nothing to address the rioters in the building or stop the officer taking what appears to be a selfie; or
>
> "According to the officers, a few officers were told to go home early on the date of the incident at the U.S. Capitol. The officers did not say, however, who instructed the officers to go home. *Officers were also told to open the U.S. Capitol doors as well…*"

(These reports are not cited, nor are any names produced, to maintain the government's protective order, but the examples cited are copied from productions made by the government).[3]

For example, a motion in limine was denied in a court where,

> "[t]he defendants' willingness to discuss their activities with a DEA agent may suggest a lack of knowledge because they did not flee or hide their activities from law enforcement. See Id. at 2304 n.1 (stating knowledge can be shown through direct and circumstantial evidence, including evidence of "a defendant's concealment of his activities" and "evasive behavior with respect to law enforcement"); United States v. Makkar, 810 F.3d 1139, 1147-48 (10th Cir. 2015) (stating the court had a "hard time imagining more powerful proof" of lack of knowledge than that the defendant "turned to law enforcement for information about the drug's composition and offered to suspend sales until tests could be performed")

*United States v. Ritchie*, 2018 U.S. Dist. LEXIS 210267, *11-12, 2018 WL 6580570.

This is relevant by way of analogy, because there is video and evidence of these Defendants inside the Capitol coming to the rescue of Officer Dunn, Meggs assisting police and exchanging pleasantries while he directs foot traffic upon his exit, and, after Meggs and Harrelson exited, why they would stand by police in a comfortable and easy communion where it was even requested of them that they guard a broken window that Hunter Ehmke had broken. They can be seen chatting amicably with police officers, and they "did not flee or hide from law enforcement." This similarly relates to intent.

Additionally, based on additional evidence that is still under investigation because of

---

[3] See CAPD reports

discovery that is outstanding (see Defendant Harrelson's Motion for Discovery filed contemporaneously today), the evidence already available is anticipated to be genuinely probative because it will also go to Defendants' intent and their knowledge before entering the space alleged to be restricted, and at the Capitol.

Additionally, it may show entrapment-by-estoppel defense, a separate defense from the public authority defense, which would be on the defendants' show that,

> 'Entrapment by estoppel is the unintentional entrapment by an official who mistakenly misleads a person into a violation of the law." *Ramirez-Valencia*, 202 F.3d at 1109. It derives from the Due Process Clause of the Constitution, which prohibits convictions based on misleading actions by government officials. *Tallmadge*, 829 F.2d at 773 (*citing and discussing Cox v. Louisiana*, 379 U.S. 559, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965), and *Raley v. Ohio,* 360 U.S. 423, 3 L. Ed. 2d 1344, 79 S. Ct. 1257 (1959)).
>
> In order to establish entrapment by estoppel, a defendant must show that (1) "an authorized government official," "empowered to render the claimed erroneous advice," *Brebner*, 951 F.2d at 1024, 1027, (2) "who has been made aware of all the relevant historical facts," *Tallmadge*, 829 F.2d at 774, (3) "affirmatively told him the proscribed conduct was permissible," *Ramirez-Valencia*, 202 F.3d at 1109, (4) that "he relied on the false information," Tallmadge, 829 F.2d at 774, and (5) "that his reliance was reasonable." *Id.* As to this last element, we have stated that "[a] defendant's reliance is reasonable if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" Ramirez-Valencia, 202 F.3d at 1109 (*quoting United States v. Lansing*, 424 F.2d 225, 227 (9th Cir. 1970)).

*United States v. Batterjee*, 361 F.3d 1210, 1216-1217, (9th Cir. 2004).

Moreover, the government has admitted to continuing to supplement discovery at the last conference, and these Defendants are still working to analyze discovery, therefore, these 2 motions that are overly broad and seek to bar significant evidence are prejudicial to Defendants being able to rebut specific intent charges.

Defendant Harrelson, however, has no intention of raising a defense of "diminished physical capacity."

WHEREFORE, Defendant Kenneth Harrelson respectfully requests that the Court deny these two Motions in Limine to bar this evidence at trial where it is highly prejudicial because the evidence relates to Defendant's specific intent under Federal Rules of Civil Procedure 403 and Rule 404(b), other than allowing Defendant to stipulate with the government that they are not seeking to show "diminished physical capacity."

Dated: August 13, 2022             RESPECTFULLY SUBMITTED

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S.
303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

/s/ Jonathon Alden Moseley
Jonathon Alden Moseley, Esq.
DC Bar No. VA005
Virginia State Bar No. 41058
Mailing address only:
5765-F Burke Centre Parkway, PMB #337
Burke, Virginia 22015
Telephone: (703) 656-1230
Contact@JonMoseley.com
Moseley391@gmail.com

## CERTIFICATE OF SERVICE

      I hereby certify that on August 13, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S.
303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708
