IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) **Criminal No. 1:22-cr-00015-APM** |
| **v.** | ) |
| | ) *USA v. Stewart Rhodes, et al.* |
| **KENNETH HARRELSON** | ) |
| | ) |
| **Defendant** | ) |

**STATUS AND PROGRESS REPORT REGARDING SUPPLEMENT TO DEFENDANT
HARRELSON'S ECF 285 AND 267 FILING REGARDING EXPERT DISCLOSURES**

1) Not having all the discovery Defendant Harrelson is entitled to as set forth in ECF 283
   that formalized Government discovery failures including Brady information set forth in
   ECF 225, Defendant Harrelson is now positioned to make an additional supplemental
   disclosure regarding Defendant Harrelson's anticipated expert testimony through a brief
   outline and an executive summary (Attachment One). Defendant Harrelson's plan is to
   have a final report ready for the Government as soon as possible, but the final report will
   have the same conclusions and scope as reflected in this document only limited by the
   extent and nature of late breaking receipt of discovery compliance from the Government.

2) In simplest terms, after reconstructing to the extent possible the most accurate context of
   events, the experts will compare and contrast objective behavior of rally attendees
   including Oath Keepers and police, and some rally attendees. In a nutshell, some
   displayed characteristics and behavior that is consistent with plans and actions or
   agreement in furtherance of a plan and others displayed behavior and characteristics that
   is inconsistent with plans and actions or agreement in furtherance of a plan. This can be
   discerned through observation of objective behavioral characteristics.

3) Today undersigned counsel submitted the appropriate forms for Defendant Haelson's experts to access Evidence.Com.  It is anticipated that access to heretofore sealed information will solidify and strengthen anticipated expert witness testimony outlines as experts are permitted to make tentative conclusions based on observable behavior by individual across locations.

4) Charges related to 18 U.S.C. 1512 – Obstruction of an Official Proceeding and Aiding and Abetting and Preventing an Officer from Discharging Any Duties – do not apply to Mr. Harrelson because the Official Proceeding and acts by Members of Congress to discharge their duties, as well as to induce them to leave the place these duties were being performed, because the decisions to evacuate the House and the Senate were made before he entered the Capitol[1] and the critical time path for clearing the Capitol and its grounds, which (according to official timelines) led to the decision being decided at 6:30 p.m. that the Capitol activities could be resumed by 7:30 p.m., was based on factors, considerations, and in part on what we believe was a serious USCP misunderstanding of the threat posed by the crowds that could not have been affected by Mr. Harrelson, directly or indirectly.  Further, those same official timelines record that the "USCP secured the Senate and House chambers, along with the basement, subways, first floor, and crypts by 4:28 p.m" meaning that other activities had to be completed that had nothing to do with containing and ejecting the protestors and it is our conclusion that the officers required to contain and eject those protestors could not have been reassigned,

---

[1] US v. Cole Affidavit from the FBI Affiant relating to the time the house and senate were ordered to evacuate/ 2:20 pm.  Shortly after both house and senate were completely evacuated (See Case: 1:22−mj−00184 Assigned To: Magistrate Judge Meriweather, Robin M. Assign. Date: 8/16/2022 Description: Complaint w/ Arrest Warrant)  The time given here, 2:20 p.m., can be found on page 1.

even if all of the participants inside the Capitol immediately left the building and stayed out of the building after 2:45 p.m. only a few minutes after Mr. Harrelson and other Oath Keepers entered.

5) Reviews of hundreds of charging documents, statements by participants freely made to News Media on January 6, newspaper accounts and timelines, and patterns of charges related to violence related charges, such as weapons enhancements, strongly support the conclusion that 60 percent or more of the violence was committed outside the Capitol building on the Lower West Terrace (including the Tunnel Archway, aptly termed by Officer Fanone as the "apex" of violence) as participants fought to pin down or break through police lines before 2:45 p.m. and then was aimed primarily after 2:45 p.m. at breaking through the Tunnel Archway and preventing officers from ejecting protestors from what the latter believed the Capitol and the Tunnel constituted "Their House" implying that officers had no right to force them to leave (or in the case of the Tunnel still keep them out). It should be noted that the President never suggested to his supporters that they had any special privileges that entitled them to break through police lines to enter "their House" or to resist police efforts to leave those premises.

6) Further, that same large set of sources appear to reveal that the mob near the House and the Senate on the second floor, which constituted the primary threat to the Members due to its proximity to where they were trapped, displayed very little violence before the Chambers were evacuated at 2:45 and 2:35 p.m., respectively (the same is true about Vice President Pence, where he was hidden first as well as his exit route).  This pattern strongly suggests that there was no intention to accomplish any preplanned objective inside the Capitol except to first enter the Capitol and, once in, to reach the areas near

those Chambers so that the more daring of those present –- could demonstrate to make their voices heard by a Congress that heretofore had largely ignored their concerns about an allegedly stolen election.

7) Charging documents released to the public since June 2022[2], which concern members of 3%er groups appear to contain information suggesting that such groups were more likely to have planned or carried out an insurrection, if there was one, than the charged Oath Keepers.

