## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Criminal Case No. 22-cr-15 (APM) |
| | : | |
| **KENNETH HARRELSON** | : | *Previously Included in* |
| | : | |
| Defendant | : | Case No. 21-cr-28 (APM) |
| | : | |

### MEMORANDUM OF LAW IN SUPPORT OF KENNETH HARRELSON'S MOTIONS FOR NEW TRIAL, FOR RULE 29 JUDGEMENT OF ACQUITTAL AND TO DISMISS DUE TO GOVERNMENT REFUSAL TO COMPLY WITH *BRADY V. MARYLAND* REQUIRED DISCLOSURE OF EXCULPATORY INFORMATION

Defendant, Kenneth Harrelson, through the undersigned counsel, Bradford L. Geyer, presents this Memorandum of Law in support of his Motions For New Trial, For Rule 29 Judgement Of Acquittal And To Dismiss Due To Government Refusal To Comply With *Brady v. Maryland,* 373 U.S. 83 (1963) and progeny Required Disclosure Of Exculpatory Information, stating as follows:

## I.  POSTURE OF THE CASE

Defendant Kenneth Harrelson was found guilty by the jury in the case of USA v. Stewart Rhodes, et al., Criminal Case No. 1:22-cr-00015, of (only)

a)  Obstruction of an official proceeding in violation of 18 U.S.C. § 1512 (c)(2) (Count 3)

b)  Conspiracy to Prevent an Officer from Discharging Any Duties in violation of 18 U.S.C. § 372 (Count 4)

c)  Tampering with Documents or Proceedings and Aiding and Abetting in violation of

18 U.S.C. § 1512(c)(1) (Count 9)

Harrelson was found not guilty of all other charges.  Therefore, where other Defendants are likely to challenge other aspects of the case, and Defendant Harrelson would agree with their arguments, Harrelson's motions here are necessarily limited to only Counts 3, 4, and 9.

Defendant Harrelson repeatedly served demand upon the Government for exculpatory information which the Government was and is compelled to provide even in the absence of a request.  Harrelson, by counsel, has repeatedly requested exculpatory information.  Harrelson warned that any conviction would be subject to reversal due to the Government's violation of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963) and progeny and the case subject to dismissal.

In one hearing, the Court expressed surprise that it had not been advised much earlier of the severe and serious problems with discovery disclosures from the Government.  In fact, however, in addition to verbal warnings in court hearings, the Court was advised in writing on the public record as far back as December 5, 2021.  The Court's rulings on discovery and *Brady* violations seems to have overlooked these warnings:

A.  Document 529, December 5, 2021, "Defendant Kelly Meggs' Response To Inquiry Of The Court Concerning Ability To Review Discovery Material," in Criminal Case No. 1:21-cr-00028.
B.  Document 536, December 9, 2021, "Amended Defendant Kelly Meggs' Response To Inquiry Of The Court Concerning Ability To Review Discovery Material," in Criminal Case No. 1:21-cr-00028.
C.  Document 567, December 29, 2021, "Supplement On Government's Failure To Provide Discovery To Defendant Kelly Meggs' Response To Inquiry Of The Court Concerning Ability To Review Discovery Material" in Criminal Case No. 1:21-cr-00028.
D.  Document 85-1, pages 6 to 9, April 13, 2022, "Defendant Kelly Meggs' Memorandum Of Law In Support Of His Motion To Compel Production Of Ordered Information By U.S. Capitol Police"
E.  Document 127 (withdrawn by counsel), May 5, 2022, "Defendant Kenneth Harrelson's First Motion of Discovery of Material Witnesses in 1:22-c5-00015

F.  Document 268, August 20, 2022, "Defendant Kenneth Harrelson's Motion for Release of Brady Materials, (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit) in 1:22-c5-00015

G.  Document 283, August 30, 2022, Defendant Kenneth Harrelson re <u>266</u> First MOTION for Release of Brady Materials (Attachments: # <u>1</u> Certificate of Service Checklist of Demanded, # <u>2</u> Exhibit Checklist of Claimed but not produced, # <u>3</u> Exhibit Missing Productions from known persons, # <u>4</u> Exhibit Updated Expert Requests)

## II. INTRODUCTION

Mr. Harrelson never attacked police or engaged in vandalism -- he actually can now be seen responding to the scene and defending police. He knew nothing of sedition or insurrection and the record, all his known communications and actions, now seen on video, now confirm this. He responded as anyone would expect.  Whereas prosecutors have focused on misinterpreting and making unfounded assumptions about comments made by other Defendants, aside from one text from February 6, 2021 that lacks context or clear meaning, the prosecutors have found no comments by Defendant Harrelson capable of being turned into something negative or different from what was intended.

