EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 22-cr-15-APM |
| | § | |
| ELMER STEWART RHODES, III, | § | |
| KELLY MEGGS, | § | |
| KENNETH HARRELSON, | § | |
| JESSICA WATKINS, and | § | |
| THOMAS CALDWELL | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS AMENDED MEMORANDUM IN SUPUPORT OF JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29

Defendants Stewart Rhodes, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell, by and through their undersigned counsel, move pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a Judgment of Acquittal, file this Amended Memorandum of Points and Authorities in further Support of their Motion, ECF 432, and request oral argument.

## I.   INTRODUCTION

"There was no plan."  The government's entire case was predicated on innuendo and inference and the evidence at trial bore out this defense theme.  Indeed, of the Indictment's twenty-eight (28) counts, the jury returned a verdict of not guilty for eleven (11) of them, including not guilty verdicts for three (3) of the five (5) charges of seditious conspiracy.  This remarkable outcome followed months of investigation by the government in which it has been nothing if not consistent in its allegations against the Oath Keepers.  Just days after the events at the Capitol on January 6, 2021, the government began filing sealed complaints against members of the Oath

Keepers, whom the government initially described as, "a large but loosely organized collection of militia who believe that the federal government has been co-opted by a shadowy conspiracy that is trying to strip American citizens of their rights." Aff at 3 ¶12, Complaint, *United States v. Watkins*, 21-mj-86 (Jan. 16, 2021) (ECF No. 1-1). Members of the organization, the government alleged, "have been arrested in connection with a wide range of criminal activities, including various firearms violations, conspiracy to impede federal workers, possession of explosives, and threatening public officials." *Id.* at 5, Complaint, *United States v. Watkins*, 21-mj-86 (Jan. 16, 2021) (ECF No. 1-1). And despite the events of January 6, 2021, giving rise to what the government has described, as early as March 2021, as "one of the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence," Mot. Continue at 2, *United States v. Caldwell*, No. 21-cr-28 (March 12, 2021) (ECF No. 73), the government had concluded that the Oath Keepers had, *inter alia*, "conspired together and with others known and unknown to obstruct the United States Congress's affirmation of the Electoral College vote regarding the results of the 2020 U.S. Presidential Election." Aff. at 2, Complaint, *United States v. Meggs*, No. 21-mj-225 (Feb. 11, 2021) (ECF No. 1-1). In the more than eighteen (18) months that have followed, the government's investigative focus has been unwavering. The operative indictment as against the defendants describes the Oath Keepers as, "a large but loosely organized collection of individuals [--] some of whom are associated with militias [--] [with a] focus on recruiting current and former military, law enforcement, and first-responder personnel," and charges various members with, *inter alia*, having participated in a scheme – seditious conspiracy – to illegally oppose the lawful transition of presidential power leading up to and on January 6, 2021. Superseding Indictment at 3 ¶ 3 (ECF No. 167).

At trial, however, the government told a different narrative. Not one focused on the

preconceived belief that the Oath Keepers' leadership had conspired, beginning on or just after the Presidential Election on November 3, 2020.  Rather, the government explained to the jury: "The defendants are not charged with entering into an agreement *ahead of time*, ahead of January 6th, to storm the United States Capitol.  *That is not the allegation in this case*."  Tr. at 9911:8-11 (Nov. 18, 2022).

The government is not "free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial . . . ." *Russell v. United States*, 369 U.S. 749, 768 (1962). It is a fundamental precept of federal constitutional law that a "court cannot permit a defendant to be tried on charges that are not made in the indictment" or allow a prosecutor to broaden the possible bases for conviction from that which appear in the indictment. *Stirone v. United States*, 361 U.S. 212, 215-17 (1960). This is because every accused person has the right to be informed of the nature and cause of the accusations filed against him. U.S. Const. amend VI; *see also United States v. Combs*, 369 F.3d 925, 935 (6th Cir). A variance occurs "when the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986) (quoting *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985). If the incongruency between the facts alleged in the indictment and those adduced at trial prejudices the defendant, the variance is fatal. *United States v. Cross*, 766 F.3d 1, 5 (D.C. Cir. 2013).

If the incongruency between the facts alleged in the indictment and those adduced at trial prejudices the defendant, the variance is fatal. *United States v. Cross*, 766 F.3d 1, 5 (D.C. Cir. 2013).

For example, in Stone, the district court granted the defendant's Rule 29 motion after it found that the government attempted to formulate an alternative theory of criminal liability at trial.

Stone, 2012 WL 1034937, at *7. The indictment in that case alleged

> a specific plan that was to be initiated by [the defendants]. The [defendants']
> "general plan" was to commit some violent act to provoke a response from law
> enforcement. After the violent act, the [defendants] planned to attack the funeral
> procession, and then retreat to a "rally point." From there, they would defend
> against the government. This engagement would serve as a catalyst for a more
> widespread uprising against the United States Government.

Id. at *6 (emphasis in original).

At trial, however, the government backed off its theory that the defendants themselves planned to initiate the conflict; it posited that the defendants could have planned to simply engage in the conflict once it was already initiated by others. Id. The court noted that "[t]he inescapable conclusion of such a tactic is that the Government recognizes that its proofs at trial failed to establish the plan described in the Indictment." This attempt to broaden the charges at trial was deemed impermissible because the defendants relied upon the government's theory of the case as set forth in the indictment to formulate their defenses. Id. at *7.

Here, however, not only did the government broaden the time period of the alleged conspiracy beyond what was alleged in the Indictment – all of the specific "acts in furtherance of the conspiracy" alleged in the Indictment, which are arranged in chronological order, have dates on or before January 20, 2021. ECF 167 at 10-32 – but the penultimate act alleged is dated January 20, and the final one has no date at all. And nothing in the Indictment alleges that the conspiracy extended into the Biden presidency. *Id.* at 32.   The Indictment in this case only alleged that the defendants conspired "to oppose the lawful transfer of presidential power by force," and the government's *primary* argument at trial was that the defendants tried to disrupt the Electoral College certification on January 6. However, as evidenced by the jury's verdict, the government utterly failed to prove that there was an agreement between Rhodes and Meggs to use force to stop

or delay the certification. The jury did **not** find that the defendants conspired to "use force to prevent, hinder, or delay the execution of" the Twelfth Amendment or the Electoral Count Act. ECF 410 at 1-2.

Having recognized its failure to establish the plan described in the Indictment, the Government attempted to formulate an alternative theory of liability—that the defendants actually planned to "start a rebellion." In closing, the government argued:

> "[t]hink about that, ladies and gentlemen. Mr. Rhodes told you in his own words he was prepared to start a rebellion the day that President Biden took office. We'll talk about, at the end of this trial, that that is exactly what is charged in the conspiracy. The charges in this case don't end on January 20th. The defendant is charged with engaging in a conspiracy to use force against the government from the time period of November through January of 2021."

(11.18. 2022, Morning Session, Tr. 9926, L. 10-18).

Moreover, rather than relying upon the theory pled in the Indictment that the defendants conspired to "oppose the lawful transfer of power," the prosecution characterized Defendant Rhodes and his co-conspirators as planning to *overthrow* the United States government by force. The defendants were not charged under the clause of § 2834 proscribing a conspiracy "to overthrow, put down, or destroy by force" the United States government because the prosecution clearly could not prove such an agreement; the most the government could prove concerning the defendants was that they did not want Joseph Biden to become president. Yet, much of what the jury apparently relied upon to convict Defendants Rhodes and Meggs of Seditious Conspiracy was their bombastic language about a "civil war" or events unrelated to the "lawful transfer of presidential power." This shift in the government's theory of the case as set forth in the Indictment amounts to a broadening of the charges. Because "the defendants relied upon the government's theory of the case as set forth in the Indictment to formulate their defenses" and the remainder of

the evidence is insufficient to sustain a conviction, the defendants were prejudiced and acquittal is the only remedy. *Stone*, 2012 WL 1034937, at *7.

In sum, despite ample opportunity to prove the broad conspiracy alleged in the indictment, by the conclusion of all the evidence in this case, the government's theory was merely that, "[f]or these defendants, the attack on the Capitol was a means to an end [--] [t]hat end being to use any means necessary, up to and including force, *to stop the lawful transfer of power*." *Id.* at 9911:15-18. In the pages that follow, it should be clear beyond cavil that no reasonable juror could have been so persuaded. Indeed, the jury *in this case* concluded, *as to every defendant*, that the government had failed to prove beyond a reasonable doubt seditious conspiracy for the object of using "force to prevent, hinder, or delay the execution of any law of the United States."

## II. PROCEDURAL BACKGROUND

On January 27, 2021, defendants Thomas Caldwell and Jessica Watkins were first indicted for Conspiracy to Obstruct an Official Proceeding, Obstruction of an Official Proceeding, Destruction of Government Property, and Entering a Restricted Building or Grounds. *See* 21-cr-28, ECF 4. Less than a month later, the Government filed a superseding indictmen naming several other defendants, including Kelly Meggs. *See* 21-cr-28, ECF 27. Defendant Kenneth Harrelson was added to the second superseding indictment in March of 2021. *See* 21-cr-28, ECF 77. Through the remainder of that year, the grand jury handed down multiple superseding indictments, adding additional defendants and counts. *See* 21-cr-28, ECF 127, 196, 328, 513.

Stewart Rhodes was first indicted on January 12, 2022, when the grand jury added a count of Seditious Conspiracy. *See* ECF 1. That indictment alleged that the "purpose of the conspiracy was to oppose the lawful transfer of presidential power by force, by preventing, hindering, or

delaying by force the execution of the laws governing the transfer of power . . . ." *Id.* at 8. The final superseding indictment ("Indictment"), upon which the government proceeded to trial, was filed June 22, 2022. *See* ECF 167. The Indictment expanded the scope of the Seditious Conspiracy charge, alleging that the defendants also conspired to "oppos[e] by force the authority of the Government of the United States." *Id.* at 8.[1]

A trial began on September 26, 2022, culminating in a jury verdict on November 29, 2022. The jury found Stewart Rhodes and Kelly Meggs guilty of Seditious Conspiracy but acquitted the other three defendants of the same count. ECF 410 at 1-3. As to the object of the conspiracy, the jury unanimously concluded it was only "[t]o oppose by force the authority of the Government of the United States." *Id.* at 1-2. The jury did *not* find Rhodes and Meggs guilty of conspiring "[t]o use force to prevent, hinder, or delay the execution of any law of the United States." *Id.*

The jury found defendants Kelly Meggs and Jessica Watkins guilty of Count 2, Conspiracy to Obstruct an Official Proceeding; it acquitted defendants Stewart Rhodes, Kenneth Harrelson, and Thomas Caldwell on the same count. ECF 410 at 3. Every defendant was found guilty of Count 3, Obstruction of an Official Proceeding and Aiding and Abetting. *Id.* at 4. With respect to Count 4, the jury found Meggs, Harrelson, and Watkins guilty of Conspiracy to Prevent an Officer from Discharging any Duties for "prevent[ing] a Member of Congress from discharging a duty as a Member of Congress." *Id.* at 5. The jury found Rhodes and Caldwell not guilty of Count 4. *Id.* at 4, 6.

---

[1] Rhodes was also charged with Count 2, Conspiracy to Obstruct an Official Proceeding; Count 3, Obstruction of an Official Proceeding and Aiding and Abetting; Count 4, Conspiracy to Prevent an Officer from Discharging any Duties; and Count 7, Tampering with Documents or Proceedings and Aiding and Abetting. Meggs was also charged with Counts 1, 2, 3, and 4; Count 5, Destruction of Government Property and Aiding and Abetting; and Count 8, Tampering with Documents or Proceedings and Aiding and Abetting. ECF 167 at 1.

The jury found the three defendants charged with Count 5—Meggs, Watkins, and Harrelson—not guilty of Destruction of Government Property. *Id.* at 6. Watkins was the only defendant charged with Count 6, Obstructing Officers During a Civil Disorder, and the jury found her guilty. *Id.* Each defendant charged with "Tampering with Documents or Proceedings" – Rhodes, Meggs, Harrelson, and Caldwell – was found guilty of their respective counts. *Id.* at 6-7.

### III. LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all of the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering a Rule 29 motion, this Court must determine "whether upon the evidence, viewed in a 'light most favorable to the Government giving full play to the right of the [trier of fact] to determine credibility, weigh the evidence and draw justifiable inference of fact,' a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Recognition Equip., Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989); *see United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (*quoting United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)); *United States v. SaFavian*, 644 F. Supp. 2d 1, 7-8 (D.D.C. 2009); *United States v. Duran*, 884 F. Supp. 577, 583 (D.D.C. 1995), *aff'd*, 96 F.3d 1495 (D.C. Cir. 1996).

Still, the Court must "accord[] the government the benefit of all legitimate inferences," *see United States v. Weiss*, 718 F.2d 413, 437 (D.C. Cir. 1983), *cert. denied*, 465 U.S. 1027 (1984), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *see United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Moreover, Rule 29 requires the Court to

view the evidence that the government deems must be evidence of guilt—but can otherwise be explained as equally innocent—in a balance. *See Curley v. United States*, 160 F.2d 229, 233 ("[I]f, upon the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained."). Thus, to find a legitimate and nonspeculative inference of guilt, the government must articulate a rational basis in the evidence upon which that inference can arise. *Recognition Equip.*, 725 F. Supp. at 588.

This Court must grant Defendants' motion for judgment of acquittal if it finds that the evidence—even if viewed in the light most favorable to the government—is such that a reasonable trier of fact would have a reasonable doubt as to the existence of any of the essential elements of the crimes. *United States v. Durant*, 648 F.2d 747, 750 (D.C. Cir. 1981); *see also United States v. Foster*, 783 F.2d 1087, 1088 (D.C. Cir. 1986). Finally, this Court "cannot let a case go to the jury unless there is evidence of some fact which to a reasonable mind fairly excludes the hypothesis of innocence." *Curley*, 160 F.2d at 233.

Put another way, the Court must grant a motion for judgment of acquittal if "a reasonable juror *must necessarily* have had a reasonable doubt as to the defendant[']s guilt." *See United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983) (emphasis in original) (*citing United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)); *see also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley*, 160 F.2d at 232-33 ([I]f there is no evidence upon which a reasonable might fairly conclude guilt beyond a reasonable doubt, the motion [for judgment of acquittal] must be granted.").

## IV. LEGAL ARGUMENT

### A.  Seditious Conspiracy (Count 1) as to Defendants Rhodes and Meggs

Despite ample opportunity to present evidence in this case, no reasonable mind could fairly

conclude guilt beyond a reasonable doubt as to the government's marquee charge in its prosecution of the events of January 6, 2021:  Seditious Conspiracy.

*First*, the government utterly failed to prove an agreement actually existed between Rhodes and Meggs to use force "to stop the lawful transfer of power." Though the law does not require that all members of a conspiracy meet directly or discuss their objectives between themselves for there to be a conspiracy, it does require proof beyond a reasonable doubt that at least two persons came to an implicit understanding to work together to achieve an unlawful common goal. Here, there was no evidence of cooperation or a "meeting of the minds" between Rhodes and Meggs— let alone one to specifically "use force" to stop the transfer of presidential power.

