**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 22-cr-15 (APM)** |
| | **:** | |
| **ELMER STEWART RHODES III,** | **:** | |
| **KELLY MEGGS,** | **:** | |
| **KENNETH HARRELSON,** | **:** | |
| **JESSICA WATKINS, and** | **:** | |
| **THOMAS CALDWELL,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

### GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENTS OF ACQUITTAL

The United States respectfully opposes the motions for judgments of acquittal, pursuant to Federal Rule of Criminal Procedure 29, that have been made by Defendants Elmer Stewart Rhodes III, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell. The evidence presented by the government at trial established that in the days and weeks following the 2020 U.S. Presidential Election, the defendants entered into an agreement to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force. On January 6, 2021, the defendants, along with hundreds of other rioters, attacked the United States Capitol, delayed the certification of the Electoral College vote ("Certification proceeding"), prevented Members of Congress from discharging their duties, and interfered with officers trying to protect the building. In the weeks that followed, the defendants continued to plot ways to forcibly oppose the transfer of presidential power, and they destroyed evidence of their participation in the attack on the Capitol.

The defense case failed to undermine this evidence. Defense witnesses—including Defendants Rhodes, Watkins, and Caldwell—could not deny their frequent and fervent

statements vowing to oppose the authority of the United States government by force, nor could they credibly deny their transporting arms to this area in support of their conspiracy and their participation in the attack on the Capitol on January 6.  The defense witnesses could only implausibly claim they were not being serious or that they were advocating for violent overthrow of the government at some point after the Certification proceeding.

Viewed in the light most favorable to the government, the evidence presented over the course of the trial was more than sufficient to permit a rational trier of fact to find the essential elements of the crimes charged in the Indictment with respect to each defendant beyond a reasonable doubt.  Accordingly, defendants' motions for judgments of acquittal should be denied.

## I.   <u>Background</u>

### A.  Procedural Background

All defendants were charged with seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three); and conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four).  ECF No. 167.  Meggs, Watkins, and Harrelson were additionally charged with destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361 and 2 (Count Five), for damage to the East Rotunda Doors entrance area that they attempted and aided and abetted as they breached the building.  *Id.*  The Indictment further charged Watkins with civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2 (Count Six), for her efforts to push past a line of riot police to gain access to the

Senate Chamber.  *Id.*  Finally, Rhodes, Meggs, Harrelson, and Caldwell were charged with tampering with documents or other objects and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(1) and 2 (Counts Seven through Nine and Thirteen), for destroying digital evidence of their participation in the attack on the Capitol and encouraging others to do so.  *Id.*

The government presented its case-in-chief over the course of roughly five weeks, from October 3, 2022, through November 3, 2022.  At the close of the government's case, all defendants made oral motions for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  11/3/22AM Tr. at 6793-6794.  Defendant Caldwell supplemented his motion with a written brief, ECF No. 384, and the government filed a written opposition to all defendants' motions, ECF No. 383.  The Court deferred ruling on the motions until after all parties had an opportunity to file written briefs supplementing these motions.  11/3/22AM Tr. at 6687-6688.

From November 3, 2022, through November 17, 2022, the defendants presented their evidence.  At the close of all the defense evidence, the defendants renewed their oral motions for judgment of acquittal.  11/17/22 Tr. at 9663-9664.  The Court again deferred ruling.  *Id.* at 9664. The government then presented a brief rebuttal case on November 17, 2022.

The government asks that the Court deny the defendants' initial motions for judgment of acquittal, at the close of the government's case, for the reasons stated in its brief filed on November 3, 2022. ECF No. 383.  The government incorporates by reference the factual background presented in that filing.  The government will address here the defendants' arguments for judgment of acquittal based on all of the evidence presented at trial.

### B.  Legal Standard

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  When ruling on a motion for judgment of acquittal, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt."  *See United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)); *United States v. Duran*, 884 F. Supp. 577, 583 (D.D.C. 1995), *aff'd*, 96 F.3d 1495 (D.C. Cir. 1996).  A defendant "seeking to overturn a jury verdict for insufficient evidence bears an exceedingly heavy burden." *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993).  Sufficiency review "is highly deferential: [the Court] must accept the jury's verdict if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (quotation marks omitted).  The Court "view[s] the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Id.* (quotation marks omitted).

The Court must "accord[ ] the government the benefit of all legitimate inferences," *see United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983), *cert. denied* 104 S. Ct. 1285 (1984), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir.

2002) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   Put another way, the Court may grant a motion for judgment of acquittal only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt."  *See Weisz*, 718 F.2d at 437 (emphasis in original) (citing *United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)); s*ee also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted."), *cert. denied*, 331 U.S. 837 (1947).  This well understood and often applied standard bears noting here, since the defendants repeatedly reference the jury's verdicts on some counts to argue for their acquittal on other counts.   In addition to the longstanding rule that a defendant may not upset an "inconsistent verdict," *United States v. Powell*, 469 U.S. 57, 65 (1984), the jury's verdict simply has no bearing on the adjudication of motions for acquittal under Rule 29.  *See, e.g.*, *United States v. Dykes*, 406 F.3d 717, 722 (D.C. Cir. 2005) ("We do not know what went through the jurors' minds. . . . But even if the [verdicts were inconsistent], a 'criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.'") (quoting *Powell*, 469 U.S. at 58). The question before the Court is focused exclusively on the sufficiency of the evidence and whether it could establish for a rational juror the elements of each offense.

II.   **Argument**

Taking the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crimes charged in the Indictment beyond a reasonable doubt.  The defendants' motions for judgment of acquittal should be denied.

### a.  Count One: Seditious Conspiracy

The government's evidence was sufficient for the jury to find that the defendants entered into an agreement to oppose the lawful transfer of power following the 2020 Presidential election.  As a matter of law, proof of such an agreement constitutes a conspiracy to oppose by force the authority of the government of the United States.  As a matter of fact, the evidence established that the defendants knowingly entered into this agreement with awareness of this goal.

> i.  <u>An agreement to oppose the lawful transfer of presidential power by force constitutes opposing the authority of the government of the United States.</u>

Defendants suggest that the government failed to prove a seditious conspiracy to oppose by force the authority of the Government of the United States because, as a matter of law, a conspiracy to oppose the lawful transfer of presidential power is not a conspiracy to oppose by force "some positive assertion" of authority by the government.  ECF No. 435-1 at 16-18.[1]  As this Court has already found in resolving the motions to dismiss filed earlier in this case, "resistance to the authority of the United States" is what must be proven to establish a seditious conspiracy.  *See* June 28, 2022 Mem. Op., ECF No. 176 at 11-13.  It is difficult to imagine a greater "resistance to the authority of the United States" than one aimed at undermining the lawful transfer of power following a presidential election.  *See United States v. Rahman*, 854 F. Supp. 254, 259 (S.D.N.Y. 1994) (observing that Section 2384 "protects basic societal interests and must be read to cover a wide spectrum of activities").

A violation of Section 2384 under either of the two prongs charged in this case requires proof that a defendant agreed to use force against the "government *as a government*," and thus

---

[1] Defendant Caldwell made the same argument in his mid-trial motion for judgment of acquittal.  ECF No. 384 at 15-17.  Although Defendant Caldwell was acquitted on this Count, the government still asks that this Court find that this count was properly submitted to the jury for its consideration.

requires that a defendant planned to use force "to resist some positive assertion of authority by the government" or to resist "the authority of the United States while endeavoring to carry the laws into execution." *Baldwin v. Franks*, 120 U.S. 678, 693 (1887) (emphasis added). The evidence must establish that defendants planned a "forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Id.*

An agreement to oppose by force the lawful transfer of power constitutes such "forcible resistance of the authority of the United States while endeavoring to carry the laws into execution."

