# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | **Case No. 22-cr-15-APM** |
| | § | |
| **ELMER STEWART RHODES, III,** | § | |
| **KELLY MEGGS,** | § | |
| **KENNETH HARRELSON,** | § | |
| **JESSICA WATKINS, and** | § | |
| **THOMAS CALDWELL** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29

Defendants Stewart Rhodes, Kelly Meggs, Kenneth Harrelson, Jessica Watkins, and Thomas Caldwell, by and through their undersigned counsel, submit this Reply Memorandum of Points and Authorities in further support of their Rule 29 motions to include ECF 432 and 435 and in Response to the Government's Opposition Memorandum at ECF 440.

## ARGUMENT

### I. Count One: Seditious Conspiracy

A. *The government mischaracterizes and undermines the elements of Section 2384.*

In its Opposition, the government argues that the seditious conspiracy statute "[d]oes not require forcible resistance to a show of force from the government." ECF 440 at 8. Put another way, the government argues that liability under Section 2384 does not "arise[] only where individuals intend forcible resistance against a proactive use of force (or compulsion) by the government to compel obedience to a command of law." *Id.* These statements are

misinterpretations of the law set forth by the Supreme Court in *Baldwin v. Franks*, 120 U.S. 678 (1887).

As the government correctly notes, *Baldwin* established that the evidence in a seditious conspiracy statute must show that the defendants planned a "**forcible resistance** of the authority of the United States while endeavoring to carry the laws into execution." ECF 440 at 7 (emphasis added) (citing *Baldwin*, 120 U.S. at 693). The government proceeds by arguing, however, that the "forcible resistance" need not be directed at some "show of force" by the government. *Id.* at 8. As previously noted by Defendant Caldwell, however, this interpretation belies the very definition of the word "resistance" at the time the Supreme Court used it in the *Baldwin* decision:

> The key word is "resist." To "forcibly resist" governmental authority clearly means to stand against or oppose an enforcement action by government officials:
>
> > **RESISTANCE**. The act of resisting opposition; the employment of forcible means to prevent the execution of an endeavor in which force is employed.
>
> BLACK'S LAW DICTIONARY (1st ed. 1891) (emphasis added). Likewise, Bouvier's Dictionary defined "resistance" as: "The opposition of force to force."BOUVIER'S DICTIONARY, supra, (defining "resistance"); *see also State v. Welch*, 37 Wis. 196, 201 (1875) (noting that "Bouvier defines ["resistance"] to be the opposition of force to force."). One cannot "forcibly resist" a passive opponent. Instead, a "forcible resistance" can only occur in response to government officials using physical force, compulsion, an assertion of authority, or some other "force."

ECF 384 at 10. Thus, the crux of the *Baldwin* holding is that the force must be aimed towards at least one human, who has authority to enforce the law in question, "while [that authorized person is] endeavoring to carry the laws into execution." ECF 384 at 12 (emphasis added) (quoting *Baldwin*, 120 U.S. at 693).

The government attempts to distinguish the case at bar from *Baldwin*, *Anderson v. United States,* 273 F. 20, 26 (8th Cir. 1921), and *Haywood*, 268 F. 795 (7th Cir. 1920), by simply by the fact that the defendants in those cases targeted non-governmental actors. *See* ECF 384 at 8. But

those cases—each of which involve reversing a seditious conspiracy conviction—offer more insight and involve more similarities with the instant case than the government admits. For example, the *Anderson* court explained

> Inasmuch as this count not only fails to charge the intended use of the requisite force as an element of the conspiracy, but specifically charges that a force was to be exerted in a manner and for a purpose not within the statute, it negatives any inference that might be indulged from the use of the bare statutory words that the prohibited force inheres in the charge.

*Anderson*, 273 F. at 26-27. While the *Anderson* defendants were charged with conspiring to use force against industrial interests, they were also charged with inciting and aiding others to "fail to register [and] to fail and refuse to enlist for military service" by distributing publications and songs discouraging registration and enlistment. *Id.* at 24. Though clearly aimed at *hindering* the execution of the draft laws, this action was not taken in response to some positive show of force by the government. *See id.* at 26-27.

And *United States v. Stone*, which followed *Anderson* in reversing a conviction under § 2384, the court found that:

> the discussions of seditious conspiracy in *Baldwin* and *Anderson* are important to this case; while the Government presented evidence of vile and often hateful speech, and may have even shown that certain Defendants conspired to commit some crime—perhaps to murder local law enforcement—offensive speech and a conspiracy to do something other than forcibly resist a positive show of authority by the Federal Government is not enough to sustain a charge of seditious conspiracy. A conspiracy to murder law enforcement is a far cry from a conspiracy to forcibly oppose the authority of the Government of the United States.

*United States v. Stone*, No. 10–20123, 2012 WL 1034937, at *5 (E.D. Mich. Mar. 27, 2012). The District Court in *Stone* explained that in *Anderson v. United States*, the Eighth Circuit applied *Baldwin* and dismissed a seditious conspiracy charge where the force sought to be exerted was "not against those whose duty it should be to execute the laws." *Id.* at 4 (*citing Anderson*, 273 F. at 26); *see also United States v. Rahman*, 854 F. Supp. 254 (S.D.N.Y. 1994); *Commonwealth of*

*Pennsylvania v. Nelson*, 350 U.S. 497, 505 (1956) ("Sedition against the United States is not a local offense. It is a crime against the Nation." (citation and quotation marks omitted)).

The government relies on *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999), for its argument that seditious conspiracy does not require "a proactive use of force (or compulsion) by the government to compel obedience to a command of law." ECF 440 at 8. However, despite being convicted on both the "levy war" and "oppose by force the authority of" prongs of Section 2384, the court only addressed the former prong when holding that the evidence was sufficient. *See Rahman*, 189 F.3d at 123-24. The Second Circuit held that there was "ample evidence in the record to support the jury's finding that there was indeed a conspiracy to "levy war" against the United States" and that the conspiracy contemplated the use of force. *Id*. at 124. Evidence included his participation in the World Trade Center attack and a plot to bomb the Lincoln and Holland Tunnels and the UN. *Id.* The defendants purchased fuel, fertilizers, and timers and actively sought detonators. *Id.* at 123-124. The defendants had also begun construction of the explosives when they were arrested, in addition to participants planning to murder Mubarak among others. *Id.* The *Rahman* court's discussion of the evidence does nothing to support the government's view of Section 2384's other two prongs.

The government was required to prove that Rhodes and Meggs intended to use force against some "actual exercise" or "positive assertion" of governmental authority. "The lawful transfer of power," as it was charged in the indictment and illustrated at trial, does not qualify as such an exercise of power. Consequently, the government's argument fails at its first stage.

B. *The government's repeated citations to Defendants' hyperbolic statements does not cure the lack of evidence showing Rhodes and Meggs actually agreed to use force against the government.*

The government argues that the "essential nature of the plan" was "to oppose by any means

necessary, up to and including the use of force, the lawful transfer of power following the 2020 presidential election." ECF 440 at 10 (emphasis added).  In its Opposition, the government spends over five pages recounting messages from the exhibits it used in trial, including several statements made by the other Defendants who were acquitted of seditious conspiracy. *See* ECF 440 at 10-16. The messages, while bombastic and extreme, simply do not show any agreement or plan to actually use force against the United States government. And vague references to what may occur— "whatever happens happens (at night)" (the reference to the night does not relate to the ECA) (Gov. Exh. 1008 Msg.1.S.656.9990), or "if he fails to act, then we will" (Gov. Exh. 6860 Msg. 1.S.656.10101-02)—are sweeping platitudes of the type uttered by people in countless contexts every day. They do not convey an actual agreement—let alone an agreement to perpetrate violence.

