UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Criminal Case No. 22-cr-15 (APM) |
| | : | |
| **KENNETH HARRELSON** | : | *Previously Included in* |
| | : | |
| Defendant | : | Case No. 21-cr-28 (APM) |
| | : | |

**SENTENCING MEMORANDUM REPLY**

**I.    Harrelson's Health**

Harrelson arrived in DC Corrections with normal blood work, but the diet there is high in starch and extremely low on protein. While in DC, he never had a protein source that wasn't soy. His blood work has reflected this with increasing blood glucose levels, increasing A1c, AST and ALT suggesting pre-diabetes and that he may have sustained organ damage. Attachment A.

Harrelson arrived in Lewisburg Prison on March 13, 2023, where BOP provided expert nutrition, kind treatment and humane conditions and his health quickly improved. However, on March 20, 2023, BOP drew blood that suggests the poor diet he received in DC Corrections may have pushed him to untreated type II diabetes and undersigned counsel would request the Court request that the BOP conduct a full medical evaluation and provide him with proper medications.

1

## II. Request for Assignment to Facilities Near the Defendant's Home

Defendant Harrelson respectfully requests, if appropriate, that the Court consider requesting that the Bureau of Prisons assign him to a facility near the family home. Since his arrest, Harrelson has been prohibited from Zoom visits so he has not seen the faces or communicated "face to face" with his children since his arrest.

For the Court's information the closest facility to the Defendant's home is Coleman Prison at 846 NE 54th Ter, Coleman, FL 33521 and the next closest facility is FPC 110 Raby Ave. Pensacola, FL 325509.

## III. The Guidelines Enhancements Should Not Apply (Supplement)

**The "administration of justice" enhancements should not apply**

<u>The §2J1.2(b)(1)(B) enhancement does not apply</u>

The 8-level enhancement under 2J1.2(b)(1)(B) should not apply because the Oath Keepers' relevant conduct did not involve causing or threatening property damage or physical injury. Although there were several injuries to police and millions of dollars in property damage that day, not all January 6 defendants are personally responsible—this enhancement does not apply to *everyone*. Rather, it applies to those January 6 defendants who personally took part in or encouraged property damage or injuries. The government's arguments for including property damage and injuries in these defendants' relevant offense conduct do not hold water.

First, the government generally asserts that these defendants "were part of a mob of rioters that caused injuries to Capitol Police officers" and damaged Capitol "doors." Gov. Mem. 33–34. But since the Oath Keepers generally stood by and only entered when the doors were opened from the inside, the conduct of this "mob" is not part of the Oath Keepers' jointly-undertaken criminal activity. Next, the government points out that some of the Oath Keepers, including Watkins and

Minuta, "pushed against a line of MPD riot officers" in the Rotunda. *Id*. at 34. But no officer testified that any of the brief periods of pushing by Oath Keepers in the Rotunda caused any injuries. The government claims that "Officer Owens and Officer Jackson both testified to the physical injuries they and their fellow officers suffered during *this encounter*." *Id*. (emphasis added). But on the contrary, no testimony about injuries is cited for Officer Jackson; and Officer Owens's testimony was that at the end of the *entire day*, his "arms and legs were bruised and bloodied and battered." *Id*.[1] This includes encounters where rioters were "punching, kicking, swinging flagpoles and two-by-fours." 10/26/22AM Tr. at 5451. There is thus no evidentiary basis for concluding that it was the relatively short period where Watkins and other Oath Keepers pushed against the police line that caused the bruising and bloodying on Officer Owens's arms and legs. *See also* Gov. Mem. 34–35 (including no injuries in quotations regarding Minuta pushing on officers).

Next, the government resorts to claiming that general chants of "Treason" by "Harrelson and Dolan," were "threatening and intimidating." *Id*. at 35. Assuming that was true, Congress had already been evacuated by the time the Oath Keepers entered, so there were no lawmakers around to feel threatened and no obstruction to be achieved through such "threats," as the adjustment requires. This is a far cry from the case cited by the government, *United States v. Rubenacker*, No. 21-cr-193 (May 26, 2022), Sent. Tr. at 58, where the "defendant's yelling and taunting at the officers . . . in an agitated manner with his finger outstretched was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers."