8) Nevertheless, the placement of bombs near both the RNC and DNC on January 5, 2021 strongly imply that there was preplanning of sorts that involved a conspiracy with the intention of using these placement as a political statement against both parties – not just Democrats – in some coordinated fashion with the Storming of the Capitol whether that activity was itself coordinated or not.  We conclude that the Oath Keepers were not involved in planning the placement of bombs nor their coordination with any activities associated with storming the Capitol.

9) The official Select Committee on January 6 website at https://www.jan-6.com/january-6-timeline-old provides a timeline which, if it is still accurate, supports this conclusion about coordination because it explicitly describes a preplanning phase that is, in terms of its main conclusions, largely consistent with our findings.

10) Review of charging documents, relevant case evidence held by the FBI, and what has been provided to date as part of discovery for the case strongly suggests that the evident lack of a written plan to conduct an insurrection on their part to date is due to there being no plan at all due, in our judgement, to their apparent technical incompetence at creating

---

[2] *Ibid*.  See especially the discussion about the B Squad and the more than 40 other members of B SQUAD that stayed on the same floor of that hotel on January 5, 2021.  See page 4.

any coherent plan beyond a Personal Security Detail Operations Plan of 1 to 2 pages. Beyond their Personal Security responsibilities that day, they appear to have been waiting passively for direction from the President when and if he had invoked the Insurrection Act and had called for civilian volunteers, which one would suspect was never a serious consideration on his part.

11) Dr. Snell's Qualifications:  While working at Sandia National Laboratory between 1979 and 2019 for the Department of Energy and, through them, for the Department of Defense at certain times, among other things he led a multi-year Laboratory-Directed Research and Development project, that he believes to still be technically state of the art even when he retired in 2019, that examined probable adversary planning steps for terrorist attacks, each in detail by itself, in order to analyze precisely how adversaries with specified knowledge and capabilities could be defeated or detected due to that step. The combination of the results of this project combined with other technical professional skills he gained over that nearly 40 years career before he retired, leads him to technically assess that he still remains among the top 5 experts in the world at being able to create his own and to positively critique others' terrorist threat attack plans for analysis to determine if they could realistically succeed in evading those countermeasures and still be considered by expert attackers to be reasonably successful to the extent that they could be candidates for further analysis by security analysts through the application of such analysis tools such as tabletop exercises, computer modeling and simulation, and field exercises.  He cites as just one document incorporating his expertise the International Atomic Energy Agency's (IAEA's) Nuclear Security Assessment Methodologies for Regulated Facilities: *Final Report of a Coordinate Research Project* (TECDOC 1868)

which documents the results of an IAEA sponsored research project he served as the technical lead for.

12)   <u>Sergeant Hill's Qualifications</u>:  Steven Hill is a retired Systems Engineer with Transportation Systems Analysis at Sandia National Laboratories (SNL).  At SNL, Steve was a member of the Security Training and Risk Analysis Team (STRAT) where he built response related training programs and conducted security analysis in the areas of nuclear, radiological, chemical and biological security and response.

13) Steve provided workshops and training courses for the physical protection of nuclear facilities for the Department of Energy, National Nuclear Security Administration, International Nuclear Security, and the International Atomic Energy Agency, in the US and in numerous countries.

14) Steve's areas of expertise are tactical operations, response force training, nuclear/radiological security of fixed and transportation assets.  He is an expert in the use of tabletop exercises for response training, data collection and physical security for fixed and mobile security high-risk assets.

15) Steve conducted ballistic testing for SNL and other governmental agencies and was party to numerous lab directed research and development projects (LDRD) which resulted in further research and patents.

16) Other areas of expertise include firearms instruction, security response training, tactical response, Live-Fire Shoot House (LFSH) training, lethal/less lethal response, critical incident response, tabletop exercises, procedure development and various police/security officer survival techniques. He is a Master level certified instructor through the DOE/National Training Center and specializes in advanced tactical management, critical

incident management, SWAT (SPO-III), hazardous material tactical response, mobile field force, firearms instruction, criminal investigations, rappel master, first line supervision, electronic surveillance operations, and police civil liability.

17) Steve is retired from the Albuquerque Police Department, where he led and supervised hundreds of high-risk tactical events to include hostage resolutions, high risk search warrants, armed/violent offenders, demonstrator, and riot control.  He served as the supervisor of the SWAT Team for over 8 years and was a detective in the Special Investigative Department/Repeat Offender Project. Steve has more than 30 years of experience in training state, local and federal law-enforcement personnel and has worked part time for the DOE National Training Center and the U.S. Department of State. Steve is also a veteran of the United States Air Force.


Dated:  September 6, 2022                    RESPECTFULLY SUBMITTED
                                             KENNETH HARRELSON, *By Counsel*
                                             /s/ Brad Geyer

                                             Bradford L. Geyer, PHV
                                             PA 62998
                                             NJ 022751991
                                             Suite 141 Route 130 S., Suite 303
                                             Cinnaminson, NJ 08077
                                             Brad@FormerFedsGroup.Com
                                             (856) 607-5708


## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

                                             /s/ Brad Geyer
                                             Bradford L. Geyer, PHV

PA 62998
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708