Sergeant Kenneth Harrelson, Ret. can only now be seen on video, in spite of a systemic effort to make it so difficult to access and review the video record that unfortunately has only been made possible through delay, logistical hurdles and protective orders.

After almost leaving and going home to Florida on January 5, 2022, on January 6th, 2022, Harrelson arrived late to the Ellipse for the President's speech and, consistent with Secret Service directives that had been communicated to Kelly Meggs, they came wearing no protective gear and Harrelson wore a tee shirt and a baseball cap.  Harrelson performed security in the morning and served as an anchor on the last security detail that arrived at the "bloody angle" between Suspicious Actors near the Senate and around the planters in front of the East Steps. Salted in the crowd in between both groups were trained influencers who were joined to remove or knock over barriers in an efficient and astonishing 40 seconds as captured on video recordings (Defense Exhibits H-8 and H-9) and who, as "pathfinders" guided the unsuspecting to walk towards the East Steps.  Promotions for the event, approved by US Capitol Police, created expectations that the protest would occur on the lawn and East Steps of the Capitol (Defense



Exhibit H-4)

By this time, coordinated attacks, barrier and signage removal – recorded on video -- had already begun in the West and a change in incident response from USCP to MPD under the leadership of Robert Glover, had resulted in police resources in the East being drawn down.

Harrelson rolled up into a huddle with his assigned VIP protectees six minutes before the coordinated attack occurred and as the protectees made inquiries and searched in vain for the stage and equipment for what was an officially approved event.  When the coordinated attack

occurred—minutes later--there was weak USCP presence and Suspicious Actors marched in columns that to many lacking context and with efforts engaged in earlier to provide benign explanation for what they were seeing, for a time seemed to have been led by police.

The legal theory is simple: Others committed the crimes that have been attributed to Mr. Harrelson and these "Suspicious Actors" can be seen on video, most of it under protective order, attacking police and working in coordinated ways to engage in the crimes alleged against the Oath Keepers that they themselves did not commit. Many of these activities occur in two areas where the Capitol inexplicably does not have surveillance video: 1) on any part of the exterior Columbus Doors level—*the main entrance to the Capitol*--and 2) anywhere around where Mr. Harrelson and other Oath Keepers came to the defense of a US Capitol Police Officer and diffused a dangerous situation.

We are 18 months into having to pry disclosures from the Government.  This has caused dramatic misunderstandings of events by prosecutors of record and defense counsels alike born of what can only be described as systemic failures by the Government's discovery clearing house, the Capitol Siege Unit ("Siege Unit).  The Siege Unit being overwhelmed has not been timely in *Brady* disclosures to trial staffs that are necessary for Defendants to put on defenses. It has been undersigned counsel's observation that assigned Government counsel are always responsive and professional, but proper *Brady* disclosures can only occur *AFTER* prosecutors first receive the disclosures from the Capitol Siege Unit which must earlier receive them from investigative and other agencies. AUSAs cannot provide what other elements of the Government have not forwarded to them.

### III. GOVERNING LAW:  *BRADY* and Other Obligations

Rule 29 of the Federal Rules of Criminal Procedure provides:

Rule 29. Motion for a Judgment of Acquittal

\* \* \*

(c) AFTER JURY VERDICT OR DISCHARGE.

(1) *Time for a Motion.* A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.

(2) *Ruling on the Motion.* If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

(3) *No Prior Motion Required.* A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

\* \* \*

The Defendants are entitled to the documents and the evidence, to the extent potentially or here likely to be exculpatory information as required by *Brady v. Maryland, 373 U.S. 83 (1963) ; See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan,  (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

"[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

Even apart from a Rule 29 motion to dismiss at trial, an actual conviction after trial can be overturned on appeal for violation of *Brady* if evidence favorable to the accused for exculpatory or impeachment purposes was suppressed by the government which prejudiced the accused. *Id*.   Favorability to the accused means exculpatory or impeachment value. *Id.* Suppression by the government can be an intentional or inadvertent failure to disclose the evidence. *Id.* at 137.

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *Sitzmann*, 74 F.Supp.3d at 134. However, the defendant must raise at least a colorable claim that the material contains evidence "favorable to him and material to his claim of innocence." *Id.* Prejudice to the Defendant means a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 134 (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

And courts in in this jurisdiction disfavor narrow readings by prosecutors as to their obligations under *Brady*. *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

When the Defendant requests *Brady* materials

> **"The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*Saffarinia*, 424 F.Supp.3d at 85.