Second, even if there was sufficient proof of *a* conspiracy, it did not amount to *seditious* conspiracy. Stewart Rhodes and Kelly Meggs were convicted of Seditious Conspiracy for "opposing by force the authority of the government of the United States"—a charge requiring proof that the defendants "resist[ed] some positive assertion of authority by the government." *Baldwin v. Franks*, 120 U.S. 678, 693 (1887). Yet, the Indictment failed to allege that any "positive assertion of authority" was resisted by Meggs and Rhodes; the certification of the Electoral College vote did not amount to a positive show of federal authority as contemplated by *Baldwin*.

Third, the government engaged in an impermissible variance by arguing and presenting evidence that the objective of the seditious conspiracy was not to oppose the lawful transfer of presidential power, but to do something more general like "stage a rebellion" or engage in "civil war." This post-indictment broadening of the charges prejudiced the defendants because they relied on the government's theory of the case as set forth in the Indictment to formulate their defenses and the remainder of the evidence was insufficient to sustain a conviction.

Finally, if the Court finds that the seditious conspiracy count is sustained on this

alternative theory of staging a "rebellion" or "civil war," the defendants are entitled to acquittal because the seditious conspiracy statute, as applied, is constitutionally vague and violated their First Amendment rights to freedom of speech and assembly. Under *Brandenburg*, speech is constitutionally protected so long as its purpose or tendency is not to incite imminent lawless action. The overwhelming bulk of evidence presented against Rhodes consisted of his own bombastic words—in the form of open letters, public appearances, and messages—indicating a belief that force should be used or predicting that it would be used. This speech never strayed over the *Brandenburg* line, and never amounted to an actual conspiracy to use force. Thus, it remained protected—and a conviction under § 2384 was unconstitutional as applied to Rhodes and Meggs.

## 1. Elements of the Charge

The essential elements of Seditious Conspiracy, as applied to this case, are (1) a conspiracy (2) to oppose by force the authority of the government of the United States. *See United States v. Khan*, 461 F.3d 477, 487-88 (4th Cir. 2006), *cert. denied* 550 U.S. 956; 18 U.S.C. § 2384.

To prove the existence of a criminal conspiracy, the government must show an agreement or "meeting of the minds"—that two or more defendants actually "agreed to the same *type* of conduct." *See United States v. Treadwell*, 760 F.2d 327, 336-37 (D.C. Cir. 1985). As applied to the defendants themselves, the government must prove (1) that Rhodes and/or Meggs conspired or agreed with at least one other person with the goal of opposing by force the authority of the government of the United States and (2) that Rhodes and/or Meggs knowingly became a member of the conspiracy, with the intent to oppose by force the authority of the government of the United States. *See United States v. Khan*, 461 F.3d 477, 487-88 (4th Cir. 2006), *cert. denied* 550 U.S. 956; *Smith v. United States*, 568 U.S. 106, 110.

---

To satisfy the second element, the government must prove beyond a reasonable doubt that (1) "force" was "brought" (2) "to resist some positive assertion of authority by the government." *See Baldwin v. Franks*, 120 U.S. 678, 693 (1887). As the Supreme Court has explained, a conviction on this clause requires "an attempt to prevent the actual exercise of authority by the government." *Id.*

### 2. The government failed to prove that Rhodes and Meggs formed an agreement to forcibly stop the lawful transfer of power.

The existence of an "agreement" is the first essential element of a statutory criminal conspiracy. *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985). Although an "agreement" does not require the conspirators to agree on the details of their criminal scheme, the government *is* required to show the "essential nature of the plan." *Id.* (quoting *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). This is because it is "essential to determine what kind of agreement or understanding existed as to each defendant." *Id.* (quoting *United States v. Borelli*, 336 F.2d 376, 384 (2d. Cir. 1964). Thus, the government must show that the co-conspirators "agreed to the same *type* of conduct." *Id.* at 337 (emphasis in original). And though the law does not require that all members of a conspiracy meet directly or discuss their objectives between themselves for there to be a conspiracy, it does require proof beyond a reasonable doubt that at least two persons came to an implicit understanding to work together to achieve an unlawful common goal. *Id.* at 336-37.

The issue of guilt or innocence in a conspiracy is always an individualized inquiry. *Kotteakos v. United States*, 328 U.S. 750, 772 (1946). The government must prove the intent of each individual conspirator to enter into the conspiracy, knowing of its objectives, and agreeing to further its goals. *See* ECF 396 at 17-19. Thus, two different types of intent are required to convict

---

a defendant of conspiracy: "the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20 (1978).

Furthermore, when a conspiracy implicates First Amendment protections such as freedom of speech and freedom of association, the court must make a "specially meticulous inquiry" into the government's evidence so there is not "an unfair imputation of the intent or acts of some participants to all others." *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972). Because the government's proofs in this case consist overwhelmingly of speech and association, the Court must take "particular care to analyze the evidence against each defendant to determine whether it is capable of convincing beyond a reasonable doubt." *United States v. Stone*, No. 10–20123, 2012 WL 1034937, at *3 (E.D. Mich. Mar. 27, 2012).

   a.  *By the government's own admission, there was no plan to stop the Electoral College certification or enter the Capitol.*

Here, even when viewing the evidence in the light most favorable to the government, no rational juror could have concluded beyond a reasonable doubt that an agreement existed between Rhodes, Meggs, or others to *use force* to stop the lawful transfer of power. Principally, no evidence was put on by the government that the defendants had any definite plan or meeting of the minds before or on January 6. Each of the civilian witnesses the government called—Mike Adams, Terry Cummings, Jason Dolan, and Graydon Young—initially testified that there was never any agreement or plan to go into the Capitol to stop the certification process. For example, Jason Dolan, testified that his decision to enter the Capitol was spontaneous:

    Q: So what prompted you to go up the stairs?
    A: The crowd surged forward.
    . . .
    Q: Was there a plan—before you went up the stairs, was there a plan for you to go

---

up the stairs?
A. No.
. . .
Q: Okay. And you said you went in because the crowd went in?
A: Yes.

Q: There wasn't any—isn't it correct, **there wasn't any plan by Mr. Rhodes or Kelly Meggs or anyone else put out in advance** saying, we're going to go into the Capitol?
A: **No.**

(10.19.22, Morning Session, Tr. 4246-48). In fact, the government itself admitted there was no plan when it said, "Let me be clear on behalf of the United States of America, *we do not allege a specific plan to storm the United States Capitol*. We never have and we are not now. *We do not have to prove a plan*." (11.21.2022, Tr. 10296: 5-8) (emphasis added).

Having recognized that there was no plan, the government instead suggested that there was some implicit agreement to do "something." In closing, the government explained:

> You know that is the plan not just from the circumstantial evidence clearly suggesting that it is, but you know that from the words of the co-conspirators, the real, live people who participated and pled guilty to this conspiracy and came in and testified before you . . . . It was the same texts over and over: "We will do something. We will do something. We will do something." And now here we are in front of the Capitol doors, and they opened. And it was: "Let's do something."

(11.18.2022, Morning Session, Tr. 9946: 18-22); (11.18.2022, Morning Session, Tr. 9974: 7-10). With no details, no specifics, and *no plan*, no rational juror could have found that a knowing agreement took place between any alleged co-conspirator, let alone Rhodes and Meggs. *See Treadwell*, 760 F.2d 327 ("Although the government in order to prove an agreement need not show that the conspirators agreed on the details of their criminal scheme, **it is required to show the 'essential nature of the plan**.'" (emphasis added) (quoting *Blumenthal*, 332 U.S. at 557)).

> *b.  Even if there was some agreement between Meggs and Rhodes, the government failed to prove that they intended that force would be used.*

---

DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29          14

The jury was properly instructed that "[a]n act involves force if it threatens or results in violence or if it threatens or results in harming or destroying property or harming or killing people." ECF 396 at 25. While the government did not have to prove that force was actually used, it *did* have to prove that Meggs and Rhodes agreed "that physical force would be used." *Id.*

In the Indictment, the government alleged that the defendants' agreement to "use force" was mainly evidenced by the QRFs in Virginia:

> RHODES and certain co-conspirators . . . planned to stop the lawful transfer of power by January 20, 2021, which included multiple ways to deploy force. They coordinated travel across the country to enter Washington, D.C., equipped themselves with a variety of weapons, donned combat and tactical gear, and were prepared to answer RHODES'S call to take up arms at RHODES'S direction. Some co-conspirators also amassed firearms on the outskirts of Washington, D.C., distributed them among "quick reaction force" ("QRF") teams, and planned to use the firearms in support of their plot to stop the lawful transfer of presidential power. . . . The QRF teams were prepared to rapidly transport firearms and other weapons into Washington, D.C., in support of operations aimed at using force to stop the lawful transfer of presidential power. The QRF teams were coordinated, in part, by THOMAS CALDWELL and EDWARD VALLEJO.

One of two main "coordinat[ors]" of the QRF, however, was acquitted of seditious conspiracy— indicating that the QRFs failed to prove the force element. *See* ECF 410 at 3 (finding Thomas Caldwell "Not Guilty" of Seditious Conspiracy). The government also did not produce any evidence that Rhodes or Meggs had the QRF teams prepared to rapidly transport weapons into Washington, D.C. Furthermore, it is undisputed that neither Meggs nor Rhodes brought any lethal weapons to the Capitol or to the District of Columbia at any time, including the entire period from November 2020 through January 20, 2021. In fact, Jason Dolan testified to the following:

> Q: Did you bring a firearm into the District on the 6th?
> A: No.
> Q: Did anybody you were with bring a firearm to the District on the 6th?
> A: I didn't see any.
> Q: Did you have any information of any Oath Keeper bringing a firearm into the District on the 6th?

---

A: No.

(10.19.22, Tr. 4240: 13-21).

Having utterly failed to establish that the QRFs were part of a conspiracy to use force, the

government at closing instead argued:

> The evidence has shown for weeks, if not months, prior to January 6th, these
> defendants banded together and agreed to do whatever was necessary, up to and
> including using force and violence, to stop that election result from becoming
> finalized. And then on January 6th, they struck. They saw the riot unfolding at the
> Capitol, ***they threw their bodies to the cause***, and they took it.

(11.18.2022, Morning Session, Tr. 9980-91). Rhodes, Meggs, Watkins, Harrelson, and Caldwell,

however, were not charged with assault or alleged in the trial to have assaulted anyone inside or

outside the Capitol, and the three defendants charged with destruction of property were found not

guilty on that count. ECF 410 at 6. The allegation raised in closing that "***they*** threw their bodies to

the cause" lacked factual foundation and prejudice the defendants without supporting evidence.

At most, the government's evidence has shown that Rhodes and Meggs entered into an

agreement to travel to Washington, D.C. on January 5 and 6, and that the defendants separately

prepared for the possibility of the Insurrection Act to be legally invoked by former President

Trump. The government has failed to prove, however, that "the essential nature of" the defendants'

itinerary was to stop the lawful transfer of power by force. *See Treadwell*, 760 F.2d at 336. Because

there was no mutual understanding between Rhodes and Meggs—let alone one involving force—

the defendants must be acquitted of seditious conspiracy.

**3. Even if there was a conspiracy to use force, it did not fit the definition of "oppos[ing] by force the authority of the government" as set forth in *Baldwin v. Franks*.**

The seditious conspiracy statute criminalizes, *inter alia*: "[A]ny conspir[acy] to overthrow,

put down, or to destroy by force the Government of the United States, or to levy war against them,

*or to oppose by force the authority thereof* . . . ." 18 U.S.C. § 2834 (emphasis added). The

---

defendants in this case were only convicted under that final clause; the only object of the conspiracy, according to the jury, was "to oppose by force the authority of the Government of the United States." ECF 410 at 1-2. The Supreme Court's ruling in *Baldwin*, respectfully, requires the defendants' acquittals. The *Baldwin* Court stated:

> All, therefore, depends on that part of the section which provides a punishment for "opposing" by force the authority of the United States . . . . This evidently implies force against the government as a government. To constitute an offense under the first clause, the authority of the government *must be opposed*; that is to say, force must be brought to *resist some positive assertion of authority by the government*. A mere violation of the law is not enough; there must be an attempt *to prevent the actual exercise of authority*.

*Baldwin*, 120 U.S. at 693 (emphasis added). In *Baldwin*, "the Supreme Court made clear that to be convicted of seditious conspiracy, one must specifically oppose by force the government of the United States *while it is executing its authority*." *Stone*, 2012 WL 1034937 at *4 (emphasis added). "[A] conspiracy to do something other than forcibly *resist a positive show of authority* by the Federal Government is not enough to sustain a charge of seditious conspiracy." *Id.* at *5.

For example, in *Baldwin*, the defendant was charged with conspiring with others to unlawfully arrest, detain, and expel a group of Chinese citizens from a California town where they legally resided and worked. *Baldwin*, 120 U.S. at 680-81. Using arms, intimidation, and violence, the co-conspirators forcibly placed them on a steamboat barge that was leaving the town. *Id.* at 681. The Supreme Court held that these facts could not amount to a seditious conspiracy because the defendants exerted its force toward the Chinese citizens, rather than against the government in its efforts to protect them. *Id.* at 693. Thus, the charge could not stand because the "conspiracy was for 'ill treatment itself,' and 'not for hindering or delaying the United States in the execution of their measures to prevent it.'" *Stone*, 2012 WL 1034937 (*quoting Baldwin*, 120 U.S. at 694).

Therefore, here, the Indictment must allege that the *purpose* of Rhodes's conspiracy was

to "resist," by force, "some positive assertion" or "actual exercise" of authority by the government. *Baldwin*, 120 U.S. at 693. The purpose of the conspiracy, according to the Indictment, was to "oppose the lawful transfer of presidential power." ECF 167 at 8. The Indictment lays out in detail "the procedures and dates governing the transfer of presidential power in the United States," including the Twelfth and Twentieth amendments, the Electoral Count Act, and the itinerary for the Certification of the Electoral College vote on January 6, 2021. *Id.* at 2. This process is clearly *not* a "positive assertion of authority by the government" as contemplated by *Baldwin.* Instead, it is a perfunctory, nonassertive, quadrennial process outlined in the Constitution.

On January 6, 2021, Congress was not exercising "authority" or engaging in a separate and distinct "positive assertion of authority" as contemplated by *Baldwin*. Rather, Congress was simply following its constitutional obligations under the Twelfth Amendment: The Vice President and Congress were participating in a legislatively-choreographed Electoral College certification process, opening and counting ballots, making and ruling on objections, and other "mandated constitutional and statutory acts." ECF 176 at 15. Additionally, as the Court has acknowledged, the Twentieth Amendment is "self-executing." *Id.* at 20-21. Therefore, there was no "actual exercise of authority" that Rhodes or Meggs could have opposed even *after* the certification process on January 6.

In short, the Indictment failed to allege—and the evidence at trial failed to prove—"some positive assertion of authority" made by the United States government that Rhodes and Meggs specifically conspired to forcibly "resist." Because the "lawful transfer of presidential power" does not equate to a "positive assertion of authority" as outlined by the Supreme Court, defendants must be acquitted of Count 1.

---

DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29          18

4. **The seditious conspiracy statute, as applied to Rhodes and Meggs, is constitutionally vague and violates the First Amendment.**

The crime of seditious conspiracy is inherently political, and—as a result—its "formula[] for the repression of expression . . . can claim no talismanic immunity from the First Amendment." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). In fact, it was the fear-driven passage of the Sedition Act of 1798, and the subsequent political persecution that masqueraded as enforcement, which "first crystallized a national awareness of the central meaning of the First Amendment." *Id.* at 273-74.