Contrary to the defendants' assertion, the lawful transfer of power is not "a perfunctory, nonassertive, quadrennial process outlined in the Constitution." ECF No. 435-1 at 19. It is a critical underpinning of our democratic system of government and a central aspect of our government's obligations under the Constitution. More to the point, as this Court has found, the transfer of power requires governmental actors to take many actions and steps in exercise of their statutory and Constitutional authority:

> The Twelfth Amendment directs that the "President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates [of the Electors] and the votes shall then be counted." U.S. CONST. amend. XII. The Electoral Count Act of 1887 provides additional, precise instructions. *See* Electoral Count Act of 1887, Pub. L. No. 49-90, 24 Stat. 373 (1887). Before a Joint Session of Congress, the President of the Senate serves as the presiding officer, opens the certificates of the electoral votes, and hands them to tellers appointed by each House who make a list of the votes. 3 U.S.C. § 15. When announcing each certificate, the President of the Senate calls for objections, which if made must be in writing and signed by one Senator and one member of the House of Representatives. *Id.* Thereafter, the Senate and the House withdraw to their respective chambers to consider each objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once[.]" Id. § 17. The President of the Senate is empowered to cut off debate after two hours, id., and he also has the "power to preserve order" during the session, *id.* § 18. The Electoral Count Act even details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers, and others are to sit in the chamber. *Id.* § 16. And it commands that the Joint Session "not be

dissolved until the count of electoral votes shall be completed and the result declared." *Id.*

June 28, 2022 Mem. Op., ECF No. 176 at 13-14.  In other words, the lawful transfer of power requires the government to exercise its authority by carrying laws into execution.  *Id.*

Section 2384 does not require forcible resistance to a show of force from the government. Defendants' reliance on *Baldwin*—a decision this Court fully considered in denying the motions to dismiss (*see* ECF 176)—does not militate in favor of this position.  As this Court observed, the Supreme Court in *Baldwin* vacated a seditious conspiracy conviction where the defendant agreed to (and did) use force against non-governmental actors.  *See Baldwin*, 120 U.S. at 694 (noting that the defendant exerted his force "against the Chinese people, and not against the government in its efforts to protect them"); *see also Anderson v. United States*, 273 F. 20, 26-27 (8th Cir. 1921) (overturning seditious conspiracy conviction where defendants targeted industrial interests, not the government itself); *Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) (same).  The language from *Baldwin* to which defendants refer underscores the point that individuals do not violate Section 2384 if they conspire to use force against non-governmental actors.   That language—such as references to "positive assertion or actual exercise of authority"—does not imply that liability under Section 2384 arises only where individuals intend forcible resistance against a proactive use of force (or compulsion) by the government to compel obedience to a command of law.  Indeed, in *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999), in which the defendants were convicted of violating Section 2384 under both prongs charged in this case (as well as the levy-war prong), neither the instructions nor the evidence required the showing the defense advocates.  *See id.* at 104-05 (describing evidence, which involved an assassination attempt on the Egyptian president and bombing various buildings

around New York City, including the World Trade Center); *see also Abdel Rahman* instructions (previously submitted to the Court).

Accordingly, as a matter of law, the establishment of a conspiracy to oppose by force the lawful transfer of presidential power is sufficient to prove a seditious conspiracy to oppose by force the authority of the Government of the United States.

> ii. <u>The government proved that Rhodes and Meggs formed an agreement to forcibly oppose the lawful transfer of power.</u>

The evidence, when viewed in the light most favorable to the government, amply establishes beyond a reasonable doubt that Rhodes and Meggs (and others) entered into an agreement to oppose by force the lawful transfer of power following the 2020 presidential election. To prove a conspiratorial agreement, "the government need only show that the conspirators agreed on 'the essential nature of the plan,' not that they 'agreed on the details of their criminal scheme.'" *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (quoting *United States v. Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985) (citation and quotation marks omitted)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (citing *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)). As the Supreme Court in *Blumenthal v. United States*, 332 U.S. 539 (1947), explained, "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Id.* at 557 (footnote omitted). "Otherwise," the Supreme Court observed, "the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity." *Id.* It follows, therefore, that the evidence need not establish that the defendants settled on every detail of an intricately developed plan. Nor does it matter whether the persons

who formed the agreement actually carried out their plans or whether the agreement ultimately was successful; though, proof concerning the accomplishment of the object of the conspiracy may certainly be evidence of the existence of the conspiracy itself.  *See, generally, Court's Final Jury Instructions*, ECF No. 400 at 17-19 (describing what is required to establish the existence of a conspiratorial agreement).

The defendants contend that the government failed to establish a seditious agreement because it failed to establish *a plan* in advance of January 6 to attack the Capitol to interfere with Congress' Certification of the Electoral College vote.  ECF No. 435-1 at 12-14; *see also* ECF No. 384 at 22-23.  "With no details, no specifics, and no plan, no rational juror could have found that a knowing agreement took place between any alleged co-conspirator, let alone Rhodes and Meggs."  *Id.* at 14.  As defendants acknowledge, however, the government "need not show that the conspirators agreed on the details of their criminal scheme;" it need only "show the 'essential nature of the plan.'"  *Id.* (quoting *Treadwell,* 760 F.2d at 327).

Here, the government's evidence showed the Rhodes and Meggs and others entered into an agreement, and that the "essential nature of the plan" was to oppose by any means necessary, up to and including the use of force, the lawful transfer of power following the 2020 presidential election.[2]  The government's evidence showed that almost immediately after the November 2020 presidential election, Rhodes, began scheming to forcibly stop the transfer of power from President Trump to President Biden, and that Meggs signed on to the plan.  In early November 2020, Rhodes was advocating force to oppose any transfer of power through leadership chat messages, *see* Gov. Exh. 6615.C ((Msg. 1.S.696.13005), and in a GoToMeeting call, 10/4/22AM

---

[2] The government highlights here the most significant evidence of the "essential plan" agreed upon by Rhodes and Meggs but also adopts by reference the more detailed overview of the evidence of the agreement provided in its initial written opposition to the motions for judgment of acquittal.  See ECF No. 383 at 4-20.

Tr. at 1442-1481; Gov. Exhs. 1000.1 through 1000.11, 6611, 6615.D (Msg. 1.S.696.13376)—in both of which Meggs and other co-conspirators participated.  At the GoToMeeting call on November 9, for example, Rhodes sketched out the details of how the defendants would achieve their objective: an armed QRF would stand by as those committed to his vision of the country entered D.C. and readied themselves to fight to stop what they viewed as a fraudulent election. Rhodes urged those on the call to follow the example of Serbians who (as Rhodes had earlier described in detail in Signal chats) had enacted regime change by breaking through barricades and storming the legislature.  *See* ECF No. 383 at  4-6.  Immediately after that meeting, Meggs sent a message to an invitation-only Signal group chat titled, "OKFL Hangout" ("OKFL Hangout Chat"), which included other co-conspirators, in which he stated, "Anybody not on the call tonight.  We have been issued a call to action for DC.  This is the moment we signed up for . . . ." Gov. Exh. 6616.B (Msg. 1.S.656.4143).

Beginning in mid-December 2020, Rhodes and his co-defendants began to call more directly for the use of force to oppose the transfer of power—regardless of whatever action the President would or would not take—and to focus on the Certification proceeding set to take place on January 6, 2021, as a day of action to advance their criminal objective.  As early as December 10, Rhodes began expressing in private circles his skepticism that the President would invoke the Insurrection Act and his belief that he and other Oath Keepers members and affiliates would need to take matters into their own hands.  In a message to Kellye SoRelle and two other acquaintances, Rhodes wrote, "[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) Against the ChiCom puppet Biden. Take your pick."  Gov. Exh. 6748 (Msg. 1.T.2186.50).  On December 14, the day that the Electors of the Electoral College met in their respective states and cast votes that

resulted in the necessary number for President Biden to be elected, Rhodes told co-conspirators on the OLD Leadership CHAT, "Trump has one last chance to act. He must use the insurrection act. Unless we fight a bloody civil war/revolution."  Gov. Exh. 6701 (Msgs. 1.S.696.15779, 15784).  In an open letter on December 23, Rhodes wrote that if the President did not act before or on January 6 to stop the fraudulent election results from being certified, Rhodes and others may have to "take to arms in defense of our God given liberty."  Gov. Exh. 1008.