   C. *The government's broad interpretation of Section 2384 further demonstrates that it is impermissibly vague and was unconstitutional as applied to the First Amendment activities of Rhodes and Meggs.*

   The government argues that the seditious conspiracy statute's "application to the facts adduced at trial bears no relationship to protected First Amendment activity such as protesting, but instead targets the defendants' conduct of planning to use force—and for many, in fact using force—in an effort to stop the transfer of presidential power." ECF 440 at 21. "That application," the government argues, "gives rise to no unconstitutional vagueness concerns." *Id.* This argument ignores the breadth of the statute and the underlying facts which give rise to the Defendants' First Amendment challenge. As explained in *Rahman*, "laws targeting 'sedition' must be scrutinized with care to assure that the threat of prosecution will not deter expression of unpopular viewpoints by persons ideologically opposed to the government." *Rahman*, 189 F.3d at 116.  The *Rahman* court further explained that "[t]here is indeed authority suggesting that the word 'seditious' does not sufficiently convey what conduct it forbids to serve as an essential element of a crime. *Id.*  The

*Rahman* court also attempted to distinguish *Keyishian v. Board of Regents,* 385 U.S. 589, 598 (1967)*,* which found regulations void for vagueness and "dangers fatal to First Amendment freedoms inhere in the word 'seditious.'" *Id.*

The Supreme Court has noted that "mere Party membership, even with knowledge of the Party's unlawful goals, cannot suffice to justify criminal punishment, nor may it warrant a finding of moral unfitness justifying disbarment." *Keyishian v. Board of Regents,* 385 U.S. 589, 607 (1967) (internal citations omitted). A long line of Supreme Court cases addresses the risk that exists here, as argued by the Defendants:

> The seditious conspiracy statute as applied in this case is constitutionally vague under the Fifth Amendment because unimpeached and undisputed evidence at trial showed that defendants headed to the Capitol because the organization they worked with obtained a permit to protest at the Capitol on January 6th, 2022 to take place after the rally for the President on the mall. (KM-Exs. 71, 72 and 73). Based on the application of this case, the statute is constitutionally vague and violates the First Amendment because any legal planned protest activity against Congress can be construed as an attempt to "overthrow the government.

ECF 435 at 20).

Similarly, the Supreme Court has explained the risk of vagueness in a statute that can lead to selective law enforcement with protest activity:

> As counsel [for appellant] admitted, a war protestor who, while attending a rally at which it begins to rain, evidences his disrespect for the American flag by contemptuously covering himself with it in order to avoid getting wet, would be prosecuted under the Massachusetts statute. Yet a member of the American Legion who, caught in the same rainstorm while returning from an 'America -- Love It or Leave It' rally, similarly uses the flag, but does so regrettably and without a contemptuous attitude, would not be prosecuted." 471 F.2d, at 102 (emphasis in original). Where inherently vague statutory language permits such selective law enforcement, there is a denial of due process.

*Smith v. Goguen*, 415 U.S. 566, 575-576 (1974).

The Court of Appeals in *Rahman* noted that the word "seditious" does not appear in the text of the statute, but only in the caption. *Rahman*, 189 F.3d at 116. The court proceeded to

determine that Section 2384 was not vague as applied to the defendants in that case because "[the elements] unquestionably specify that agreement to use force is an essential element of the crime." *Id*.

As the Defendants have previously argued, while Defendant Rhodes' words at times expressed the belief that a civil war was imminent—or even a personal desire for a civil war and its attendant violence at some undetermined future time—they did not amount to an incitement to "imminent lawless action." *C.f. Yates v. United States*, 354 U.S. 298, 318 (1957), *overruled in part on other grounds*, *Burks v. United States*, 437 U.S. 1, 7 (1978). Thus, the application of the seditious conspiracy statute to these defendants constitutes both a vagueness issue and a violation of the First Amendment. The government made no attempt to distinguish any of the cases cited by the Defendants on this point, including but not limited to: *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964); *Reno v. ACLU*, 521 U.S. 844, 870-871 (1997); *Stomberg v. California* 283 U.S. 359, 369 (1931); *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 582-584 (D.D.C.), *aff'd*, 409 U.S. 972, 34 L. Ed. 2d 236, 93 S. Ct. 311 (1972); *Bynum v. United States Capitol Police Bd.*, 93 F. Supp. 2d 50, 54, (D.D.C. 2000), *vacated in part on other grounds*, 96 F. Supp. 2d 4; *Watts v. United States*, 394 U.S. 705, 707 (1969); *Herndon v. Lowry*, 301 U.S. 242, 258 (1937); and *Whitney v. California*, 274 U.S. 357, 374 (1927), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). *See* ECF 435 at 19-24.

Yet the government argues with a broad brush: "This statute's application to the facts adduced at trial bears no relationship to protected First Amendment activity such as protesting, but instead targets the defendants' conduct of planning to use force—and for many, in fact using force—in an effort to stop the transfer of presidential power. That application gives rise to no unconstitutional vagueness concerns." ECF 440 at 21. Furthermore, it only cites to one case—

*Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993)—for the notion that courts may consider First

Amendment speech as evidence of some other crime. There, however, the Supreme Court stated

that only "[o]nce any ambiguities as to the meaning of the statute are resolved, we may form our

own judgment as to its operative effect." *Id.* at 484.

> The Supreme Court in *Alvarez* explained,
>
> Still, the sweeping, quite unprecedented reach of the statute puts it in conflict with
> the First Amendment. Here the lie was made in a public meeting, but the statute
> would apply with equal force to personal, whispered conversations within a home.
> The statute seeks to control and suppress all false  statements on this one subject in
> almost limitless times and settings. And it does so entirely without regard to
> whether the lie was made for the purpose of material gain. *See San Francisco Arts
> & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 539-540, 107 S.
> Ct. 2971, 97 L. Ed. 2d 427 (1987) (prohibiting a nonprofit corporation from
> exploiting the "commercial magnetism" of the word "Olympic" when organizing
> an athletic competition (internal quotation marks omitted)).

*United States v. Alvarez*, 567 U.S. 709, 722-723 (2012).

It is the government, however, that argues the sweeping expanse of Section 2384.  As

previously noted, it argues that "Section 2384 does not require forcible resistance to a show of

force from the government." ECF 440 at 8. The government further argues "[t]hat language—such

as references to "positive assertion or actual exercise of authority"—does not imply that liability

under Section 2384 arises only where individuals intend forcible resistance against a proactive use

of force (or compulsion) by the government to compel obedience to a command of law." *Id.* It

goes on to assert that

> [i]t follows, therefore, that the evidence need not establish that the defendants
> settled on every detail of an intricately developed plan. Nor does it matter whether
> the persons who formed the agreement actually carried out their plans or whether
> the agreement ultimately was successful; though, proof concerning the
> accomplishment of the object of the conspiracy may certainly be evidence of the
> existence of the conspiracy itself.

*Id*. at 10 (citing *Court's Final Jury Instructions*, ECF No. 400 at 17-19).

Thus, the government's entire case was built on the communications among these Defendants related to Biden and Trump and the fact that certain Defendants entered the Capitol. Under the vague and overbroad application of association that the government has applied, the hundreds of other protestors on January 6th could arguably be construed as "co-conspirators" for entering the Capitol with these Defendants. Belonging to a chat or paying a membership fee to a national organization appears to be enough to become an alleged "co-conspirator"—even when that organization had independent and unrelated state chapters.

D. *Contrary to the government's contention, the impermissible variance from the conspiracy charged in the indictment was prejudicial to the Defendants.*

The government argues that

> [t]o obtain reversal, the defendant bears the burden of showing that "(1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another.

ECF 440 at 18-19 (quoting *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988)). *Tarantino* nevertheless also explained that "a variance between the allegations of the indictment and the proof at trial constitutes grounds for reversal only if the appellant proves (1) that the evidence at trial established facts materially variant from those alleged in the indictment, and (2) that the variance caused substantial prejudice." *Tarantino*, 846 F.2d at 1391 (*citing e.g. United States v. Caporale*, 806 F.2d 1487, 1499-1500 (11th Cir. 1986), *cert. denied*, 483 U.S. 1021, 107 S. Ct. 3265, 97 L. Ed. 2d 763 (1987)).

The government attempts to argue that Defendants failed to establish prejudice from the variance they claim occurred. ECF 440 at 17. However, as Defendants argued in their motion, the government's misrepresentation of the evidence is obviously prejudicial.  Defendants wrote, "[t]his post-indictment broadening of the charges prejudiced the defendants because they relied on

the government's theory of the case as set forth in the Indictment to formulate their defenses and the remainder of the evidence was insufficient to sustain a conviction." ECF 435-1 at 10. So the government turns to its overbroad and vague language that is present in the Indictment: "Indeed, the conspiracy charged in the indictment runs from November *through* January 2021, *including and following* the January 20 Inauguration date." ECF 440 at 18 (internal citations omitted). Having recognized its failure to establish the plan described in the Indictment, the government attempted to formulate an alternative theory of liability—that the defendants actually planned to "start a rebellion." In closing, the government argued:

> Think about that, ladies and gentlemen. Mr. Rhodes told you in his own words he was prepared **to start a rebellion the day that President Biden took office.** We'll talk about, at the end of this trial, that that is exactly what is charged in the conspiracy. The charges in this case don't end on January 20th. The defendant is charged with engaging in a conspiracy to use force against the government from the time period of November through January of 2021.