---

[1] 10/26/22AM Tr. at 5453 ("Q. And what time did you ultimately leave the United States Capitol? A. Around 8:00 or 9:00 p.m. that evening. Q Did you suffer any physical injuries that day? A. Yes, ma'am. My arms and legs were bruised and bloodied and battered. Other than that, I didn't have any significant injuries from that day.")

Finally, the government claims that "Vallejo and Caldwell managed an arsenal of firearms at a hotel in Virginia as part of an armed Quick Reaction Force to support the other conspirators on the ground at the Capitol building." Gov. Mem. 35–36. Putting aside the patent falsity of this claim that the QRF was intended to support an attack on the Capitol—which numerous witnesses and multiple documents contradict—merely having weapons on standby in Virginia does not qualify as "threatening to cause physical injury to a person…in order to obstruct the administration of justice," §2J1.2(b)(1)(B), where no such firearms were ever brandished to achieve that result.[2]

The 2J1.2(b)(2) adjustment for substantial interference does not apply

Like the injury and property damage adjustment, Section 2J1.2(b)(2) does not apply to *every* January 6 defendant. It only applies if the relevant conduct of *these* defendants resulted in the "unnecessary expenditure of substantial governmental or court resources." *Id*. This is an individual, not a collective, question. Vallejo does not contest that "[t]he events of January 6" as a whole resulted in substantial expenditures, including "damages…[to] the U.S. Capitol totaling more than $2.8 million." Gov't Mem. at 38. But there is no genuine dispute that the Oath Keepers did not personally take part in any property damage. Likewise, "the evacuation of hundreds of lawmakers and the suspension of the certification proceedings," *id*., was not caused by these defendants, but by initial breachers who apparently acted in accordance with a preestablished plan.[3]

---

[2] The government cites interstate threat cases to argue that threats need not be communicated directly to a victim; but sending a threat through the wires—where the threat itself is the crime—is completely different than threatening a victim with firearms in order to obstruct justice. Clearly, if no Oath Keeper told any officer about weapons stashed in Virginia in order to make them leave their post, their mere existence does not constitute a threat under this provision. For the same reason, the government's reliance on *Reffitt*, No. 21-cr-32 (Aug. 1, 2022), Sent. Tr. at 20-21, is misplaced. In *Reffitt*, the defendant had a firearm on his person, creating a present and credible threat to those he encountered when combined with threatening words.

[3] The government attempts to justify the defendants' personal responsibility for the substantial expenditure of resources by arguing that "[d]efendants…were unlawfully on the Capitol grounds

4

Nor did these defendants "substantial[ly]" delay the reentry of Congress. §2J1.2(b)(2). None were in the building for more than 12 to 20 minutes, they exited without significant resistance, and they were far from the last to remain in the building. Simply put, this enhancement should be reserved for defendants who conduct was most responsible for the expense of January 6 either because they acted first, delayed things the longest, or contributed to particular damage. The Oath Keepers did none of those things.

Dated:  May 15, 2023           RESPECTFULLY SUBMITTED
                               KENNETH HARRELSON, *By Counsel*

                               /s/ Brad Geyer

                               Bradford L. Geyer, PHV
                               PA 62998
                               NJ 022751991
                               Suite 141 Route 130 S., Suite 303
                               Cinnaminson, NJ 08077
                               Brad@FormerFedsGroup.Com
                               (856) 607-5708

---

before the Senate went into emergency recess at 2:13 p.m., and…before the House went into emergency recess at 2:29 p.m." Gov. Mem. 39. But the testimony of Congressional staff established that it was the presence of rioters "in the building," *id*., that required the recesses. *See* 10/26/22AM Tr. at 5428–29 (Hawa); 1/6/23AM Tr. at 3315–18, 3352-55 (Fleet).

**CERTIFICATE OF SERVICE**

      I hereby certify that on May 15, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

      /s/ Brad Geyer
      Bradford L. Geyer, PHV
      PA 62998
      NJ 022751991
      Suite 141 Route 130 S., Suite 303
      Cinnaminson, NJ 08077
      Brad@FormerFedsGroup.Com
      (856) 607-5708