Under *Brady*, evidence may still be material and favorable despite being inadmissible, provided it could lead to admissible evidence. *Saffarinia*, 424 F.Supp.3d at 91.

Local Rule 5.1 "DISCLOSURE OF INFORMATION" prescribes that:

> (a) Unless the parties otherwise agree and where not prohibited by law, the government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under Brady v. Maryland, 373 U.S. 83, 87 (1963), and that is known to the government. This requirement applies regardless of whether the information would itself constitute admissible evidence. The information, furthermore, shall be produced in a reasonably usable form unless that is impracticable; in such a circumstance, it shall be made available to the defense for inspection and copying. Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after

its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case. (b) The information to be disclosed under (a) includes, but is not limited to: (1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged; (2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty; (3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged; (4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and 132 (5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness. (c) As impeachment information described in (b)(5) and witness-credibility information described in (b)(4) are dependent on which witnesses the government intends to call at trial, this rule does not require the government to disclose such information before a trial date is set. (d) In the event the government believes that a disclosure under this rule would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of the requirements of this rule, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information. (e) For purposes of this rule, the government includes federal, state, and local law enforcement officers and other government officials who have participated in the investigation and prosecution of the offense(s) with which the defendant is charged. The government has an obligation to seek from these sources all information subject to disclosure under this Rule. (f) The Court may set specific timelines for disclosure of any information encompassed by this rule. (g) If the government fails to comply with this rule, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances.

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression occurs when the government fails to turn over even evidence that is *'known only to police*

*investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility

that had the evidence been disclosed to the defense, the result of the proceeding would have been

different",' although a 'showing of materiality does not require demonstration by a preponderance of

the evidence that disclosure of the suppressed evidence would have resulted ultimately in the

defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict.'"

The scope of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963),  is very broad.

*See* United States Justice Manual (USJMM) § 9-5.001.  For instance, a "prosecutor must disclose

information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial
> doubt upon the accuracy of any evidence---including but not
> limited to witness testimony—the prosecutor intends to rely
> on to prove an element of any crime charged, or might have a
> significant bearing on the admissibility of the evidence.  This
> information must be disclosed regardless of whether it is
> likely to make the difference between convictions and
> acquittal of the defendant for a charged crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether the

information subject to disclosure would itself constitute admissible evidence."  Id.

It is highly relevant that the Defendant is explicitly asking for specific information, not

passively hoping that the prosecution will notice and think to disclose information on its own

initiative.

> "The test of materiality in a case like *Brady* in which specific
> information has been requested by the defense is not necessarily the
> same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

" The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

"If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.20 Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

*Id.* at 112.  To extend this point, the U.S. Supreme Court is saying that the requirement that a

Defendant be presumed innocent until proven guilty beyond a reasonable doubt is a principle that

applies to all aspects of the case, including whether a failure to disclose potentially exculpatory

information violates the Due Process Clause.

"Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an Defendant," *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, it may make

> the difference between conviction and acquittal. Cf. *Napue v. Illinois*,
> 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The
> jury's estimate of the truthfulness and reliability of a given witness
> may well be determinative of guilt or innocence, and it is upon such
> subtle factors as the possible interest of the witness in testifying
> falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Prosecutions alleging conspiracies carry the "inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants."   *United States v. Dennis*, 384 U.S. 855, 873 (1966).  Under these circumstances, it is imperative the defense, the judge, and the jury be assured "the doors that may lead to truth have been unlocked.*" Id.*

> In our adversarial system rarely is the prosecution justified in
> having "exclusive access to a storehouse of relevant fact" and
> exceptions to this notion must be justified by the "clearest and
> most compelling of considerations."

*Id.* at 873-874.

Determining usefulness can only be made by an advocate for the defense. *Id.* at 875. The trial judge's function is limited to determining if a case for production has been successful and supervising the process. *Id.*

Closely associated with the federal rule are several U.S. Supreme Court decisions which hold that a defendant has a right to the testimony of witnesses even appearing before a federal grand jury when he can show a particular need for this testimony. *See, United States v. Dennis*, 384 U.S. 855 (1966); *United States v. Proctor & Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime are the
> property of neither the prosecution nor the defense. Both sides
> have an equal right, and should have an equal opportunity, to
> interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model Code Of Prof'l Responsibility Rule 3.8(d).