The seditious conspiracy statute as applied in this case is constitutionally vague under the Fifth Amendment because unimpeached and undisputed evidence at trial showed that defendants headed to the Capitol because the organization they worked with obtained a permit to protest at the Capitol on January 6th, 2022 to take place after the rally for the President on the mall.  (KM-Exs. 71, 72 and 73).  Based on the application of this case, the statute is constitutionally vague and violates the First Amendment because any legal planned protest activity against Congress can be construed as an attempt to "overthrow the government."

As Chief Justice Hughes wrote in *Stromberg v. California* in setting aside a conviction based on a statute that "[t]he question is thus narrowed to that of the validity of the first clause, that is, with respect to the display of the flag "as a sign, symbol or emblem of opposition to organized government,"… "A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity [of free speech] is repugnant to the guaranty of liberty contained in the Fourteenth Amendment. . . ."  283 U.S. 359, 369 (1931).  The Supreme Court made clear that even "when statute is vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it

problematic for purposes of the First Amendment." *Reno v. ACLU*, 521 U.S. 844, 870-871 (1997).

("[r]egardless of whether the CDA is so vague that it violates the Fifth Amendment,)

> 'Vagueness and overbreadth, although related are separate concepts having their immediate foundations in the Fifth Amendment due process clause. The First Amendment has its own force, however, independently of due process concepts such as vagueness and overbreadth. A statute which directly impinges upon rights granted in that Amendment may be found constitutionally defective without resort to due process formulations.

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 582-584 (D.D.C.), *aff'd*, 409 U.S. 972, 34 L. Ed. 2d 236, 93 S. Ct. 311 (1972)(the DC Circuit Court of Appeals struck former 40 USCS § 193g on constitutional grounds and differentiated the right of protestors at Courthouses, versus those at the Capitol)(*citing Cox II, Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S. Ct. 680, 683, 9 L. Ed. 2d 697 (1963) invalidating a statute finding that a conviction may not stand resting on speech that "stirred people to anger, invited public dispute, or brought about a condition of unrest." *Id.* at 238.)   The District Court enjoined restrictions on First Amendment conduct within the United States Capitol on the basis that such conduct is "expressive conduct that convey[s] a message supporting or opposing a point of view or has the . . . propensity to attract a crowd of onlookers;"). *Bynum v. United States Capitol Police Bd.*, 93 F. Supp. 2d 50, 54, (D.D.C. 2000), vacated in part (on o' grounds), 96 F. Supp. 2d 4.

Courts "must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Watts v. United States*, 394 U.S. 705, 707 (1969) (quoting *New York Times*, 376 U.S. at 270). Even speech that a "vast majority of its citizens believe to be . . . fraught with evil" cannot be punished unless it represents a clear and present danger.

---

*Whitney v. California*, 274 U.S. 357, 374 (1927), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). A statute, as applied, may only criminalize expression when the speech, thought, or assembly "is directed to inciting or producing imminent lawless action" in accord with the charged offense, and is "likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447. In other words, an expression is "protected unless both the intent of the speaker and the tendency of the words [is] to produce or incite an imminent lawless act." *United States v. Freeman*, 761 F.2d 549, 552 (9th Cir. 1985) (citing *Brandenburg*, 395 U.S. at 447-48).

In *Herndon v. Lowry*, the Supreme Court reviewed the application of a state "insurrection" statute similar to the seditious conspiracy provision at issue in the instant case. The Court emphasized the importance of the construction of statutes which implicate speech and association in their application:

> [W]here the statute merely prohibits certain acts involving danger of substantive evil, without any reference to language itself, and it is sought to apply its provisions to language used by the defendant for the purpose of bringing about the prohibited results . . . [and] it [is] contended that the statute cannot be applied to the language used by the defendant because of its protection by the freedom of speech or press, it must necessarily be found [by the court] . . . whether the specific language used involved such likelihood of bringing about the substantive evil as to deprive it of constitutional protection.

*Herndon v. Lowry*, 301 U.S. 242, 258 (1937).

In *Herndon*, the defendant was charged with an attempt to induce "combined resistance to the lawful authority of the state with intent to deny, defeat, and to overthrow such authority by open force, violent means, and unlawful acts." *Herndon*, 301 U.S. at 245. The Supreme Court first emphasized that the documentary evidence did not indicate an intent to incite forcible subversion of the "lawful authority of the State" of Georgia. *Id.* at 253. The Court then distinguished the future threat of violence against the government at some indefinite time from that causing a "reasonable

apprehension of danger to organized government." *Id.* at 258-61. Ultimately, the Court found that the insurrection statute, as construed and applied at the defendant's trial, violated his First Amendment rights to freedom of speech and association because there was no "clear and present danger of forcible obstruction of a particular state function." *Id.* at 261.

To be sure, that otherwise-protected speech may play a part in the commission of a crime does not insulate that crime from prosecution. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("[W]hen speech and nonspeech elements are combined in the same course of conduct, a sufficient important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."). And, of course, protected speech and mere words can be sufficient to show an unlawful conspiracy. *See Freeman*, 761 F.2d at 551.

*Brandenburg*'s holding, however, is not limited to facial challenges of statutes that explicitly proscribe "advocating" for violence or some unlawful action. Rather, courts have routinely applied *Brandenburg* when assessing as-applied constitutional challenges to criminal conspiracies and substantive crimes where the defendant's conduct amounted to advocacy or mere rhetoric. *E.g. United States v. Fullmer*, 584 F.3d 132, 154 (3d. Cir. 2009) (applying *Brandenburg* test to charges of conspiracy to commit interstate stalking; conspiracy to use a telecommunications device to abuse, threaten, and harass; and conspiracy to violate the American Enterprise Protection Act (AEPA)); *United States v. Phipps*, 595 F.3d 243, 247 (5th Cir. 2010) (applying *Brandenburg* to charge of corrupt impediment of the internal revenue laws). In fact, the *Brandenburg* test has invalidated convictions for a host of crimes. *E.g.*, *United States v. Lee*, 6 F.3d 1297 (8th Cir. 1993) (conspiracy to "injure, oppress, threaten, or intimidate" in order to violate another's civil rights); *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir. 1983) (aid or assistance in filing a fraudulent tax return); *United States v. Silverman*, 248 F.2d 671 (2d. Cir. 1957) (conspiracy to violate the

Smith Act); *United States v. Salazar*, 362 N.W.2d 913 (Mich. App. 1985) (murder solicitation).

In its pretrial order denying Meggs' Motion to Dismiss, this Court ruled that the seditious conspiracy statute "does not impinge on protected First Amendment activities" because it only "prohibits certain agreements to use force." ECF 238 at 5. The Court then noted that the First Amendment does not protect the defendants' conduct because they were not "indicted purely for their speech or assembly." *See id.* at 6. In fact witnesses all testified that none of the alleged co-conspirators[2] brought lethal weapons to the Capitol or to the District of Columbia for January 6th nor any time thereafter.  Moreover, there was no evidence that these defendants destroyed government property.  (The jury found all defendants charged with destruction of property not guilty). The government plead overt acts including the participation on the Zello call, a matter of speech at a protest, (Jessica Watkins' who was on the Zello call was found not guilty of Seditious Conspiracy).  Similarly, the government alleged in the Superseding Indictment that "The QRF teams were coordinated, in part, by Thomas Caldwell and Edward Vallejo."  (See SI at ¶12).  (Thomas Caldwell was found not guilty of Seditious Conspiracy), the government put forth no evidence that any of the defendants asked for weapons to be brought to DC on January 6th or thereafter, which supports the lack of evidence that the QRF constituted the "overt act" towards use of force for seditious conspiracy.  Further, no evidence was shown that it was illegal for the

---

[2] "[M]ere association, standing alone, is inadequate; an individual does not become a member of a conspiracy merely associating with conspirators known to be involved in crime."  *United States v. Gaskins*, 402 U.S. App. D.C. 262, 273 (D.C. Cir., 2012) ("The agreement is the sine qua non of a conspiracy, and this element is not supplied by mere knowledge of an illegal activity . . . , let alone by mere association with other conspirators." (internal quotation marks omitted)); *United States v. Diaz*, 637 F.3d 592, 602 (5th Cir. 2011) ("If all that was shown was a defendant's . . . 'close association with conspirators,' jurors would not be entitled to infer participation in the conspiracy." (internal quotation marks omitted)); *Nusraty*, 867 F.2d at 764 ("[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement.")

defendants to have weapons in Virginia.  Mr. Meggs was alleged to have  to said,  "we need to make those senators very uncomfortable with all of us being a few hundred feet away."  (S.I. at ¶ 34),  And as to Rhodes, the evidence at trial *was* largely confined to advocative speech. *See, e.g.*, ECF 167 ¶¶ 18, 19, 23, 25, 30, 31, 40.[3] Rhodes's public lobbying of former President Trump and private bombastic rhetoric in conversations with other Oath Keepers certainly did not present a "clear and present danger" so as to strip his speech from First Amendment protections. And while his words at times expressed the belief that a civil war was imminent—or even a personal *desire* for a civil war and its attendant violence at some undetermined future time—they did not amount to an incitement to "imminent lawless action." *C.f. Yates v. United States*, 354 U.S. 298, 318 (1957), *overruled in part on other grounds*, *Burks v. United States*, 437 U.S. 1, 7 (1978). Thus, the application of the seditious conspiracy statute to these defendants constitutes a violation of the First Amendment.

## B.      Conspiracy to Obstruct an Official Proceeding (Count 2)

The essential elements of the charge of conspiracy to obstruct an official proceeding include proof beyond a reasonable doubt that the defendants conspired or agreed with at least one other person with the goal of committing the crime of obstructing an official proceeding and the that the defendants joined or entered into that agreement with awareness of its unlawful goal.  [ECF 400 at 25].  The essential elements of the charge of obstruction of an official proceeding include proof beyond a reasonable doubt that the defendant obstructed or impeded an official proceeding; the defendants intended to obstruct or impede the official proceeding; that the defendants acted

---

[3] The physical actions alleged as to Rhodes were limited to traveling to D.C., assembling near the U.S. Capitol on 1/6, and purchasing firearms. It is undisputed that, independent of the conspiracy, these actions were entirely lawful.

knowingly; and that the defendants acted corruptly.  [ECF 400 at 26].  Here, no reasonable juror could have found that the government proved sufficient evidence to find that Defendants Meggs and Watkins committed the offense of conspiracy to obstruct an official proceeding beyond a reasonable doubt.

First, the government conceded there was no written evidence of any plan to enter the Capitol or otherwise interfere with the certification of the electoral college vote such that any "agreement" to do so was reached [insert inferentially] and not explicitly.  Tr. 10,014 and 10,298. Thus, any proof of Defendant Meggs's and Watkins's knowing and/or corrupt intent must necessarily have also been  inferential and/or non-explicit.  Yet, no reasonable juror could have found sufficient evidence of the same.  To the contrary, the jury concluded there was not proof beyond a reasonable doubt that Defendants Meggs and Watkins committed the offence of seditious conspiracy, "to use force to prevent, hinder, or delay the execution of any law of the United States," to include the laws governing the transfer of presidential power such as the certification of the electoral college vote.  Yet, the evidence admitted at trial as proof of Defendant Meggs's and Watkins's intent to interfere with the certification of the electoral college vote *was the same as* the evidence of Defendant Meggs's and Watkins's intent to commit the crime of seditious conspiracy with the object of preventing, hindering, or delaying the certification.

Second, the evidence at trial failed to evince any corrupt intent to interfere with the certification.  Indeed, the evidence at trial was that Congress had recessed at 2:29 p.m. [Tr. 4442-43].

Third, even if the government's theory that Defendants Meggs's and Watkins's presence within the Capitol interfered with the certification insofar as any further proceeding was delayed by their presence, the evidence at trial lacked any proof of corrupt intent.  To prove corrupt intent,

the government must establish a defendant's use of unlawful means or an improper purpose, as well as that defendant's action with "consciousness of wrongdoing."  What the evidence at trial established was that Defendants Meggs and Watkins remained in the Capitol for roughly twenty (20) minutes and ultimately left voluntarily.  Indeed, the evidence at trial established that Defendant Meggs was depicted ushering individuals from the Capitol before exiting peacefully himself.  And to the extent the government argues that Defendant Watkins's presence in the Senate Hallway evidences corrupt intent, the jury already concluded such intent was lacking insofar as it failed to find beyond a reasonable doubt that Defendant Watkins committed the offense of seditious conspiracy for the purpose of using force to prevent, hinder, or delay the execution of any law of the United States, to include the transfer of Presidential power and the certification of the electoral college vote.

**B.  <u>Obstruction of an Official Proceeding (Count 3)</u>**

    **1.  Elements of the Charge**

        **a.  Substantive Crime**

The essential elements of the substantive offense of obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) require the government to prove beyond a reasonable doubt that the individual defendant: (1) **actually obstructed or impeded** an official proceeding, (2) **intended** to obstruct or impede the official proceeding, (3) acted **knowingly**, with the awareness that the natural and probable effect of his or her conduct would be to obstruct or impede the official proceeding, and (4) acted **corruptly**. ECF 396 at 26 (Emphasis added); *see also United States v. Miller*, No. 1:21-cr-00119, 2022 WL 1718984, at *2-6 (D.D.C. May 27, 2022).

If an official proceeding was not pending at the time of the alleged offense, the government must prove beyond a reasonable doubt that the official proceeding was "reasonably foreseeable"

to the defendant. ECF 396 at 27; *see also United States v. Sandlin,* No. 21-cr-88, 2021 WL 5865006, at \*12 (D.D.C. Dec. 10, 2021); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995). That is, the defendant must "contemplate a particular, foreseeable official proceeding" and act with knowledge that his or her behavior would probably obstruct or impede that contemplated proceeding. *Sandlin*, 2021 WL 5865006, at \*12.

Furthermore, the government must prove that the defendant acted with "consciousness of wrongdoing." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005); *see United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at \*11 (D.D.C. Dec. 20, 2021). This means the defendant's conduct must be "independently criminal" that is "inherently malign" and "committed with the intent to obstruct an official proceeding." *Sandlin*, 2021 WL 5865006, at \*13 (internal quotation marks omitted) (quoting *United States v. North*, 910 F.2d 843, 943 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part); *Arthur Andersen*, 544 U.S. at 704). Thus, those who engage in lawful, innocent conduct—even when done with the intent to obstruct, impede, or influence the official proceeding—cannot be guilty of violating § 1512(c)(2). *Id.* (citing *Arthur Andersen*, 544 U.S. at 705-06).

### b. Attempt

The jury was also instructed that it could convict on Count 3 if the government proved beyond a reasonable doubt that the individual defendant (1) **intended to commit the crime** of obstruction of official proceeding and (2) took a **substantial step** toward committing the crime of obstruction of an official proceeding which strongly corroborates or confirms that the defendant intended to commit that crime. ECF 396 at 28.

The D.C. Circuit has explained that "[t]he substantial step must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in

---

DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29          27

context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *United States v. Nitschke*, 843 F. Supp. 2d 4, 10 (D.C. Cir. 2011) (quoting *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000)). The defendant's actions must "unequivocally demonstrate[e] that the crime will take place unless interrupted by independent circumstances." *Id.* (quoting *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007)).