That same day, December 23, Meggs told those on the OKFL Hangout chat: "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside ! Scare the hell out of them with about a million surrounding them should do the trick !" *Id.* (Msg. 1.S.656.9619).  He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of the Capitol !!" *Id.* (Msg. 1.S.656.9620).  On December 24, Meggs wrote to the same chat, "We have 10-12 staying there.  So it's gonna be a WILD time in DC we gotta get the crowd going during the day.  I think we get everyone up good and close to the Capitol bldg so they can here is inside.  Then at night well whatever happens happens." *Id.* (Msg. 1.S.656.9990).

In late December 2020 and early January 2021, Rhodes, Meggs, and their co-conspirators ramped up logistical plans focused on January 6, the day that Congress met to certify the results of the 2020 Presidential Election.  ECF No. 383 at 15-20.  These plans included arming themselves, traveling to the District of Columbia, discussing different strategy and tactics, and delivering a cache of firearms to the "QRF hotel" in Northern Virginia, all while regularly communicating with each other, including over encrypted Signal chats. *Id.*  Meggs took a leadership role in organizing these plans for an armed QRF and coordinated these plans with Rhodes. *See* Gov. Exh. 6923 (Msgs. 1.S.159.450, 524-526) (Meggs messaging the DC OP: Jan 6

21 Signal chat that he would coordinate the QRF plans with the NC leaders and later reporting back on the QRF rally points that had been selected); *see also id.* (Msg. 1.S.613.173-177) (Messages between Meggs and Rhodes from January 2 in which Meggs told Rhodes about the "QRF RP" and Rhodes responded, "Ok.  We WILL have a QRF.  this situation calls for it.").  In the days leading up to January 6, the defendants acknowledged that they were "done talking" because "they won't fear us till we come with rifles in hand" (Rhodes, Gov. Exh. 6749 (Msg. 1.S.737.2820)); that their preparations were not in service of a "Rally," but instead to "make history" (Meggs, Gov. Exh. 6868 (Msgs. 2000.T.289, 2000.T.1164)); and that if Congress sought to "certify some crud on capitol hill," the "kettle [was] set to boil" (Caldwell, Gov. Exh. 6923 (Msg. 2001.C.2)).

     None of these plans were contingent upon the President invoking the Insurrection Act.  As Rhodes wrote to the OKFL Hangout Signal chat on December 25, "Trump needs to know we support him in using the Insurrection Act," but "he needs to know that if he fails to act, then we will.  He needs to understand that we will have no choice."   Gov. Exh. 6860 (Msg. 1.S.656.10101-02).  Rhodes' co-conspirators heard him loud and clear.  As Florida Oath Keeper and co-conspirator Jason Dolan testified,

> [W]e would have our firearms in—in Virginia. The overall goal why is if the Insurrection Act was declared, we would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress. . . . And if [President Trump] didn't do it, then we would need to step up and stop the certification of what—what I saw—I don't want to put words in his mouth, but as what I saw as an illegitimate election. So the certification process would still have to be stopped.

10/18/22PM Tr. at 4109-4110.

     On January 6, that is exactly what happened.  ECF No. 383 at 20-25.  When the President and Vice President did not intervene to stop the Certification proceeding, Rhodes told his co-

conspirators on the DC OP: Jan 6 21 Signal chat, "I see no intent by [Trump] to do anything.  So the patriots are taking it into their own hands."  Gov. Exh. 1501.  Moments later, Meggs and Watkins led a group of co-conspirators towards the Capitol.  *Id.*  As they marched down Pennsylvania Avenue, Watkins said they were "sticking together and sticking to the plan."  Gov. Exh. 1500, 1502.  At 2:35 p.m., after getting off the phone with Rhodes and operations leader Michael Greene, Meggs led 13 other co-conspirators in falling into a stack formation (Stack One), marching up east side of the Capitol building, and breaching the interior.  Gov. Exh. 1500, 1503.  Once inside, the group split into two teams of seven (one that marched toward the House, the other toward the Senate) and tried to force their way past police officers.  Gov. Exh. 1504-1506.  As that was occurring, Caldwell climbed up the outside of the Capitol building and tried, ultimately unsuccessfully, to break into the building.  Gov. Exh. 1500.  Approximately thirty minutes later, another group of co-conspirators, Stack Two, also surged into the building through the same doors as Stack One.  *Id.*  Further evincing their close coordination, the co-conspirators—including those who breached the building and those who had not—met together on Capitol grounds within hours of Stack One and Stack Two breaching the building.  *Id.*  The defendants' coordinated actions on January 6 also provide compelling evidence of their conspiratorial agreement.

Nor did the defendants' unlawful agreement cease on January 6.  That night, Rhodes wrote to the DC OP: Jan 6 21 Signal chat: "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming."  Gov. Exh. 6732 (Msg. 1.S.159.1328). Meggs echoed Rhodes, adding to that same Signal chat a message stating, "We aren't quitting!! We are reloading!!"  *Id.* (Msg. 1.S.159.1326).  Between January 6 and the Inauguration on January 20, Rhodes did reload—to the tune of $17,000 in firearms and tactical equipment—

while also summoning other co-conspirators, including Joshua James (who brought "all available firearms" to Texas).   Gov. Exh. 1540.   And in a "Critical Message for Oath Keepers and Patriots" that Rhodes posted to the OLD Leadership CHAT on January 14, he wrote:

> Now that it is regretfully becoming clear that President Trump will not be taking the decisive action we urged him to take, using the Insurrection Act and a declass/data dump, let's follow the Founders' game plan, using their strategies and methods, which focused first on declarations of illegitimacy, nullification (declaring unconstitutional acts to be null and void from inception, and refusing to obey them), unified mass non-compliance with unconstitutional and oppressive actions and then on self defense, mutual defense, and resistance when the domestic enemies of the Constitution come for us. That's how the Founders did it, and it worked. There is nothing new under the sun.   Let us adapt their game plan to our current situation.

Gov. Exh. 9073.1 (Msg. 1.S.696.19133).[3]

The evidence recounted above demonstrates that the defendants' conspiracy targeted stopping the lawful transfer of presidential power.   It also demonstrates that the defendants agreed to use force to carry out their unlawful objectives.   For the purposes of Section 2384, force is understood in its ordinary sense to mean an act or acts "that threaten[] or result[] in violence" or "threaten[] or result[] in harming or destroying property or harming or killing people." *Final Jury Instructions*, at 25.[4]   The defendants need not, however, actually use force to

---

[3] Defendants claim that "there was no 'actual exercise of authority' [by the United States government] that Rhodes or Meggs could have opposed even *after* the certification process on January 6."   ECF No. 435-1 at 18.   But under Article II, Section 1 of the Constitution, the transfer of power is not complete until the incoming President takes the oath of office.   The government introduced the text of Article II as Exhibit 3500.2, and this Court instructed the jury that "[t]he 'laws' for purposes of this goal are those governing the transfer of presidential power, including: the United States Constitution (specifically Article II and the Twelfth Amendment) and Title 3, Section 15 of the United States Code," ECF No. 400 at 24.   Therefore, the defendants' continued plotting, after January 6, to use force to stop incoming President Biden from taking that oath *would* constitute forcible opposition to the government's exercise of authority.