(11.18. 2022, Morning Session, Tr. 9926, L. 10-18) (emphasis added).[1]

---

[1] These discrepancies in the evidence further highlight the vagueness and overbreadth behind the seditious conspiracy statute as applied to these facts. Instead of addressing the cases on both vagueness and overbreadth as well as the First Amendment, the government argues that—as a simple matter—they have a jury verdict. Yet it is undisputed that Defendants entered the Capitol with protestors after attending a Rally for the President of the United States, which included the Defendants. Furthermore, the facts the government raises in its Opposition are just as easily applied to protestors and political speech:

> That same day, December 23, Meggs told those on the OKFL Hangout chat: "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside ! Scare the hell out of them with about a million surrounding them should do the trick !" Id. (Msg. 1.S.656.9619). He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of the Capitol !!" Id. (Msg. 1.S.656.9620). On December 24, Meggs wrote to the same chat, "We have 10-12 staying there. So it's gonna be a WILD time in DC we gotta get the crowd going during the day. I think we get everyone up good and close to the Capitol bldg so they can here is inside. Then at night well whatever happens happens." Id. (Msg. 1.S.656.9990).

Again, missing from the narrative in the case at bar is the agreement to use force where undisputedly none of the Defendants brought firearms or told anyone to bring firearms into the District. Instead, the government brushes over this gaping discrepancy and argues,

> Further evincing their close coordination, the coconspirators—including those who breached the building and those who had not—met together on Capitol grounds within hours of Stack One and Stack Two breaching the building. *Id.* The defendants' coordinated actions on January 6 also provide compelling evidence of their conspiratorial agreement.

ECF 440 at 14. Here, the government is referencing the protestors standing near the grounds around 3:00 - 4:00 PM. The fact that these Defendants found each other outside the Capitol and were members of an association (the Oath Keepers) does not in and of itself show coordination, but constitutes "mere association." And freedom of association is First Amendment activity. Moreover, an alleged call between Rhodes and Greene and allegedly Kelly Meggs lacks foundation to be coordination to enter the Capitol where there is no corroborating evidence and neither Rhodes or Greene are alleged to have entered the Capitol.

The government further conflates evidence when it argues:

> Nor did the defendants' unlawful agreement cease on January 6. That night, Rhodes wrote to the DC OP: Jan 6 21 Signal chat: "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." Gov. Exh. 6732 (Msg. 1.S.159.1328). Meggs echoed Rhodes, adding to that same Signal chat a message stating, "We aren't quitting!! We are reloading!!" *Id.* (Msg. 1.S.159.1326). Between January 6 and the Inauguration on January 20, Rhodes did reload—to the tune of $17,000 in firearms and tactical equipment . . . .

First, the government combines the allegations related to multiple conspiracies in this paragraph. Secondly, the government's witness, Special Agent Kelsey Harris, testified that he was unaware of any evidence that Mr. Meggs ever went back to the Capitol after he left on January

---

ECF 440 at 12.

6th. TR.6244: 7-10 (Nov. 1, 2022).   And Agent Harris further testified that this message "We aren't quitting!! We are reloading!!" was not to be taken literally and that it was rhetoric. Tr. at 6244 l.17-25 –6245 l.1-5. Furthermore, the fact that one individual (Rhodes) legally bought firearms in Texas does not evidence an "agreement" to act.

> But at trial, the government instead argued:

> The evidence has shown for weeks, if not months, prior to January , these defendants banded together and agreed to do whatever was necessary, up to and including using force and violence, to stop that election result from becoming finalized. And then on January 6th, they struck. They saw the riot unfolding at the Capitol, ***they threw their bodies to the cause***, and they took it.

ECF 435 at 16 (citing 11.18.2022, Morning Session, Tr. 9980-91)).   This is prejudicial and evidences the vagueness with which the statute is applied; Rhodes, Meggs, Watkins, Harrelson, and Caldwell were not charged with assault and there was no evidence they destroyed property. Many protestors indeed "threw their bodies to the cause" on January 6th as a part of a protest, but they are not all charged with seditious conspiracy, because the government cannot prove any agreement to use force. The allegation raised in closing that "***they*** threw their bodies to the cause" lacked factual foundation and prejudiced the defendants without supporting evidence. Even assuming *arguendo* that the government's reliance on "pushing past officers" is true (despite CCTV showing otherwise, *see* KM-86), "pushing past law enforcement" is not the "use of force" contemplated by the seditious conspiracy statute. Entering the Capitol at a point when a number of protestors entered it is as well and Congress was indisputably already in recess is certainly not evidence of "an agreement to overthrow the government."

> The Defendants were also prejudiced by the mischaracterization of the evidence when it argued that:

> [t]hey stopped the lawful transfer of presidential power.  They physically drove members of Congress from the Capitol Building, and they halted Congress's joint session.

Tr. 10294 l.12-15 (Nov. 21, 2022). The government's own witness, Thomas Wickam, set forth that Congress was in recess first at 2:18 PM on January 6th, and again at 2:29 PM. Tr. 4441:21-25 -Tr. 4443:1-10 (Oct. 19, 2022). Defendants could not have "halted" the Congressional session when it was already in recess; Mr. Meggs and others, such as Graydon Young, reached the steps of the Capitol at 2:35 PM, Tr. 9950:6-7 (Nov. 18, 2022), and then undisputedly only entered the Capitol at 2:41 PM—well after Congress was already in recess the second time. A variance that so clearly misrepresents the evidence is prejudicial.

The government further conflated evidence when it ignored the fact that Mr. Meggs has no military background.  Instead, the government argued that, "Mr. Dolan explained to you the concept of the commanders' intent, which he learned during his 19 years as a United States Marine. The commanders' intent explains the reasons why the group wants to achieve the common goal." Tr. 10302 l.22-25.  However, the government read a stipulation that makes clear Mr. Meggs has no military background. (Gov't Stipulation, 3004).   Even in its Opposition, the government continues to expound on the military hierarchy when it argues "According to Young, **Kelly Meggs was his superior** and was attempting to 'rendezvous with Stewart' to decide 'next actions as a group.'" ECF 440 at 29 (citing 10/31/22PM Tr. at 5857). These references attempt to transform into a military exercise what was simply members of a group who all attended a rally for the President of the United States, after which they headed up to the Capitol with other protestors, where more protests were scheduled.

These mischaracterizations of the evidence, combined with the impermissible variance by the government, show that the jury was substantially likely to transfer evidence from one theory

of seditious conspiracy to another. This undoubtedly prejudiced the defendants, requiring reversal

as to Count One.

## II. Counts Two and Three: Conspiracy to Obstruct an Official Proceeding and Obstruction of an Official Proceeding

A. *The government failed to prove that Defendants acted "corruptly."*

The vagueness present in the application of seditious conspiracy statute is further

confirmed by the government's own argument on Conspiracy to Obstruct an Official Proceeding

charge. As the government set forth:

> Counts Two and Three charge all the defendants with conspiracy and substantive
> violations of 18 U.S.C. § 1512(c)(2). Section 1512(c)(2) makes it a crime to
> corruptly obstruct or impede an official proceeding, which includes the
> Certification of the Electoral College vote.  *See United States v. Caldwell*, 581 F.
> Supp. 3d 1, 11-15 (D.D.C. 2021). The same general conspiracy principles described
> above apply here.

ECF 440 at 23.