Here, even government officials or agents and law enforcement officials – although employees of government – are equally the witnesses of the Defendants as they are of the prosecution.

## IV. ARGUMENT

### A.   OBSTRUCTION OF OFFICIAL PROCEEDING – All Communications and Documents of Threat Assessments Prior to Arrival of the Oath Keepers at the U.S. Capitol

The Government has steadfastly refused since as early as November 2021, when specifically asked, to disclose any records, documents, or information as to (1) what actually caused the recess of the Joint Session of Congress on the afternoon of January 6, 2021, or (2) under its belated, newly-minted theory what actually delayed the resumption of the Joint Session of Congress.

The denial of this evidence by the Government denied Harrelson a fair trial.  He is entitled to a new trial, a judgment of acquittal, or dismissal of the case.

This is a crucial aspect of the case.  The U.S. Capitol Police's persistent refusal to provide any actual evidence of what caused the official proceeding to recess or factors of its resumption fail to provide admissible evidence that any of the Defendants obstructed an official proceeding.  The persistent refusal to disclose this information gives rise to the presumption that the information systematically withheld would be exculpatory and not useful to the Government's prosecution case.  Rather than providing actual documents, records, and information as demanded by Harrelson, the Government has resorted to conjecture and speculation.

Before trial, one could have speculated that the information is not exculpatory.  After trial, however, we see that none of this evidence was presented against Harrelson.  Thus, we now

know for certain that the information being withheld is in fact exculpatory.  It was not used as evidence against Harrelson, even though no other sound evidence was presented either.

There was no evidence presented at trial that either Harrelson or any other Oath Keepers' Defendant caused the recess of the Joint Session of Congress.  Despite Harrelson's Motion in Limine to exclude arguments of guilt by association or the civil doctrine of *res ispa loquitor* – which the Government insisted it would not engage in.  Assumptions, conjecture, and speculation were the only "evidence" relied upon by the prosecution.  Again, the Government opposed Harrelson's Motion in Limine by assuring the Court it would not make such arguments.  But it did.  And those arguments of guilt by association were the only evidence presented.

There was no evidence presented at trial that either Harrelson or any other Oath Keepers' Defendant delayed the resumption of the Joint Session of Congress.

Unless the Oath Keepers were the last to leave the Capitol, they cannot be the cause of a delay in resuming the official proceeding.  The evidence shows that once inside the Capitol, the Oath Keepers scattered and wandered around uncoordinated – showing no plan or goals or conspiracy  – and exited the Capitol building in different small groups, in different directions, at different times between 2:59 PM and 3:20 PM.  However, hundreds if not a thousand others remained after the Oath Keepers had already left.  Therefore, they cannot be the cause of any delay in the Joint Session resuming, either.

Worse, this newly-created hypothesis, unsupported by evidence, that the Oath Keepers delayed the resumption takes us even further away from the legal scope of 18 U.S.C. § 1512(c)(2).  If the original hypothesis under 18 U.S.C. § 1512(c)(2) has problems of statutory interpretation, the new idea has even more problems.  The application of 18 U.S.C. § 1512(c)(2) is currently on appeal before the U.S. Court of Appeals for the District of Columbia. But the mis-

use of the statute to apply to a delayed resumption is another step removed from the statute.

The new hypothesis includes the idea that by merely existing the Oath Keepers obstructed an official proceeding.  Simply by being alive and drawing breath, they are guilty. The concept being applied is merely speculation.  Moreover, the prosecution assured this Court in official pleadings that it would not make such arguments, in objecting to Harrelson's Motion in Limine.

Harrelson and his co-Defendants are erroneously accused of obstructing an official proceeding, even though they arrived at the Capitol an hour or several hours after security threats were already occurring.

The U.S. Capitol Police ordered a lockdown of the Capitol at 2:00 PM as reported in the after-action time-line, CAPD_00000316, posted publicly (redacted) in *USA v. Gray*, Dkt. # 63-1, November 4, 2022.  Therefore, whatever cause existed for the recess of the Joint Session of Congress, it existed as early or earlier than 2:00 PM.

During the course of this trial, former Parliamentarian Wickham testified that security whisked Nancy Pelosi away from the podium of the House Chamber at 2:13 / 2:14 PM.

The discovery of pipe bombs at 12:50 PM and 1:15 PM is ignored like the Emperor's New Clothes.  Defendants are accused of "leading" crowds to do what those crowds had already done before the Oath Keepers even arrived in the area.  Defendants are accused of obstructing at 2:32 PM to 2:40 PM a Joint Session of Congress that recessed at 2:18 PM, and whose cause for the recess existed at 2:00 PM.