### c. Aiding and Abetting

The essential elements of aiding and abetting the obstruction of an official proceeding under 18 U.S.C. § 2 and § 1512(c)(2) require the government to prove beyond a reasonable doubt that: (1) **others committed or attempted to commit** obstruction of an official proceeding; (2) the defendant **knew** that obstruction of an official proceeding was going to be committed, was being committed, or was attempted to be committed by others; (3) the defendant performed at least one **act in furtherance** of the offense; (4) the defendant performed that act or acts **for the purpose of aiding, abetting, assisting, soliciting, facilitating, or encouraging others** in committing, or attempting to commit, the offense of obstruction of an official proceeding; and (5) the defendant did that act or acts **with the intent that others commit, or attempt to commit**, the offense of obstruction of an official proceeding. ECF 396 at 29-30 (Emphasis added).

To satisfy the affirmative act element, the evidence must show that the defendant took some action which rendered assistance to the principal. *Rosemond v. United States*, 572 U.S. 65, 72-73 (2014). Though it does not require participation in "each and every element of the offense," aiding and abetting requires some action by the defendant that helps to bring about an essential element of the substantive offense. *See id.* at 74-75.

Furthermore, the defendant "must not just in some sort associate himself with the venture, but participate in it as something that he wishes to bring about and seek by his action to make it

---

succeed." *Rosemond v. United States*, 572 U.S. 65, 76 (2014) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). This element is satisfied when "a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Id.* at 77. For example, preparing a fraudulent document constituted aiding and abetting mail fraud where the preparer knew his "confederate would take care of the mailing." *Id.* (citing *Pereira v. United States*, 347 U.S. 1 at 12 (1954)). But an intention to advance some different or lesser offense is generally not sufficient; the intent "must go to the specific and entire crime charged." *Id.* at 76. Likewise, mere association with persons involved in a criminal venture or mere presence during the commission of an offense is insufficient. *See United States v. Bailey*, 416 F.2d 1110, 1113 (D.C. Cir. 1969).

### d. *Pinkerton* Co-Conspirator Liability

To convict a defendant of obstruction of an official proceeding using the *Pinkerton* doctrine, the government must prove beyond a reasonable doubt that: (1) the defendant knowingly joined a conspiracy; (2) the obstruction of an official proceeding was committed by a member of that conspiracy; (3) the defendant was a member of the conspiracy at the time the obstruction was committed; (4) the obstruction was committed during the existence of the conspiracy; (5) the obstruction was committed in furtherance of the conspiracy; and (6) the charged offense was a reasonably foreseeable consequence of the conspiracy. *See* ECF 396 at 31; *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946); *United States v. Long*, 905 F.2d 1572, 1577 n.8 (D.C. Cir. 1990); *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980).

### 2. Under any theory of liability, the government failed to prove that the defendants violated 18 U.S.C. § 1512.

#### a. The government failed to prove that any of the defendants actually "obstructed" or "impeded" Congress's certification of the Electoral College

---

**because the proceeding had stopped by the time any of the defendants reached restricted grounds.**

As a general matter, the government failed to prove that any of the defendants personally obstructed or impeded Congress's certification of the Electoral College on January 6, 2021. By stipulation, members of Congress were ordered to be evacuated from the Capitol Building at 2:20 p.m. And at 2:29 p.m., the House of Representatives recessed under Rule 12(b), an emergency provision of the House Rules. (Tr. 4442-43). A "recess," according to Parliamentarian Thomas Wickham, is a "temporary break in the proceedings" and "can last an indefinite time." (Tr. 4442-43, 4457-58). The government provided no evidence that the defendants were on restricted Capitol grounds at the time members of the public breached the inside of the Capitol Building and when Congress was evacuated.

The government, moreover, provided no evidence that the specific actions of the defendants *caused* Congress's evacuation or recess. The defendants could not have "obstructed" or "impeded" the certification, which was already stopped by the time any of them entered restricted grounds. Additionally, Captain Ortega and Parliamentarian Wickham, on cross-examination, agreed that the Electoral College certification would take "hours" to be restarted after the evacuation because of the breach of the Capitol; Captain Ortega also agreed that a police-involved shooting at 2:44 p.m. inside the Capitol was a contributing factor to the "hours" delay. (Tr. 4033-35, 4058). It was therefore impossible for the defendants to "obstruct" or "impede" a proceeding that was *not* proceeding and would not be restarted for hours. Notably, the government's witnesses did not allege or proffer that the defendants' brief presence outside the Capitol delayed the restarting of the certification process.

**b. None of the defendants "aided and abetted" the obstruction of the Electoral College certification.**

---

The government also failed to adduce sufficient evidence that the defendants "aided and abetted" the obstruction of the certification. Again, at the time the members of Congress were evacuated, none of the defendants were on restricted grounds of the Capitol. The "emergency evacuation" that was "ordered" by the Capitol Police, (Tr. 4035), stopped the certification process without any of the defendants' solicitation. Additionally, the stoppage of the certification would last for hours—not because of anything the defendants did, but because of the breach of the Capitol building by others a police-involved shooting.

The government adduced no evidence that any of the Defendants did anything that would have facilitated the obstruction of the certification process before Congress was evacuated or recessed.

The government's aiding and abetting theory also fails because no proof was adduced connecting Defendants to a specific principal who caused the evacuation or recess of Congress, or who otherwise obstructed or impeded the certification: "Aiding and abetting, as used in the statute, means to assist the perpetrator of a crime." *White v. United States*, 366 F.2d 474, 476 (10th Cir. 1966). The government failed to prove that Watkins "aided someone in committing the crime." *United States v. Yost*, 24 F.3d 99, 104 (10th Cir. 1994); see also *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) ("One cannot aid or abet himself."). To "convict a defendant of aiding and abetting the commission of a crime, the government must prove that the defendant associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed." *United States v. Silvas*, No. 92-5586, 1993 U.S. App. LEXIS 39625, at *19 (5th Cir. 1993). A conviction for aiding and abetting cannot, however, be based upon a defendant's "inadvertent assistance" to others. *United States v. Ortega*, 44 F.3d 505, 507 (7th Cir. 1995).

Accordingly, as the substantive crime of obstructing an official proceeding under 18 U.S.C. § 1512(c)(2) *was already completed* before the defendants provably entered a restricted area of the Capitol grounds, the defendants could not, as a matter of law, have aided and abetted that crime. *See United States v. Ferraro*, 414 F.2d 802, 804 (5th Cir. 1969) ("A person cannot aid or abet a crime which has already been completed.").  A crime is "completed" when all of its elements have been performed unless the crime is explicitly characterized by Congress—or is by its very nature— a "continuing offense." [4] *See, e.g., United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001) (holding that the crime of bank fraud is "completed upon the execution" of the fraud for purposes of the statute of limitations); *Ferraro*, 414 F.2d at 804 (holding that defendant did not aid and abet a bank employee who stole money) ("Whether she "embezzled," "abstracted" or "purloined" the money. . . her offense was complete when she walked out of the bank with the money in her possession and met the [defendant] on the parking lot."). Finally, "[a] defendant may not properly be convicted of aiding and abetting a crime that was completed before his accessorial acts were performed."  *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006).

The crime of obstructing the certification process was *de facto* completed by the perpetrators when Congress was ordered to be evacuated at 2:20 p.m. or, at the latest, at 2:29 p.m. when Congress recessed.   By 2:20 p.m., Congress had not only been "obstructed" and

---

[4] Obstruction of an Official Proceeding under § 1512(c)(2) is clearly not a "continuing offense," as "the explicit language" of the statute "does not . . . *compel*[] such a conclusion," and "the nature of the crime involved is such that Congress [did not] *assuredly* [    ] intend[   ] . . . [to] treat[   ] [it] as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (emphasis added).  Whether § 1512(c)(2) is a "continuing offense" depends exclusively "on the nature of the substantive offense, *not on the specific characteristics of the conduct in the case at issue*." *United States v. Niven*, 952 F.2d 289, 293 (9th Cir. 1991); *accord United States v. Dunne*, 324 F.3d 1158, 1165 (10th Cir. 2003); *United States v. Sunia*, 643 F. Supp. 2d 51, 74 (D.D.C. 2009).

---

"impeded"—the proceeding had been stopped altogether and members of Congress were in route to a relocation center. *See United States v. Delpit*, 94 F.3d 1134, 1150 (8th Cir. 1996) (reversing conviction for aiding and abetting the crime of causing another to travel interstate with intent to facilitate a murder pursuant to 18 U.S.C. § 1958(a); the crime was completed once the principal actually traveled interstate with the intent to commit murder, not a week later when the murder was committed). The government adduced no evidence that the defendants were on restricted grounds before 2:29 p.m., let alone evidence that they did anything that would have facilitated the obstruction of the certification process before Congress was evacuated or recessed.

The government's aiding and abetting theory also fails because no proof was adduced connecting the defendants to a specific principle who caused the evacuation or recess of Congress, or who otherwise obstructed or impeded the certification. "Aiding and abetting, as used in the statute, means to assist the perpetrator of a crime." *White v. United States*, 366 F.2d 474, 476 (10th Cir. 1966). The government failed to prove that the defendants "aided *someone* in committing the crime." *United States v. Yost*, 24 F.3d 99, 104 (10th Cir. 1994); *see also United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) ("One cannot aid or abet himself."). To "convict a defendant of aiding and abetting the commission of a crime, the government must prove that the defendant associated with a criminal venture, participated in the venture, and sought by his action to make the venture succeed." *United States v. Silvas*, No. 92-5586, 1993 U.S. App. LEXIS 39625, at *19 (5th Cir. 1993). A conviction for aiding and abetting cannot, however, be based upon a defendant's "inadvertent assistance" to others. *United States v. Ortega*, 44 F.3d 505, 507 (7th Cir. 1995). Although the principal can be anonymous, the government still has to identify *a perpetrator* of the substantive crime who the defendants *specifically assisted* as part of a "criminal venture" on January 6.

---

The government adduced no evidence that the defendants "actively participate[d] in a criminal scheme knowing its extent and character[.]" *Rosemond v. United States*, 572 U.S. 65, 77 (2014).  Additionally, "[i]t is well settled that mere presence at the scene of a crime and awareness that a crime is being committed is insufficient to support a conviction for aiding and abetting." *United States v. Salamanca*, 990 F.2d 629, 638 (D.C. Cir. 1993); *see also United States v. Garguilo,* 310 F.2d 249, 253 (2d Cir. 1962) (a defendant's presence at the scene of the crime may be sufficient to support a conviction for aiding and abetting *only* if his presence "proved to have positively encouraged the perpetrator himself.").  As the Maryland Court of Appeals observed in reversing an aiding and abetting conviction where the defendant stood by as a 3-month-old baby was brutally murdered:

> The evidence certainly showed that Pope "witnessed a terrible event" and that she "stood by" while the mother killed the child. But the culpability for her conduct during the abuse of the child *must be determined strictly within the law or else the basic tenets of our system of justice are prostituted.* There is an understandable feeling of outrage at what occurred . . . *[b]ut it is the law, not indignation, which governs*.

*Pope v. State*, 284 Md. 309, 333 (1979) (emphasis added). Here, the defendants' mere presence near the Capitol, even as they stood witness to a "terrible event," is insufficient to establish liability.  Accordingly, the government failed to meet its burden of proof to establish that the defendants aided and abetted the commission of obstructing an official proceeding.

### c.  None of the defendants "attempted" to obstruct the Electoral College certification.

The government's case-in-chief adduced insufficient evidence to support a conviction for "attempting" to obstruct the Electoral College certification. To constitute a criminal "attempt," the government must adduce

proof of two elements: (1) an intent to engage in criminal conduct and (2) conduct

constituting a "substantial step" toward the commission of the substantive offense *that strongly corroborates the criminal intent.* If the substantial steps *are themselves the sole proof of the criminal intent*, then those steps *unequivocally must evidence such an intent; that is, it must be clear that there was a criminal design and that the intent was not to commit some non-criminal act.*

*United States v. Dworken*, 855 F.2d 12, 17 (1st Cir. 1988) (emphasis added); *accord United States v. Hite*, 769 F.3d 1154, 1164 (D.C. Cir. 2014). As Judge Boasberg summarized:

> The act in furtherance is often described as a "substantial step" that demonstrates "a true commitment toward completing the crime" and that "the crime will take place unless interrupted by independent circumstances." *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010) (internal quotations omitted). "[The substantial step] must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000) (internal citation omitted).

*Nitschke*, 843 F. Supp. 2d at 10 (D.D.C. 2011). The government's evidence does not come close to showing that the individual defendants harbored an "unequivocal" or "true commitment" to specifically (and corruptly) obstruct or impede the Electoral College certification.

The government's closing argument, in fact, forecloses any notion that Caldwell had a pre-plan to specifically obstruct the Electoral College. The government claimed that the breach into the Capitol was an "opportunity" that the *Rhodes* defendants "seized." (Tr., 9906, 10,277). In other words, the defendants did not specifically plan to approach the Capitol; rather, according to the government, they "seized an opportunity" when others took it upon themselves to penetrate the Capitol Building. Accordingly, the government, at least up until the defendants entered the restricted grounds, tacitly admitted that the defendants possessed no *mens rea* to stop the certification. Their alleged substantial steps—including approaching the Capitol Building—also do not "unequivocally" corroborate a "criminal intent" to obstruct or impede the Electoral College certification. *Dworken*, 855 F.2d at 17. The defendants' actions were not "necessary to the

consummation of the crime and [… ] of such a nature that a reasonable observer, viewing in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Nitschke*, 843 F. Supp. 2d at 4.

**3. Rhodes must be acquitted of obstructing an official proceeding because the government provided no evidence that he entered the Capitol, attempted to enter the Capitol, or encouraged others to do so.**

The government did not prove beyond a reasonable doubt—under any theory of liability— that Defendant Rhodes is guilty of § 1512(c)(2). Principally, it is undisputed that Defendant Rhodes never entered the Capitol Building on January 6. Rhodes did not even arrive at the grounds *near* the Capitol until approximately 1500—well after members had been evacuated. Rhodes therefore physically could not have "obstructed" or "impeded" the certification so as to support his conviction for the substantive crime.

Moreover, Rhodes was acquitted of Conspiracy to Obstruct an Official Proceeding— demonstrating that the government failure to prove that Rhodes agreed to obstruct an official proceeding. ECF 410 at 3. Because he did not join in the conspiracy, Rhodes cannot be found guilty of the substantive office based upon a *Pinkerton* theory of liability.

If he did not *conspire* to obstruct the Electoral College certification, he certainly did not *attempt* to do so either. The government failed to prove that any of Rhodes's actions amounted to a "substantial step" towards obstructing the official proceeding. Rhodes's acts of standing outside the Capitol and talking to others simply does not evidence "a true commitment toward completing the crime." *Nitschke*, 843 F. Supp. 2d at 10 (D.D.C. 2011). Furthermore, it cannot seriously be inferred that Rhodes "knew" his act of standing, talking, and messaging would obstruct an official proceeding. Finally, even if his actions satisfied the "knowing" element, they certainly were not "independently criminal" or "inherently malign." *See Sandlin*, 2021 WL 5865006, at *13 (internal

quotation marks omitted) (quoting *United States v. North*, 910 F.2d 843, 943 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part); *Arthur Andersen*, 544 U.S. at 704). As such, the evidence failed to support a conviction for attempt under § 1512(c).