[4] That understanding of force draws on the common-law linkage between force and violence, *see Stokeling v. United States*, 139 S. Ct. 544, 550 (2019) ("common-law authorities frequently used the terms 'violence' and 'force' interchangeably"), and reflects mid-nineteenth-

violate Section 2384.  *Id.* at 18-19; *see Bryant v. United States*, 257 F. 378, 385-86 (5th Cir. 1919); *see also Dennis v. United States*, 341 U.S. 494, 573 (1951) (Jackson, J., concurring) ("The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish.").  Most obviously, the defendants and their co-conspirators transported scores of firearms to the QRF hotel in Virginia, ultimately amassing an arsenal so extensive that, in the experience of one former Oath Keeper, it was rivaled only by military stockpiles.  *See* 10/12/22AM Tr. at 2728.  And at least Rhodes continued to amass firearms after January 6, when he purchased over $17,000 in new weapons and related equipment before the Presidential Inauguration.  The defendants extensively discussed what kind of weapons, including those less lethal than firearms, they could and did bring with them to the District of Columbia.  Additionally, many of the defendants' actions on January 6—aligning in stack formation, marching up the steps of the Capitol building and damaging property as they forced their way inside, dividing up once inside, and pushing against police lines—offered proof that the defendants intended to use, and did use, force in service of their unlawful objectives.

   iii. <u>The conspiracy established by the government's evidence and advanced by its arguments did not constitute a variance from the conspiracy charged in the indictment.</u>

  Defendants contend that the government shifted its theory of the case at trial in a manner that constituted an impermissible variance from the conspiracy alleged in the Indictment.  ECF No. 435-1 at 2-6.  According to the defendants, "rather than relying upon the theory pled in the Indictment that the defendants conspired to 'oppose the lawful transfer of power,' the

---

century legal definitions of force that would have informed the legislators who drafted and enacted the original seditious conspiracy provision.  *See Webster's American Dictionary of the English Language* (1828) (force defined as "any unlawful violence to person or property"); *see also Stokeling*, 139 S. Ct. at 550 (defining "force" as either "power, violence, or pressure directed against a person or thing," or "unlawful violence threatened or committed against persons or property") (citing dictionaries).

prosecution characterized Defendant Rhodes and his co-conspirators as planning to *overthrow* the United States government by force." *Id.* at 5.

First, the government's quotation of Rhodes's repeated calls for his co-conspirators to engage in "civil war," "rebellion," and "insurrection" was not a variance from the conspiracy articulated in the indictment. The government did not cite this evidence to prove the alternate, "levy war against the government" prong of seditious conspiracy or to present an alternate theory of the case; rather, the government highlighted these messages for the jury because these words are strong evidence that the goal of the conspiracy in this case was to oppose the lawful transfer of power *by force*. Contrary to the defendants' assertion, their "bombastic language about a 'civil war'" was *directly* related to the "lawful transfer of presidential power." *See, e.g.*, "Gov. Exh. 6615.A (Msg. 1.S.696.12491) ("We MUST refuse to accept Biden as a legitimate winner" and warned, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit."); Gov. Exh. 6748 (Msg. 1.T.2186.50) ("[E]ither Trump gets off his ass and uses the insurrection Act to defeat the ChiCom puppet coup, or we will have to rise up in insurrection (rebellion) Against the ChiCom puppet Biden. Take your pick."). In other words, these messages showed that Rhodes and his co-conspirators were prepared and preparing to use force to stop President Biden from taking office.

Second, defendants fail to establish prejudice from the variance they claim occurred. Significantly, even if they could successfully establish a variance occurred – and they have not – a variance between a single conspiracy charged in an indictment and alleged multiple conspiracies proven at trial requires reversal of a conviction only if the defendant suffered prejudice as a consequence. *United States v. Cross*, 766 F.3d 1, 5 (D.C. Cir. 2013) (citations omitted). The defense seems to argue that Rhodes' statements advocating for civil war

constituted evidence of a separate conspiracy to forcibly oppose the Biden government after he took office on January 20.  ECF No. 435-1 at 5-6.  As explained above, such statements, though, do not relate to a separate conspiracy than the one charged.  And defendants could not be prejudiced by this evidence.  While they claim that they had no notice of such a theory of the case and are prejudiced as a result, *id.,* these messages in which Rhodes threatened civil war if Biden took office are quoted in the indictment.  *See, e.g.*, ECF No. 167 at ¶ 23 ("RHODES stated that if President-Elect Biden were to assume the presidency, 'It will be a bloody and desperate fight.  We are going to have a fight.  That can't be avoided.'").  Indeed, the conspiracy charged in the indictment runs from November *through* January 2021, *including and following* the January 20 Inauguration date.  *Id.* at ¶ 15.

Moreover, whether the evidence establishes a single conspiracy or multiple conspiracies "is a question of fact for the jury."  *McGill*, 815 F.3d at 928.  Where, as here, the jury has been given a multiple-conspiracy instruction and has concluded that a single conspiracy existed, the court's role "is limited."  *Id.*  The court "review[s] the evidence in the light most favorable to the government and ask only whether '*any* rational trier of fact' could have found the elements of a single conspiracy beyond a reasonable doubt." *Id.* (quoting *(Perry) Graham*, 83 F.3d at 1471).

In determining whether a single conspiracy existed, a court "look[s] for several factors, including whether participants shared a common goal ('such as the possession and distribution of narcotics for profit'); interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants."  *(Perry) Graham*, 83 F.3d at 1471 (quoting *United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988)).  To obtain reversal, the defendant bears the burden of showing that "(1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that

because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *Tarantino*, 846 F.2d at 1391.

As presented during the government's case and argued in closing, Rhodes' messages advocating for civil war and rebellion were used by the government to show how Rhodes fervently lobbied his co-conspirators to use any means necessary, up to and including force, to stop the transfer of power *before* President Biden took office. *See* 11/18/22 Tr. at 9947 ("So when Mr. Rhodes said on January 6th, 'Pence is doing nothing as I predicted. All I see Trump is doing is complaining so the patriots are taking it into his own hands,' he didn't need to say anything more.  For him and for his co-conspirators, that was the message, that was go time. And even if he hadn't said that, they knew from the context, from everything that they had talked about, everything that he had planned, that that was the moment to strike.").  For this reason, there was no variance from the conspiracy charged in the Indictment, and the evidence at trial established the one conspiracy alleged in the Indictment.

> iv.  <u>This application of the seditious conspiracy statute is not impermissibly vague, nor does it violate the defendants' First Amendment rights.</u>

Defendants contend: "The seditious conspiracy statute as applied in this case is [un]constitutionally vague under the Fifth Amendment because unimpeached and undisputed evidence at trial showed that defendants headed to the Capitol because the organization they worked with obtained a permit to protest at the Capitol on January 6th, 2022 to take place after the rally for the President on the mall. (KM-Exs. 71, 72 and 73). Based on the application of this case, the statute is [un]constitutionally vague and violates the First Amendment because any legal planned protest activity against Congress can be construed as an attempt to "overthrow the government."  ECF No. 435-1 at 19.  As a foundational matter, this argument provides a prime

example of a tactic employed throughout Defendants' motion: treating their preferred evidence as the only evidence and claiming that their preferred evidence is unimpeached and undisputed when it was very much impeached and disputed.  Under the guise of motions for judgment of acquittal, they are effectively arguing how the evidence should be weighed and that certain evidence should be excluded.  These are impermissible arguments at this juncture.  The core of the inquiry is whether sufficient evidence exists to support the conviction.

The evidence outlined above showed that there was sufficient evidence for the jury to conclude that the defendants entered into a seditious conspiracy to oppose the government by force and *that* is why they headed to the Capitol on January 6.  *See also* Testimony of Graydon Young, 10/31/2022PM Tr. at 5853 ("We talked about doing something about the fraud in the election before we went there on the 6th.  And then when the crowd got over the barricade and they went into the building, an opportunity presented itself to do something.  We didn't tell each other that.").  More to the point, the members of Stack One and Stack Two who marched to the Capitol on January 6 were not marching to a protest.  As Stack One marched down Pennsylvania Avenue, Watkins explained why: "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol, all million of us."  Gov. Exh. 1502.  She continued a minute later, "Trump's been trying to drain the swamp with a straw.  We just brought a shop vac."  While Stack One initially marched with one "protectee" (whose name, incidentally, no witness could remember), they abandoned her once they got near the Capitol and saw rioters scaling the walls of the Capitol.  Testimony of Terry Cummings, 10/12/22 Tr. at 2740.  Similarly, as Stack Two rode their golf carts to the Capitol, Roberto Minuta declared, "Headed to the Capitol building, patriots storm the Capitol Building.  There's uh violence against patriots by the DC police so we're en route in a grand theft auto golf cart to the Capitol Building right now."