The government continues its argument, showing the lack of evidence in the case relating

to corrupt intent:

> Even if the jury did not find a conspiracy to obstruct the Certification and interfere
> with members of Congress prior to January 6, the defendants' conduct and
> statements on that day would also be sufficient evidence upon which the jurors
> could convict the defendants of the conspiracy charges in Counts Two and Four.
> That day, at about 1:25 p.m., when it became clear that President Trump and Vice
> President Pence were not going to intercede to stop the Certification of the Electoral
> College vote, and as a large crowd gathered on the Capitol grounds and converged
> on the building, Rhodes sent the messages described above, lauding the patriots
> who were taking matters into their own hands. Gov. Exh. 1500. Similarly, at 1:41
> p.m., Rhodes sent a message to the OLD Leadership CHAT stating, "Hey, the
> founding generation stormed the governors mansion in MA . . . . They didn't fire
> on them, but they street fought. That's where we are now. Next comes our
> 'Lexington.'" Id. In the context of all the messages Rhodes and his co-defendants
> had exchanged in the lead-up to January 6, these words were a call to action.

ECF 440 at 27.

This argument highlights the lack of evidence and the prejudicial variances in the

Indictment and the argument by the government because the government must prove that the defendant acted with "consciousness of wrongdoing." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705-06 (2005); *see United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11 (D.D.C. Dec. 20, 2021). This means the defendant's conduct must be "independently criminal," that is "inherently malign" and "committed with the intent to obstruct an official proceeding." *Sandlin*, No. 21-cr-88 (DLF), 2021 WL 5865006, at *13 (D.D.C. Dec. 10, 2021) (internal quotation marks omitted) (*quoting United States v. North*, 910 F.2d 843, 943 (D.C. Cir. 1990) (Silberman, J., concurring in part and dissenting in part); *Arthur Andersen*, 544 U.S. at 704). Thus, those who engage in lawful, innocent conduct—even when done with the intent to obstruct, impede, or influence the official proceeding—cannot be guilty of violating § 1512(c)(2). *Id.* (*citing Arthur Andersen*, 544 U.S. at 705-06).

Specifically, the government has failed to allege that anyone "corruptly" did anything, that any "official proceeding" was implicated, or what conduct by the Defendants constituted any actus reus amounting to an "attempt[] to," and allegedly successful "corruptly obstruct[ion], influence, and impede[ment] [of] an official proceeding."

Finally, if recourse to any of the "traditional tools of statutory construction leaves any doubt" about the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress" as those terms are used in Section 1512(c)(2), this Court should also invoke the Rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547-48) (*quoting Cleveland v. United States*, 531 U.S. 12, 25 (2000)).

The government provided no evidence that the defendants were on restricted Capitol grounds at the time protestors breached the inside of the Capitol Building and when Congress was evacuated.  By stipulation, members of Congress were ordered to be evacuated from the Capitol

Building at 2:20 P.M. And at 2:29 P.M., the House of Representatives recessed under Rule 12(b), an emergency provision of the House Rules. (Tr. 4442-43). A "recess," according to Parliamentarian Thomas Wickham, is a "temporary break in the proceedings" and "can last an indefinite time." (Tr. 4442-43, 4457-58). As a general matter, the government failed to prove that any of the defendants personally obstructed or impeded Congress's certification of the Electoral College on January 6, 2021.

While other protestors ("the Mob") are alleged to have engaged in violent conduct, Defendants mere alleged presence as part of "Stack One" does not plead adequately to establish a claim for the use of force to oppose the authority of the government:

"[M]ere association, standing alone, is inadequate; an individual does not become a member of a conspiracy merely associating with conspirators known to be involved in crime." *United States v. Gaskins*, 402 U.S. App. D.C. 262, 273 (D.C. Cir., 2012) (*quoting United States v. Wardell*, 591 F.3d 1279, 1288 (2009)); *see also United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011) ("The agreement is the sine qua non of a conspiracy, and this element is not supplied by mere knowledge of an illegal activity . . . , let alone by mere association with other conspirators." (internal quotation marks omitted)); *United States v. Diaz*, 637 F.3d 592, 602 (5th Cir. 2011) ("If all that was shown was a defendant's . . . 'close association with conspirators,' jurors would not be entitled to infer participation in the conspiracy." (internal quotation marks omitted)); *U.S. v. Nusraty*, 867 F.2d 759, 764 (2d Cir 1989) ("[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement.")

Further, the Supreme Court has held that the same conclusion follows for acts of concealment that postdate the conclusion of the conspiracies. Even in the context of criminal conspiracies, acts of concealment that follow completion of the conspiracies' main objective are

generally not considered to be part of the conspiracy. *See Grunewald v. United States*, 353 U.S. 391, 402 (1957).

Of note, Judge Nichols's conclusion, and decision incorporated herein, *is also* consistent with the Supreme Court's consideration of a nearly identical challenge to the same chapter of the criminal code in *Yates.* Specifically at issue was whether the breadth of a sister-section, 18 U.S.C. § 1519, was unconstitutional. A majority of the Court concluded it was and reversed a fisherman's conviction under an "accountant's offense"—both § 1512(c) and § 1519 were "originally passed to confront the sort of document destruction conducted by Anderson Consulting in the early days of the Enron investigations." *See* Gregory M. Gilchrist, Regulation by Prosecutor, 56 Am. Crim. L. Rev. 315, 338 (2019); *see also Yates*, 574 U.S. at 535 ("The Sarbanes-Oxley Act, *all agree*, was prompted by the exposure of Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen LLP, had systematically destroyed potentially incriminating documents." (emphasis added)). The fisherman had been convicted for "destruction" of evidence –illegally caught fish—with the "intent to impede, obstruct, or influence" an investigation. *Yates*, 574 U.S. at 531. Although the Court agreed the statute as applied to *Yates* was unconstitutionally broad, it did not agree on the manner by which to reach that conclusion. Regardless of the approach taken here, however, *Yates* dictates that the government's application of Section 1512(c)(2) to the Defendants is unconstitutionally overbroad.

Section 1512(c)'s nouns are limited to "records, documents, or other objects," precluding the "alter[ation], destr[uction], mutilat[ion], or conceal[ment]" of that which "impair[s] the object's integrity or availability for use in an official proceeding." Put differently, the statute prohibits tampering with a record to impede an official proceeding. The additional verbs that

follow—"obstruct[], influence[], or impede[]"—which themselves are modified by the adverb "otherwise," must be read collectively with the actions (verbs) that precede.

Justice Alito acknowledged the shortcomings of relying solely on the nouns and verbs within a section to derive legislative intent and/or meaning, *see Yates*, 574 U.S. at 551 ("focusing on the verbs, the category of nouns appears to be filekeeping [and while] [t]his observation is not dispositive, . . . neither is it nothing"), ultimately the section's title tipped the scales. Title IX of the Sarbanes-Oxley Act—the "Corporate Fraud Accountability Act of 2002" (emphasis added)— provides § 1512(c)'s language within a section entitled, "Tampering With a Record or Otherwise Impeding An Official Proceeding." The section's title thus affirms the foregoing interpretation— "or otherwise obstructs, influences, or impedes and official proceeding" is intended to be read collectively with the statute's prohibition of tampering with a record to impede an official proceeding.

In *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), the D.C. Circuit ruled that the word "corruptly" is prone to causing vagueness citing Section 1505 of Title 18 of the United States Code. The court concluded that the word "corruptly" in the text "must have some meaning, because otherwise the statute would criminalize all attempts to 'influence' congressional [proceedings]—an absurd result that Congress could not have intended in enacting the statute." *Poindexter*, 951 F.2d at 377 (citing *United States v. North*, 910 F. 2d 843, 881-82 (D.C. Cir. 1990)). The D.C. Circuit acknowledged, as this Court must as well, that, "on its face, the word 'corruptly' is vague; that is, in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application.'" *Id*. at 378.

Applying *Poindexter*, the only way the use of the word "corruptly" in Section 1512 passes constitutional muster if it is "clearly indicates a more specific meaning" and Defendants' "conduct

comes within that meaning." *Id.* at 379.  Because no obvious specific content applies to the use of the word "corruptly"—whether transitively or intransitively—the word lacks definition and remains too vague to provide constitutionally-required notice.