Therefore, a fair trial consistent with Due Process under *Brady v. Maryland* required full disclosure by the Government of all records, documents, communications, and information about exactly why, when, and how the U.S. Capitol Police reached its decision to recommend a recess

to the President Officers of each chamber.

Now, it is clearly true that some of the demonstrators who became true rioters took very direct actions that actually did cause disruption of the House and Senate Chambers. ***But the crucial point is this:  <u>Harrelson did not.</u>***

And this is the fatal flaw throughout the Government's case:  The fact that other people obstructed the official proceeding does not mean that Harrelson did.  The Government's theory is that merely because someone else is guilty, therefore Harrelson is guilty.

The threat analysis and decision to recess the Joint Session will show that the Oath Keepers did not cause any obstruction of the official proceeding.  Kenneth Harrelson did not, in fact, obstruct any official proceeding.

Defendant Harrelson was entitled to that exculpatory information before or at least during the trial.  He did not receive a fair trial.

To dodge the requirement of *Brady v. Maryland*, the hypothesis was invented – without proof, merely as creative imagination – that maybe the Oath Keepers Defendants could have delayed the resumption of the Joint Session of Congress.

However, there was no evidence of any of this.  "Maybe" is not proof beyond a reasonable doubt.  The mere possibility that the Oath Keepers Defendants might have obstructed an official proceeding does not satisfy the required standard of "presumed innocent until proven guilty beyond a reasonable doubt."  *See, e.g., Taylor v. Kentucky*, 436 U.S. 478 (1978).  The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. See id.; see also *Patterson v. New York*, 432 U.S. 197, 215 (1977).

Furthermore, the Sixth Amendment to the U.S. Constitution provides the right of Defendant Harrelson to confront his accusers.  The claim that "maybe" Harrelson might have obstructed the official proceeding violates his Sixth Amendment rights.

Harrelson is and was entitled to any and all communications, messages, radio traffic,[1] analyses, conclusions, proposals of action, opinions, recommendations, text messages, email messages, or the like including any threat assessment by the U.S. Capitol Police, the Federal Bureau of Investigation, the Secret Service, Metropolitan Police Department of the District of Columbia or other law enforcement agencies concerning any perceived threats and security arrangements for January 6, 2021.

Specifically, Harrelson is entitled to records showing when the USCP and other agencies started to decide that there was a threat possibly requiring the Joint Session of Congress to be recessed, the role of the search for more pipe bombs played, when exactly the USCP decided that the Joint Session of Congress should recess, and from what threat exactly.

> This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9,*

---

[1]     The Government has produced police radio recordings which concern such mundane matters as distributing hot meals to MPD officers and making sure MPD police cruisers are topped off with fuel.  Certainly those are important to the officers on duty in the field, but for the purposes of prosecuting the Oath Keepers Defendant the recordings reveal "the dog that didn't bark" and show a complete absence of anything to support prosecution of Harrelson.  The only relevance is the occasional chronic misidentification of unaffiliated crowds as being Proud Boys when they are not, as confirmed by the descriptions of outfits the Proud Boys did not wear.

*2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others).* And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians***. This violates the First Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228, 252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond question, but when that interest collides with rights guaranteed by the First Amendment, the "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]

> Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added).*

## B.    OBSTRUCTION OF OFFICIAL PROCEEDING – No Evidence that Kenneth Harrelson Obstructed Proceeding

To avoid confusing the jury and allow defense counsel to mount an effective defense, the prosecution was required to disclose as exculpatory information that details, proof, and evidence, that the U.S. Congress successfully operates every business day with hundreds of visitors, school children on sometimes noisy tours, lobbyists, journalists, citizen advocates, staff and

Instead, the Government relied upon the supposition that merely the presence of people in the 751 foot long building would in and of itself disrupt Congressional proceedings.  There was no evidence of this.  And the Government was required to provide and disclose information that would prove to the jury that the presence of hundreds of people in the U.S. Capitol does not disrupt the proceedings of Congress.

As Federal courts in this District have reasoned in reaching legal conclusions:

> ***The Capitol Grounds*** (excluding such places as the Senate and House floors, committee rooms, etc.) ***have traditionally been open to the public***; indeed, thousands of people visit them each year. Thus, we cannot agree with the defendants that the Capitol Grounds have ever been characterized by the serenity and quiet of a hospital or library.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) *(emphases added)*.