Furthermore, the evidence fails to show that Rhodes aided or abetted any principal in obstructing the Electoral College vote. As noted, the government failed to prove that there was a plan to enter the Capitol or that Rhodes ever encouraged others to do so. In fact, witnesses testified that he expressed displeasure with those who *did* enter the Capitol that day. His actions of standing near the Capitol as others breached it also does not make him guilty: "It is well settled that mere presence at the scene of a crime and awareness that a crime is being committed is insufficient to support a conviction for aiding and abetting." *United States v. Salamanca*, 990 F.2d 629, 638 (D.C. Cir. 1993); *see also United States v. Garguilo,* 310 F.2d 249, 253 (2d Cir. 1962) (a defendant's presence at the scene of the crime may be sufficient to support a conviction for aiding and abetting *only* if his presence "proved to have positively encouraged the perpetrator himself."). Accordingly—under any of liability—the evidence cannot sustain Rhodes's conviction for obstructing an official proceeding.

### 4.  With regard to Defendant Watkins

The government failed to adduce legally sufficient evidence that Watkins violated 18 U.S.C. § 1512(c)(2) as charged in Count 3 of the Indictment. The jury was instructed as to four theories of criminal liability upon which to convict Watkins under Count 3: 1) that Watkins actually obstructed the Electoral College certification; 2) *Pinkerton* co-conspirator liability; 3) that Watkins "aided and abetted" others to obstruct the proceeding; or, 4) that Watkins "attempted" to obstruct the proceeding. (ECF 400, at 26) (jury instructions). As outlined below, the government failed to meet its burden as to each theory of liability.

a. ***Watkins did not personally "obstruct" or "impede" the Electoral College certification.***

As a matter of law, Watkins did not personally "obstruct" or "impede" Congress's certification of the Electoral College on January 6, 2021. By stipulation, Members of Congress were ordered to be evacuated from the Capitol Building at 2:20 p.m. Government's Exhibit 1500 included CCTV footage of Watkins, as a member of group 1, stepping onto the Northwest Drive sidewalk at approximately 2:21 P.M. (Govt. Exh. 1056.603.0224). Although Capitol Police Captain Ortega established portions of Northwest Drive were restricted grounds on January 6, 2021, the government failed to establish notice of these restrictions. The barriers and signs indicating the restricted portions of Northwest Drive were taken down prior to group 1 being present on the grounds, and therefore Watkins's, arrival at 2:21 P.M. (Caldwell Exhibit 80). Furthermore, the government offered no proof that Watkins, specifically, lacked the authority to be present on unrestricted grounds on January 6, 2021.

The government, moreover, offered no proof that Watkins' actions caused Congress' evacuation or recess. Watkins did not "obstruct" or "impede" the certification, which was already stopped or recessed, by the time she entered restricted grounds. The initial breach of the Capitol that subsequently led to the evacuation of Congress occurred at 2:29 P.M. Additionally, Captain Ortega and Parliamentarian Thomas Wickham, on cross-examination, agreed that the Electoral College certification would take "hours" to be restarted after the evacuation because of the breach of the Capitol; Captain Ortega also agreed that a police-involved shooting at 2:44 p.m., (Tr., 4058), inside the Capitol was a contributing factor to the "hours" delay and the government failed to distinguish how that delay, as opposed to Watkins' presence in the Capitol, further delayed the certification.  (Tr., 4033-35, 4459-60). It was impossible for Watkins to "obstruct" or "impede" a

proceeding that was *not* proceeding and would in fact, per the undisputed testimony, not be restarted for hours.[1]   The government's witnesses did not allege or proffer that Watkins's presence delayed the restarting of the certification process.

### b.  Pinkerton Liability

The government improperly relied on the *Pinkerton Doctrine* when attempting to adduce evidence beyond a reasonable doubt that Watkins obstructed an official proceeding. The arguments above are incorporated herein.  When examining Watkins and Meggs, the government failed to adduce sufficient evidence that a conspiracy to obstruct an official proceeding existed. The communication between defendants Watkins and Meggs preceding January 6, 2021 was sparse at best. Furthermore, the interactions between defendants Watkins and Meggs on January 6, 2021were limited; mere presence in the same group does not suffice to amount to a conspiracy on January 6, 2021. The government failed to adduce any evidence, let alone sufficient evidence, that would have permitted a reasonable trier of fact to have reasonably inferred either Meggs or Watkins had specific knowledge of the other's intent, or lack thereof, to obstruct an official proceeding. *See United States v. Cook*, 848 F. App'x 431 (D.C. Cir. 2021).

Given the *Pinkerton Doctrine* presupposes the existence of a conspiracy, its application is therefore rendered inappropriate in the absence of a conspiracy and is therefore inapplicable in the case *sub judice*.

### c.  *Watkins did not "aid and abet" the obstruction of the Electoral College certification.*

The government failed to adduce sufficient evidence that Watkins "aided and abetted" the obstruction of the Electoral College certification. (ECF 400, at 29-30), and all of the arguments are incorporated from above.

---

The government also failed to meet its burden of proof as to aiding and abetting because the evidence, in relation to Watkins, supported "an obvious alternative motive for [her] behavior." See *United States v. Williams*, 865 F.3d 1328, 1347 (11th Cir. 2017) (finding evidence insufficient to convict defendant of aiding and abetting a boat operator's attempt to "evade the Coast Guard by jettisoning packages" by making "the boat lighter" when the defendant's motive was just as likely to have been to "rid [   ] the boat of contraband."). Watkins was one of tens of thousands of protestors in Washington, D.C. on January 6, 2021. Watkins was outfitted with gear that unmistakably identified her as an individual who was exercising her First Amendment rights and more consistent with one who was there to render medical aid than riot. There were "obvious alternative motive[s]" for Watkins's conduct on January 6, 2021. First, Watkins's primary motive on January 6, 2021 was to attend a variety of events, namely President Trump's speech. Second, motive of Watkins was to provide security detail to the VIP speakers of the "Stop the Steal" events.. Third, Watkins could have been there to "have her voice heard". Fourth, she could have been present, and evidence was adduced to this effect, to render medical aid. These "motives"— especially in light of the stoppage of the certification process before Watkins entered Capitol grounds—were much more likely than a motive to "obstruct" or "impede" a recessed proceeding. See *Rosemond*, 572 U.S. at 76 ("a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission[,] [but] [a]n intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged[.]") (emphasis added).

The government's evidence, additionally, was not legally sufficient to show that Watkins acted "corruptly" within the meaning of § 1512(c)(2). Watkins did not use "unlawful means," (ECF 400, at 27), on January 6, 2021. Watkins committed no assaults against police, and never

encouraged anyone to do those acts. Likewise, Watkins did not act with an "improper purpose." *Id*. Watkins's actions were consistent with tens of thousands of protestors who came to the District to exercise their First Amendment rights. Simply put, the government failed to prove that Watkins acted "corruptly" in any shape or form on January 6, 2021.

### d. *Watkins did not "attempt" to obstruct the Electoral College certification.*

The government's closing argument, in fact, forecloses any notion that Watkins had a pre-plan to specifically obstruct the Electoral College. The government claimed that the breach into the Capitol was an "opportunity" that the *Rhodes* defendants "seized" upon. (Tr., 9906, 10,277). In other words, Watkins did not specifically plan to approach the Capitol; rather, according to the government, she "seized an opportunity" when others took it upon themselves to penetrate the Capitol Building. Accordingly, the government tacitly admitted that Watkins possessed no *mens rea* to stop the certification. Watkins's alleged substantial step, i.e., yelling "push" in the Senate hallway does not "unequivocally" corroborate a "criminal intent" to obstruct or impede the Electoral College certification. *Dworken*, 855 F.2d at 17. Watkins's actions were not "necessary to the consummation of the crime and [ ] of such a nature that a reasonable observer, viewing in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Nitschke*, 843 F. Supp 2d at 4.

There were no barriers blocking Watkins's way when she entered the Capitol grounds, which are typically open to the public. Moreover, the government adduced no testimony that Watkins's actions *actually* obstructed or impeded, or *could have* obstructed, the certification. What Watkins was allegedly "attempting," i.e., stopping the certification, was both legally and factually impossible because the proceeding had been evacuated and recessed. While

"impossibility" is not a defense to a criminal attempt when the defendant is *unaware* of the impossibility, e.g., attempting to solicit an FBI agent posing online as a minor, it is an airtight defense when the defendant *is* aware of the impossibility. How could Watkins specifically intend to "obstruct" or "impede" a proceeding that she knew was not proceeding because Members of Congress had already left the Capitol?

### 5. Defendant Caldwell

The government failed to adduce legally sufficient evidence that Caldwell violated 18 U.S.C. § 1512(c)(2) as charged in Count 3 of the Indictment.  The jury was instructed as to four theories of criminal liability upon which to convict Caldwell under Count 3:  1) that Caldwell actually obstructed the Electoral College certification; 2) *Pinkerton* co-conspirator liability; 3) that Caldwell "aided and abetted" others to obstruct the proceeding; or, 4) that Caldwell "attempted" to obstruct the proceeding.  (ECF 400, at 26) (jury instructions).  As outlined below, the government failed to meet its burden as to each theory of liability.[5]

> *a. Caldwell did not personally "obstruct" or "impede" the Electoral College certification.*

As a matter of law, Caldwell did not personally "obstruct" or "impede" Congress' certification of the Electoral College on January 6, 2021.  By stipulation, Members of Congress

---

[5] In addition to the arguments set forth in the instant filing, Caldwell asserts as grounds for granting judgment of acquittal as to Count 3 his legal arguments set forth in two prior motions to dismiss, which argued that 18 U.S.C. § 1512(c)(2) does not apply to scenarios that involve non-tangible evidence tampering and that the Electoral College certification is not an "official proceeding" under the statute.  *See United States v. Caldwell* (ECF Nos. 240, 350, 566 and 558) and *Rhodes* at (ECF No. 84, at 19-30 & ECF No. 176)).  Accordingly, because the government failed to adduce evidence that an "official proceeding" was taking place on January 6, 2021 and no evidence was presented that Caldwell targeted tangible objects for obstruction, Caldwell's motion for judgment of acquittal should be granted.

---

were ordered to be evacuated from the Capitol Building at 2:20 p.m.  Government's Exhibit 1500 included a "selfie" of Caldwell taken at 2:19 p.m. while he was standing by the Peace Fountain which, according to Capitol Police Captain Ortega, was unrestricted grounds on January 6, 2021. (Tr., 4028-29; Govt. Exh. 7026).  The government provided no testimony as to when Caldwell specifically entered restricted grounds, although a photo taken by Caldwell's cell phone placed him close to the Capitol steps at 2:38 p.m.  (Govt. Exh. 1500).

Government's Exhibit 1500 proved that Caldwell was not on restricted Capitol grounds at the time members of the public breached the inside of the Capitol Building and when Congress was evacuated.  The government, moreover, offered no proof that Caldwell's actions caused Congress's evacuation or recess.  Caldwell did not "obstruct" or "impede" the certification, which was already stopped by the time he entered restricted grounds.  Additionally, Captain Ortega and Parliamentarian Thomas Wickham, on cross-examination, agreed that the Electoral College certification would take "hours" to be restarted after the evacuation because of the breach of the Capitol; Captain Ortega also agreed that a police-involved shooting at 2:44 p.m., (Tr., 4058), inside the Capitol was a contributing factor to the "hours" delay.  (Tr., 4033-35, 4459-60).   It was impossible for Caldwell to "obstruct" or "impede" a proceeding that was *not* proceeding and would in fact, per the undisputed testimony, not be restarted for hours.[6]  Notably, the government's witnesses did not allege or proffer *that Caldwell's brief presence outside the Capitol delayed the*

---

[6] At 2:29 p.m., the House of Representatives recessed under Rule 12(b), an emergency provision of the House Rules.  (Tr., 4442-43).  A "recess," according to Parliamentarian Wickham, is "a temporary break in the proceedings" and "can last an indefinite time."  (Tr., 4442-43, 4457-58). Wickham testified that armed law enforcement was on the Senate floor after the recess until at least 3:08 p.m.  (Tr., 4449).  Special Agent Palian acknowledged that Caldwell was not on Capitol grounds at 3:05 p.m.  (Tr., 1649).

DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29          43

*restarting of the certification process.*

Government's Exhibit 1500 provided Caldwell a rock-solid alibi proving that he did not actually obstruct or impede the Electoral College certification.  Caldwell ascended one flight of stairs, exited to a temporary Inaugural balcony, and spent minutes on the balcony before exiting.[7] By 3:05 p.m. Caldwell, per Special Agent Palian's testimony, was not even on Capitol grounds, whereas armed law enforcement were still occupying the Senate floor at 3:08 p.m.  (Tr., 1649, 4449).  In short, the government provided no evidence that Caldwell personally obstructed or impeded a proceeding that was already stopped and where Members of Congress were in route, per an evacuation order, to an off-site relocation center during the brief time Caldwell was on Capitol grounds.[8]

   b.  *As Caldwell was acquitted of conspiracy, Pinkerton liability does not apply.*

A second theory upon which Caldwell was accused of violating 18 U.S.C. § 1512(c)(2) was *Pinkerton* co-conspirator liability.  (ECF 400, at 31).  Caldwell, however, was acquitted of all conspiracy counts, including Count 2, which charged him with Conspiracy to Obstruct an Official Proceeding.  Accordingly, Caldwell cannot be found guilty of the substantive offense of Obstruction of an Official Proceeding based upon a *Pinkerton* theory of liability.

---

[7] The government's case provided scant assistance vis-a-vis a timeline of Caldwell's whereabouts.  At 2:19 p.m., Caldwell was clearly on unrestricted grounds by the Peace Fountain. At 2:38 p.m., the government placed Caldwell on Capitol grounds approaching scaffolding.  The "Pelosi doorknob video" taken by Mrs. Caldwell is one minute and seventeen seconds in duration and starts at timestamp 2:51:56 p.m.  (Caldwell Exh. 87).  At the end of the video, Caldwell and his wife start the process of leaving the balcony.  Accordingly, the *government's case-in-chief* supported an inference that Caldwell was on the Inaugural balcony for only two to three minutes before he exited with his wife.

[8] Captain Ortega testified that Members of Congress were evacuated to a "relocation center." (Tr., 4025).  The location of this relocation center was not disclosed to the jury.

---

c. *Caldwell did not "aid and abet" the obstruction of the Electoral College certification.*

The government failed to adduce sufficient evidence that Caldwell "aided and abetted" the obstruction of the Electoral College certification .  (ECF 400, at 29-30).  The undisputed evidence is that Caldwell was physically situated on unrestricted grounds at the time members of Congress were evacuated.  The "emergency evacuation" that was "ordered" by the Capitol Police, (Tr., 4035), stopped the certification process without Caldwell's facilitation.  Additionally, as noted above, the stoppage of the certification would last for hours, not because of anything Caldwell did, but because of the breach of the Capitol Building by others and a police-involved shooting.

Accordingly, as the substantive crime of obstructing an official proceeding under 18 U.S.C. § 1512(c)(2) *was already completed* before Caldwell provably entered a restricted area of the Capitol grounds, he could not, as a matter of law, have aided and abetted that crime.  *See United States v. Ferraro*, 414 F.2d 802, 804 (5th Cir. 1969) ("A person cannot aid or abet a crime which has already been completed.").  A crime is "completed" when all of its elements have been performed unless the crime is explicitly characterized by Congress, or is by its very nature, a "continuing offense."[9]  *See, e.g., United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001) (holding that the crime of bank fraud is "completed upon the execution" of the fraud for purposes of the statute of limitations); *Ferraro*, 414 F.2d at 804 (holding that defendant did not aid and abet a bank employee who stole money:  "Whether she "embezzled," "abstracted" or "purloined" the money. . . her offense was complete when she walked out of the bank with the

---

[10] The Caldwells wore no military-style gear and were not performing any security functions on January 6, 2021.  Mrs. Caldwell was adorned in "Trump" campaign paraphernalia, and the couple was also carrying Trump and American flags.

money in her possession and met the [defendant] on the parking lot.").  Finally, "[a] defendant may not properly be convicted of aiding and abetting a crime that was completed before his accessorial acts were performed."  *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006).