Gov. Exh. 1500.  Meanwhile, Stack Two's "protectee," Roger Stone, was at the Willard Hotel. Accordingly, the seditious conspiracy statute has not been used here to criminalize protest activity and is thus not unconstitutionally vague as applied.  This statute's application to the facts adduced at trial bears no relationship to protected First Amendment activity such as protesting, but instead targets the defendants' conduct of planning to use force—and for many, in fact using force—in an effort to stop the transfer of presidential power.  That application gives rise to no unconstitutional vagueness concerns.

Consistent with controlling law, moreover, the jury instructions ensured that the jury did not improperly convict the defendants for protected First Amendment conduct.  The Supreme Court has explicitly held that courts may consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). Accordingly, the Court instructed the jury, "You may not find that a defendant committed a crime, or that a conspiracy existed, simply because you find that a defendant, or other individuals, engaged in speech you find to be offensive. You may, however, consider the statements made by defendants and other individuals as evidence that, for example, a conspiracy existed, a defendant entered into a conspiracy, or a defendant had a certain motive, intent, or knowledge." *Final Jury Instructions*, at 13.  This was an accurate statement of law and no doubt insured that the jury did not convict these defendants solely on the basis of protected speech or protest activity.

     v.  <u>The government's proof at trial was also sufficient, as a matter of law, to demonstrate an agreement to oppose by force the execution of the laws of the United States.</u>

Finally, in his mid-trial motion for judgment of acquittal, Defendant Caldwell relitigated an argument he made in support of his earlier motion to dismiss Count One of the Indictment, that the prong of seditious conspiracy for conspiring to forcibly prevent, hinder or delay the execution of any law of the United States cannot be based on a conspiracy to interfere with the laws and provisions governing the Certification of the Electoral College vote following a presidential election, because Congress does not "execute" the law in carrying out its duties with respect to that proceeding.  ECF No. 384 at 1-14, 17-20.  For all of the reasons cited by the Court in denying that motion, ECF No. 176, the government submits this Court should also deny Caldwell's motion for judgment of acquittal on this prong of Count One.[5]

**b.   Counts Two through Four: Conspiracy to Obstruct an Official Proceeding, Obstruction of an Official Proceeding, and Conspiracy to Interfere with Officers.**

Defendants' motion with respect to these three counts boils down to two main arguments: (i) factually, the government failed to prove an agreement to or any intent to obstruct the Certification Proceeding or to use force, intimidation, or threat to prevent the members of Congress from discharging their duties on January 6; and (ii) as a matter of law, the defendants

---

[5] As stated in note 1, supra, even though Caldwell was acquitted on Count One, the government still asks that this Court find that both prongs of Count One against Caldwell were properly submitted to the jury for their consideration.  Additionally, the defendants are wrong when they suggest that "the jury in this case concluded, as to every defendant, that the government had failed to prove beyond a reasonable doubt seditious conspiracy for the object of using 'force to prevent, hinder, or delay the execution of any law of the United States.'"  ECF No. 435-1 at 6.  With respect to the objects of the conspiracy, the jurors were instructed, "You must be unanimous as to one or the other or both," and, "At any time during your deliberations you may return your verdict of guilty or not guilty with respect to any defendant on any count."  ECF No. 400 at 48.  That they returned a verdict of guilty on the seditious conspiracy counts after finding Defendants Rhodes and Meggs guilty beyond a reasonable doubt as to the first prong does not mean that they failed to find guilt as to the second prong; they may simply have returned the verdict without reaching that issue.

could not have achieved these goals because Congress had already recessed by the time they or their co-conspirators breached the building.  ECF No. 435-1; *see also* ECF No. 384 at 23-24. Because the government presented ample evidence from the defendants' statements and conduct of an intent to obstruct the January 6 Certification proceeding and prevent members of Congress from performing their duties that day, and because the defendants' conduct did actually interfere with the proceeding by impeding Congress' ability to complete the session (which remained ongoing even during the recess), defendants' motion should be denied on these grounds, as well.

i. <u>The government's evidence was more than sufficient to find an agreement and corrupt purpose to obstruct an official proceeding and interfere with members of Congress discharging their duties.</u>

As discussed above and in greater detail in ECF No. 383, the defendants' words and actions from late December through their breach of the Capitol building and grounds on January 6 established their criminal objective of stopping Congress's certification of the Electoral College vote on January 6, 2021.  This evidence was sufficient for the jury to convict on Counts Two through Four.

*1.  Legal Standard*

Counts Two and Three charge all the defendants with conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2).  Section 1512(c)(2) makes it a crime to corruptly obstruct or impede an official proceeding, which includes the Certification of the Electoral College vote. *See United States v. Caldwell*, 581 F. Supp. 3d 1, 11-15 (D.D.C. 2021).  The same general conspiracy principles described above apply here.  *See Joint Proposed Jury Instructions*, at 19 (incorporating conspiracy principles for Count Two).  A violation of Section 1512(c)(2) requires proof that the defendant (1) obstructed or impeded an official proceeding; (2) intended to obstruct or impede that proceeding; (3) acted knowingly, with awareness that the natural and

probable effect of the defendant's conduct would be to obstruct or impede the official proceeding; and (4) acted corruptly. *Id.* at 20.

To prove that a defendant acted corruptly for purposes of Section 1512(c)(2), the government must establish that the defendant acted either "with a corrupt purpose" or through "independently corrupt means," or both, *see United States v. Sandlin*, 575 F. Supp. 3d 16, 31 (D.D.C. 2021) (quoting *United States v. North*, 910 F.2d 843, 942-43 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part), *withdrawn and superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *see also Joint Proposed Jury Instructions*, at 21. The government must also prove that the defendant acted "with consciousness of wrongdoing," namely with "an understanding or awareness that what the person is doing is wrong." *Final Jury Instructions*, at 27; *see also United States v. Reffitt*, No. 21-cr-32, ECF No. 119 at 26 (D.D.C. Mar. 7, 2022); *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005) (faulting jury instructions in Section 1512 case for "fail[ing] to convey the requisite consciousness of wrongdoing").

Count Four charges the defendants with conspiracy to prevent Members of Congress by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372. To prove a violation of Section 372, the government must prove (1) a conspiracy, (2) that the defendants voluntarily joined the conspiracy, and (3) that the conspirators agreed to prevent an officer of the United States from discharging his or her duties "by force, intimidation or threat," *United States v. Beale*, 620 F.3d 856, 864 (8th Cir.

2010), or to leave the place where the officer's duties are required to be performed, *Final Jury Instructions*, at 32.

### 2. Evidence of Agreement and Intent

The evidence demonstrating the defendants' conspiratorial agreements to stop the Certification and prevent members of Congress from discharging their duties in connection with that proceeding, and their corrupt intent in participating in the attack on the Capitol, consists of the many statements and actions that established their participation in a seditious conspiracy and that were described in detail in the government's initial opposition pleading, ECF No. 383. To recap in a few sentences: the defendants agreed to take whatever steps were necessary, up to and including using force, to stop the lawful transfer of presidential power following the 2020 election because they believed the election was rife with fraud, and they conspired together, in person, over calls, and through Signal chats to halt that transfer. In late December 2020, they agreed to focus these efforts on stopping Congress' certification of the Electoral College vote. On January 6, they carried out this agreement by participating in the attack on the Capitol.

Defendants point to the government's arguments in closing, that the defendants need not have formulated a specific plan to attack the Capitol to be guilty of the conspiracy charges alleged in the Indictment, as a concession that there was no conspiracy to obstruct the Certification proceeding or interfere with members of Congress prior to January 6. ECF No. 435-1 at 26. Not so. The government was merely articulating an accurate statement of law upon which the Court instructed the jury in its final instructions: To prove a conspiratorial agreement, the government need not show that the co-conspirators 'agreed on the details of their criminal scheme' but, rather, that they agreed on 'the essential nature of the plan.'" *Treadwell*, 760 F.2d at 336.