B.  *The certification of the Electoral College is not an "official proceeding."*

Moreover, even if the certification of the electoral college is an "official" act, it is not a proceeding.  As held by the Seventh Circuit, "[t]o be liable under § 1512(c)(2), a defendant must obstruct or impede an 'official proceeding.' A separate section of the statute defines 'official proceeding' as 'a proceeding before a judge or court of the United States . . . or a Federal grand jury.'" *United States v. Burge*, 711 F.3d 803, 808, (7th Cir. 2013), *certiorari denied by Burge v. United States*, 134 S. Ct. 315 (2013) (citing 18 U.S.C. § 1515(a)(1)(A) (emphasis added)). No one appears "before" the Congress; no formal investigation or consideration of facts ensues; and there is little to no discretion afforded either Congress or its Presiding Officer. No parties are summoned to attend the proceedings; no witness or evidence is produced, offered or taken; and nothing is adjudicated by Congress. As such, the certification contrasts with tribunal proceedings, and have nothing in common with the "business done in courts," or acts "done by the authority or direction of the court, express or implied."  *See United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013) ("'Proceeding' is a word much used to express the business done in courts and "is an act done by the authority or direction of the court, express or implied.").

C.  *The evidence was insufficient as to Count Three (Caldwell).*

1.  Caldwell did not delay the restarting of the Certification proceeding.

The government does not challenge Caldwell's assertion that he was not responsible for Congress's evacuation and recess.  The government rejoins, however, that "while these defendants and their co-conspirators may not have *caused* the break in the proceeding on January 6, their

19

[continued presence in the building] certainly *prevented* it from resuming, and thus *hindered*, *delayed*, and ultimately obstructed it."  ECF No. 440 at 32 (emphasis original).  As applied to Caldwell, the government's argument is without merit.

First, as Caldwell was acquitted of all conspiracy counts, including Count 2 (Conspiracy to Obstruct an Official Proceeding), he had no "co-conspirators."  Accordingly, Caldwell's acquittal as to all conspiracy counts *ipso facto* means that he cannot be held responsible for protestors that entered the Capitol before (and remained), during, or after his brief presence on the inaugural balcony.  Second, as Caldwell never attempted to enter, or actually entered, the Capitol, the government's "continuing presence in the building" argument is simply inapposite to Caldwell. Before Caldwell set foot on restricted Capitol grounds on January 6, scores of protestors had breached the Capitol, with many remaining there for hours.  Protestors also entered the Capitol from the eastside while Caldwell was on the opposite side of the Capitol.  And protestors entered the Capitol *after* Caldwell left the balcony (2:54 p.m.) and later the Capitol grounds (before 3:05 p.m).[2]

The government adduced no testimony about whether non-violent protestors like Caldwell *outside* of the Capitol delayed the resumption of the official proceeding.  And if Congress could not restart until all unauthorized persons[3] were removed from inside the Capitol, how could Caldwell have delayed the restarting of the proceeding when scores of protestors independently entered the Capitol *after* he had exited Capitol grounds?  In short, the government adduced no testimony that Caldwell's specific actions delayed for one second the resumption of a proceeding

---

[2] In fact, "Stack Two" entered the Capitol building at 3:14 p.m.  *See* Govt. Exh. 1056.7029.0314.
[3] Interestingly, the government's case-in-chief adduced no testimony that Caldwell lacked authority to be on the Capitol grounds.  Not one witness testified that Caldwell's presence on Capitol grounds was unauthorized.

that was recessed and evacuated from Capitol Hill.

That Caldwell never attempted to enter, or actually entered, the Capitol negates an inference that he obstructed or impeded Congress. The *inside* of the Capitol had to be decluttered of protestors before the Electoral College certification could proceed because the breaching protestors did not go through security, making the building unsafe for Members of Congress to return until their removal. Additionally, after securing the building, law enforcement would undoubtedly need to conduct a security sweep before allowing Members of Congress to return. No such security measures were needed, however, as to those *outside* the Capitol. Accordingly, while those who actually entered the building could, under certain factual scenarios, be found to have delayed the restarting of the proceeding even if they engaged in no assaultive or disruptive behavior, a peaceful protestor on the outside of the building cannot be found liable under § 1512 on the record before the Court.

### 2. Caldwell's messages do not demonstrate a "corrupt purpose."

The government's claim that Caldwell's messages demonstrate his "corrupt purpose" is without merit. Contrary to the government's suggestion, (ECF No. 440 at 31), Caldwell did not physically break through two rows of barricades, steal police riot shields, or throw fire extinguishers through windows.[4] Caldwell's use of the pronoun "We" in his colorful messages

---

[4] The government and Caldwell introduced, *inter alia*, more than 100 photos, 2 cell phone videos, and surveillance footage from in and around the Capitol that showed Caldwell and his wife on or around Peace Circle, Capitol grounds, and the inaugural balcony. Not once is Caldwell shown to possess a police riot shield or fire extinguisher. The photos and videos also do not show Caldwell charging up Capitol Hill, breaking barriers, being hit with tear gas, or any number of Walter Mitty-isms Caldwell wrote in his messages. Additionally, the "Pelosi doorknob video" proved that Caldwell had no line of sight into an elevated entry way on the inaugural balcony. *See* Govt. Exh. 22.V.1. In fact, this video proved that at the time a police riot shield made its way out of the entry way, Caldwell and his wife were in the process of exiting the balcony. *Id*.

was typically a reference to the crowd in general, not to the actions taken by him and his wife. Video introduced by Caldwell in the government's case clearly showed that barricades and a police line blocking the walkway from the Peace Circle to the Capitol had disappeared more than 15 minutes before Caldwell and his wife arrived at Peace Circle.  *See* Caldwell Exh. 80.  A bird's-eye view surveillance video of the inaugural balcony showed thousands of protestors packed in on the west side Capitol lawn while Caldwell and his wife were still situated at the Peace Circle.[5]  *See* Govt. Exh. 6757.  The government can't have it both ways as to Caldwell's messages.  For nearly an hour during its redirect examination of Special Agent Palian, the government, in defending the FBI's handling of the arrest, search, and charging decisions related to Caldwell, methodically undermined the credibility and reliability of Caldwell's Facebook messages.  Caldwell's Facebook messages are not only uncorroborated, they are entirely at odds with video and photographic evidence introduced by the government, (e.g., Govt. Exh. 6757, showing that a crowd had displaced all barriers), and the defense.  *See, e.g.*, Caldwell Exhibits 45 & 46 (photos showing no barriers); (Tr., 8520-21) (testimony of Sharon Caldwell).  In short, Caldwell's messages do not prove his corrupt intent.

Caldwell had no communication with his co-defendants on January 6 after the very early morning hours and, importantly, was acquitted of all conspiracy counts.  Moreover, the government adduced no evidence that Caldwell communicated with anyone except his wife while on restricted grounds.  Caldwell's conduct on the balcony consisted of taking a handful of "selfies," hamming it up for the camera while his wife made a video, and chanting U.S.A. a few times.

---

[5] Notably, the government's case showed that Caldwell remained at the Peace Circle for roughly 80 minutes, even as thousands of protestors marched on the west side grounds of the Capitol, an action which belies any notion that Caldwell acted with a corrupt intent to disrupt, hinder, or delay the Certification proceeding.

Despite saturation coverage of the inaugural balcony by surveillance cameras, bodycam footage, personal cell phones, and photos and video taken by Caldwell and his wife, the government can neither point to one act of assaultive or violent behavior by Caldwell nor one police officer in Caldwell's field of vision that was being assaulted, pepper sprayed, or injured.  Finally, Caldwell encouraged his wife to leave the balcony with him after only a brief period of time, an action that multiple Capitol Police testified would have assisted law enforcement on January 6.  *See, e.g.*, (Tr., 5642) (testimony of Officer Harry Dunn).  No other similarly situated person has been charged with a *misdemeanor* in a January 6 case let alone the 20-year felony that Caldwell was found guilty of by the jury.

3.   Caldwell had no corrupt intent by the government's own definition.

At a motions hearing on September 8, 2021 in *United States v. Caldwell*, the Court engaged in the following colloquy with the Government regarding how expansive the language of § 1512(c)(2) should be read vis-à-vis the types of conduct covered by the statute:

> THE COURT:  [T]ake the hypothetical that is the obvious one. Somebody stands up at a Senate confirmation hearing for a Supreme Court justice and yells, "stop these proceedings." Is that a 20-year felony?
> MR. NESTLER:  Likely not. And there are a couple of reasons: Well, we have to look at the person's intent. What were they -- was their intent corrupt and *what did they intend to actually accomplish*? Did they intend to have their voice heard by Congress and have their position known and to have a momentary second *or minutes*?
> THE COURT:  So what if the person stands up and says, "Stop these proceedings now," "These proceedings have to come to a stop now," because that's what you've alleged the object of the conspiracy here is, was to halt these proceedings, right? Would that be a 20-year felony?
> MR. NESTLER:  No. But the object here was not just to halt the proceedings, *the object here was to scare Congress into halting the proceedings*.