> The courts in this jurisdiction have long recognized that ***"[t]he United States Capitol is a unique situs for demonstration activity"*** and ***"is a place traditionally open to the public thousands visit each year to which access cannot be denied broadly or absolutely,*** [a fact which must be weighed] against the government's interest in protecting against possible `damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff."' *Kroll v. United States*, 590 F. Supp. 1282, 1289, 1290 (D.D.C.1983) (*quoting Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 583-85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S. Ct. 311, 34 L. Ed. 2d 236 (1972)).

*Wheelock v. United States* 552 A.2d 503, 506 (D.C. 1988) *(emphases added)*.

### C.   OBSTRUCTION OF OFFICIAL PROCEEDING – No Evidence that Kenneth Harrelson Obstructed Proceeding

As it turns out, after trial, the Government never had any evidence that Kenneth Harrelson caused any obstruction of the official proceeding at issue, the Joint Session of Congress convened every four years on January 6.  While the prosecution confused the jury, effective cross-examination and rebuttal required the *Brady* disclosure that the prosecution was simply guessing.  The Government was required to disclose the exculpatory information that it had nothing more than conjecture, speculation, and assumptions with which to prosecute Harrelson.   Harrelson's mere existence in the vicinity of the Joint Session of Congress did not and could not obstruct that official proceeding.  The Government offered no evidence of any causation between any action by Harrelson and any interruption of the Joint Session.

These are criminal cases.  There are no "maybes" in criminal prosecutions.  No "maybe"

can satisfy the standard of "guilty beyond a reasonable doubt." Throughout all January 6 related cases, the Government's reliance upon "maybes" and "could bes" and "possiblies" is prominent but legally unacceptable.

The standard is that an accused is presumed innocent until proven guilty beyond a reasonable doubt. *See, e.g., Taylor v. Kentucky*, 436 U.S. 478 (1978). The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. See id.; see also *Patterson v. New York*, 432 U.S. 197, 215 (1977). Furthermore, the Sixth Amendment to the U.S. Constitution requires that Harrelson have a right confront his accusers. But "maybes" and "could bes" do not allow Harrelson to confront his accusers.

Throughout all aspects of the Government, as well as the Congress, the idea of actually proving individual guilt with probative evidence seems to have been abandoned as a quaint, forgotten custom. No effort is made to show that any particular defendant is actually guilty of a crime but merely that they are guilty by association, that is near to a crime. (*Res Ispa Loquitur* is limited to civil litigation in only certain limited causes of action; it cannot be used in criminal prosecutions.) A conviction of a criminal charge requires evidence, not supposition.

To avoid confusing the jury and allow defense counsel to mount an effective defense, the prosecution was required to disclose as exculpatory information that no evidence exists that Harrelson caused the obstruction of an official proceeding, either by interrupting the Joint Session of Congress or by delaying its resumption.

It is of course the duty and constitutional role of federal judges and the courts to prohibit such erosion of due process and American jurisprudence.

### D.   WHO "LED" THE "ATTACK" ON THE U.S. CAPITOL?

The Government persistently claims without evidence that the Proud Boys and Oath Keepers entered into an alliance [2] and the two groups jointly "led" an "attack" upon the U.S. Capitol / U.S. Congress.

To seek to prove that the Oath Keeper Defendants did not "led" an attack, Harrelson demanded any and all evidence as to the Government's surveillance and evaluation of (a) **_who_** first approached the U.S. Capitol building on January 6, 2021, (b) exactly **_when_** someone or some persons first approached the U.S. Capitol building, (c) exactly what the Government contends constitutes an "attack" such as precisely defining where or at what distance people approaching the building crossed the Government's line to becoming an "attack" and who the Government contends engaged in such an "attack," and (d) in what way the Oath Keepers Defendants "led" anything on January 6, 2021.

The denial of this evidence by the Government denied Harrelson a fair trial.  He is entitled to a new trial, a judgment of acquittal, or dismissal of the case.

This evidence would be exculpatory by identifying those who specifically "led" an "attack" on the U.S. Capitol, because it would show neither Harrelson nor his co-Defendants did so.  Since Harrelson knows he did not "led" any "attack" on the Capitol nor did any other Oath Keepers, and knows there is no evidence that they did, evidence of who did lead the "attack" would be exculpatory for these Oath Keepers' Defendants.