The crime of obstructing the certification process was *de facto* completed by the perpetrators when Congress was ordered to be evacuated at 2:20 p.m. or, at the latest, at 2:29 p.m. when Congress recessed.  By 2:20 p.m., Congress had not only been "obstructed" and "impeded"--the proceeding had been stopped altogether and Members of Congress were enroute to a relocation center.  *See United States v. Delpit*, 94 F.3d 1134, 1150 (8th Cir. 1996) (reversing conviction for aiding and abetting the crime of causing another to travel interstate with intent to facilitate a murder pursuant to 18 U.S.C. § 1958(a); the crime was completed once the principal actually traveled interstate with the intent to commit murder, not a week later when the murder was committed).  The government adduced no evidence that Caldwell was on restricted grounds before 2:29 p.m. let alone evidence that he did anything that would have facilitated the obstruction of the certification process before Congress was evacuated or recessed.

The government's aiding and abetting theory also fails because no proof was adduced connecting Caldwell to a specific principal who caused the evacuation or recess of Congress, or who otherwise obstructed or impeded the certification:  "Aiding and abetting, as used in the statute, means to assist the perpetrator of a crime."  *White v. United States*, 366 F.2d 474, 476 (10th Cir. 1966).  The government failed to prove that Caldwell "aided *someone* in committing the crime."  *United States v. Yost*, 24 F.3d 99, 104 (10th Cir. 1994); *see also United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) ("One cannot aid or abet himself.").  To "convict a defendant of aiding and abetting the commission of a crime, the government must prove that the defendant associated with a criminal venture, participated in the venture, and sought by his

action to make the venture succeed." *United States v. Silvas*, No. 92-5586, 1993 U.S. App. LEXIS 39625, at *19 (5th Cir. 1993). A conviction for aiding and abetting cannot, however, be based upon a defendant's "inadvertent assistance" to others. *United States v. Ortega*, 44 F.3d 505, 507 (7th Cir. 1995).

The jury acquitted Caldwell in relation to the alleged Oath Keepers "criminal venture." The government's case, accordingly, did not identify a principal that Caldwell *specifically* assisted in obstructing or impeding the certification. Although the principal can be anonymous, the government still has to identify *a perpetrator* of the substantive crime who Caldwell *specifically assisted* as part of a "criminal venture" on January 6, 2021. The government produced no video or witnesses to show or describe Caldwell's actions between 2:19 p.m. and 2:38 p.m. The infamous "Pelosi doorknob video" shows Caldwell saying "USA, USA," but interacting with *nobody* except his wife before encouraging her to exit the balcony with him. *See United States v. Camacho*, 233 F.3d 1308, 1317 (11th Cir. 2000) (to prove aiding and abetting, the government must demonstrate that "the defendant committed an act which contributed to and furthered the offense[.]"). The "doorknob" video shows no "concert of purpose" by Caldwell with a principal to obstruct the certification process. *See United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938).

The government adduced no evidence that Caldwell "actively participate[d] in a criminal scheme knowing its extent and character[.]" *Rosemond v. United States*, 572 U.S. 65, 77 (2014). Additionally, "[i]t is well settled that mere presence at the scene of a crime and awareness that a crime is being committed is insufficient to support a conviction for aiding and abetting." *United States v. Salamanca*, 990 F.2d 629, 638 (D.C. Cir. 1993); *see also United States v. Garguilo,* 310 F.2d 249, 253 (2d Cir. 1962) (a defendant's presence at the scene of the crime may be sufficient

to support a conviction for aiding and abetting *only* if his presence "proved to have positively encouraged the perpetrator himself.").  As the Maryland Court of Appeals observed in reversing an aiding and abetting conviction where the defendant stood by as a 3-month old baby was brutally murdered:

The evidence certainly showed that Pope "witnessed a terrible event" and that she "stood by" while the mother killed the child. But the culpability for her conduct during the abuse of the child *must be determined strictly within the law or else the basic tenets of our system of justice are prostituted*. There is an understandable feeling of outrage at what occurred . . . *[b]ut it is the law, not indignation, which governs*.  *Pope v. State*, 284 Md. 309, 333 (1979) (emphasis added).

The government also failed to meet its burden of proof as to aiding and abetting because the evidence, in relation to Caldwell, supported "an obvious alternative motive for [his] behavior." *See United States v. Williams*, 865 F.3d 1328, 1347 (11th Cir. 2017) (finding evidence insufficient to convict defendant of aiding and abetting a boat operator's attempt to "evade the Coast Guard by jettisoning packages" by making "the boat lighter" when the defendant's motive was just as likely to have been to "rid […] the boat of contraband.").  Caldwell was one of tens of thousands of protestors in Washington, D.C. on January 6, 2021.  Caldwell and his wife were outfitted with gear that unmistakably identified themselves as individuals who were exercising their First Amendment rights.[10]  There were "obvious alternative motive[s]" for Caldwell's conduct on January 6, 2021. First, as there were no barriers blocking access at the time of his arrival to the Peace Fountain, (Tr., 4813; Caldwell Exh. 80), Caldwell's motive could have been--under the belief that his

---

[10] The Caldwells wore no military-style gear and were not performing any security functions on January 6, 2021.  Mrs. Caldwell was adorned in "Trump" campaign paraphernalia, and the couple was also carrying Trump and American flags.

conduct was legal--to simply walk on Capitol grounds that are "typically" open to the public.  (Tr., 4029).  Second, Caldwell's motive could have been to "vent" his frustration at Congress.  Third, Caldwell may have simply wanted to have his "voice heard."  Fourth, Caldwell may have just followed the crowd with no particular purpose in mind.  All of these "motives"—especially in light of the stoppage of the certification process before Caldwell entered Capitol grounds—were much more likely than a motive to "obstruct" or "impede" a recessed proceeding.  *See Rosemond*, 572 U.S. at 76 ("a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission[,] [but] [a]n *intent to advance some different or lesser offense* is not, or at least not usually, sufficient: Instead, the intent must go to *the specific and entire crime charged*[.]") (emphasis added).

The government's evidence, additionally, was not legally sufficient to show that Caldwell acted "corruptly" within the meaning of § 1512(c)(2).  Caldwell did not use "unlawful means," (ECF 400, at 27), on January 6, 2021.  Caldwell committed no assaults against police, never attempted to enter the Capitol, and never encouraged anyone to do those acts.  Likewise, Caldwell did not act with an "improper purpose."  *Id*.  Caldwell's actions were consistent with tens of thousands of protestors who came to the District to exercise their First Amendment rights.  Simply put, the government failed to prove that Caldwell acted "corruptly" in any shape or form on January 6, 2021.

Accordingly, the government failed to meet its burden of proof that Caldwell aided and abetted the commission of Obstruction of an Official Proceeding.

### d.  Caldwell did not "attempt" to obstruct the Electoral College certification.

The government's case-in-chief adduced insufficient evidence to support an "attempt" to obstruct the Electoral College certification conviction.  Per Caldwell Exhibit 80, introduced during

Special Agent Whitney Drew's testimony, the police presence and barriers blocking access to the walkway leading from the Peace Fountain to the Capitol steps had been thoroughly vanquished by 12:57 p.m., sixteen minutes before Caldwell arrived at the Peace Fountain.[11]  (Tr., 4812-13). Captain Ortega testified that the restricted grounds upon which Caldwell traversed are typically open to the public and that individuals who walk up the Capitol steps are ordinarily met by an officer who directs them to a public entrance to the Capitol.  (Tr., 4029).

To constitute a criminal "attempt," the government must adduce proof of two elements: (1) an intent to engage in criminal conduct and (2) conduct constituting a "substantial step" toward the commission of the substantive offense *that strongly corroborates the criminal intent.*  If the substantial steps *are themselves the sole proof of the criminal intent*, then those steps *unequivocally must evidence such an intent; that is, it must be clear that there was a criminal design and that the intent was not to commit some non-criminal act.  United States v. Dworken*, 855 F.2d 12, 17 (1st Cir. 1988) (emphasis added); *accord United States v. Hite*, 769 F.3d 1154, 1164 (D.C. Cir. 2014).  As Judge Boasberg summarized:  The act in furtherance is often described as a "substantial step" that demonstrates "a true commitment toward completing the crime" and that "the crime will take place unless interrupted by independent circumstances." *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010) (internal quotations omitted). "[The substantial step] must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *United States v.*

---

[11] Special Agent Drew could not testify as to what time Caldwell arrived at the Peace Fountain. (Tr., 4813).  However, Govt.'s Exhibit 1500 *depicted an expanding orange line* showing that Caldwell and his wife arrived at the Peace Fountain at 1:13 p.m.  *See* (Govt.'s Exh. 1500).

---

*Bailey*, 228 F.3d 637, 640 (6th Cir. 2000) (internal citation omitted).

*United States v. Nitschke*, 843 F. Supp. 2d 4, 10 (D.D.C. 2011).  The government's evidence doesn't come close to showing that Caldwell harbored an "unequivocal" or "true commitment" to specifically (and corruptly) obstruct or impede the Electoral College certification.The government's closing argument, in fact, forecloses any notion that Caldwell had a pre-plan to specifically obstruct the Electoral College.  The government claimed that the breach into the Capitol was an "opportunity" that the *Rhodes* defendants "seized" upon.  (Tr., 9906, 10,277).  In other words, Caldwell did not specifically plan to approach the Capitol; rather, according to the government, he "seized an opportunity" when others took it upon themselves to penetrate the Capitol Building.  Accordingly, the government, at least up until Caldwell's arrival at the Peace Fountain, tacitly admitted that Caldwell possessed no *mens rea* to stop the certification.  Caldwell's alleged substantial step, i.e., walking on Capitol grounds, up a flight of stairs, and saying "USA, USA," does not "unequivocally" corroborate a "criminal intent" to obstruct or impede the Electoral College certification.  *Dworken*, 855 F.2d at 17.  Caldwell's actions were not "necessary to the consummation of the crime and […] of such a nature that a reasonable observer, viewing in context, could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute."  *Nitschke*, 843 F. Supp 2d at 4.

Caldwell was towards the back of a crowd that made its way onto Capitol grounds.  There were no barriers blocking Caldwell's way when he entered the Capitol grounds, which are typically open to the public.  Special Agent Palian testified that Caldwell neither entered the Capitol nor damaged any property on Capitol grounds.  (Tr., 1648-49).  Caldwell, in fact, voluntarily exited the Inaugural balcony after only a few minutes.  Moreover, the government adduced no testimony that Caldwell's actions *actually* obstructed or impeded, or *could have* obstructed, the certification.

What Caldwell was allegedly "attempting," i.e., stopping the certification, was both legally and factually impossible because the proceeding had been evacuated and recessed. While "impossibility" is not a defense to a criminal attempt when the defendant is *unaware* of the impossibility, e.g., attempting to solicit an FBI agent posing online as a minor, it is an airtight defense when the defendant *is* aware of the impossibility. How could Caldwell specifically intend to "obstruct" or "impede" a proceeding that he knew—as demonstrated by the "Pelosi doorknob video"--was not proceeding because Members of Congress had already left the Capitol?[12]

Accordingly, for the reasons stated *supra*, Caldwell did not, as a matter of law, "attempt" to obstruct or impede the certification process.

### e. The government cannot rely on Caldwell's uncorroborated messages.

To the extent that the government relies on messages that Caldwell made subsequent to the events at the Capitol on January 6, 2021 in support of upholding the § 1512(c)(2) conviction, such reliance is misplaced as Caldwell's statements were not corroborated. The D.C. Circuit has ruled that "a conviction cannot rest on a defendant's out-of-court statement made *subsequent* to the crime, whether exculpatory or inculpatory, unless the government produces *substantial independent evidence* which would tend to establish the trustworthiness of the statement." *United States v. Dickerson*, 163 F.3d 639, 641 (D.C. Cir. 1999) (emphasis added) (citing *Opper v. United States*, 348 U.S. 84, 92-93 (1954)). Rather than adducing "substantial independent evidence . . . establish[ing] the trustworthiness" of Caldwell's messages, the government specifically *questioned* the trustworthiness of Caldwell's messages before the jury.

In redirect examination of Special Agent Palian, the government expressly blamed

---

[12] In the "doorknob" video, Mrs. Caldwell is heard saying that "Congress has left" the Capitol because they were "p------." (Caldwell Exh. 87).

Caldwell's fantastical messages to explain why the FBI mistakenly believed that Caldwell had:  1) entered the Capitol Building,[13] (Tr., 1850-51, 1859); 2); led the Oath Keepers stack in breaching the Capitol on January 6, 2021,[14] (Tr., 1857); 3) actively searched for Members of Congress in tunnels on January 6, 2021,[15] (Tr., 1859-60); 4) received instructions on how to track down Members of Congress from the outside, (*id*.); and 5) why the FBI  believed that Caldwell posed a specific danger to the public,[16] (Tr., 1866), justifying an FBI raid of Caldwell's farm for which

---

[13] Palian testified that Caldwell's Facebook records contained "statements made by Mr. Caldwell that gave [me] the impression that he was inside the [Capitol] building[.]"  (Tr., 1850).

[14] Palian testified:

> Q. In the next message . . . what did Mr. Caldwell say at 2:48 p.m.?
> A. At 2:48 p.m., "We are surging forward. Doors breached."
> Q. Had you read this message before you applied for a warrant for Mr. Caldwell's arrest?
> A. Yes, and at that time, *we also know that the Oath Keepers Stack 1 had breached those doors at 2:40 p.m.*

(Tr., 1857) (emphasis added).

[15] Palian testified:

> Q. Turning to the next message, message 55, did somebody say, "Tom, all legislators are down in the tunnels, 3 floors down"?
> A. Yes, this caused us to believe that Mr. Caldwell was receiving instructions from the outside while he was inside the Capitol.

(Tr. 1859-60).

[16] Palian testified:

> Q And did . . . these messages that you found, inform at all your understanding of any threat that might be posed by Defendant Caldwell?
> A Yeah, we thought there was a significant threat *at the time*.

(Tr., 1866) (emphasis added).

---

DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29                53

"predication" was based upon false assumptions.[17]  On cross-examination, Palian bluntly testified that Caldwell was not "truthful" in his messages.[18]  (Tr., 1648-49).

In short, instead of corroborating the trustworthiness of Caldwell's post- January 6, 2021 messages, the government's case sent a clear message to the jury:  Caldwell's messages cannot be trusted.  Additionally, the content of Caldwell's messages was clearly at odds with video and photographic evidence presented by the government.  Caldwell did not plant a flag on the Capitol steps as he mused in a message, (Govt. Exh. 2001.T.1); Caldwell, in fact, was at the Peace Fountain at 2:11 p.m. when this message was sent.  *See* (Govt. Exh. 1500).  Caldwell did not "take the damn Capitol," (Govt. Exh. 2001.T.1), as he boasted in a subsequent message; there were throngs of people between Caldwell and the Capitol at the time this message was sent.