Here, while there may not have been a plan to attack the Capitol at the conspiracy's inception, there was ample evidence that in advance of January 6 the defendants and their co-conspirators agreed to stop the Certification, they believed an opportunity to do so might present itself on January 6, and they seized the opportunity presented on January 6 to attack the Capitol in furtherance of this plan.  For example, on December 29, Rhodes privately messaged SoRelle: "This will be DC rally number three. Getting kinda old. They don't give a shit how many show up and wave a sign, pray, or yell. They won't fear us till we come with rifles in hand."  Gov. Exh. 6749 (Msg. 1.S.737.2820).  On January 3, Meggs told one acquaintance on Facebook, "The natives are very restless . Tell your friend this isn't a Rally," and told another acquaintance, "1776 we are gonna make history."  Gov. Exh. 6868 (Msgs. 2000.T.289, 2000.T.1164).  As Caldwell posted in a comment on Facebook on December 31, the kettle was "set to boil."  Gov. Exh. 6923 (Msg. 2001.C.2 ("It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets. Let them try to certify some crud on capitol hill with a million or more patriots in the streets. This kettle is set to boil….")).

Co-conspirators Dolan and Young both testified that their actions on January 6 were directly linked to the implicit agreement they had entered with other Oath Keeper members and affiliates—including the defendants—*prior to January 6* to stop the lawful transfer of presidential power by any means necessary.  Dolan testified that his understanding of the criminal objective was derived from messages like the December 25 messages sent by Rhodes to the OKFL Hangout chat, where Rhodes stated that if President Trump did not act to stop the election fraud, then the Oath Keepers would have to.  Dolan explained:

> Well, that's my exact understanding: If the president didn't act, then we needed to. We were up in D.C. We were there. We were on location. So when the Capitol Building—when the doors opened, we get—went in. I mean, we were all in line. We could have gotten out of line. We could have moved out of the way. We—it

probably would have been hard or difficult. But we went in. And it's—it's this—it was that same idea of the—the texts over and over: We will do something. We will do something. We will do something. And now here we are in front of the Capitol doors, and they opened. And it was: Let's do something.

10/19/2022PM Tr. 4417-4418.

Young testified: "We talked about doing something about the fraud in the election before we went there on the 6th. And then when the crowd got over the barricade and they went into the building, an opportunity presented itself to do something. We didn't tell each other that." 10/31/2022PM Tr. 5853. Rather, in Young's words, it was "common sense." *Id.* Young further explained that he and his co-conspirators had come to D.C. on January 6 prepared to fight against "[t]he corrupt elements in the government that were allowing the election to proceed, and obviously leftists and extremists and whoever else was in the way." 10/31/2022PM Tr. at 5866.

Even if the jury did not find a conspiracy to obstruct the Certification and interfere with members of Congress *prior* to January 6, the defendants' conduct and statements on that day would also be sufficient evidence upon which the jurors could convict the defendants of the conspiracy charges in Counts Two and Four. That day, at about 1:25 p.m., when it became clear that President Trump and Vice President Pence were not going to intercede to stop the Certification of the Electoral College vote, and as a large crowd gathered on the Capitol grounds and converged on the building, Rhodes sent the messages described above, lauding the patriots who were taking matters into their own hands. Gov. Exh. 1500. Similarly, at 1:41 p.m., Rhodes sent a message to the OLD Leadership CHAT stating, "Hey, the founding generation stormed the governors mansion in MA . . . . They didn't fire on them, but they street fought. That's where we are now. Next comes our 'Lexington.'" *Id.* In the context of all the messages Rhodes and his co-defendants had exchanged in the lead-up to January 6, these words were a call to action.

Indeed, shortly thereafter, as video recovered from Watkins' phone shows, members of Stack One started moving from the Ellipse towards the Capitol.  Gov. Exhs. 1500; 192.V.1.  As she marched with Stack One down Pennsylvania Avenue at approximately 1:50 p.m., Watkins announced over the "Stop the Steal J6" Zello channel, "We have a good group. We've got about 30, 40 of us. We're sticking together and sticking to the plan."  Gov. Exh. 1500, 1502.  What plan?  She elaborated, "It has spread like wildfire that Pence has betrayed us, and everybody's marching on the Capitol."  *Id.*  She continued, "Trump's been trying to drain the swamp with a straw.  We just brought a shop vac."  *Id.*  Then, at about 2:00 p.m., Watkins told those on the Zello channel, "We're one block away from the Capitol now.  I'm probably gonna go silent when I get there because I'm gonna be a little busy." *Id.*[6]

Defendant Rhodes contends he must be acquitted of Count Three because "the government provided no evidence that he entered the Capitol, attempted to enter the Capitol, or encouraged others to do so."  ECF No. 435-1 at 36.  That is incongruous with all the evidence of his guilt on the seditious conspiracy charge discussed above.  Moreover, by 2:30 p.m. on January 6, Rhodes had entered the restricted areas of the Capitol grounds[7] himself and had begun

---

[6] Defendant Watkins claims the government failed to establish that she had notice that she had entered a restricted area on January 6.  Although she is not charged with entering or remaining in a restricted building or grounds, the government introduced a photograph from Watkins' phone showing co-conspirators Sandra and Bennie Parker standing on a sidewalk in front of a bike rack fence surrounding the Capitol that has not one but *four* large "Area Closed" signs on it, Gov. Exh. 192.P.4, and presented video evidence that the Capitol alarm bells were blaring as Watkins and her co-conspirators breached the building, Gov. Exh. 1503.  That would suffice, in addition to all the other evidence, to put Watkins on notice that her presence at Capitol that day was not welcome.

[7] Rhodes may claim he did not know he was in a restricted space, but Kellye SoRelle, who entered the grounds with Rhodes, reported to her Facebook followers in real time, "Over the top, they've occupied both sides now, oh no, think we're gonna hang 'til the 20th or what? Don't know. Here you go, just so you can see, they had barricades up.  Keeping us away from the building was the goal."  Gov. Exh. 6747.1.  That communication would make any such claim for Rhodes incredible.

explicitly directing his co-conspirators to come to the Capitol to join him.  Gov. Exh. 1500.

Florida Oath Keeper Terry Cummings testified about Stack One's march towards the Capitol.

He recalled that on the way, Meggs mentioned that people had breached the Capitol.

10/12/22AM Tr. at 2732, 2739-2741.  Meggs then "was wondering about whether we should

enter the Capitol."  *Id.* at 2741. Cummings continued, "He was wanting to find someone to talk

to them."  *Id.*  Cummings then took a wisely timed bathroom break, and when he returned, Stack

One was gone.  *Id.*  According to Young, Kelly Meggs was his superior and was attempting to

"rendezvous with Stewart" to decide "next actions as a group."  10/31/22PM Tr. at 5857.

At about 2:32 p.m., Meggs engaged in a phone conversation with Rhodes, who was

already on the phone with Michael Greene, an operational leader for January 6.  Rhodes merged

them into a three-way call.  Gov. Exhs. 1500, 6740; 10/20/22PM Tr. at 4709-4710.  Moments

later, Meggs led Stack One up the east steps of the Capitol to the area outside the East Rotunda

doors, where rioters were using their hands, flags, and chemical spray to assault the officers

guarding the doors, and violently trying to force entry.  Gov. Exhs. 1500; 10/20/22PM Tr. at

4710-4712.  For minutes, the crowd—including Meggs, Watkins, Harrelson, and other co-

conspirators—attempted to break into the Capitol.  When the doors eventually opened, Meggs

motioned for Stack One to enter.  *Id.*

The jury did not have to guess as to Stack One's intent as they entered.  As discussed

above, they heard from co-conspirators Jason Dolan and Graydon Young about how the attack

on the Capitol was a way to carry out their plans to stop the Certification and the transfer of

presidential power by any means necessary.  But the jury also heard from one of the defendants:

Jessica Watkins.  The jury heard that she told the FBI during an interview in March 2021 that she

knew exactly what was going to happen when she got into the stack: she knew they were going

into the United States Capitol and that they had the necessary amount of people to force entry if needed.  11/17/22AM Tr. at 9667.