(Tr., 52) (Sept. 8, 2021 motions hearing) (emphasis added).

The Court also questioned the Government on the issue of what constitutes the defendants' "corrupt intent."  The government argued:

MR. NESTLER:  In this situation, it's intimidating Congress. That is what the government intends to prove at trial; *that the defendants here were corrupt because they intended to intimidate Congress*, obstruct Congress, interfere with Congress. And they were corrupt *because they were intending to intimidate Congress into stopping* what Congress was doing. *One person standing outside of the Capitol building yelling "don't certify the Electoral College vote" is not going to accomplish their ends.* So what they did was they broke through the doors and made Congress literally flee from their seats so they couldn't do what they were doing. *The government's position is that's what evidences their corrupt state of mind.*

(Tr., 59) (emphasis added).  Caldwell was acquitted of the conspiracy counts, and his independent actions on January 6 did not provide the jury with legally sufficient inferences to convict Caldwell under § 1512(c)(2).  Caldwell and his wife, per the government's case, were legally situated at Peace Circle for nearly 80 minutes before they walked up towards the Capitol, hardly indicative of an intent to intimidate Congress.  Caldwell engaged in no violence towards law enforcement and was only on the balcony for "minutes" taking pictures and chanting "USA" before voluntarily leaving.  Most important, Congress had already stopped the certification and left (or were in the process of leaving) Capitol Hill under an evacuation order before Caldwell entered restricted grounds and twenty minutes before Caldwell set foot on the inaugural balcony.  Caldwell did not intend to "intimidate" Congress into leaving the Capitol—they had already left before he entered restricted grounds.

In short, Caldwell acted with no corrupt intent by the government's own definition, and his actions did not obstruct or impede a proceeding that had been recessed and evacuated. Accordingly, the Court should grant Caldwell's Motion for Judgment of Acquittal as to Count 3.

### III. Count Ten: Tampering with Documents or Proceedings (Caldwell)

*A.   The government did not challenge key assertions by Caldwell.*

As to Count 10, evidence tampering, the government did not challenge the following assertions by Caldwell as to the government's case-in-chief:   1) that no direct evidence was adduced that Caldwell personally deleted the 30-page Caldwell-Crowl Facebook thread; 2) that no direct evidence was adduced that Caldwell specifically intended to obstruct the Grand Jury by deleting photographs; 3) that no direct evidence was presented that the Grand Jury proceeding was a matter of public knowledge; that Caldwell had actual or constructive knowledge of the Grand Jury proceeding; or that he was aware that he was in legal jeopardy in relation to a *felony* prosecution; 4) that the government cannot identify the specific content of 175 of the 180 unsent messages let alone hazard a guess as to which, if any, contained photographs specified in the Indictment; 5) that to delete the 11 photographs at issue[6] would have required Caldwell to delete the entire 30-page Caldwell-Crowl Facebook thread with one swipe of a finger; 6) that multiple messages contained within the 30-page Caldwell-Crowl Facebook thread were either sent before January 6, were not photographs, involved medical issues with Caldwell's wife, or had absolutely no evidentiary value to the Grand Jury; 7) that after Caldwell was put on notice that Watkins and Crowl had outstanding arrest warrants, he took no actions indicative of evidence tampering in the subsequent 36 hours leading up to his arrest.   Finally, the government conceded that the 11 photos at issue were "saved on [Caldwell's] phone" and were recovered by the FBI subsequent to his arrest.   ECF No. 440 at 38.

As to Caldwell's case-in-chief, the government did not challenge the following assertions:

---

[6] Notably, the 11 photographs at issue document that Caldwell and his wife followed a crowd of people up the Capitol steps, under scaffolding, and on to the inaugural balcony without any barriers in sight to bust through.  *See* Govt. Exh. 2001.T.61 at 69-79.

1) that Caldwell, prior to his arrest, did not delete from his cell phone a 3-way "text chat" with Watkins and Crowl, which contained 39 photos related to January 6, including the 11 photographs at issue; 2) that Caldwell did not delete January 6 photographs contained in text chats with five other contacts; 3) that Caldwell had retained, at the time of his arrest, the originals and copies of all (134) of his January 6 photos on two separate back-up external drives, including the 11 photos at issue; 4) that a Facebook message from Caldwell to an acquaintance on January 11, 2021, *three days before Crowl and Watkins traveled to his farm in Virginia*, documented that Caldwell was already in the process of taking down photos from Facebook: "I am in the process of pulling off all my pix, etc. [from Facebook]."  (Caldwell Exh. 50).

> *B.   The government failed to prove a prima facie case as to tampering with photographs.*

The government's case-in-chief in relation to tampering with photographs was legally insufficient to support a guilty finding as to Count 10.  With only circumstantial evidence, the government's evidence was a house of speculative cards.  First, no rational jury could conclude beyond a reasonable doubt that Caldwell personally deleted the Caldwell-Crowl thread.[7]  Second, assuming *arguendo* that sufficient proof existed that Caldwell swiped the delete button himself, the government adduced insufficient proof that Caldwell specifically targeted for deletion *any* photos, which were contained within 30 pages of the Caldwell-Crowl thread that included text-type messages, memes, videos, etc.[8]  Third, the government failed to prove that Caldwell's actions were tied to a foreseeable, "particular proceeding."[9]  Fourth, as the 11 photos at issue show

---

[7] The government adduced no evidence that Caldwell had exclusive access to his Facebook messenger account or his phone.  Without direct evidence that Caldwell personally swiped the delete button, the government's case was insufficient.

[8] The Caldwell-Crowl thread consists of a total of 90 messages, 11 of which contain the photos at issue.  *See* Govt. Exh. 2001.T.61 at 61-91.

[9] The government avers "that the deletion encouraged or committed by these defendants was directly related to their fears about the use of these materials against them in a criminal

Caldwell and his wife engaging in no violence in areas of Washington, D.C. that are saturated with surveillance cameras, the evidence was insufficient to show that Caldwell knew that the "natural and probable effect" of his conduct would be obstructing a Grand Jury investigation.  Fifth, it was pure speculation for the jury to conclude that Caldwell's specific intent in deleting 30 pages of Caldwell-Crowl Facebook records, which contained multiple messages of no evidentiary value, was to prevent the 11 photos at issue from coming into the possession of the Grand Jury.  Finally, as Caldwell possessed the original 11 photographs at issue and two copies contained on separate external back-up drives, Caldwell did not completely "destroy" the "object," i.e., the 11 photographs, named in the Indictment.  *See Costanzo v. State*, 152 So. 3d 737, 738 (Fla. Dist. Ct. App. 2014) (holding that defendant did not "completely destroy[] potential evidence" as he had transmitted the video at issue to others).  In short, the government's case-in-chief adduced insufficient evidence to convict Caldwell for tampering with photographs.

C.  *It's not the "quantum" of deletions—it's the intent behind the deletions.*

The government's main rejoinder counters Caldwell's "suggestion that a conviction for obstruction/tampering with evidence requires some quantum of deleted items."  ECF No. 440 at 38.  The government misunderstands Caldwell's position.  Caldwell's issue isn't with the small number of photos that were deleted.  Rather, the issue is:  What was Caldwell's specific intent in allegedly deleting the 11 photographs?  Without direct evidence of Caldwell's intent, the

---

investigation." ECF No. 440 at 36.  While the government's claim may have traction with a different defendant, as to Caldwell the government presented no evidence in its case-in-chief that Caldwell encouraged evidence tampering or was aware of a Grand Jury or law enforcement investigation pertaining to himself, Crowl or Watkins.  Special Agent Palian testified that upon his arrest, Caldwell asked why he was under arrest, and was advised by Palian that he was being charged with trespassing.  (Tr., 1651, 1661).  Finally, it should be noted that the government introduced evidence of media coverage in the form of a *New Yorker* article during the defense case, not the government's case-in-chief.  *See* Govt. Exh. 9337.

government must rely upon circumstantial evidence.   And the circumstantial evidence was powerful that Caldwell did not delete photographs "with the intent to impair . . . [their] availability for use" before the Grand Jury.  ECF No. 167 at 44 (Indictment).