However, the prosecution responded to this motion, in its GOVERNMENT'S OPPOSITION TO DEFENDANT HARRELSON'S MOTION TO COMPEL DISCLOSURE OF EXCULPATORY INFORMATION, August 23, 2022, Dkt. # 272, page 7:

---

[2]    Using evidence that exclusively concerned a threatened riot purely inside Florida.

e. Information About Who "Led" the Attack on the Capitol

Defendant Harrelson's next request is for information on "Who 'Led' the "Attack" on the U.S. Capitol?" ECF No. 268 at 21. Defendant frames this inquiry as needed to respond to the government's allegations, but nowhere in the Indictment does it allege that the defendants "led" the attack on the Capitol. Accordingly, Defendant Harrelson's discovery requests along these lines are not material

However, after claiming that the topic was "not material" (moot), the Government then opened its opening statement by arguing to the jury that the Oath Keepers "led" the attack on the U.S. Capitol – exactly what the Government represented in an official court filing it would not do.

Thus the prosecution violated *Brady v. Maryland* and Due Process by failing to disclose to the Defendants and denied Harrelson a fair trial.

###### E.  CAPITOL BUILDING SECURITY CAMERA VIDEO OF HALLWAY SHOWING OFFICER HARRY DUNN AND OTHER INFORMATION ABOUT DUNN

As the Honorable Judge Amit Mehta ruled in open court on or about April 8, 2022, most or all of the charges brought against the Defendant and the allegations that constitute those charges are unusually sensitive to the trier of fact (the jury) deciding what was the Defendant's intent.  The Court necessarily had to reach more than an idle opinion that only the Defendants' intent is the real issue in order to then proceed to deny motions about a continuance and acceleration of discovery.  Judge Mehta ruled upon several motions based upon the idea that only the Oath Keepers' intent matters, making the Judge's official interpretation.

The fact that the Oath Keepers stopped, turned, and defended U.S. Capitol Police is not merely some good act.  This is not as if a robber of a jewelry store tossed a diamond necklace in a beggar's hat on the sidewalk on the way out.

The intent to assist the U.S. Capitol Police is a fundamental contradiction of the intent that the Court argued about.  One cannot have the intent to attack the U.S. Capitol and obstruct proceedings in it, while turning to defend the U.S. Capitol Police against the mob.  The intent to defend the U.S. Capitol Police is a complete and total rejection of any intent to take over the Capitol.

Because of the central role of proving that Harrelson had no intent to obstruct any official proceeding -- and that his merely being alive and existing in the vicinity of the Joint Session of Congress does not establish his guilt – the Government's failure to comply with *Brady v. Maryland* disclosures requires a new trial and/or judgment of acquittal.

1) There was extensive disagreement between  US Capitol Police Officer Harry Dunn's 302's and testimony.

2) However, Capitol surveillance system camera recordings would show exactly what did or did not happen.  Officer Dunn's attempt to minimize Kenneth Harrelson's and Kelly Meggs' assistance directly confused and mislead the jury about whether Harrelson had the criminal intent necessary to obstruct an official proceeding, or whether he was simply alive in the vicinity of an official proceeding.  However, the security camera video would settle the dispute once and for all.

3) The Government claims that no security cameras exist of the hallway just off the heavily-trafficked Rotunda, where the encounter between Harrelson and Dunn occurred.  This is simply not credible.

The encounter between Dunn and other USCP officers and Harrelson and other Oath Keepers was in one of the hallways off of the Rotunda.  Dunn in his Form 302 interview explains that it was at the top of the stairway heading down to the lower level, where US Capitol Police

were being treated for injuries.



By stairway, we mean the type of massive, ornate structure typical of federal buildings. It is simply not credible that there are no security cameras viewing this hallway. Of all of the heavily trafficked public areas of the U.S. Capitol, the Rotunda is the center piece. It is the museum of the building. It is where all visitors tour the building most of all. The Rotunda and Statuary Hall is where our nation's most iconic and historic works of art about our nation are hung for public viewing, priceless statues, along with copies of the U.S. Constitution and Declaration of Independence.

If there is any place in the Capitol that would be viewed by security surveillance cameras it is the Rotunda and the adjoining hallways. If there are security cameras in that hallway, if the Government writ large deleted the video or concealed the existence of video, or mishandled the

evidence, then the entire case must be thrown out.