## C.  Conspiracy to Prevent Members of Congress from Discharging Their Duties (Count 4)

Defendants Meggs, Harrelson and Watkins were convicted of Conspiracy to Prevent Members of Congress from Discharging their Duties.  As charged, the elements of the offenses could require proof of a fact the other does not.  As found, the offenses do not require proof of a different fact.

---

[17] Palian testified that the FBI investigation into Caldwell was "predicated" on the Bureau's mistaken belief that Caldwell held a "leadership role" within the Oath Keepers and that he "stormed inside the Capitol" on January 6, 2021.  (Tr., 1629-31).

[18] Palian testified:

Q. But you can confirm that the words in Mr. Caldwell's messages didn't match up with his actions that day; is that correct?

A. No, Mr. Caldwell doesn't seem to have been truthful; that's correct.

(Tr., 1648-49).

In *Blockburger v. United States*, 284 U.S. 299 (1932), the Supreme Court outlined the test to determine whether the same act or transaction constitutes a violation of two distinct statutory provisions. "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id*. at 304.

The elements of Count two are: "First, that the defendant conspired or agreed with at least one other person with the goal of committing the crime of obstructing an official proceeding. Second, that the defendant joined or entered into that agreement with awareness of its unlawful goal." [ECF 400, at 25].

The elements of Count Four are: "First, that the defendant agreed with at least one other person to, by force, intimidation, or threat, (1) prevent a Member of Congress from discharging a duty as a Member of Congress, or (2) induce a Member of Congress to leave the place where the member of Congress's duties are required to be performed. Second, that the defendant knew of the agreement and willfully joined the agreement." [ECF 400, at 32].

The findings of the jury eliminated proof of a different fact when they determined the defendant's guilt based on a theory of liability that the defendants prevented Congress from discharging their duty and not inducing a member of Congress to leave the place where the member of Congress' duties are required to be performed. he definitions are the same regarding Congress' duty in each Count and thus fall prey to a *Blockburger* analysis as <u>found</u>. Accordingly, the elements of the offenses do not require proof of a separate fact or element.

Consequently, the analysis for Count Four is the same as articulated *supra* regarding Count Two and will not be re-stated herein for purposes of brevity.

---

DEFENDANTS' JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29        55

### D.  Obstructing Officers During a Civil Disorder (Count 6)

The essential elements of the charge of interference with officers during a civil disorder include proving beyond a reasonable doubt that the defendant knowingly committed an act; in committing that act, the defendant intended to obstruct, impede, or interfere with one or more law enforcement officers; at the time of the defendant's actual act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder; and the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. (Jury Instructions, ECF 400) (*See also United States v. Bingert*, 2022 U.S. Dist. LEXIS 83790 (D.D.C. May 25, 2022). Here no reasonable juror could have found the government provided sufficient evidence that Defendant Watkins committed the offense of obstructing officers during a civil disorder beyond a reasonable doubt at the close of the government's case in chief.

The government relied on public source footage of Watkins shouting "push. . . they can't hold us."  The government, however, failed to provide evidence of *who* Watkins was referencing when she stated "they"; there government provided no evidence that Watkins was referencing the police. 18 U.S.C. § 231(a)(3) requires the defendant act with obstructive intent, meaning the defendant need act with specific intent to obstruct a law enforcement officer. *McHugh*, 2022 U.S. Dist. LEXIS 18138, 2022 WL 296304, at *14 (*citing Nat'l Mobilization Comm. to End War in Vietnam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) and *United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971). Watkins could not see the end of the Senate Hallway and therefore lacked the requisite knowledge of identity of the entity providing resistance. "They" could have been a reference to an object physically blocking the hallway or other individuals participating in the

push; there is no evidence denoting "they" was an explicit reference to law enforcement. Without this knowledge, Watkins consequently lacked the requisite specific intent; it was not shown she knew the entity resisting the "push" was law enforcement as opposed to other persons in the Capitol and therefore could not have intended to obstruct, impede, or interfere with one or more law enforcement officers.

## E.  Tampering with Documents or Proceedings (Counts 7-10)

The jury convicted Defendants Rhodes, Meggs, Harrelson, and Caldwell of Tampering with Documents or Proceedings pursuant to 18 U.S.C. § 1512(c)(1) Counts 7-10).  To sustain a conviction under § 1512(c)(1), the government was required to prove:

> First, the defendant altered, destroyed, mutilated, or concealed a record, document, or other object;
> Second, the defendant acted knowingly;
> Third, the defendant acted corruptly; and
> Fourth, the defendant acted with intent to impair the object's integrity or availability for use in an official proceeding.

### a.  The Grand Jury Proceeding was not Foreseen.

With respect to each of the charged defendants, the government failed to prove a "nexus" as between their conduct and the Grand Jury's investigation.  Specifically, the "official proceeding" the government alleges was affected by the defendants' alleged actions was a grand jury empaneled on or about January 8, 2021.  Gov. Exh. 3012.  Other than the stipulation, however, there was no evidence of the defendants' actual knowledge of the official proceeding. Accordingly, the instant case is distinguishable from other § 1512 cases wherein defendants had actual knowledge of grand jury proceedings or investigations targeted at them.  *See, e.g.*, *United States v. Pugh*, 937 F.3d 108, 121 (2d Cir. 2019) ("[W]e have found the nexus requirement satisfied where a grand jury proceeding was 'foreseeable' because the defendant was aware that he was the

---

target of an investigation."); *United States v. Black*, 530 F.3d 596, 603 (7th Cir. 2008) ("There was evidence that Black knew that the alleged frauds were being investigated by a grand jury and by the SEC."); *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014) ("Simpson admitted that he deleted the emails after learning about the executed search warrants."); *United States v. Persico*, 645 F.3d 85, 108 (2d Cir. 2011) ("In sum, the evidence was sufficient for the jury to find that Persico had been informed by the government that he was the target of an investigation into the disappearance of Cutolo; [and,] that a grand jury proceeding on that matter was thus foreseeable to Persico and DeRoss[.]").

To violate § 1512(c)(1), "[a] proceeding must at least be 'foreseen,' such that the defendant has in contemplation *some particular official proceeding* in which the destroyed evidence might be material." *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014) (emphasis added); *accord United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015). The government must show that the defendants intended "actions were likely to affect a[n] [official] proceeding" to prove beyond a reasonable doubt that he "had the requisite intent to obstruct." *United States v. Friske*, 640 F.3d 1288, 1293 (11th Cir. 2011). The government's argument as to these defendants' alleged unlawful intent is circular, i.e., because the government believes the defendants engaged in felonies on January 6, therefore, their actions in relation to Facebook must have been motivated to cover up his felonious conduct. In reality, any person in the defendants' shoes would not reasonably believe that felony charges—which are the subject of grand jury proceedings—would be lodged against him. In reality, the evidence as against these defendants would not give rise to the assumption that they should anticipate being charged with a crime or, at most, being charged with anything more than misdemeanor trespassing, which would not be the subject of a grand jury proceeding. In short, there was insufficient evidence that these defendants foresaw a grand jury proceeding into

---

their conduct or that their actions would likely affect such a proceeding.

2.  Meggs  and Harrelson (Counts 8 and 9)

As the government has acknowledged, the *only* evidence of Defendants Meggs and Harrelson having "deleted" any messages from their phones is the fact that following their arrest, there were messages missing from their phones during the period relevant to the Indictment and a text exchange as between Defendants Meggs and Harrelson regarding cleaning out messages in our chats.  *See* Gov. Opp. Rule 29 at 33 (Nov. 3, 2022) (ECF No. 383).  Importantly, however, the government presented no evidence that any forensic analysis was done of Defendant Meggs and Harrelson's phone for the purpose of determining whether any messages were "deleted" from their phones or whether they were removed from the phones through some other non-nefarious means.

For example, there was testimony at trial that Signal permitted the automatic deletion of messages – a setting that if enabled before any grand jury had been empaneled, setting aside the issue of whether Defendants Meggs and Harrelson could have known that fact, would have led to the "disappearance" of the messages in question.  Or the messages could have been removed from Defendants Meggs's and Harrelson's phones by virtue of their having exited the chats in question.  As Defense Exhibit KM-79 makes clear, it is undisputed that Defendant Meggs exited various chats the government deemed significant prior to the date the grand jury was empaneled.

Perhaps most importantly, when FBI Special Agent Moore was asked about whether the purportedly missing messages were missing prior to a certain time in January – a fact of significance based on the allegation messages relevant to conduct at issue in this case were deleted, Special Agent Moore *could not recall*.  Tr. at 6567:6-16.

Finally, even were the messages exchanged as between Defendants Meggs and Harrelson sufficient for a reasonable juror to conclude that *someone* had deleted messages that could have

been used in the grand jury proceedings, the messages *at most* establish only that Defendant Harrelson took any action such that there is no evidence of Defendant Meggs doing anything to his phone at all.

3. Caldwell (Count 10/13)

    a. *The government failed to prove that Caldwell tampered with evidence as specifically outlined in the Indictment.*

Contrary to the government's suggestion in opening argument, (Tr., 1125), and at other portions of the trial, Caldwell was *not* charged by the Grand Jury *with unsending 180 Facebook messages*. As the Court ruled in relation to jury instructions, Caldwell was charged with unsending *one* message, which allegedly contained a "video," and "deleting" an unspecified number of "photographs" from his Facebook account that documented "his participation in the attack on the Capitol on January 6, 2021." (ECF 400, at 40) (jury instructions).

    b. *"Unsending" is not the same as "deleting."*

In relation to Facebook, the actions of "unsending" and "deleting" are notably different. In Count 13, the Grand Jury clearly distinguished between the "unsent" video and the "deleted" photographs. The government, in fact, *stressed this distinction* between "unsending" and "deleting" items from Facebook during its direct examination of Meta, Inc. records custodian Tyler Harmon, who testified at length as to the difference between the two actions. According to Harmon, when a Facebook user unsends a message, that message is permanently erased from the sender's *and* recipient's Facebook accounts and *all* Facebook records, although a record is kept noting the "action" of unsending. (Tr., 6181-85). By contrast, a Facebook user cannot "delete" an isolated message; instead, according to Harmon, to "delete" a single message from Facebook requires that the user "delete" *the entire conversation thread*, including all the messages contained

---

therein. (Tr., 6183). A deleted thread, moreover, unlike an unsent message, is not deleted from the *recipient's* Facebook records. The difference between "unsent" and "delete" vis-à-vis Facebook and the use of those terms in the Indictment is substantial. Caldwell cannot be convicted of evidence tampering based upon allegations not specified in the Indictment. *See Stirone v. United States*, 361 U.S. 212, 217 (1960) (reaffirming "the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.").

Both the government and defense agree that Caldwell's Facebook records show that 180 total Facebook messages were "unsent," of which 5 messages relate directly to the alleged unsent "video," which were recovered from Crowl's cell phone.[19] These 5 unsent messages were originally contained within a 30-page Facebook conversation thread, which was "deleted," between Caldwell and Crowl (hereinafter "the Caldwell-Crowl thread"). Both sides also agree that the other 175 unsent messages were from other conversation threads in Caldwell's records. *See* ECF 383, at 32, 53 (Govt.'s Opp. to MJOA).

    *c.  The government tacitly conceded that it can't prove the contents of 175 messages.*

Ironically, in its Opposition to Defendants' Motions for Judgments of Acquittal, the government *tacitly admitted* that it was speculating in regards to the content of the 175 unsent messages that have not been recovered by law enforcement:

> Meanwhile, on January 14, as Watkins and Crowl were on their way to hide at his home, Caldwell "unsent" and deleted over 175 messages from his Facebook account that, based on the timing and context, ***likely*** referenced his role in the conspiracy.

(ECF 383, at 32) (emphasis added). The government's entire argument in opposing Caldwell's

---

[19] These 5 unsent messages were the only unsent messages that law enforcement recovered. They were recovered from Crowl's phone.

Rule 29 motion as to Count 13, in fact, centered exclusively upon alleged tampering with *text-type* messages--not *photographs* as charged in the Indictment.  *Id*. at 32 ("Finally, the evidence . . . established that Caldwell deleted over 175 messages on his Facebook account, including messages he had sent to co-conspirators like Donovan Crowl in which *he discussed their actions* on January 6, 2021.") (emphasis added).

Again, Caldwell was charged by the Grand Jury with 1) *deletion* of; 2) *photographs*; 3) that *specifically depicted* his "participation in the attack on the Capitol."  The government's educated guess ("likely") that the 175 "unsent" messages "discussed" a conspiracy is the polar opposite of legally sufficient proof that Caldwell *definitively* withheld *photographs* from the Grand Jury by *deleting* them.  *Caldwell was not charged by the Grand Jury with "unsending" the 175 identified Facebook messages*.  Even if Caldwell was so charged, identifying the contents of the 175 unrecovered, unsent messages is abject speculation.  Did they contain text-type messages?  Memes?  News articles?  Videos?  Wedding photos?  Non-germane January 6, 2021 photos?  Or photographs depicting Caldwell's alleged "participation in the attack on the Capitol on January 6, 2021"?[20]  Special Agent Palian, Meta custodian Harmon, and Special Agent John Moore testified that the content of the unsent messages is "unknown."  (Tr., 1862, 6191, 6725).  Accordingly, the 175 unsent messages cannot be the basis for convicting Caldwell regarding deleted January 6, 2021 photographs.

    *d.   There are only 11 photos at issue.*

---

[20] Respectfully, Caldwell did not participate in an "attack on the Capitol"; hence, it was also impossible for the government to prove beyond a reasonable doubt that Caldwell destroyed photos related to something he did not do.  The language in the Grand Jury indictment, which did not change over twenty months, was likely based upon the government's earliest claims that Caldwell stormed the Capitol.

---

The only evidence that the government adduced regarding the *deletion* of *photographs* was Caldwell allegedly deleting *the entire 30-page Facebook Messenger thread* between himself and Crowl, i.e., the Caldwell-Crowl thread, (Govt.'s Exh. 2002.T.61), which contained 11 January 6, 2021-related photos.  *Id*. at 69-79.  This evidence, however, failed to establish a *prima facie* case of violating § 1512(c)(1) because to "delete" the 11 photographs contained within the Caldwell-Crowl thread, Caldwell had to delete *the entire 30-page thread*.  Accordingly, the government failed to prove that Caldwell *intentionally targeted* the photographs *within* the 30-page Caldwell-Crowl thread for deletion.  In other words, it is impossible to know whether Caldwell desired to delete from the Caldwell-Crowl thread one written message, ten written messages, one non-incriminating photo, the entire thread, or the January 6, 2021 photos alleged in the Indictment.  To carry forward any of these "intentions" required Caldwell to make one "swipe" on his phone, which resulted in automatic "deletion" of *every* message within the 30-page Caldwell-Crowl thread.  "Deletion" in relation to a Facebook thread is an all-or-nothing action, making it impossible for a finder-of-fact, absent direct evidence, to determine Caldwell's intent.