Once inside, half of Stack One, led by Watkins, tried to force their way past riot police to the Senate Chamber.  Gov. Exhs. 1500, 1505; 10/20/22PM Tr. at 4781-4798.  The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" as she and six of her co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber.  Gov. Exh. 1505. District of Columbia Metropolitan Police Department (MPD) Officer Christopher Owens, who was deployed to that hallway with other officers to form a line to try to block the mob from getting to the Senate Chamber, described the size and force of the mob and how it continued to push back the police line.  10/26/22AM Tr. at 5446-5454.  Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line.  Gov. Exhs. 1505; 10/26/22AM Tr. at 5446-5454.  Watkins later described her conduct in that hallway: "We were in the thick of it. Stormed the Capitol. Forced our way into the Senate and House. Got tear gassed and muscled the cops back like Spartans."  Gov. Exh. 6734 (Msg. 192.T.1521).

Meanwhile, the other half of Stack One, led by Meggs and Harrelson, pushed into the House side of the building, in search of Speaker of the House Nancy Pelosi.  Gov. Exhs. 1500, 1505, 1506, 6734 (Msgs. 7.T.570.9758, 9760-61).  There, they encountered U.S. Capitol Police Officer Harry Dunn, who was guarding a staircase down to the Crypt level of the building.  10/31/22AM Tr. at 5593.  Officer Dunn and U.S. Capitol Police Special Agent David Lazarus explained that Meggs and Harrelson and their co-conspirators were only about ten feet from the entrance to Speaker Pelosi's office suite at this time; however, the sign to the office had

fortunately already been torn down by rioters, obscuring the nature of the office.  10/31/22AM
Tr. at 5658-5659.

While the members of Stack One breached the east side of the Capitol and split into
teams pushing toward the House and Senate, Caldwell had, in his words, "climbed the steps after
breaking 2 rows of barricades" and "got on the parapets" on the west side of the Capitol.  Gov.
Exhs. 1500, 6734 (Msg. 22.T.27.2883).  There, Caldwell joined the mob that was assaulting
officers and trying to break into the building.  As Caldwell later described it, "[T]he people in
front of me broke through the doors and the doors and started duking it out with the pigs who
broke and ran.  Then we started stealing the cops riot shields and throwing fire extinguishers
through windows. It was a great time." *Id.*   Contrary to Caldwell's claim that these were
uncorroborated messages, ECF No. 435-1 a 52-53, the photos from Caldwell's own phone
demonstrate that he *did* pass through the barricades, cross the west lawn, climb up the steps
under the scaffolding, and get feet from the building and very close to serious violence against
law enforcement officers—much closer to the building and the action than the vast majority of
rioters that day.  *See, e.g.*, Gov. Exhs. 22.P.3, 22.P.4, 22.P.7, 6757.  Caldwell's statements and
conduct in the weeks leading up to January 6 and after further demonstrate that he took these
actions with a corrupt purpose and the intent to disrupt, hinder, or delay the Certification
proceeding.  So, too, for all the other defendants.

> ii.   The fact that these defendants and their co-conspirators breached the
>       Capitol after the initial rioters caused a recess in the proceedings is
>       immaterial to their guilt on these charges.

The government introduced evidence that, as a result of the rioters' breach of the
building, the Senate went into recess at 2:13 p.m., and the House recessed at 2:29 p.m.  Gov.
Exh. 1516.  This recess did not constitute a dissolution of the proceedings.  According to former

House Parliamentarian Thomas Wickham, by law, the Joint Session for the Certification of the Electoral College vote is not dissolved (and does not permanently end), until "the presiding officer declares the result of the electoral count and announces a winner."  10/19/22PM Tr. at 4432-4433; *see also* Gov. Exh. 3501.16 (quoting 3 U.S.C. § 16: "Such joint meeting shall not be dissolved until the count of electoral votes shall be completed and the result declared.").  The "recess" that both houses of Congress were forced to call due to the presence of rioters in the building was just a "temporary break in the proceedings."  10/19/22PM Tr. at 4432-4433. United States Secret Service Special Agent Lanelle Hawa, who served as part of Vice President Pence's security detail on January 6, testified that the continued presence of rioters in the building prevented the Joint Session from resuming.  10/26/22AM Tr. at 5428.  That did not occur until after 8:00 p.m., Gov. Exh. 1516, and the Joint Session did not conclude until nearly 4:00 a.m. the next morning, 10/19/22PM Tr. at 4472-4473.  In other words, while these defendants and their co-conspirators may not have *caused* the break in the proceeding on January 6, their actions certainly *prevented* it from resuming, and thus *hindered*, *delayed*, and ultimately obstructed it.  *Cf.* 18 U.S.C. § 1512(c)(2).

   **c.  In addition to the evidence presented in the government's case, Watkins Admitted Guilt to Count Six in Her Testimony and Her Counsel Conceded the Charge in Closing Argument.**

   Defendant Watkins contends, "Here no reasonable juror could have found the government provided sufficient evidence that Defendant Watkins committed the offense of obstructing officers during a civil disorder beyond a reasonable doubt at the close of the government's case in chief."  ECF No. 435-1 at 56.  The government's evidence established that Watkins led six other co-conspirators down the hallway leading to the Senate Chamber and joined the mob trying to force their way past riot police to gain access to the Chamber.  Gov.

Exhs. 1500, 1505; 10/20/22PM Tr. at 4781-4798.  MPD Officer Christopher Owens, who was deployed to that hallway with other officers to form a line to try to block the mob from getting to the Senate Chamber, described how the conduct of Watkins and other members of the mob interfered with his abilities to do his job.  10/26/22AM Tr. at 5446-5454.  Only by deploying chemical spray were Officer Owens and his fellow officers able repel Watkins, her co-conspirators, and the rioters back and hold their line.  Gov. Exhs. 1505; 10/26/22AM Tr. at 5446-5454.

The government established that this conduct was part of a civil disorder through the testimony of USCP Captain Ronald Ortega and the video introduced during his testimony. Gov. Exh. 1515; 10/18/22AM Tr. at 3920-3946; 10/18/22PM Tr. at 3998-4061. This testimony and video evidence established the immense nature and scale of the attack on the Capitol, as well as the tremendously taxing impact it had on the resources of not only the U.S. Capitol Police, but numerous other law enforcement agencies in this area.  The government further established that this civil disorder obstructed, delayed, and adversely affected interstate commerce, the movement of articles and commodities in interstate commerce, and the conduct or performance of a federally protected function.  ECF No. 383 at 28-30.

In addition, from her opening statement, Watkins conceded this charge.  In opening statement, her counsel told the jury, "I do believe that you will find her not guilty of everything except the civil disorder."  10/3/22PM Tr. at 1240-1241.  Then, during her testimony, Watkins admitted that she committed this offense.  She acknowledged her presence in the hallway, she agreed that she participated in the crowd's surge against the line of riot police officers trying to guard the Senate chamber, and she agreed that her voice was the one heard on the recording shouting, "Push!  Push!  Push!  Get in there!  They can't hold us!"  Watkins' counsel then asked

her, "Do you realize what you are saying is you interfered with police and the performance of their duties?"  She responded, "Absolutely."  In closing, her counsel instructed the jury: "Count 6. When you go back to the deliberations, get out your jury verdict form and check guilty. That is what she said."  11/21/22 Tr. at 10194.  That concession was correct.