Caldwell literally possessed three separate copies of the 11 photos at issue at the time of his arrest.  In addition to two back-up copies on separate external drives, Caldwell retained the 134 "original" January 6 photos on his phone. (Tr., 8853-55).  Additionally, Caldwell made no attempt to delete six separate text chats on his phone that included all or some of the photos at issue, including one chat with Crowl and Watkins, the original targets of the FBI.[10]   That, as the government noted, the FBI finds it "relatively simpler to execute search warrants for social media accounts," (ECF No. 440 at 38), is esoteric information unknown to the general public and completely irrelevant as to Caldwell's intent.  *Cf. United States v. Katakis*, 800 F.3d 1017, 1030 (9th Cir. 2015) (holding that, under 18 U.S.C. § 1519, "concealment" requires more than a defendant inconveniencing a reasonable investigator; there must be some likelihood that the item will not be found).  The Ninth Circuit rejected the government's instant argument:  "[T]he Government is in essence arguing that it need not undertake any investigation at all: if things are not as the Government expects to find them, a defendant may be exposed to a term of twenty years' imprisonment."  *Id*.

The Indictment alleged that Caldwell intended to delete specified photographs "to impair [their] *integrity* and *availability* for *use* in an official proceeding, that is, the Grand Jury investigation into the attack on the Capitol on January 6, 2021."  ECF No. 167 at 44 (emphasis added).  The "integrity" of the photos, however, was not compromised, and multiple copies—

---

[10] Additionally, despite having Caldwell's Facebook messages, text messages, and emails, the government adduced no evidence that Caldwell encouraged the recipients of his January 6 photos to delete or hide them.

including the originals--of the photos were "available" for "use" before the Grand Jury.  18 U.S.C. § 1512(c)(1).  Without a confession or other direct evidence, a rational jury could not infer beyond a reasonable doubt that Caldwell intended to deprive the Grand Jury of the "use" of his photographs, as he retained the originals and two copies in his home, never deleted the photos from *Crowl's* Facebook records,[11] and never deleted the photos at issue contained in text chats with Crowl, Watkins, and five over contacts.  Caldwell didn't "destroy" the photos—he preserved and multiplied them.

> D.  Caldwell did not unsend a "video."

In its response, the government did not challenge Caldwell's argument that an unsent "hyperlink" cannot be the basis for finding Caldwell guilty of tampering with a "video."  Instead, referencing an "attachment" that Caldwell sent at the beginning of a series of unsent Facebook messages, (Gov. Exh. 9079 at 1 (Msg. 200.F.1.30)), the government claims that Caldwell actually "did unsend a message containing a video."  ECF No. 440 at 37.  The government's argument is factually incomplete[12] and without merit.  First, Special Agent Jack Moore testified that even the

---

[11] The alleged "deletion" by Caldwell of the Caldwell-Crowl thread did not result in the deletion of the 11 photos at issue from Crowl's Facebook records.  *See* Govt. Exh. 2002.T.61.

[12] The government, respectfully, should consider withdrawing its argument that a message with an "attachment" contains a video.  The contents of Caldwell's unsent messages were retrieved *in toto* from Crowl's phone, so there is no mystery as to what was recovered.  (Tr., 6551).  The message relied upon by the government and introduced into evidence was a homemade slide with the words "Tom sent an attachment" printed on it.  Govt. Exh. 9079 (Msg. 200.F.1.30).  The government introduced this slide as the first of a series of unsent messages that were recovered from a download of Crowl's phone.

The government's homemade message, however, was a *redacted* representation of the actual message.  The unredacted message, which was provided in discovery but *not* introduced into evidence, shows that the *actual attachment* to the message relied upon by the government is a URL, not a video.  *See* Caldwell Exh. 53 (not introduced; supplied to the Court prior to trial).  This URL, notably, is the same URL as that contained in the subsequent message requested by Crowl, which contained a hyperlink to Ford Fischer's News2Share segment.  As explained more fully, *infra*, there is no "video" in the unredacted message relied upon by the government.  The government, respectfully, should either withdraw its argument on this point or, alternatively,

FBI could not tell whether this message with an "attachment" contained a video:

> Q [Ms. Rakoczy:] Okay. And so we see in this first message that Mr. Caldwell sent an attachment according to what was preserved on Mr. Crowl's phone; is that right?
> A. [Special Agent Moore:] That's right.
> Q *Were we able to tell from Mr. Crowl's phone what that attachment was*?
> A. *We were not*.
> Q. Could it have been a video?
> A. It could have.
> Q. *Could it have been something else*?
> A. *It could have*.

(Tr., 6767) (emphasis added).   Agent Moore also testified that the mystery "attachment" relied upon by the government and the subsequently sent "link" to the Ford Fischer segment "show[] the same video."  (Tr., 6770).  Caldwell, moreover, specifically noted in the second message that Watkins and Crowl appear "at the 3:21 mark of this great video."  *See* Govt. 9079 (Msg. 200.F.1.31).  The "3:21 mark," coincidentally, is the exact time that Crowl and Watkins appear in the hyperlinked Ford Fischer's News2Share article that Caldwell resent, at Crowl's request, four hours later.  *See* Govt. Exh. 1051; 9079 (Msg. 22.F.1.34).  In other words, Caldwell, being advised that Crowl was having trouble forwarding the News2Share footage, resent Crowl the same URL/hyperlink to the Ford Fischer segment.   The mystery "attachment" is no mystery, i.e., Caldwell simply resent the URL/link to the Ford Fischer segment that, for whatever reason, Crowl could not forward.[13]

---

supplement their filing with an explanation of what it believes constitutes a "video" within the unredacted message in its possession.

[13] For the sake of comparison, Caldwell sent a Facebook message to Stu McNamara on January 13, 2021 stating:  "I appear around the 2:24 mark of the video calling all the bastard politicians in the building traitors."  *See* Govt. Exh. 2001.T.1 at 73.  This message referenced the preceding message Caldwell sent to McNamara, which contained *a hyperlink to a news story*, not a "video."  *Id*.  In other words, Caldwell used the term "video" in lieu of "hyperlinked news story."  This particular news segment, which was played at trial, is different than the Ford Fischer News2Share segment.

Second, the message with attachment relied upon by the government is *not* the alleged "message containing the video" that is specifically referenced in the Grand Jury's Indictment, which charged: "On January 8, 2021, *in response to a request* for a video from a person known to the Grand Jury, CALDWELL sent the video, and subsequently unsent the message containing the video." ECF No. 167 at 44 (emphasis added). The jury instructions, in fact, specified that Crowl made the request for the video: "[T]hat on or about January 8, 2021, *in response to a request from Donovan Crowl for a video*, [Caldwell] sent the video, and subsequently unsent the message containing the video." ECF No. 400 at 40 (emphasis added). Accordingly, the Grand Jury was quite clear that the "video" in question was one that was *solicited* by Crowl, sent by Caldwell, who subsequently unsent the message containing the video.

The message with attachment relied upon by the government was the *first* of several messages sent between Caldwell and Crowl regarding the News2Share segment. *See* Govt. Exh. 9079 (Msg. 22.F.1.30-37). A thorough review of Crowl's Facebook records, including all *preceding* messages, proves that Crowl did not *solicit* what was contained in the first message. On January 7, 2021 at 4:24 p.m., Caldwell, unsolicited, sent the message with attachment relied upon by the government to Crowl. *See* Govt. Exh. 9079 (Msg. 22.F.1.30). Approximately four hours later, at 8:46 p.m., Crowl sent a message to Caldwell requesting that he *resend* the "video": "Can you send that last video again in a text message? I'm having trouble sharing it already." *See Id*. (22.F.1.30, 22.F.1.34). Seven minutes later, at 8:53 p.m., Caldwell sent Crowl a link to the News2Share "video" via *both* Facebook Messenger and text message. (Tr., 6769-70; Caldwell Exh. 54).[14] It was this latter, specific unsent message containing the link to News2Share that the

---

[14] Caldwell resent the hyperlink to the Ford Fischer segment to Crowl via Facebook at 8:53 p.m., and then followed up at 8:55 p.m. with a Facebook message advising Crowl that "I just sent it as a message to your phone." *See* Govt. Exh. 9079 (Msg. 22.F.1.35). The text message that was

Grand Jury charged Caldwell with tampering with, *at a time when the government (and Grand Jury) lacked knowledge of the content of the unsent messages*.  Accordingly, the government's argument is not only factually incorrect, it also misidentifies the subject matter of the Grand Jury's Indictment.