### F.   CAPITOL BUILDING SECURITY CAMERA VIDEO OF EXTERIOR MAIN ENTRANCE (COLUMBUS DOORS) AND ANY INFORMATION ON DOOR OPERATION

Somehow we are asked to also believe that among hundreds of security cameras the Capitol neglected to put any cameras in and around the front door, its main entrance.  This is not credible.  The defense was unsuccessful in getting any information from the Capitol about surveillance video from this area (anywhere on the exterior Columbus Door level).  It was unsuccessful in getting information about door engineering or door operation including whether or not the Columbus Doors could be opened remotely from a control room which is strongly suggested by available video evidence.

### G.   SUSPICIOUS ACTORS THAT MAY HAVE BEEN EXECUTING THE PLAN ALLEGED AGAINST HARRELSON

While simultaneously dismissing the relevance of suspicious actors and eyewitnesses identified in ECF 225-1-2 and 3, since Defendant Harrelson made these discovery filings other components of DOJ seem to have sprung into investigative action making identifications and arrests, but turning over almost no discovery.

We now know that dozens of the suspicious actors and/or material witnesses identified in Harrelson's filings have been identified to the FBI, many for almost two years. A handful have even been arrested. Additionally, some like James Haffner (a/k/a #ZZTopPB) and Ronald Loehrke (a/k/a #MaroonPB) (ECF 225-3 p.3) were arrested more than a year ago on a felony complaint, yet there is no

public record of an indictment despite the fact that had it not been for their actions, my client likely would have never would have reacted by going inside the Capitol. Yet the Government has refused to provide requested discovery in advance of trial.

Most notably, the government also failed to provide requested discovery on suspicious actor Sam Andrews, (ECF 225-2 p.11) and it then presented alarming information in its case and chief suggesting that the Oath Keepers were acting in conformance with Andrews' call for 500,000 armed patriots to come to Washington DC on January 4th and that they tacitly approved of his actions.  In the Government's presentation, it neglected to reference the fact that Andrews was among the first to appear at the Peace Circle and that he was also present shortly before the coordinated barrier breach in the East at 1:58 p.m.

Among the most prominent status changes of suspicious actors Defendant Harrelson identified as suspicious actors and/or material witnesses are:

William Dunfee – Pastor Bill -  Arrested 10/5/22 (ECF 225-2 p.33)

Israel James Easterday – Arrested 12/15/22 (225-3 p. 36 a/k/a #JamesDeanWannabe)

Daniel Leyden - #TealScrambler – Arrested 8/22/22 (225-2 p.43)

Kaleb Dillard - #Smokey Insider – Arrested 8/23/22 (225-3 p. 46)

Eric Christie – Arrested 12/22/2022 (ECF 225-2 p.26)

Dunfee and Christie appear on video inciting crowds at the east center line with bullhorns. Leyden was the first to push the gate along with Loerke, Haffner and Ray Epps which opened the Capitol grounds to protestors. Dillard was one of the unidentified subjects that broke the glass in the Columbus Doors, which the government blamed on the Oath Keepers.  Easterday held the East's only observable rebel flag, he may have participated on the attack on Oath Keeper James Dolan on the steps, he led the mace attack on police and pulled people in the Columbus Doors to clear the crowd crush that occurred when the doors opened at 2:38:30. Haffner and Loehrke appear to be coordinating an attack on police at the Columbus doors while the Oath Keepers were finishing singing the Star Spangled Banner on the steps.

We made repeated requests to the government in writing, clearly identifying the individuals involved and laying out in excruciating detail a compelling basis why we needed all discovery regarding these individuals, namely, that these were the subjects who were engaging in the activity Defendant Harrelson was erroneously accused of participating in. These were subjects who appeared to be acting with purpose and coordination and who leading others to achieve goals that were not known about or shared by Defendant Harrelson.

## V.  CONCLUSION

The Defendant requests this Court to grant this Motion and such other relief as may be deemed just.  Defendant Kenneth Harrelson, has been denied a fair trial without the potentially exculpatory information he identified and requested.

Dated:  December 23, 2022          RESPECTFULLY SUBMITTED
                                   KENNETH HARRELSON, *By Counsel*

                                   /s/ Brad Geyer

                                   Bradford L. Geyer, PHV
                                   PA 62998
                                   NJ 022751991
                                   Suite 141 Route 130 S., Suite 303
                                   Cinnaminson, NJ 08077
                                   Brad@FormerFedsGroup.Com
                                   (856) 607-5708

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

                                   /s/ Brad Geyer
                                   Bradford L. Geyer, PHV
                                   PA 62998
                                   NJ 022751991
                                   Suite 141 Route 130 S., Suite 303
                                   Cinnaminson, NJ 08077
                                   Brad@FormerFedsGroup.Com
                                   (856) 607-5708