Within the 30-page deleted Caldwell-Crowl thread--wherein the 11 January 6, 2021-related photos were located— are multiple messages and posts that clearly have nothing to do with January 6, 2021. (Govt. Exh. 2002.T.61).  For example, two detailed messages describe a January 10, 2021 emergency room visit regarding Caldwell's wife, Sharon.  *Id*. at 88-89.  The Caldwell-Crowl thread also includes multiple posts of news articles and the Facebook re-posts of others not connected to the instant Indictment.  *Id*. at 61-64.  Other messages detail a particular password that Caldwell was sending to Crowl.  *Id*. at 91.  Six pages contain messages that were originally sent *before* January 6, 2021.  *Id*. at 61-67.  There are also dozens of non-photographic messages related to January 6, 2021 activities.  To claim that Caldwell's specific intent in deleting the entire 30-

page Caldwell-Crowl thread was to target 11 photographs is speculation on steroids.  Ironically, by "deleting" the entire Caldwell-Crowl thread instead of taking a narrowly-tailored action like unsending the 11 photographs therein, which would have erased the photos from *all* Facebook records, Caldwell actually *preserved* the 11 photographs in Crowl's Facebook records.  Why didn't Caldwell simply unsend the 11 photos within the Caldwell-Crowl thread—which would have permanently deleted the photos from *all* Facebook records instead of just Caldwell's--if his intent was to hide them from the Grand Jury?[21]

> *e.  The government did not prove that Caldwell is the person who "deleted."*

Absent a confession or other direct evidence, it was impossible for the government to meet its evidentiary burden to find that Caldwell specifically targeted 11 photos for deletion within 30 pages of Facebook records.  Similarly problematic, the government's case-in-chief adduced legally insufficient evidence to prove that Caldwell was actually the person who "deleted" the Caldwell-Crowl thread.  The government produced no eyewitness testimony, confession, or admission definitively showing that Caldwell deleted the Caldwell-Crowl thread.  Legally sufficient proof that Caldwell deleted the Caldwell-Crowl thread requires more than motive and opportunity.  *See State v. Schmitz*, 2005 Ohio App. LEXIS *5939 (Ohio Ct. App. 2005) (finding insufficient evidence that child pornography defendant deleted photographs:  "No additional direct or circumstantial evidence linked defendant to the deletion process besides a theoretical motive and opportunity. Motive and opportunity, without more, do not prove an act.").

---

[21] In fact, the unsent "video"—which turned out to be a link to a news site—was contained within the Caldwell-Crowl thread.  That Caldwell unsent this link, but not the January 6, 2021 photographs contained in the same thread, further proves that he did not intend to hide the photos from the Grand Jury.

---

f.  *The government failed to prove Caldwell's unlawful intent as to both tampering allegations.*

The government's case-in-chief failed to adduce legally sufficient evidence that Caldwell specifically intended to withhold evidence from the Grand Jury.  First, no evidence was adduced that the Grand Jury proceeding looking into January 6, 2021 was a matter of public knowledge.  Second, no evidence was adduced that Caldwell was put on actual notice of the Grand Jury proceeding.  Third, no evidence was adduced that Caldwell, Watkins, or Crowl were publicly named as subjects of an FBI or grand jury investigation as of January 14, 2021.  Fourth, no evidence was adduced that law enforcement or prosecutors took steps that would have alerted Caldwell that he was the potential subject of Grand Jury proceedings.  Fifth, Watkins and Crowl were not arrested until three days *after* Caldwell allegedly tampered with the video and photographs specified in the Indictment.  Sixth, the evidentiary record showed that Caldwell did not delete, unsend, or otherwise dispose of potential evidence *after* he became aware that Watkins and Crowl were charged.  Seventh, Caldwell was not a participant in the Oath Keepers Signal chats wherein message deletion was encouraged.  Eighth, Caldwell did not confess or make inculpatory statements to third parties in relation to specifically intending to engage in evidence tampering.  The government, in short, did not produce one piece of direct evidence proving that Caldwell was on actual or constructive notice of a particular proceeding or that he intended to impair the availability of evidence from the Grand Jury.

Without direct evidence, the government relies entirely on circumstantial evidence as to Caldwell's intent.  While "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction[,] . . . mere suspicion or speculation cannot be the basis for creation of logical inferences."  *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986).  The

government placed great weight on Caldwell's alleged tampering taking place while Watkins and Crowl were driving to his farm.  However, this coincidence does not establish legally sufficient proof beyond a reasonable doubt as to Caldwell's intent vis-à-vis Facebook.  In fact, when *all* of the circumstantial evidence is considered, even in the light most favorable to the prosecution, the government did not come close to meeting its burden.

There are multiple innocent explanations for why Caldwell would delete the Caldwell-Crowl thread.  First, Caldwell may have desired to "clean up" his phone by deleting chats. Second, Caldwell's intent may have been to delete certain messages in the thread (e.g., his wife's medical condition) but, by deleting some, he automatically deleted all of the messages, including January 6, 2021 photographs.  Third, the deletion could have been accidental.  Fourth, someone other than Caldwell could have deleted the thread from his phone or computer.  Fifth, Caldwell may have decided he just didn't need the thread any more.  Sixth, Caldwell and Crowl may have decided to text one another instead of using Facebook, so the thread was no longer necessary.  Seventh, Caldwell may have decided to cut ties with Crowl for reasons that had nothing to do with a grand jury investigation.  In short, the government's circumstantial case does not compel a legally sufficient basis to find Caldwell guilty beyond a reasonable doubt.

*g.  A "link" is not a "video."*

The Grand Jury specifically charged in Count 13 that Caldwell unsent a "video" and then subsequently unsent the message containing the video. (ECF No. 1).  Contrary to the government's assertion during closing argument, the Grand Jury accused Caldwell of tampering with a video—not a message.  For example, if Person A instructs Person B to burn the envelope containing an incriminating VHS tape, the subject of the evidence tampering, i.e., the thing made unavailable to the Grand Jury, is the VHS tape, not the conduit wherein the evidence resides.  The undisputed

evidence presented in the government's case was that Caldwell unsent a "link," not a "video."  A link or "hyperlink" is "an electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or a different document."[22] Like sand and steel, a hyperlink and a video are not the same things.  *See Stirone v. United States*, 361 U.S. 212, 217 (1960).  The undisputed evidence showed that the government did not know the specific content of the unsent message until 20-plus months after Caldwell was charged and at least one month after the instant *Rhodes* Indictment was returned.  (Tr., 6729).  A pitfall of indicting before investigating is that innocent people can get charged with crimes they did not commit, such as tampering with a non-existent video.  Caldwell should be acquitted by the Court because the government's evidence (a "link") did not prove the allegation in the Indictment (a "video").

> *h.  A hyperlink is not a record, document, or object.*

To violate Section 1512(c)(1), Caldwell had to tamper with a "record, "document," or other "object."  A hyperlink is not a record, document, or object within the meaning of § 1512(c)(1).  A "record" is "an official written document that gives proof of something or tells about past events."[23]  A "document" is "an official paper that gives information about something or that is used as proof of something."[24]   An "object" is "a thing that you can see and touch and that is not alive."[25]  A hyperlink is certainly not a "document" or "record."  And as you cannot "see *and*

---

[22] MERRIAM WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/hyperlink.

[23] THE BRITANICA DICTIONARY ONLINE, https://www.britannica.com/dictionary/record

[24] THE BRITANICA DICTIONARY ONLINE, https://www.britannica.com/dictionary/document

[25] THE BRITANICA DICTIONARY ONLINE, https://www.britannica.com/dictionary/object

touch" a hyperlink, it is not an "object." Accordingly, the government failed to prove that Caldwell tampered with any items listed in § 1512(c)(1).

    *i.  Unsending a hyperlink to an open source news segment is not evidence tampering.*

To violate § 1512(c)(1), a defendant must "alter, destroy, mutilate, or conceal" evidence with "the intent to impair [its]. . . availability for use in an official proceeding." A hyperlink to an "open source" news segment is, as confirmed by Special Agent Moore, "available" to the entire world, including the FBI and Grand Jury. (Tr., 6716, 6725). The hyperlinked News2Share footage did not even feature Caldwell. Additionally, the undisputed evidence is that Caldwell texted the same link to Crowl minutes later at the latter's request and never deleted the text from his phone. It is speculation that Caldwell's intent was to make "unavailable" to the Grand Jury an open-sourced news segment that did not feature him or his wife and which he retained a copy of on his phone in a text chat with Crowl.[26] (Tr., 6775).

    *j.  Evidence introduced in Caldwell's case buttresses his request for MJOA.*

Undisputed evidence presented in Caldwell's case-in-chief should further compel the Court to grant judgement of acquittal as to Count 13. First, Caldwell Exhibits 64-68 included screenshots of Caldwell's cell phone, which the FBI has continually possessed since Caldwell's arrest on January 19, 2021. These screenshots confirm that Caldwell, as part of a 3-way chat, texted Watkins and Crowl 39 photos relating to January 6, 2021, *including the very photos contained in the Caldwell-Crowl deleted thread.* (Caldwell Exh. 60(a-y)). Additionally, Caldwell texted January

---

[26] In the middle of the 5 (recovered) unsent messages relating to the "link" is a message, which Caldwell did *not* unsend, which is a clear request by Crowl asking Caldwell to "send me that last video again in a text msg[.]" (Govt. Exh. 2002.T.61, at 84). If Caldwell's intent was to hide the "link" from the Grand Jury, it seems odd that Caldwell did not unsend this message, which gave investigators a direct road map to find the "link."

6, 2021-related photographs to five other individuals in these exhibits.  (Caldwell Exhibits 64(a-c), 65(a-k), 66(a-j), 67(a-e), 68(a-f), and 68.1).  None of Caldwell's text messages containing the January 6, 2021 photos were deleted from his phone.  The government, moreover, rebutted none of this physical evidence.  Mr. Caldwell testified, without government pushback, that he retained multiple copies[27] of all January 6, 2021 photographs he took on his cell phone including the 134 photos introduced into evidence, (Caldwell Exhibits 45(1-86) & 46(1-48)).  These 134 photos include the originals of the photos that were deleted in the Caldwell-Crowl thread.  (Caldwell Exh. 45(61-83)).

Caldwell's retention of multiple copies of his January 6, 2021 photos—including the photos deleted from the Caldwell-Crowl thread—completely debunks the notion that he was attempting to "impair" their "availability" for the Grand Jury.  "[T]here are some circumstances in which the removal of one of several identical items may not tend to prove a specific intent to make evidence unavailable for use in an official proceeding."  *People v. Rieger*, 436 P.3d 610, 615 (Colo. App. 2019).  A Florida appellate court has ruled that, under evidence tampering statute similar to § 1512(c)(1), a defendant's deletion from his cell phone of a video was insufficient to convict in light of his transmission of the video to multiple parties.  *Costanzo v. State*, 152 So. 3d 737, 738 (Fla. Dist. Ct. App. 2014).  The *Costanzo* Court, characterizing such circumstantial conduct as "equivocal," noted that the defendant did not "completely destroy[] potential evidence" and therefore deleting the video did not demonstrate the necessary intent to make the evidence

---

[27] Caldwell testified that he backed up "multiple copies" of all January 6, 2021 photos on a Western Digital hard drive and a Gorilla-brand flash drive.  (Tr., 8853-54).  Caldwell's phone has been continuously in FBI custody since January 19, 2021; all of his January 6, 2021 photos were still on his phone when he examined it at an FBI evidence facility prior to trial.  (Tr., 8855).

unavailable. *Id*. at 738-39 ("The statute does not criminalize deleting evidence existing in the memory of a particular electronic device, particularly where such evidence resides elsewhere in the electronic ether.").[28]

Caldwell's intent in allegedly deleting January 6, 2021-related photographs was, likewise, circumstantially "equivocal." Caldwell retained the original photos on his phone, and backed up multiple copies on external hard drives. Copies of the exact same photos were contained in an un-deleted text chat with Watkins *and Crowl*. (Caldwell Exh. 60(a-y)). Caldwell retained text chats with five other contacts that contained January 6, 2021 photos, *including the exact same photos he allegedly deleted from the Caldwell-Crowl thread*. (Caldwell Exhibits 64(a-c), 65(a-k), 66(a-j), 67(a-e), 68(a-f), and 68.1). The government recovered every single January 6, 2021, photo contained in the Caldwell-Crowl thread and provided them in discovery to the defense. The weight of the evidence was overwhelming that Caldwell possessed multiple copies of every January 6, 2021-related photograph that he and his wife snapped, including the 11 photos that the government claims were "unavailable" to the Grand Jury.

Finally, the testimony of retired Special Agent John Roeper was compelling as he confirmed that, at the time Caldwell was on the west-side Capitol grounds, he saw no violence with police and no barriers blocking entrance to the Capitol grounds. The testimony of Roeper

---

[28] The allegation that Caldwell intended to withhold evidence from the Grand Jury is further undermined by Caldwell's Exhibits 47, 50, 51, 57, which showed that both Mr. and Mrs. Caldwell had made clear their intention to remove themselves from Facebook prior to Caldwell unsending or deleting anything from his Facebook account. In one text message, Caldwell, on January 11, 2021, advised a contact that "I am in the process of pulling off all of my pix, etc. [from Facebook]." (Caldwell Exh. 50). Caldwell had also opened an account on Facebook's rival "Parler" on November 10, 2020. (Caldwell Exh. 51). Mrs. Caldwell emailed her state delegate on November 9, 2020 requesting contact information for a speaker who gave a speech on how to get off of Facebook. (Caldwell Exh. 47).

and the Caldwells on these points was further buttressed by the "doorknob" video and photos taken

by the Caldwells showing no violence against police on the Inaugural balcony.

## CONCLUSION

For the foregoing reasons, the Court should enter a judgement of acquittal as to all counts

for which the defendants were found guilty.

Respectfully submitted,

/s/ Phillip A. Linder
PHILLIP A. LINDER
3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219
(214) 252- 9900 OFFICE
(214) 252-9902 FAX
PHILLIP@THELINDERFIRM.COM
TEXAS BAR NO. 12363560

/S/ JAMES LEE BRIGHT
JAMES LEE BRIGHT
3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219
TEL: (214) 720-7777
FAX: (214) 720-7778
JLBRIGHTLAW@GMAIL.COM
TEXAS BAR NO : 24001786
*Counsel for Defendant Elmer Stewart Rhodes*

/s/ Edward L. Tarpley , Jr.
A Professional Law Corporation
Louisiana Bar No. 12657
ATTORNEY AT LAW
819 Johnston Street
Alexandria, LA 71301
318-487-1460
Fax: 318-487-1462
Email: edwardtarpley@att.net
*Counsel for Defendant Elmer Stewart Rhodes*

*/s/ Stanley E. Woodward, Jr.*
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)

---

BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*/s/ Juli Z. Haller*
Juli Z. Haller, (DC 466921)
THE LAW OFFICES OF JULIA HALLER
601 Pennsylvania Avenue, N.W.,
S. Building, Suite 900
Washington, DC  20004
202-729-2201 (telephone)
HallerJulia@outlook.com
*Counsel for Defendant Kelly Meggs*

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
(856) 607-5708
Brad@FormerFedsGroup.Com
*Counsel for Defendant Kenneth Harrelson*

/s/ Jonathan W. Crisp
Jonathan W. Crisp, Esquire
4031 North Front St.
Harrisburg, PA  17110
I.D. # 83505
(717) 412-4676
jcrisp@crisplegal.com
*Counsel for Defendant Jessica Watkins*

/s/  David W. Fischer
David W. Fischer, Esq.
Federal Bar No. 023787
Law Offices of Fischer & Putzi, P.A.
Empire Towers, Suite 300
7310 Ritchie Highway
Glen Burnie, MD 21061
(410) 787-0826
*Counsel for Defendant Thomas Caldwell*