Watkins now tries to claim the government did not present sufficient evidence that Watkins knew she was pushing against police officers.  ECF No. 435-1 at 56-57.  But Watkins testified that she "saw a riot shield in the front," admitted she "assumed" that "there were police there," and agreed that she was yelling, "Push!" at the police.  11/16/22PM Tr. at 9405.  The Court should deny her motion for acquittal on this count.

### d.  Destruction of Evidence Charges

Finally, Defendants Rhodes, Meggs, Harrelson, and Caldwell challenge their convictions on Counts Seven, Eight, Nine, and Thirteen,[8] which charged each of them respectively them with evidence tampering, in violation of 18 U.S.C. § 1512(c)(1).  A violation of Section 1512(c)(1) occurs where the defendant (1) altered, destroyed, mutilated, or concealed a record, document, or other object; (2) acted knowingly; (3) acted corruptly; (4) acted with the intent to impair the object's integrity or availability for use in an official proceeding.  *United States v. Robertson*, No. 21-cr-34 (CRC), ECF No. 86 at 26 (D.D.C. Apr. 8, 2022); *accord Final Jury Instructions*, at 41.  The parties agree that the official proceeding for purposes of these Counts was the grand jury investigation into the role of these defendants and others in the attack on the United States Capitol on January 6, 2021.  They now argue that the grand jury investigation was not sufficiently foreseeable to establish a nexus between their destruction of evidence and an official proceeding.

---

[8] Pursuant to the parties' request at the conference on October 26, 2022, Count Thirteen in the Indictment was referred to as "Count Ten" for the purposes of the jury instructions and verdict form.

i. <u>The grand jury's investigation was sufficiently foreseeable to establish the requisite nexus between the corrupt intent and the official proceeding.</u>

To be guilty of a violation of Section 1512(c)(1), the official proceedings the defendant allegedly obstructed "need not be either pending or imminent" at the time the defendant sought to obstruct them.  18 U.S.C. § 1512(f)(1).  They need only be "foreseen."  *See Arthur Andersen*, 544 U.S. at 707-08 (2005).  Put differently, there simply needs to be some "nexus between the 'persuasion' to destroy documents and any particular proceeding."  *Id.*  Here, the government presented ample evidence of such a nexus.

The government presented evidence that the first indictment in this case was handed down by the grand jury on January 27, 2021, 11/2/22PM Tr. at 6560, and that Defendants Meggs and Harrelson discussed that Indictment prior to a subsequent conversation about deleting incriminating evidence from their phones.  *Compare* Gov. Exh. 9085 (messages between Meggs and Harrelson on January 28 referencing allegations in the original January 27 Indictment) *with* Gov. Exh. 9086 (messages between Meggs and Harrelson discussing ways to "clear out the messages in our chats," because, in Harrelson's words, "I don't want the boys to have anything to look at, if you know what I mean").

Additionally, Defendant Rhodes sent numerous messages, through Kellye SoRelle, in the days after January 6, encouraging co-conspirators to "DELETE your self-incriminating comments or those that can incriminate others."  Gov. Exh. 9061 (Msg. 54.S.125.2878).  In this context, it is hard to imagine that these messages referred to anything other than the specter of criminal investigations, and a reasonable juror could certainly draw such an inference.

Finally, evidence introduced through a Facebook custodian and an FBI agent established that the photos and video and messages Caldwell "unsent" from his Facebook account were deleted on January 14, the same day that media coverage of the attack on the Capitol began to

focus on Watkins, and she and Crowl fled Ohio to hide out at Caldwell's home in Virginia. 11/2/22PM Tr. at 6544-6556. All of this evidence shows that the deletion encouraged or committed by these defendants was directly related to their fears about the use of these materials against them in a law enforcement investigation. That shows the grand jury's investigation was foreseeable (and in fact known to Meggs and Harrelson) at the time of the obstructive conduct alleged and proven here.

ii. <u>Specific Challenge by Meggs and Harrelson</u>

Defendants Meggs and Harrelson further challenge their convictions on these counts because there was no evidence presented that forensically proved that the content from their phones was deleted for nefarious rather than innocent reasons. As noted above. Harrelson and Meggs exchanged messages that showed such an intent. Additionally, the government presented the testimony of a special agent, who reviewed the forensic extractions of both of these defendants' phones and learned that, at the time the phones were seized when these defendants were arrested, Kelly Meggs' phone lacked Signal data prior to some date in January 2021, and Harrelson's phone lacked Signal data prior to some date in March 2021. 11/3/22AM Tr. at 6765; 11/2/22PM Tr. at 6568. The timing of the missing data, when we know these defendants participated in Signal chats relevant to the planning and coordination of this conspiracy during those time periods, strongly suggests targeted deletion of data for the purpose of destroying incriminating evidence.

iii. <u>Specific Challenges by Caldwell</u>

Defendant Caldwell contends that he must be acquitted for obstruction/tampering because he is only alleged to have deleted one video and roughly a dozen photographs, ECF No. 435-1 at 63-64; he sent a link to a video rather than an actual video, a link is not a record, document, or

object, and the destruction of a link to a public source video cannot constitute evidence tampering, *id.* at 66-68, ECF No. 384 at 24-25; he "unsent" them which, he claims, is not the same as "deleting" them, *id.* at 60-61; the government can't definitively prove the precise nature of all the deleted content, *id.* at 61-62; some of the photos he did delete were also found on another digital device at the time it was seized by the FBI, *id.* at 68-70; the government failed to prove Caldwell is the one who deleted these messages, *id.* at 64; and even if it could, the government did not show an unlawful intent behind the deletion, *id.* at 65-66.

First, Caldwell misstates the evidence. He did unsend a message containing a video. *See* Gov. Exh. 9079 at 1 (Msg. 200.F.1.30) (noting that the message contained an attachment); *id.* at 2 (Msg. 200.F.1.31) (the very next message, unsent by Caldwell but preserved on Crowl's phone, describing the contents of the attachment to the prior message: "You and Jess appear at about the 3:21 mark of this great video. That's as far as I have gotten the number of deleted items."). When Crowl had trouble viewing the video, Caldwell also subsequently sent a link (which he then unsent), and that link makes clear that the video initially sent was a News2Share video showing Watkins and Crowl outside the East Rotunda door. 11/3/22AM Tr. at 6766-9769. That Caldwell unsent this message (and therefore made it unavailable on his and Crowl's Facebook accounts, shows he "altered, destroyed, mutilated, or concealed" it. That it contained evidence incriminating Crowl and Watkins and that he got rid of it on the day they fled to his house after the media began to focus on Watkins' participation in the attack on the Capitol, is sufficient evidence for a rational trier of fact to conclude a corrupt purpose and a intent to impair the object's integrity or availability for use in an official proceeding.

With respect to the photos deleted, the government also showed that these photos showed his and his co-conspirators' participation in the attack on the Capitol. *See* Gov. Exh. 2002.T.61.

That they were also saved on his phone and not deleted before law enforcement searched his house five days later does not render his deletion of the Facebook content less criminal. Furthermore, Special Agent Jack Moore testified that it is relatively simpler to execute search warrants for social media accounts like Facebook, so Caldwell's deletion of this evidence impeded a common first step in the investigative process.  11/3/22AM Tr. at 6775.

Taken together, this evidence established sufficient evidence for the jury to find that Defendant Caldwell altered, destroyed, mutilated, or concealed a record, document, or other object; (2) acted knowingly; (3) acted corruptly; (4) acted with the intent to impair the object's integrity or availability for use in an official proceeding.  The government is unaware of any authority, nor does Caldwell cite any, for his suggestion that a conviction for obstruction/tampering with evidence requires some quantum of deleted items.  Instead, issues like the quantum of destruction are the type of issues routinely considered at sentencing. Accordingly, the Court should decline Caldwell's request to set aside his conviction on this count.

## III.   <u>Conclusion</u>

The Court should deny the defendants' motions for judgment of acquittal under Rule 29 on all grounds.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:

Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Troy A. Edwards, Jr.
Jeffrey S. Nestler

Louis Manzo
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530


    /s/
_____
Alexandra Hughes
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004