Additionally, a thorough review of Caldwell's 291 pages of Facebook records reveals a consistent pattern as to how Facebook labels their records, and debunks any notion that the "attachment" in the message relied upon by the government contained a video.  Caldwell's Facebook records document 8 messages that contained *actual* videos that were sent or received by Caldwell.  Facebook labelled all 8 messages with the phrase "You sent a video" and stamped "video/mp4" in the record.  *See* Govt. Exh. 2001.T.1 at 65, 69-70, 73, 141, 169, 203, 217, & 220. Below is a representative sample of all 8 messages that contained actual "videos":

> **Author** Tom Caldwell (Facebook: 100044379276273)
> **Sent** 2020-12-21 21:50:30 UTC
> **Body** You sent a video.
> **Attachments** video-1608587430.mp4 (823805774852273)
> > **Type** video/mp4
> > **Size** 4967845
> > **URL**   https://interncache-frc.fbcdn.net/v/t42.3356-2/1_29631761
> > 4646015718806825    6585495807922    893393    n.mp4/video-
> > 1608587430.mp4?ccb=2&                                                        nc
> > sid=060d78&efg=eyJ1cmxnZW4iOiJwaHBfd XJsZ2Vu

*Id*. at 169.  On the 46 occasions that Caldwell sent or received "attachments," Facebook records labelled the message with "You sent an attachment" and clearly showed that a URL or hyperlink to an online source was included in the message, i.e., the URL/hyperlink *was the attachment*.  *See Id*. at 32, 42, 45, 54, 55, 62, 65, 68, 73, 84, 87, 102, 107, 112, 114, 115, 117, 156, 157, 162, 163,

---

sent by Crowl contained a hyperlink to the Ford Fischer video, too.  *See* Caldwell Exh. 54. Logically, what Caldwell originally sent to Crowl was "resent" to Crowl later, proving that the mystery "attachment" contained a link to the Ford Fischer video.

171, 191, 197, 198-99, 205, 222, 232, 236, 253, 257, & 281-82.  A representative sample of an "attachment" is shown below:

> **Author** Tom Caldwell (Facebook: 100044379276273)
> **Sent** 2020-12-25 00:51:48 UTC
> **Body** You sent an attachment.
> **Share**          **Date Created** 2020-12-25 00:51:47 UTC
>                    **Title** Status Update
>                    **Url** https://www.facebook.com/jmcubbins/posts/36254809

*Id*. at 171.[15]  Caldwell's Facebook records also specifically labelled photographs that he sent or received with the phrase "You sent a photo," which was accompanied by the notation "image/jpeg."[16]  In short, Facebook records very clearly document a sent or received "video" as a "video"; a sent or received photo as a "photo"; and where Facebook records state "You sent an attachment," what is attached is a URL or hyperlink to an outside server.  Accordingly, the message relied upon by the government, which states "Tom sent an attachment," contained a URL or hyperlink, not a "video."  In short, Caldwell never unsent a "video" as alleged in the Indictment.

> E.  *The government did not prove a corrupt intent to tamper with evidence.*

Assuming *arguendo* that Caldwell did in fact unsend a video as alleged in the Indictment, the government's case was insufficient to prove that Caldwell's intent was to prevent the Grand Jury from obtaining the video.  Most obvious, an open source news segment, by definition, was "available" for "use" by the Grand Jury regardless of any actions taken by Caldwell.  Additionally, without a confession or other direct evidence, the government again relies on circumstantial evidence to prove that Caldwell intended to specifically deny the Grand Jury the "use" of the

---

[15] In two of Caldwell's attachments, the URL section was empty.  *Id*. at 32.
[16] *See Id*. at 39, 43, 57, 60, 63, 65, 68, 71, 76, 78, 81, 85, 93, 95, 99, 104, 107, 109, 112, 115, 118, 120, 122, 126, 130, 139, 142-43, 147, 152, 154, 164, 169, 172, 174, 176, 178, 201, 211, 217, 221, 223, 225, 232, 254, 255, 257, 260, 263, 264, 266, 276, 282, & 285.

video.[17]  Facebook records show that on January 14, 2021 Caldwell unsent 171 separate Facebook

messages.  *See* Govt. Exh. 2001.T.1.  Of these 171 unsent messages, 50 messages were originally

sent *before* January 6.[18]  At least 83 of the unsent messages, based upon their context, had no

relevance to a January 6-related Grand Jury proceeding.[19]  A number of unsent messages involved

a medical issue with Caldwell's wife.  *Id*. at 46-48, 50, 90, 98, 112, 141.  The government presented

no direct evidence in its case-in-chief that Caldwell personally unsent these messages.  Even if the

jury could infer that Caldwell did the unsending, it was pure speculation to find, beyond a

reasonable doubt, that Caldwell's unsending of the alleged video, contemporaneously with his

wholesale unsending of scores of messages unrelated to January 6, was done with the specific

intent of preventing its use before the Grand Jury.[20]

As the government failed to adduce a prima facie case of evidence tampering pursuant to

18 U.S.C. § 1512(c)(1), the Court should acquit Caldwell as to  Count 10 of the Indictment.

## <u>CONCLUSION</u>

For the foregoing reasons as well as those set forth by Defendants in ECF 435-1, this

---

[17] The government's circumstantial case is based upon the unsending taking place while Crowl
and Watkins made their way to Caldwell's farm.  ECF No. 440 at 35-36.  However, Caldwell
introduced in his case an accidentally recorded voicemail from his wife's phone, recovered by
the FBI, which was captured while Caldwell was on a call with Crowl discussing the latter's
desire to come to his farm.  *See* Caldwell Exh. 78.  In this recording, Caldwell never mentions
police involvement to his wife; rather, he indicated that "the media" was hounding Watkins,
prompting the request to stay at the Caldwell farm.  Neither Mr. nor Mrs. Caldwell expressed
any concern that Watkins and Crowl were wanted by law enforcement and, in fact, moved on to
a discussion about a groceries.  *Id*.
[18] *Id*. at 32, 45-48, 59, 62, 70, 87-88, 101-02, 136 151, 166, 169, 171-72, 174, 220-21, 228-29,
232, 235, 262, 280-82, & 285.
[19] *See* footnote 17 *supra*.  In addition to pre-January 6 messages:  *See, e.g., Id*. at 46-48, 50, 97-
98, 111-12, 141, 235-37.
[20] Caldwell also sent the "video," at Crowl's request, as a text message.  *See* Caldwell Exh. 54
(Introduced during the government's case through Special Agent Moore) (Tr., 6718-23).
Caldwell did not delete this text message from his phone.  *Id*.

Court should grant the Defendants' motions for judgment of acquittal under Rule 29.

Respectfully submitted,

/s/ Phillip A. Linder
PHILLIP A. LINDER
3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219
(214) 252- 9900 OFFICE
(214) 252-9902 FAX
PHILLIP@THELINDERFIRM.COM
TEXAS BAR NO. 12363560

Counsel for Stewart Rhodes


_/s/ Stanley E. Woodward, Jr._
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

_/s/ Juli Z. Haller*_
Juli Z. Haller, (DC 466921)
THE LAW OFFICES OF JULIA HALLER
601 Pennsylvania Avenue, N.W., Suite 900
Washington, DC  20004
202-729-2201 (telephone)
HallerJulia@outlook.com

_Counsel for Defendant Kelly Meggs with permission
to sign for Co-Defendants_

**<u>Certificate of Electronic Service</u>**

I hereby certify that on January 24, 2023 I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties of record.


       */s/ Juli Z. Haller*
       Juli Z. Haller, (DC 466921)
       THE LAW OFFICES OF JULIA HALLER
       601 Pennsylvania Avenue, N.W., Suite 900
       Washington, DC  20004
       202-729-2201 (telephone)
       HallerJulia@outlook.com

       *Counsel for Defendant Kelly Meggs*