```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      UNITED STATES OF AMERICA,      ) Criminal Action
 3                                   ) No. 1:22-cr-00015-APM
                       Plaintiff,    )
 4                                   ) Jury Trial - Day 5
      vs.                            ) (afternoon session)
 5                                   )
      ELMER STEWART RHODES III,      )
 6    et al.,                        ) Washington, D.C.
                                     ) October 4, 2022
 7                      Defendants.  ) Time:  1:35 p.m.
      _____
 8
                    Transcript of Jury Trial - Day 5
 9                           Held Before
                      The Honorable Amit P. Mehta
10                    United States District Judge
      _____
11
                      A P P E A R A N C E S
12
      For the Government:      Kathryn L. Rakoczy
13                             Troy A. Edwards, Jr.
                               Jeffrey S. Nestler
14                             UNITED STATES ATTORNEY'S OFFICE
                               FOR THE DISTRICT OF COLUMBIA
15                             601 D Street, Northwest
                               Washington, D.C. 20579
16
                               Alexandra S. Hughes
17                             Louis J. Manzo
                               U.S. DEPARTMENT OF JUSTICE
18                             950 Pennsylvania Avenue, Northwest
                               Washington, D.C. 20530
19
      For the Defendant Elmer Stewart Rhodes III:
20                             Phillip A. Linder
                               James L. Bright
21                             Edward L. Tarpley, Jr.
                               BARRETT BRIGHT LASSITER LINDER
22                             3300 Oak Lawn Avenue, Suite 700
                               Dallas, Texas 75219
23
      For the Defendant Kelly Meggs:
24                             Stanley E. Woodward, Jr.
                               BRAND WOODWARD LAW
25                             1808 Park Road, Northwest
                               Washington, D.C. 20010
```

```
 1                    A P P E A R A N C E S, continued

 2       For the Defendant Kelly Meggs:
                              Juli Z. Haller
 3                            LAW OFFICES OF JULIA HALLER
                              601 Pennsylvania Avenue, Northwest
 4                            Washington, D.C. 20036

 5       For the Defendant Kenneth Harrelson:
                              Bradford L. Geyer
 6                            FORMERFEDSGROUP.COM LCC
                              141 I Route 130 South, Suite 303
 7                            Cinnaminson, New Jersey 08077

 8       For the Defendant Jessica Watkins:
                              Jonathan W. Crisp
 9                            CRISP AND ASSOCIATES, LLC
                              4031 North Front Street
10                            Harrisburg, Pennsylvania 17110

11       For the Defendant Thomas Caldwell:
                              David W. Fischer, Sr.
12                            FISCHER & PUTZI, P.A.
                              7310 Governor Ritchie Highway
13                            Glen Burnie, Maryland 21061-3065

14       _____

         Stenographic Official Court Reporter:
15                            Nancy J. Meyer
                              Registered Diplomate Reporter
16                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
17                            Washington, D.C. 20001
                              202-354-3118
18

19

20

21

22

23

24

25
```

1

<u>**I N D E X**</u>

2

<u>PAGE</u>:

3

<u>**Witnesses**</u>:

4

<u>Michael Palian</u>

5

  Cross-Examination, continuing, by Mr. Linder..... 1610
  Cross-Examination by Mr. Fischer................. 1613
6  Cross-Examination by Mr. Woodward................ 1699
  Cross-Examination by Mr. Geyer.................. 1710
7  Cross-Examination by Mr. Crisp................... 1717
  Redirect Examination by Ms. Rakoczy............. 1729

8

9

<u>**Exhibits Admitted**</u>:

10

  Government Exhibit 1.S.159.524................... 1741
11  Government Exhibit 1.S.159.525................... 1741
  Government Exhibit 1.S.159.526................... 1741
12  Government Exhibit 22.T.15.26................... 1738

13

  Defendant Caldwell Exhibit 5-1.................. 1673
14  Defendant Caldwell Exhibit 5-2.................. 1673
  Defendant Caldwell Exhibit 5-3.................. 1673
15  Defendant Caldwell Exhibit 5-4.................. 1673
  Defendant Caldwell Exhibit 5-5.................. 1673
16  Defendant Caldwell Exhibit 5-6.................. 1673
  Defendant Caldwell Exhibit 5-7.................. 1673
17  Defendant Caldwell Exhibit 5-8.................. 1673
  Defendant Caldwell Exhibit 5-9.................. 1673
18  Defendant Caldwell Exhibit 5-10................. 1673
  Defendant Caldwell Exhibit 5-11................. 1673
19  Defendant Caldwell Exhibit 5-12................. 1673
  Defendant Caldwell Exhibit 5-13................. 1673
20  Defendant Caldwell Exhibit 5-14................. 1673
  Defendant Caldwell Exhibit 5-15................. 1673
21  Defendant Caldwell Exhibit 5-16................. 1673
  Defendant Caldwell Exhibit 5-17................. 1673
22  Defendant Caldwell Exhibit 5-18................. 1673
  Defendant Caldwell Exhibit 5-19................. 1673
23  Defendant Caldwell Exhibit 5-20................. 1673
  Defendant Caldwell Exhibit 5-21................. 1673
24  Defendant Caldwell Exhibit 5-21................. 1673
  Defendant Caldwell Exhibit 5-23................. 1673
25  Defendant Caldwell Exhibit 5-24................. 1673
  Defendant Caldwell Exhibit 5-25................. 1673

1    **I N D E X**, continued

2                                                          PAGE:

3    Defendant Caldwell Exhibit 5-26.................. 1673
     Defendant Caldwell Exhibit 5-27.................. 1673
4    Defendant Caldwell Exhibit 5-28.................. 1673
     Defendant Caldwell Exhibit 5-29.................. 1673
5    Defendant Caldwell Exhibit 5-30.................. 1673
     Defendant Caldwell Exhibit 5-31.................. 1673
6    Defendant Caldwell Exhibit 5-32.................. 1673
     Defendant Caldwell Exhibit 5-33.................. 1673
7    Defendant Caldwell Exhibit 5-34.................. 1673
     Defendant Caldwell Exhibit 5-35.................. 1673
8    Defendant Caldwell Exhibit 5-36.................. 1673
     Defendant Caldwell Exhibit 5-37.................. 1673
9    Defendant Caldwell Exhibit 5-38.................. 1673
     Defendant Caldwell Exhibit 14.................... 1691
10   Defendant Caldwell Exhibit 38.................... 1697
     Defendant Caldwell Exhibit 39.................... 1697

11

12   Defendant Meggs Exhibit KM.01................... 1704
     Defendant Meggs Exhibit KM.02................... 1707

13

14

15

16

17

18

19

20

21

22

23

24

25

1    P R O C E E D I N G S

2    (REPORTER'S NOTE:  The morning session of the jury

3    trial was reported by William P. Zaremba who prepared said

4    transcript.)

5    THE COURT:  Okay.  So on the issue of the video,

6    Mr. Woodward.

7    MR. WOODWARD:  Thank you, sir.

8    I don't take the admonishment of the Court lightly.  I

9    do think the Court should know a little bit more about the

10    series of events that led to where we are.

11    We received the video in discovery.  I've confirmed that

12    over the break.  For the first time this morning, we were

13    advised that there would be -- that the creator of the video

14    would have concern and, in fact, was intending to invoke the

15    Fifth Amendment.  That, of course, seems reasonable to us given

16    that by definition recording the video meant that he had

17    trespassed at the Capitol.

18    This whole problem could be resolved by the government's

19    having given the witness immunity, which you know it has done

20    to others who created videos in these cases, and so to put us

21    in the position --

22    THE COURT:  That's news to me.  I have not heard

23    that.

24    MR. WOODWARD:  Well, I can confirm it because I've

25    represented witnesses that have received immunity to testify in

 1   other cases before Judge McFadden in the *Couy Griffin* trial.

 2   So it is not a foreign concept to the government that they

 3   could resolve the issue simply by providing the witness with

 4   immunity.

 5        And so to put on us the obligation of waiving the

 6   authenticity process simply because they've chosen not to

 7   invoke immunity would potentially do our clients a disservice,

 8   and there are other pieces of evidence that are going to come

 9   up where authenticity is an issue and the material in question

10   is significantly more inculpatory than this video, and we

11   certainly don't want to waive the right to force the government

12   to do its job.

13        THE COURT:  Mr. Woodward, I get it.  I've done what

14   you've been doing for plenty of years before I got this job.  I

15   understand it's defense counsel's obligation to zealously

16   represent their clients.  There's also such a thing as being

17   measured in doing so.  You are absolutely right; you have a

18   right on behalf of your client to make the government, you

19   know, lay every single foundation there is to admit every

20   single piece of evidence, but that's going to come at two

21   costs.  Okay?

22        One, it's going to extend the length of this trial for

23   far longer than any of us would like; that's one.  And two,

24   it's not going to make me very happy.  So, you know, you've got

25   to balance those things with your interests and protecting your

1    client's interests.  If there're actually pieces of evidence

2    that you think have genuine authenticity disputes, let's talk

3    about those.  But for the sake of simply making the government

4    go through the burden of having to lay foundation as to which

5    there's otherwise no controversy, that is where I have some

6    problems.

7         Now, again, I can't -- I can't force you to accept that

8    as a principle, but I would urge you to think about it in that

9    light, because I will tell you, it feels like your co-counsel

10   have.

11        MR. WOODWARD:  Well, I think that if we'd like to

12   call them up there and put their position on the record, we can

13   do that.  I think if we did that, you would find that not

14   everybody is willing to argue with the Court, perhaps.  With

15   all of that said --

16        THE COURT:  That's your job.  You can argue with me.

17   I'll agree with you sometimes.  I'll disagree with you other

18   times.

19        MR. WOODWARD:  We do not -- defense counsel does not

20   object to the introduction of the exhibits that the government

21   has proffered.

22        THE COURT:  I'm sorry?  The one that we've just been

23   talking about, you now do not object to it?

24        MR. WOODWARD:  Correct.

25        THE COURT:  All right.  So we will not need that

 1     individual's testimony.  You can -- I mean, do we need to

 2     release him then, or do you want to still keep him under

 3     subpoena?

 4              MR. NESTLER:  No, that's fine, Your Honor.  I can

 5     let him know he's released, and that's Exhibit 1083.  And we

 6     have a few clips of that we're going to play later in the

 7     trial, and we know that they're going to be admissible now.

 8     That's it.

 9              THE COURT:  Okay.  And then -- I don't know whether

10     Mr. Woodward is present for the other witness, and I don't know

11     whether the same agreement can be reached as to the recording

12     of that podcast.

13              MR. WOODWARD:  I was --

14              MR. NESTLER:  I believe that Mr. Crisp might have --

15              THE COURT REPORTER:  I'm sorry.

16              MR. NESTLER:  I believe that Mr. Crisp may have

17     information to relay on that other witness who recorded the

18     podcast on January 6th and January 7th, whose name is

19     Mr. Hancock.  So I'll pass the mic to Mr. Crisp.

20              MR. WOODWARD:  Sorry.  Your Honor, just to clarify,

21     if there are exhibits other than 1083, from this particular

22     witness, we're not -- I'm not aware of those.

23              MR. NESTLER:  Sorry.  Two completely separate

24     witnesses.

25              THE COURT:  Right.

1    MR. NESTLER:  Today's witness is Brian Lee, who

2  recorded Government Exhibit 1083.  I believe that issue was

3  done.  I believe Your Honor was indicating that there was

4  another witness with a very similar issue, which is he has, in

5  this case, an audio recording and also indicated an intent to

6  invoke his Fifth Amendment privilege, and the government simply

7  seeks to authenticate the file.

8    THE COURT:  All right.  No.  That's why I'm raising

9  it, because it's the same issue.

10    MR. CRISP:  Good afternoon, Your Honor.

11    THE COURT:  Good afternoon.

12    MR. CRISP:  The government is going to bring this

13  witness, but it's my understanding he's going to invoke as

14  well, and I don't see a need to do that, bring him in and just

15  go through the -- as Your Honor referenced, a dog-and-pony

16  show.  That it is our intent to preserve the objection from an

17  authentication standpoint because we can as to that.  I also --

18  and Your Honor may bring it in.

19    THE COURT:  But here's the --

20    MR. CRISP:  I don't have a reason other than -- go

21  ahead.  I'm sorry.

22    THE COURT:  Sorry.  Here's the problem.

23    MR. CRISP:  Sure.

24    THE COURT:  Or the difficulty.  And, again, if you

25  have genuine questions about the authenticity of the video --

1    or the audio, I want to hear it.  But if this gentleman comes

2    in and intends to invoke the Fifth --

3              MR. CRISP:  Uh-huh.

4              THE COURT:  -- because he simply recorded a

5    podcast --

6              MR. CRISP:  Uh-huh.

7              THE COURT:  -- I then have to hear him out on why he

8    has a Fifth Amendment privilege.  Okay?  I've got to do that in

9    camera.  If I then conclude he does not have a Fifth Amendment

10   privilege and he still does not -- if he's unwilling to

11   testify --

12             MR. CRISP:  Uh- huh.

13             THE COURT:  -- my only recourse is to hold him in

14   contempt and either fine him or lock him up until he's willing

15   to testify.  Now, that's the course that may need to be taken,

16   if that's the way it plays out.

17        But I would ask you, as I would ask all of the defense

18   counsel, is that really something we need to do if there's no

19   genuine dispute about the authenticity of the evidence?

20             MR. CRISP:  No, there isn't.  But I would -- it was

21   an alternate course of action.  I think we can stipulate -- the

22   government and defense could stipulate -- and I have not heard

23   this.  But as Your Honor was saying this, we could agree that

24   he would invoke.  Whether it's a valid invocation is a separate

25   matter.  But that he would invoke his Fifth Amendment right.

 1    The Court has not made a ruling as -- you know, something to

 2    the effect of a stipulation of expected testimony.  Don't bring

 3    him out here to do that.  We can come up with something that

 4    would obviate the need to do this, and then Your Honor could

 5    still make a ruling as to whether or not it's admissible,

 6    period.

 7             THE COURT:  I guess I don't quite follow what you're

 8    suggesting, which is -- and this is -- maybe this is more than

 9    we need to discuss right now, but since we're on the topic.  I

10    mean, if what you're suggesting is a stipulation to tell the

11    jury that this witness would invoke five, I'm unlikely to do

12    that because I'm not calling in witnesses for live testimony if

13    there's stipulations to invoke five.

14             MR. CRISP:  Right.

15             THE COURT:  So it seems to me that you can either

16    stipulate to whatever foundational concerns you have or force

17    me to go through the steps that we've discussed, which is fly

18    this gentleman out from California.  I've got to hear him out

19    on his Fifth.  If he's got a genuine Fifth Amendment privilege,

20    okay.  If he doesn't, then he'll have to decide whether he's

21    prepared to testify or face contempt.  I mean, I -- you know,

22    that seems to me to be quite a dramatic thing to have to do for

23    a rather small point.

24             You know, this is not -- you know, this is not --

25             MR. CRISP:  Okay.

1      THE COURT:  I'm forgetting the name of the -- the

2  journalist in the Scooter Libby case who spent some time in

3  jail, and Judge Walton put her there.  And I'm -- anyway.

4      MR. CRISP:  Right.  I think we can -- it's probably

5  prudent to have an additional discussion with counsel.

6      THE COURT:  Okay.

7      MR. CRISP:  And since we're not there yet -- but I

8  don't want to -- I don't want to come up with something that --

9      THE COURT REPORTER:  I'm sorry.  What did you say?  I

10 don't want to come up with something that --

11     MR. CRISP:  Not everyone agrees with.

12     I'm sorry.  Thank you.

13     THE COURT:  All right.  Just a couple of loose ends.

14 There was this question about the FBI record and whether it's a

15 business record.  I went back.  There's not a lot in the

16 circuit about this issue, but there's a case from 1975.  I

17 didn't find anything earlier -- I mean later than that.  It's

18 *U.S. v. Smith*, 521 F.2d 957.  The Court basically says that,

19 you know, this is under the old -- the federal rule had just

20 come into existence, the Federal Rule of Evidence.

21     The court writes that "We adopt the approach of these

22 circuits.  While the record sought" must be -- "to be admitted

23 must, of course, be shown to meet the standards of the Business

24 Record Act" -- which was the predecessor to the rule, so -- "we

25 see no reason to exclude a police record made in the course of

1    regular business, it being the regular course of police work to

2    make the record at issue.  Thus Form 251" -- which is a D.C.

3    police form -- "and the radio broadcast transcript were

4    properly admissible as business records upon a showing of their

5    trustworthiness."

6        The court goes on to say, "Thus, a police record, a

7    Form 251, for instance is admissible as substantive evidence to

8    show the date a crime was reported, or the fact that it was

9    reported at all, even if the recorder was not the officer to

10   whom the report was made.  On the other hand, the complaining

11   witness' description of the crime, recorded by the police

12   officer in his report, is not made in the regular course of the

13   witness' business and does not deserve the presumption of

14   regularity accorded a business record."

15       So I think what that means is that that particular

16   document -- and it's not clear to me the foundation was laid

17   for it, but -- and maybe there's a certification to this

18   effect.  But if it's simply, kind of, the logging of tips when

19   they come in, sort of that, you know, routine work of the FBI

20   when a tip comes in, they log it -- time, date, et cetera -- I

21   think that's admissible.  Clearly, the content as conveyed by

22   the witness or the tipster is not, and the government's not

23   trying to admit that, in any event.

24       So I do think subject to the laying of further

25   foundation and -- Ms. Rakoczy, either through a certification

1    or through testimony, that document can come in under circuit

2    precedent.

3            Only one other thing I just want to just mention, a

4    small point.  I know the government said in opening that they

5    intend to call some number of summary witnesses.  I just want

6    to make sure everybody is aware of the circuit's view of

7    summary witnesses and restrictions and what I need to do in

8    providing a limiting instruction about summary witnesses.  Just

9    quickly, one of the key cases, *U.S. v. Mitchell*, 816 F.3d 865,

10   and that will lead you to some of the other older cases that

11   talk about summary witnesses.  So just in advance of that, so

12   we don't have any issues about the scope of summary testimony

13   and the like.

14           MR. NESTLER:  Yes, Your Honor.  And just to be clear,

15   our summary witnesses are going to summarize records,

16   documents, and other kinds of exhibits.  We're not intending

17   our summary witnesses to summarize testimony.

18           THE COURT:  Okay.

19           MR. NESTLER:  Or statements.  Or oral statements that

20   are not recorded.

21           THE COURT:  Right.

22           MR. NESTLER:  Which I think is a little bit of a

23   distinction in the case law about what role a summary witness

24   plays.

25           THE COURT:  Right.  I mean, there's a greater --

1    looked at with a more jaundiced eye if the summary witness is

2    going to testify about testimony as opposed to voluminous

3    documents, so.

4         Okay.  Mr. Linder, did you want to raise something, or

5    are you just getting ready for cross-examination?

6              MR. LINDER:  Just getting ready.

7              THE COURT:  Okay.  Chomping at the bit.  Chomping at

8    the bit.

9         Agent, why don't you come on up.

10              MR. LINDER:  And when I finish, I think Mr. Fischer

11   is next.

12              THE COURT:  Okay.  Well, I'm going to go down the

13   line.  I assume you're the lead, since you jumped up first, and

14   then I'll just go straight down the list here.

15              MR. LINDER:  And I will inform the Court, we had

16   mentioned earlier that a lot of times we'll have just one

17   defense counsel cross-examining witnesses.  However,

18   Agent Palian is the lead agent, so I think there will be a

19   few on this one, but I think it will scale down after that.

20              THE COURT:  Okay.  I expected as much.  I mean, he's

21   testified about all of your clients, and so it wouldn't

22   surprise me.

23              MR. WOODWARD:  So the preference would be for

24   Mr. Fischer to go next based on the subject matter he is going

25   to cover, and then I would close with not much cross after

1    Mr. Fischer.

2              THE COURT:  Okay.  I mean, look, I'll tell you

3    just as a matter of routine, I'd like to do it the way I

4    discussed earlier as opposed to hopping around so the jury sort

5    of has a sense of who's representing whom and we do this in an

6    orderly fashion.

7         I'm happy to have Mr. Fischer go next, but typically

8    what I'd like to do, unless there's good reason to, is whoever

9    is the lead, gets up first, does the cross, and then I'll just

10   go down the -- you know, the title page:  Rhodes, Meggs,

11   Harrelson, Watkins, Caldwell, in that order.

12             Now, if you-all jump up and tell me we've organized this

13   in such a way, Judge, that we'd like to have somebody else go

14   second, you know, I'm not going to be hard and fast about it,

15   but that's what I'd like to usually do.  Okay?

16             MR. WOODWARD:  Yes, sir.

17             THE COURT:  Ready when you are.

18             (Proceedings held in the presence of the jury.)

19             THE COURT:  All right.  Please have a seat, everyone.

20        Ladies and gentlemen, welcome back from your lunch

21   break.

22        Just very quickly, in terms of our schedule going

23   forward, you'll recall that tomorrow, because of the Jewish

24   holiday, we will not be sitting tomorrow; so you do not need to

25   be here.

 1          We will reconvene on Thursday, do our normal, you

 2     know, 9:30 to 5:00.  Fridays will be half days.  So we will

 3     sit from 9:30 to approximately about lunchtime on Friday.  So

 4     we'll break about mid -- you know, right after -- probably

 5     12:30, give or take.  And then I think next Monday is

 6     Columbus -- Indigenous Peoples Day.  So we'll have that off as

 7     well.

 8          So that'll be our schedule for the next four or

 9     five days.  And if there are any questions, just ask

10     Mr. Douyon, and we can clear up any questions any of you may

11     have.

12          Mr. Linder.

13               MR. LINDER:  Thank you.

14                    CROSS-EXAMINATION, continuing

15     BY MR. LINDER:

16     Q.  Special Agent Palian, good afternoon.

17     A.  Good afternoon.

18     Q.  Just for the record, you understand you're still under

19     oath?

20     A.  Yes, sir.

21     Q.  Okay.  I want to go back to this GoToMeeting tran- -- this

22     recording we saw the transcript of from November 9th.

23     A.  Okay.

24     Q.  Now, as to the 25-minute-or-so meeting that you guys

25     listened to and we had transcribed -- and the jury has seen

1     that today; correct?

2     A.  Agreed.

3     Q.  Yeah.  So in that, isn't it true that all of the talk that

4     Mr. Rhodes and others are doing in that GoToMeeting chat or

5     that GoToMeeting speech and then the relevant text messages

6     around that, that the prosecutor asked you about, from

7     November 3rd to November 9 -- isn't it true that all of that is

8     related to going to D.C. on November 14th?

9     A.  I'd agree with that.

10    Q.  Okay.  And the prepping of what they're going to do and

11    making plans, those kinds of things, for the November 14th

12    Million MAGA March?

13    A.  Right.

14    Q.  Okay.  There's no mention of January 6th in any of that

15    line of communication?

16    A.  Not January 6th specifically, no.

17    Q.  Correct.

18    A.  Not the date January 6th, of the certification.

19    Q.  Correct.

20              THE COURT REPORTER:  I'm hearing somebody on the

21    microphone.  I don't know -- thank you.

22    BY MR. LINDER:

23    Q.  And isn't it true that Stewart Rhodes and the Oath Keepers

24    also went to D.C. two other times between this November 14th

25    and January 6 time, in December -- in the month of December?

1    A.  I'm aware of December 12th.  I'm not -- what's the other

2    date you're referring to?

3    Q.  Well, there's just two dates in December.  But you're aware

4    of December 12th?

5    A.  I'm aware of December 12th.

6    Q.  So you're aware of the one.

7          Now, as mentioned earlier, there have been no other --

8    there were no incidents involving Stewart Rhodes or the

9    Oath Keepers around the November 14th Million MAGA March?

10   A.  No, that's correct.

11   Q.  Haven't filed any charges on them or anything like that for

12   violating laws other than this --

13   A.  Yes.

14   Q.  Did y'all file any charges or anything regarding their time

15   in December when they came to D.C.?

16   A.  Well, it's considered part of the conspiracy.

17   Q.  Well, aside from the conspiracy, did you charge them with

18   violations of any other laws?

19   A.  When you say "we," so you mean the FBI?

20   Q.  The federal government, yes.

21   A.  The federal government.  Not to my knowledge.

22   Q.  Okay.  Thank you.

23          MR. LINDER:  No further questions.

24          THE COURT:  Okay.  Thank you, Mr. Linder.

25          Mr. Fischer.

```
 1              Mr. Fischer on behalf of Mr. Caldwell.
 2                      CROSS-EXAMINATION
 3     BY MR. FISCHER:
 4     Q.  Good afternoon, Agent Palian.
 5     A.  Good afternoon.
 6     Q.  First of all, yesterday, I believe you indicated that
 7     you're considered the case agent on this investigation with
 8     January 6th; is that correct?
 9     A.  I'm one of the case agents.
10     Q.  One of the case agents.
11          And can you describe to the ladies and gentlemen of the
12     jury what it means when you're the case agent.
13     A.  The case agent has broad overview of the investigation.  To
14     put it in football terms, it's sometimes considered the
15     quarterback, except that we have, you know, three or four
16     quarterbacks.
17     Q.  Fair enough.
18          And as the case agent, you work very closely with the
19     U.S. Attorney's Office; is that correct?
20     A.  We work closely with the U.S. Attorney's Office, yes.
21     Q.  And those would be the prosecutors at the table to the left
22     of me?
23     A.  Correct.
24     Q.  And you -- basically, as one of the case agents, you have
25     agents that work under your supervision; is that fair to say?
```

1    A.  No, I wouldn't say that.  I'd say we collaborate.  I don't

2    say I supervise any of the other agents.

3    Q.  Okay.  Fair enough.

4         But you have other agents that you can ask them to do

5    things, like execute search warrants, serve subpoenas, gather

6    evidence?  You have the ability to ask for those others to do

7    that; is that correct?

8    A.  Yes; that's correct.

9    Q.  Okay.  And you would agree that in this case you've been in

10   fairly regular contact with the prosecutors in this case; is

11   that correct?

12   A.  Yes, I would say that.

13   Q.  Okay.  And, sir, obviously you work for the FBI; correct?

14   A.  I do.

15   Q.  And I believe yesterday Ms. Rakoczy asked you what that

16   stands for and you indicated Federal Bureau of Investigation;

17   is that correct?

18   A.  Correct.

19   Q.  Okay.  I guess the keyword in FBI is investigation, because

20   that's what you guys specialize in, in investigations; is that

21   fair to say?

22   A.  Fair enough.

23   Q.  Well, in fact, sir, the FBI enforces federal law; correct?

24   A.  We're one of the agencies that enforce federal law.

25   Q.  Fair enough.

1   And it's a law enforcement agency that's significantly

2   different than like a local law enforcement agency, like the

3   Alexandria Police or the D.C. Metro Police.  Would you agree

4   with that?

5   A.  I mean, there are differences.  I don't know what you're

6   getting at, I guess.

7   Q.  Let me -- let me help you out here.  You would agree that

8   the FBI doesn't answer 911 calls; correct?

9   A.  We don't answer 911 calls.

10  Q.  And you're not out arresting drunk drivers or arresting

11  people in bar fights; correct?

12  A.  No, we don't do that.

13  Q.  What happens is you have allegations of suspected criminal

14  activity that are brought to you, and you investigate that; is

15  that correct?

16  A.  Yes.

17  Q.  Okay.  You don't wear uniforms; right?

18  A.  No, we don't have a uniform.

19  Q.  And, in fact, when you -- you engage in something that's

20  called vertical prosecution, and what that means, you and the

21  prosecutors build a case from the ground up; is that correct?

22  A.  I've never heard that term before.  But, yes, we build

23  cases from the ground up.

24  Q.  Okay.  And I believe before you got on the January 6th

25  case, you did health care fraud investigations; is that

1    correct?

2    A.  Yes.

3    Q.  And having myself done a few of those on the other side,

4    you would agree that those cases are very document intensive

5    and could have tens of thousands, hundreds of thousands of

6    documents you have to review; is that fair to say?

7    A.  They can.

8    Q.  Okay.  And, in fact, in your experience in handling those

9    cases, you would agree that it often takes months and even

10   years to take a case to the U.S. Attorney's Office to have

11   charges filed; would that be fair to say?

12   A.  It can.

13   Q.  Okay.  And rarely do you have investigations which just in

14   a matter of a week or two that you would file federal charges

15   against somebody.  Would you agree with that?

16   A.  Depends on the imminency, if there's any danger, or any --

17   Q.  Sure.

18   A.  -- threat-to-life issues, I'd say, but we can move fast.

19   We don't always.

20   Q.  Fair enough.

21       So when the FBI does -- whether it's a health care fraud

22   case, whether it's involving, you know, white collar fraud,

23   whether it's involving some type of terrorism or narcotics, the

24   typical practice of the FBI is to take a methodical approach to

25   gather evidence, even if it takes months or years to get it

1   right; is that fair to say?

2   A.  Again, it depends on the situation.  I can't -- I can't

3   speculate on -- on hypotheticals like that, but those cases do

4   exist; and, yes, sometimes it does take time.

5   Q.  Okay.  Okay.  Well, and, sir, you would agree it's

6   important that when you conclude an investigation, you

7   obviously want to get it right; is that fair enough?

8   A.  We always want to get it right.

9   Q.  Fair enough.

10          And you would agree that it would be the best practice

11  that when you do an investigation into a crime, that you take

12  your time, be methodical, interview lots of witnesses, go

13  through evidence before you make a decision whether to charge

14  somebody.  Would you agree with that?

15  A.  No.  No, I would not agree with that.

16  Q.  You would not agree that it's the best practice to

17  methodically investigate, review evidence, interview people

18  before you make a determination whether to charge somebody?

19  A.  Again, it has to -- it goes back to whether there is an

20  imminent danger that we need to address immediately.  If

21  there's an imminent danger, then, no, I don't think we would

22  investigate everybody.  We would develop probable cause and

23  move forward from there.

24  Q.  Okay.  That's fair enough.

25          But would you agree that the accuracy of your -- the

1618

1   accuracy of whether you get it right, as far as a criminal

2   charge against somebody, to get a more accurate -- the best

3   accuracy in charging somebody, as far as whether they're guilty

4   or innocent, you would agree that it would be better to take

5   lots of time and review the evidence, interview witnesses, and

6   do it more methodically; would that be fair to say?

7   A.  I'm sorry.  I'm losing you on the guilty versus innocent

8   part because guilty versus innocent isn't a probable cause

9   issue.  That's what we do.  I don't deal with guilty or

10  innocent.  That's the jury's question.  I deal with probable

11  cause.

12  Q.  Well, sir, probable cause means, in layman's terms, that

13  there's a fair probability that somebody may be guilty --

14  A.  Correct.

15  Q.  -- of a crime; right?

16  A.  Correct.

17  Q.  In court we deal with what's called beyond a reasonable

18  doubt; correct?

19  A.  Correct.

20  Q.  Okay.  Now, just because you can charge somebody on

21  probable cause doesn't mean that's the best practice to -- to

22  charge somebody just on bare probable cause, would you agree

23  with that?

24  A.  Again, it's a hypothetical.  I don't know if I'd -- I can't

25  opine on that.

1    Q.  Sir, are you suggesting that the accuracy of an

2    investigation is -- cannot be affected by the amount of time

3    put into the investigation?

4    A.  You keep using this term "accuracy."  I'm not sure what you

5    even mean by that.  Can you define accuracy for me.

6    Q.  Well, I think it's clear, but I'll move along.

7    A.  Okay.

8    Q.  Okay.  The bottom line is, sir, you don't -- you don't want

9    to -- you certainly don't want to charge an innocent person;

10   right?

11   A.  I -- no, of course I don't want to charge an innocent

12   person.

13   Q.  And so, sir, let's step back.  Let's talk about the

14   investigation in general.  In this investigation, the FBI --

15   you and your colleagues -- issued -- or obtained search

16   warrants for properties, for houses, outbuildings, phones,

17   digital devices.  Would you agree with that?

18   A.  Over the course of the investigation, yes, we retained

19   those search warrants.

20   Q.  Okay.  And you also interviewed literally hundreds of

21   witnesses across the country who were connected to the

22   Oath Keepers; either members or affiliates or people you

23   thought had relevant information regarding the Oath Keepers.

24   Is that correct?

25   A.  Correct.

1  Q.  Okay.  You obtained lists of the Oath Keepers in various

2  states; right?

3  A.  Yes.

4  Q.  Okay.  And by the way, sir, you would agree --

5  Mr. Caldwell, based on your further investigation, after his

6  arrest, you were able to determine Mr. Caldwell's never been a

7  member of the Oath Keepers; is that correct?

8  A.  No, I wouldn't agree with that.  I -- my -- I would say

9  that Mr. Caldwell didn't pay $50 to join the organization.

10  However, he was clearly affiliated with it.

11  Q.  Okay.  Well, sir, I mean, you'd agree, you're either a

12  member or you're not a member of the Oath Keepers.  Was he a

13  member or was he not a member?

14  A.  Mr. Caldwell didn't pay $50 to join the organization.

15  Q.  In other words, he was not a member of the Oath Keepers

16  like you originally alleged he was?

17  A.  I -- I -- again, I don't think $50 determines whether

18  somebody is a member of an organization or not.

19  Q.  Well, for example, you know, it costs $25 to join the NRA.

20  A.  Uh-huh.

21  Q.  All right.  You're suggesting somebody is an NRA member if

22  they never paid $25 to join?

23  A.  I think I would suggest it in other ways; that it costs $0

24  to join a gang, and you can be a member of a gang without

25  paying any money.

1    Q.  Okay.  Fair enough.

2         Sir, you went through Facebook pages of various

3    individuals; correct?

4    A.  Yes, we reviewed Facebook records.

5    Q.  Facebook records of hundreds of people; fair to say?

6    A.  No, I don't think -- I don't think I've reviewed hundreds

7    of people's Facebook records.

8    Q.  You certainly read Facebook records of Mr. Caldwell;

9    correct?

10   A.  Yes, I did.

11   Q.  And Ms. Watkins; right?

12   A.  Yes.

13   Q.  You've also reviewed tens of thousands of text messages

14   throughout this investigation; is that fair to say?

15   A.  Correct.

16   Q.  Okay.  And also Signal messages as well?

17   A.  Correct.

18   Q.  And emails; correct?

19   A.  Yes.

20   Q.  Okay.  And so just to be clear, when the FBI seizes digital

21   devices, like computers, external hard drives, thumb drives,

22   cell phones, you have the ability -- your examiners have the

23   ability to basically siphon all of the information out of those

24   devices and make a mirrored copy; is that fair to say?

25   A.  In most instances, yes.  Not in all.

1    Q.  Okay.  Well, in this instance, with Mr. Caldwell, you were

2    able to do that with a number of devices he had; correct?

3    A.  Yes, we were.

4    Q.  And also other defendants in this case, Stewart Rhodes --

5    and you were able to do that as well.  And other defendants

6    here; is that fair to say?

7    A.  Correct.

8    Q.  And so, sir, it would be fair to say that through your

9    investigation -- and I should add, Signal -- I know my

10   colleague mentioned about Signal.  Let's be clear for those who

11   aren't -- don't quite understand it, because I didn't a couple

12   years ago.

13        Signal means I take my phone out, I can text you a

14   message, you get the message, but Big Brother or a private

15   actor cannot see what we're sending in real time; is that

16   correct?

17   A.  It's my understanding.

18   Q.  Okay.  So I would still have the message on my phone.  You

19   would still have the message on your phone, unless we delete

20   it, personally delete it; is that fair to say?

21   A.  Yes.  Again, that's my understanding.

22   Q.  And in this case, sir -- I know there was some talk about

23   some messages that were deleted.  But you would agree that the

24   FBI was able to recover phones from persons of interest in this

25   case, and you were able to recover virtually all of the Signal

 1    messages that had been -- taken place between members of the

 2    Oath Keepers in the relevant time of this conspiracy -- alleged

 3    conspiracy; correct?

 4                 MS. RAKOCZY:  Objection.

 5                 THE COURT:  You can answer.  It's overruled.

 6    A.  I don't think I'd put it in that broad of terms, but we did

 7    recover a number of messages.  I can't say what the scope is

 8    because we don't know what we don't know.  We don't know what

 9    was deleted that we couldn't recover.

10    BY MR. FISCHER:

11    Q.  Okay.  Well, the messages have dates and times on them;

12    right?

13    A.  Correct.

14    Q.  Okay.  And so you would notice, for example, if there was a

15    gap of, like, 15 days between messages?  That that would seem

16    unusual; correct?

17    A.  I don't know if I could say something was deleted because

18    there was a gap there.  That's just -- I don't think that's a

19    fair conclusion to lead to.

20    Q.  Well, you certainly could have a suspicion whether messages

21    were deleted, if, for example, a 30-day period was missing

22    between communications in a Signal chat group; right?

23    A.  Could.

24    Q.  Okay.  But the bottom line, sir, is you were able to

25    examine hundreds, thousands of messages involving Mr. Caldwell,

1    you know, involving other defendants, like Stewart Rhodes,

2    Kelly Meggs, and Ken Harrelson, Jessica Watkins.  You were able

3    to review their private correspondence; correct?

4    A.  Yes.

5    Q.  Okay.  And you were also able to review people who aren't

6    here today.  But other people you investigated or interviewed,

7    you've also been able to read their private correspondence they

8    had on text, Facebook, and Signal messages, and emails, and

9    other forms of communications; correct?

10   A.  Through either a search warrant or consent, yes, we were

11   able to review those.

12   Q.  Okay.  Fair enough.

13        And, sir, based on the -- the hundreds of personal -- in

14   the interviews you've done personally, you or your agents have

15   spent literally hundreds of hours interviewing people across

16   the country if you believed they were either a member of the

17   Oath Keepers and had some connection in D.C. or if they had

18   some relevant information to your investigation; is that

19   correct?

20   A.  I'd say that's fair.

21   Q.  And, sir, based on that, isn't it true that you have not

22   come across one single solitary witness who has claimed that

23   Thomas Caldwell had a plan to attack or breach the

24   United States Capitol on January 6th?

25        MS. RAKOCZY:  Objection.  Hearsay.

```
 1            THE COURT:  It's overruled.

 2       Can you-all get on the phone.

 3            (Bench conference on the record.)

 4            THE COURT:  It is not hearsay, it seems to me, to

 5   elicit the absence of a statement; right?  That's not being --

 6   it's not a statement -- out-of-court statement is being offered

 7   for the truth of anything.  It's the absence of an out-of-court

 8   statement.

 9       And I think that's fair game.  I think the issue, in my

10   mind, is I don't know what he's going to say.  And if he starts

11   talking about somebody else and what they've said, that clearly

12   is hearsay, and maybe it's coming in.  I mean, you've asked the

13   question.  So just with that admonition.

14            MR. FISCHER:  Understood, Your Honor.

15            THE COURT:  Okay.

16            (Proceedings held in open court.)

17            THE COURT:  The objection is overruled.

18   A.  I'm sorry.  Could you ask the question again, make sure I

19   answer it properly.

20   BY MR. FISCHER:

21   Q.  Sure.

22       Based on the large number of interviews you've done and

23   based on your review of all these social media and

24   communication devices, you haven't come across one single

25   solitary human being who has told you or your investigators
```

1    that Mr. Caldwell planned to breach or attack the United States

2    Capitol on January 6th?

3    A.  We've not come across a person that has told us that;

4    that's correct.

5    Q.  Okay.  And, sir, you also have not come across one single

6    solitary human being who has told you that the purpose of the

7    QRFs with the Oath Keepers around D.C. on January 6th was to

8    attack the United States Capitol; correct?

9    A.  Correct.

10   Q.  Okay.  Would you agree that that, perhaps, casts some doubt

11   on the theory that the government put before the jury yesterday

12   about a plan to attack the Capitol?

13   A.  No, I would not.

14   Q.  Okay.  So let's go to Mr. Caldwell's -- his specific

15   investigation.  All right, sir.  Obviously, you started

16   investigating on January 6th or shortly thereafter; is that

17   correct?

18   A.  Shortly thereafter; that's correct.

19   Q.  And would you agree on January 14th of 2021, *The New Yorker*

20   published an article regarding Jessica -- or that noted -- that

21   identified Jessica Watkins and Donovan Crowl as having been in

22   the United States Capitol on January 6th; right?

23   A.  I don't know if that was the date of the article, but it

24   was around that time, yes.

25   Q.  Fair enough.

1    So as a result of that, sir, in the investigation, you

2    or your investigators started looking into Donovan Crowl and

3    Jessica Watkins; is that correct?

4    A.  No.  I think we had leads on them prior to the article.

5    Q.  Okay.  Well, certainly on -- so at least -- well,

6    obviously, you couldn't have started investigating until

7    January 6th or January 7th; right?

8    A.  Correct.

9    Q.  So this *New Yorker* article comes out.  You read the

10   *New Yorker* article when it came out.  I said on January 14th.

11   I'm not holding you to that, but you did read the article?

12   A.  I did read the article.

13   Q.  You would agree as a result -- or maybe some other

14   investigation also, but also that news article, there was

15   further investigation into Jessica Watkins and Donovan Crowl;

16   correct?

17   A.  The article provided us with some leads that took us

18   down some investigative paths; that's how I would phrase it,

19   not --

20   Q.  And I understand.  So I understand you're not relying on

21   the article as evidence, but I mean, I understand it was just

22   another piece -- it piqued your interest, and you and your

23   agents were going full speed towards looking -- looking at

24   Jessica Watkins and Donovan Crowl; correct?

25   A.  Yes, that was part of the investigation.

1  Q.  Okay.  And Donovan Crowl, he's not on trial here today;

2  he's not one of the defendants; correct?

3  A.  Correct.  He's not on trial today.

4  Q.  Okay.  So -- and, in fact, on January 17th, three days

5  later -- I'm not sure if it was you -- it was either you or

6  your agents or your co-workers executed a search warrant on the

7  home of Jessica Watkins in Ohio; is that correct?

8  A.  I'm aware of that.  I wasn't a part of it.

9  Q.  Fair enough.

10      And as a result of that, you became aware of information

11  that Ms. Watkins was not at the home when the raid took place;

12  right?

13  A.  Correct.

14  Q.  Okay.  And you came across information from a person named

15  Montana Siniff, who apparently is Ms. Watkins's roommate at the

16  time, in Ohio?

17  A.  Yes, we came across that information.

18  Q.  Okay.  And according to Mr. Siniff, Ms. Watkins apparently

19  had went -- had went to or decided to go to a person called

20  Commander Tom's house in Virginia; right?

21  A.  Correct.

22  Q.  All right.  And, sir, the -- so then you started an

23  investigation or -- or started looking at Mr. Caldwell as a

24  suspect; is that correct?

25  A.  I don't know if that was the -- the first time we started

1    looking at Mr. Caldwell.  But, obviously, it -- it changed our

2    investigative interest.

3    Q.  Fair enough.

4        Well, you certainly weren't looking at Mr. Caldwell

5    before January 6th, 2021; right?

6    A.  Not to my knowledge.

7    Q.  Okay.

8    A.  I was not involved in that investigation, if there was one.

9    Q.  Fair enough.

10        Okay.  And, sir, can you tell the ladies and gentlemen

11    of the jury, what does it mean to give predication for an

12    investigation.

13    A.  Predication for an investigation is the standard by

14    which we need to have facts and circumstances which justify

15    the FBI opening an investigation into a -- a U.S. citizen

16    or even a person overseas, depending on what the violation is.

17    Q.  Okay.  So it's an internal rule, and you're required -- in

18    order to open an investigation, you have to get people above

19    you to authorize it; is that fair to say?

20    A.  Correct.

21    Q.  Okay.  And in this case, isn't it true you sought a

22    predication to open an investigation in this case based on

23    two reasons:  number one was that Mr. Caldwell stormed inside

24    the United States Capitol on January 6th; and number two,

25    that Mr. Caldwell was a leader of the Oath Keepers.  Is that

```
 1    correct?

 2    A.  I don't remember if that was the predication or if there

 3    was something else.

 4         Do you have a document that you can show me?

 5    Q.  I do, sir, if I -- if I may.  I guess I should mark this.

 6         MR. FISCHER:  Court's indulgence.

 7    BY MR. FISCHER:

 8    Q.  All right.  So, Agent Palian, if I were to show you an

 9    FD-1057 regarding predication, you believe that would refresh

10    your memory?

11    A.  Yes, it would.

12         MR. FISCHER:  Your Honor, may I approach the witness?

13         THE COURT:  Can I have an exhibit number for that.

14         MR. FISCHER:  I apologize, Your Honor.  107.

15         THE COURT:  This is?

16         MR. FISCHER:  Caldwell 107.

17         THE COURT:  Okay.

18         Any particular page you'd like to direct him to or --

19         MR. FISCHER:  Your Honor, it's sort of a -- if I may

20    approach the witness.

21         THE COURT:  Yeah.  If there's a particular passage

22    that would be helpful, but otherwise -- just to speed things

23    up, but if he's got to read the whole thing, he's got to read

24    the whole thing.  That's okay.

25         THE WITNESS:  Actually, I'm done.
```

1    THE COURT:  Okay.  Great.  Thank you.

2    BY MR. FISCHER:

3    Q.  Sir, does that sound correct that there were, essentially,

4    two reasons why you got a predication to open an investigation

5    into Mr. Caldwell:  number one, he had a leadership role in the

6    Oath Keepers; and number two, that he stormed into the

7    United States Capitol?

8    A.  Yeah, but I'd like to note this isn't my document.

9    Q.  Okay.  Well, sir, you're part of the investigation.  I

10   mean, is it --

11   A.  Right, but I didn't -- I didn't create this.

12   Q.  Well, sir, I'm not casting, you know -- I'm not trying to

13   accuse you of anything.  I am just indicating there was

14   predication for an investigation into Mr. Caldwell.

15   A.  Yes.

16   Q.  Correct?

17   A.  Yes.

18   Q.  You --

19   A.  The management checked off on this document and an

20   investigation was initiated.

21   Q.  Yes.  Okay.

22        And on those bases, your agency was -- was blessed -- or

23   you and your agents were blessed with the ability to have a

24   full-blown investigation?

25   A.  Correct.

1  Q.  Okay.  And would you agree today, as you indicated,

2  Mr. Caldwell is, in your words, not a dues-paying member of the

3  Oath Keepers; right?

4  A.  He's not a dues-paying member.

5  Q.  And, sir, you would also agree that Mr. Caldwell did not

6  enter the United States Capitol Building on January 6th?

7  A.  Yes, I would agree with that.

8  Q.  Okay.  And so I guess I ask the question, sir -- well,

9  first of all, you did a search warrant and an arrest warrant --

10  you arrested Mr. Caldwell on that date, on January 19th of

11  2021; right?

12  A.  Yes, that's the date.

13  Q.  And Mr. Caldwell, he actually -- he sat down with you --

14  you and, I guess, an Agent Steve Robinson; is that correct?

15  A.  Correct.

16  Q.  Okay.  And you asked him if he would speak with you and

17  give an interview; fair enough?

18  A.  Yes.

19  Q.  And he did; right?

20  A.  He did.  He consented to an interview.

21  Q.  And you'd agree at the end of the entire process that day,

22  before he was taken in, you agree that you advised Mr. Caldwell

23  that you thought he had been fully cooperative with the FBI; is

24  that correct?

25  A.  He had been cooperative insomuch as he had spoken with us.

1    Q.   Okay.  Well, he answered all of your questions over a

2    period of almost three hours; correct?

3    A.   He answered the questions.

4    Q.   He even signed a consent form for the FBI to be able to

5    go into his barn which the FBI didn't have authority to do;

6    right?

7    A.   That's correct.

8    Q.   He turned over his passwords to his computer and his

9    cell phone; right?

10   A.   If there's documentation that says that, that's fine.  I

11   don't recall that.

12   Q.   Fair enough.

13         His wife signed consent to be able to search her phone

14   as well; correct?

15   A.   Yes, she did.

16   Q.   She didn't try to run from the FBI when you guys went to

17   his house; right?

18   A.   Not to my knowledge.

19   Q.   Okay.  And when you went out there, sir, you had somewhere

20   between -- I don't know -- 20, 25 agents and other FBI

21   personnel when you executed the search warrant and you arrested

22   Mr. Caldwell on January 19th; is that true?

23   A.   I wasn't present for the arrest; so I don't know how many

24   agents were there.

25   Q.   Would it surprise you that there was an armored vehicle

1    with a battering ram there?

2    A.  Would it surprise me?  No.

3    Q.  Okay.  Or a drone was overhead taking photos and video of

4    the area?

5    A.  I don't have that information.  I don't know that.

6    Q.  Or that some of the members of the FBI that went out there

7    that did the search, they had automatic weapons and were

8    wearing military-style gear when they did the search?

9    A.  We carry rifles and --

10   Q.  Understood.

11        And so you did a search of the property of Mr. Caldwell?

12   A.  Correct.

13   Q.  And it's, like, a 30-acre farm out in the Shenandoah

14   Valley; right?

15   A.  Yes.

16   Q.  And, you know, obviously, I mean, it's pretty remote.  It's

17   in a rural area; right?

18   A.  Yes.

19   Q.  And I guess to give the jury a sense, the directions to get

20   there is you basically go to the end of the earth and make a

21   left because it's pretty far out.  Would you agree?

22   A.  It's a ways.

23   Q.  Okay.  Sir, the -- did you find -- when you searched the

24   property, was there any evidence of a military-style training

25   ground on this farm?

1   A.  I don't know what you mean by that.

2   Q.  Were there any, like, you know, outdoor training -- you

3   know, barbwire, anything that looked like somebody was training

4   up -- in a military-style fashion on his property?

5   A.  No, I don't -- I wouldn't -- we didn't find barbwire, if

6   that's your question.

7   Q.  Well, sir, certainly if you had something incriminating

8   that would've shown that Mr. Caldwell was engaging in military

9   training on his property, certainly you would show it to the

10  jury; right?

11  A.  Right.

12  Q.  Okay.  You didn't find anything that would match that

13  description; correct?

14  A.  No, I wouldn't say that.  I -- I would not say that we

15  found that.

16  Q.  Okay.  And you heard me yesterday in opening argument --

17  after I got done complimenting you, you heard me yesterday in

18  opening argument talk about Mr. Caldwell's medical issues; is

19  that correct?

20  A.  Yes, you discussed Mr. Caldwell's medical issues.

21  Q.  Fair enough.

22       And do you have any reason -- did anything I say

23  yesterday about Mr. Caldwell's medical records --

24            MS. RAKOCZY:  Objection.

25            THE COURT:  Is there a question first?

```
 1              MR. FISCHER:  I'll withdraw it.
 2              THE COURT:  Okay.
 3   BY MR. FISCHER:
 4   Q.  Sir, when you arrested Mr. Caldwell at his house, would you
 5   agree that he was having difficulty being able to interact with
 6   you initially when you arrested him because of some health
 7   issues?
 8   A.  Could you be more specific?  I'm not recalling anything.
 9   Q.  Did he have difficulty with his mobility?
10   A.  He was chained up.
11   Q.  Okay.  Well, sir, he also needed -- there was a time -- in
12   fact, sir, you had to delay your interview with him because he
13   had to have his medication given to him before you interviewed
14   him; right?
15   A.  No.  I believe the medication came a couple hours into the
16   interview.  I don't believe that was before the interview.
17   Q.  Well, your -- obviously, your agents -- maybe not your
18   agents, but your -- the FBI personnel were searching the house
19   as you were doing the interview; correct?
20   A.  Correct.
21   Q.  And at one point his wife had to come in and give him
22   medications so that he could do your interview with you; right?
23   A.  He could continue the interview.  We were a couple hours in
24   by that point.
25   Q.  Okay.  And -- and you asked him a number of questions
```

1    over -- over a two-, three-hour time; right?

2    A.  Yes.

3    Q.  And to be clear, in this case today, he's not charged with

4    lying to you, is he?

5    A.  No, he's not been charged with that.

6    Q.  Okay.  And -- and so, in fact, during your interview, you

7    warned him -- you gave him the Martha Stewart warning.  You

8    said it was a crime to lie to the FBI; is that right?

9    A.  Correct.

10   Q.  And you asked him a number of times about whether he went

11   inside the United States Capitol; right?

12   A.  We asked him a couple times.

13   Q.  And, sir, I showed a picture yesterday in opening argument

14   that I represented was a picture that you showed to

15   Mr. Caldwell, where you believe he had went inside the

16   United States Capitol.  Do you remember seeing that yesterday?

17   A.  Based on that --

18             MS. RAKOCZY:  Objection, Your Honor.  We would ask

19   that the --

20             THE COURT REPORTER:  I'm sorry.  We would ask that

21   the --

22             MS. RAKOCZY:  Objection, Your Honor.  If the witness

23   is going to be questioned about exhibits, we'd ask that he be

24   presented with them.

25             THE COURT:  Do you have it handy?

1    MR. FISCHER:  Court's indulgence.

2    BY MR. FISCHER:

3    Q.  Sir, during your interview with Mr. Caldwell, did you

4    present him with a photograph and tell him that you believed

5    he was inside the United States Capitol in the photograph?

6    A.  Based on the photograph and his own statements, yes, we --

7    Q.  Understood.

8    A.  -- believed that.

9    Q.  And would you agree today that you were mistaken?

10   A.  Yes.

11   Q.  About him being in the Capitol?

12   A.  It looked like -- although I would say we hadn't drawn a

13   full conclusion, but yes.

14   Q.  Understood.  Okay.

15       And, sir, yesterday you testified about property

16   damage that you witnessed inside the United States Capitol

17   when you first toured it after what happened; is that right?

18   A.  I don't know if I would say toured, but yes.

19   Q.  Poor choice of words.  You went through it and you're

20   looking at what happened?

21   A.  Again, I'm not trying to quibble with you on words here.  I

22   just want to make sure we're accurate.  I didn't tour the

23   Capitol.

24   Q.  Fair enough.

25       And you would agree, sir -- since you've already

1    indicated Mr. Caldwell did not go into the United States

2    Capitol on January 6th, you would agree he didn't do any of the

3    property damage that other people did on that day; is that

4    correct?

5    A.  To the interior of the Capitol, yes.  To the exterior of

6    the Capitol, we have no idea.

7    Q.  Okay.  So bottom line is to the interior of the Capitol,

8    you have no evidence that he damaged any property.  Okay.

9    A.  Correct.

10   Q.  And to the exterior, you have -- you have no evidence of

11   that either?

12   A.  We have no evidence.

13   Q.  And so, sir, when you arrested Mr. Caldwell, you charged

14   him on a charging document called a criminal complaint; is that

15   right?

16   A.  Correct.

17   Q.  Okay.  And that criminal complaint, you took out and had

18   signed before a federal magistrate judge in this court on -- it

19   was signed on January 17th of 2021; is that right?  Sound

20   right?

21   A.  It sounds right.

22   Q.  Okay.  And, in fact, that criminal complaint was taken out

23   specifically before Judge -- Magistrate Judge Meriweather, and

24   it was signed on --

25            MR. FISCHER:  Court's indulgence.

1    BY MR. FISCHER:

2    Q.  -- at 15:42 hours, 3:42 p.m. on January 17th, 2021; is that

3    right?

4            MS. RAKOCZY:  Objection.

5            THE COURT:  It's overruled.  He can answer that.

6    BY MR. FISCHER:

7    Q.  Does that sound right, January --

8    A.  If that's what it says on there, I'm sure it's correct.

9    Q.  So 3:52 [sic] in the afternoon.

10           So, sir --

11           THE COURT:  Can I interrupt for a second, and I may

12   have missed it.  Did you ask him whether this was his affidavit

13   that he submitted?

14           MR. FISCHER:  I did, I believe.  Yeah.

15           THE COURT:  Okay.

16   BY MR. FISCHER:

17   Q.  So you, sir --

18   A.  I mean, I'd like to see the affidavit.  Let's just be --

19           THE COURT:  It's okay.  If he said yes, that's fine.

20   I just may have missed it.

21           THE WITNESS:  Did I say yes, though?

22           THE COURT:  I'm not sure.  So that's why --

23           THE WITNESS:  I don't think I did.

24           THE COURT:  Can you re-ask the question.  I may

25   have --

1    THE WITNESS:  I would have asked to see it.  I don't

2    think I did say yes to that.

3    BY MR. FISCHER:

4    Q.  Sir, you sought out a criminal complaint against

5    Mr. Caldwell prior to his arrest; correct?

6    A.  Yes.  But, again, I don't know if I signed the affidavit.

7    I saw it.  I don't know if I was the -- the signing agent.

8    Q.  Okay.

9    MR. FISCHER:  If I can find a sticker, I'm going to

10   mark this as Caldwell 108.

11   All right.  If I may approach the witness, Your Honor.

12   THE COURT:  You don't need to ask.

13   THE WITNESS:  Thank you.

14   BY MR. FISCHER:

15   Q.  Sir, if you could take a look at that document, and if you

16   have had a chance to refresh your recollection, let me know

17   when you're ready.

18   THE COURT:  Can I get an exhibit number for the

19   record, Mr. Fischer.

20   MR. FISCHER:  I'm sorry?

21   THE COURT:  An exhibit number for the record.

22   MR. FISCHER:  It's 108, sir.

23   A.  Okay.

24   BY MR. FISCHER:

25   Q.  So you'd agree, 3:42 p.m. on January 17th of 2021 is when

1    you were granted the criminal complaint against Mr. Caldwell;

2    is that right?

3    A.  Yes; that's correct.

4    Q.  And in order to obtain that criminal complaint, you had to

5    go to a magistrate judge and file an affidavit; is that

6    correct?

7    A.  Yes.

8    Q.  And you typed up an affidavit -- I think it was about 13,

9    14 pages long; is that fair enough?

10   A.  I think so.

11   Q.  So to be clear, on the morning of January 17th, 2021,

12   agents go into Jessica Watkins's residence in Ohio where they

13   are told Ms. Watkins has gone to a guy named Commander Tom's

14   house in the Shenandoah Valley in Virginia; right?

15   A.  Correct.

16   Q.  And at 3:42 p.m. that afternoon, you got a criminal

17   complaint charging Mr. Caldwell that -- looks like with four --

18   at least four different crimes; is that right?

19   A.  Could you give me those times again.  I'm sorry.  I think I

20   missed that.

21   Q.  The complaint in front of you --

22   A.  No, I get the complaint in front of me.  What time -- we're

23   talking about what time the -- you said the agents went in at

24   what time?

25   Q.  January 17th, 2021, in a predawn raid in a small town in

1    Ohio.

2    A.  Right.

3    Q.  Jessica Watkins's house.  They go in.  They get information

4    that she went to Commander Tom's house in Virginia; right?

5    A.  Right.

6    Q.  And Commander Tom, that would be the person you would later

7    identify as Thomas Caldwell; correct?

8    A.  Correct.

9    Q.  Okay.  So, basically, can you tell the ladies and gentlemen

10   of the jury what, if any, investigation did you do of

11   Mr. Caldwell within that, sort of, short period of time on

12   January 17th?

13   A.  Sure.  I'm fairly certain we obtained his Facebook records

14   very quickly.

15   Q.  All right.  And did you interview any -- did you interview

16   any individual who provided you information that Mr. Caldwell

17   was involved in any type of thing on January 6th?

18   A.  Yeah.  We interviewed Mr. Siniff.

19   Q.  Okay.  Well, and Mr. Siniff -- again, he indicated he [sic]

20   went to Commander Tom's house in Virginia; correct?

21            MS. RAKOCZY:  Objection.

22            THE COURT:  It's overruled.  He's already answered

23   it.

24   BY MR. FISCHER:

25   Q.  All right.  Well, you looked at his Facebook.  Sir, again,

1   you didn't know -- you didn't have anything on Mr. Caldwell

2   before January 6th of 2021; right?

3   A.  Correct.

4   Q.  Okay.  So would you agree you didn't really do a lot of

5   investigation before you charged him?

6   A.  No, I wouldn't agree with that.

7   Q.  Were you under pressure to make quick arrests in this case

8   from anybody?

9   A.  None.

10  Q.  Okay.  The -- the FBI director wasn't putting pressure to

11  try to arrest people quickly?

12  A.  I have never spoken to the FBI director.

13  Q.  Okay.  Well, sir, you said you did it because it was -- I

14  think you indicated you normally would do a lengthy

15  investigation, but there are exceptions you would do.  What was

16  the exception with Mr. Caldwell?

17  A.  Mr. Caldwell talked about continuing operations and going

18  to state capitols to continue raiding state capitols.  He also

19  had violent statements about killing politicians and about

20  storming the Capitol.  There was a number of things that we --

21  we took into consideration.

22  Q.  Yeah.  Yeah.  And -- and, sir, you took that into

23  consideration.  But you also found out when you read his --

24  another reason why -- that you sought an arrest warrant out for

25  Mr. Caldwell, he had made a couple statements about storming

1    the castle and being an instigator.  He said he was such an
2    instigator; is that right?
3    A.  He did make those statements.
4    Q.  And you remember during your interview of Mr. Caldwell --
5    do you remember that even you -- when it was brought to your
6    attention, you recognized the lines from the movie *The Princess*
7    *Bride*; right?
8    A.  I did.  I don't know if those were actually the lines, but,
9    yes, storming the castle is in the -- in the movie.
10   Q.  And also some of the messages you just referred to before,
11   like the let's -- specifically, you talked about let's take
12   this to other states.  He had indicated -- Mr. Crowl and
13   Ms. Watkins were from Ohio; right?
14   A.  That's correct.
15   Q.  And so he had indicated something to the effect, oh, let's
16   do this, you know, in Ohio or whatever, exclamation point;
17   right?
18   A.  I'd want to see the records to say -- to be able to say
19   what exactly he said, but yes.
20   Q.  Okay.  Sir, subsequent to that affidavit and criminal
21   complaint, you sought out an amended criminal complaint; is
22   that correct?  On -- on January 19th of 2021 --
23   A.  I'd like to see it.  But, yes, that sounds correct.
24   Q.  Okay.
25              MR. FISCHER:  If I may approach the witness.

```
1              THE COURT:  You may.

2              MR. FISCHER:  It's No. 109.

3              THE WITNESS:  Thank you.

4    BY MR. FISCHER:

5    Q.  And after reviewing that document, does that refresh your

6    recollection, sir?

7    A.  Yes.  But I'd like to see the affidavit that goes along

8    with this too.  Do you have that --

9    Q.  Okay.

10   A.  -- before I answer questions about what I said in it?

11   Q.  Well, I -- sir, I'm just going to ask you questions

12   regarding that page.

13        Sir, you just testified that you had no evidence that

14   Mr. Caldwell destroyed any property inside or outside the

15   Capitol; correct?  Is that correct?

16   A.  Correct.

17   Q.  Okay.  And, sir, you'd also agree that on January 19th of

18   2021, you charged Mr. Caldwell with a felony of destruction of

19   government property; correct?

20   A.  Yes, that's what it says.

21   Q.  And you indicated before you had no evidence -- you said he

22   did not go into the United States Capitol on January 6th,

23   20- --

24   A.  He didn't go into the Capitol on January -- I'm so sorry.

25   Q.  But, in fact, in your -- in your affidavit, you allege that
```

```
 1   he made violent entry into the Capitol?
 2   A.  Again, I'd like to see the affidavit so I can see --
 3   Q.  I'm sorry.  I apologize.
 4        You charged him with violent entry into the Capitol
 5   under 40 U.S.C. 5014(e)(2); right?
 6        MS. RAKOCZY:  Objection as to stating what the charge
 7   is under the law.
 8        THE COURT:  That's not -- I don't know what it says
 9   on the document, but whatever -- just read what the document
10   says.
11        MR. FISCHER:  Well, I'll withdraw.
12   BY MR. FISCHER:
13   Q.  Sir, you certainly accused Mr. Caldwell of violent entry
14   into the United States Capitol; right?
15   A.  Again, I can't say what I've accused him of and what I
16   can't until you provide me with the affidavit.  I don't know
17   why you're not providing it to me.
18        MR. FISCHER:  Okay.  Well, fair enough.  I'll get the
19   affidavit.  I think we're on 109.
20        THE COURTROOM DEPUTY:  110.
21        MR. FISCHER:  110.  I apologize.
22        If I may approach the witness.
23        THE WITNESS:  Thank you.
24        Here's the comment I was talking about.  "Let's storm
25   the Capitol in Ohio."
```

1    BY MR. FISCHER:

2    Q.   That's right, sir.

3         And, Agent Palian, if I could just stop you right there.

4    Were you aware that the demonstration at the Capitol in Ohio

5    had taken place before January 6th?

6    A.   I don't know if that's a prerequisite to storm a capitol,

7    is there has to be a demonstration.

8    Q.   Well, sir, do you have any evidence -- you went through

9    Mr. Caldwell's computer, phones, and other correspondence.  Did

10   you see any evidence of any planning to go into -- into the

11   Ohio Capitol?

12   A.   No planning, no.  We have the statements.

13   Q.   And you never -- did you ever ask Mr. Caldwell about that

14   during your interview with him?

15   A.   No, we didn't.

16   Q.   Okay.  And so, sir, you also -- one of the reasons why you

17   believe Mr. Caldwell went inside the Capitol was that there

18   were a couple of messages he sent on Facebook that said, quote,

19   unquote, inside and, quote, unquote, doors breached, unquote.

20   Do you remember that?

21   A.   I think the full quote is "Doors breached, storming

22   forward," I think was the quote.  Does that sound correct?

23   Q.   But you can confirm that the words in Mr. Caldwell's

24   messages didn't match up with his actions that day; is that

25   correct?

1    A.  No, Mr. Caldwell doesn't seem to have been truthful; that's

2    correct.

3    Q.  Oh.  Sir, one of the messages said inside; right?  That was

4    one of the messages he sent?

5    A.  Yes.  At 3:05 p.m. on January 6th, Mr. Caldwell sent a

6    message and said inside; correct.

7    Q.  Okay.  And were you aware, sir, that Mr. Caldwell was not

8    even on the Capitol Grounds at that time?

9    A.  No, I was not at that time.

10   Q.  And, in fact, sir, he was giving a play-by-play of what was

11   happening inside the Capitol based on news reports?

12   A.  I have no knowledge of that.

13   Q.  Okay.  Sir, would you agree you sort of have a selective

14   memory today when it comes to defense counsel asking you

15   questions?  Would you agree with that?

16   A.  No, I would not.

17            MS. RAKOCZY:  Objection.  Argumentative.

18            THE COURT:  Sustained.

19   BY MR. FISCHER:

20   Q.  Sir, the --

21            MR. FISCHER:  Court's indulgence.

22   BY MR. FISCHER:

23   Q.  Sir, you would agree that you were able to determine after

24   your arrest of Mr. Caldwell that he's a retired lieutenant

25   commander in the Navy; is that correct?

1   A.   Correct.

2   Q.   Okay.  And you would agree that you believe that

3   Mr. Caldwell held a leadership role in the Oath Keepers based

4   on a social media message where somebody called Mr. Caldwell

5   the commander; is that correct?

6   A.   No.  There was other evidence of that.

7   Q.   There was?

8   A.   Absolutely.

9   Q.   What was the other evidence?

10  A.   The other evidence is his coordination of the QRF.

11  Q.   I'm sorry, sir.  You lost me.  The -- what was the evidence

12  that you knew he was a retired lieutenant commander in the

13  Navy?

14  A.   We obtained his military records.

15  Q.   When did you do that?

16  A.   I'm not sure.  It was subsequent to that.  I don't

17  remember.

18  Q.   Subsequent to his arrest; correct?

19  A.   Oh, when did we -- no, we knew he was -- so you're asking

20  two separate questions.  The first question is when did we know

21  he was in the Navy.  That was prior.  We obtained the full

22  records after the fact.  I apologize if I was not clear about

23  that.

24  Q.   And, sir -- quite frankly, sir, during your interview -- by

25  the way, you recorded his interview; is that correct?

1    A.  I did.

2    Q.  And by the way, you said that Mr. Caldwell wasn't -- you

3    know, you said that he had lied; is that right?

4    A.  He did.

5    Q.  Oh, he did.  Okay.

6         And, sir, when you arrested Mr. Caldwell, isn't it true

7    Mr. Caldwell asked you why he was under arrest; is that

8    correct?

9    A.  I believe he did, yes, several times.

10   Q.  And your answer was for trespassing?

11   A.  I don't recall that.  You'd have to show me some video.

12   Q.  Sure.

13        Sir, we will get the transcript for you, sir.  But, sir,

14   isn't it true he asked you specifically what am I being charged

15   with and you told him trespassing?

16   A.  Again, you have to show me something to refresh my memory.

17   I'm just not -- I don't recall exactly what I said to him.

18   Q.  Do you recall whether Mr. Caldwell asked you if you were

19   recording him?

20   A.  No, I don't recall that.  I recall some vague discussion

21   about shoe phones, as you alluded to in your opening, but I

22   don't recall a specific question about are you recording this.

23   Q.  Well, you did record Mr. Caldwell; right?

24   A.  I did.

25   Q.  And Mr. Caldwell was not aware you were recording; is that

1    correct?

2    A.  No, he was not.

3    Q.  Okay.  And the shoe phone, sir -- in fact, Mr. Caldwell

4    asked you if you -- in the context of whether you were

5    recording, whether you had a shoe phone; right?

6    A.  I didn't think that was in the context of recording, but --

7    Q.  Well --

8    A.  Again, I'd have to see the video to say what the context

9    was.

10   Q.  Well, you certainly know that a shoe phone -- in fact, you

11   told him that you knew what a shoe phone was, that it was from

12   a 1960s sitcom with a guy named Don Adams called *Get Smart*;

13   right?

14   A.  Correct.

15   Q.  And as part of that, sir, the actor in there had a phone --

16   he was a spy and he had a phone in a shoe, but it also acted as

17   a tape recorder?

18   A.  I just thought it was a phone.  I just thought the

19   shoe phone was a phone.  I didn't know it was a recorder.  I

20   wasn't around in 1960.

21   Q.  Well, you weren't around in 1960, sir, but in your

22   interview with Mr. Caldwell, you certainly were familiar with

23   the show; right?

24   A.  I've seen the reruns.

25   Q.  Oh, okay.  So you weren't around in 1960, but you saw the

 1    reruns; right?

 2    A.  Correct.

 3    Q.  Well, I wasn't around in 1960 either also, sir, but I saw

 4    the reruns also.

 5    A.  Okay.

 6    Q.  And you were able to tell Mr. Caldwell the actress in the

 7    show was Barbara Feldon; right?

 8    A.  Did I say that?  Again, I'd have to see a tape.  I don't

 9    know if I knew that.

10    Q.  Sir, the bottom line is --

11    A.  I don't think I've ever known Barbara Feldon.

12    Q.  Let's just be clear, sir.  You absolutely lied to

13    Mr. Caldwell and you suggested to him that you were not

14    recording him, sir; isn't that true?

15    A.  No, I don't believe it is.  Again, please show me the tape,

16    and I'll interpret it for you, and I'll tell you the context.

17    But, no, I don't believe that.

18    Q.  Sir, did you ask him over and over about whether he used a

19    walkie-talkie app?

20    A.  I believe we asked him a couple of times.  I don't know if

21    I would characterize it as over and over.

22    Q.  Well, you asked him about whether he had -- was using a

23    radio; right?

24    A.  Uh-huh.

25    Q.  Correct?

1    A.  Yes.

2    Q.  And whether he was communicating with others on the radio

3    at -- on January 6th; right?

4    A.  Yes.

5    Q.  Okay.  And you asked him whether he was using a

6    walkie-talkie app to communicate with others; right?

7    A.  Correct.

8    Q.  And, in fact, the -- your colleagues here put up something

9    about Zello in their presentation when you were on the witness

10   stand.  Do you remember that?

11   A.  Yes.

12   Q.  Okay.  And on that there, it indicated that Mr. Caldwell

13   had apparently -- there was -- CAG Spy had signed up for Zello

14   on November 13th of -- of 2020; right?

15   A.  Yes; that's correct.

16   Q.  And that phone -- Mr. Caldwell's phone where the Zello app

17   was found -- right? -- has been in the FBI's possession since

18   it was seized on January 19th, 2021; right?

19   A.  Correct.

20   Q.  And it's still there.  It's in an evidence locker in

21   Manassas, Virginia, at this time; right?

22   A.  Yes.

23   Q.  And, in fact, sir, the defense -- we requested for the FBI

24   to determine --

25             MS. RAKOCZY:  Objection.

1    MR. FISCHER:  I haven't even asked the question.

2    THE COURT:  Can I hear the question first before I --

3    can I hear the question first, Mr. Fischer.

4    MR. FISCHER:  I'll withdraw and ask him differently.

5    BY MR. FISCHER:

6    Q.  Sir, the phone that you recovered, you sent that phone to

7    the FBI CART Team for forensic analysis; right?

8    A.  Yes.

9    Q.  And one of the things you wanted to find out in your

10   investigation is whether Mr. Caldwell was utilizing Zello on

11   January 6th, 2021; right?

12   A.  Correct.

13   Q.  Okay.  And would you agree, sir, that you got results back

14   on whether his phone was using Zello on January 6th, 2021;

15   right?

16   A.  Correct.

17   Q.  And, in fact, you found out that since mid-November through

18   January 6th, there was no evidence Mr. Caldwell was using Zello

19   on his cell phone; is that right?

20   A.  That's right.

21   Q.  Okay.  So, in other words, sir, that was another thing you

22   believe that Mr. Caldwell was -- let me -- I'm going to

23   withdraw it.

24       You would agree that when you arrested Mr. Caldwell, you

25   and your agents believed that Mr. Caldwell was on Zello as a

1    commander giving orders out to members of the Oath Keepers?

2    A.  No, I don't think we believed that.

3    Q.  You never did?  You sure about that?

4    A.  No.  I recall that portion of the interview.  We asked him

5    several questions about it.  He told us, I believe, that at one

6    time he had Zello on his phone.  He had taken it off in

7    November.  I think we moved on pretty quickly after that.  It

8    wasn't a focal point of the interview at all.

9    Q.  Absolutely.  I understand, sir.

10        And so -- sir, so --

11   A.  I don't really even recall what you're talking about, about

12   trying to say that he was on Zello and commanding people from

13   the Oath Keepers that way on January 6th.  No, I don't think

14   that happened.

15   Q.  Okay.  And so neither you nor -- to your knowledge, anybody

16   in the FBI believed that Mr. Caldwell was using Zello on

17   January 6th?

18   A.  Again, I can't speak for anybody else in the FBI.  I don't

19   believe I thought that, and we didn't have any knowledge of

20   that.  We had the Zello recordings.  At the time we had

21   Ms. Watkins on the Zello recordings.  I don't remember

22   Mr. Caldwell even coming up in reference to that.  If you have

23   something to show me, please show me; I'll take a look at it.

24   But I don't recall that.

25   Q.  Well, sir, you're running the investigation, not me.  You

1    agree with that; right?

2    A.  I would agree I'm running the investigation, not you, yes.

3    Q.  And that's not a small little thing.  You either believed

4    he was on Zello or you did not believe he was on Zello.  Now,

5    which is it?

6    A.  I think I'm pretty clear.  I don't believe he was on Zello

7    on January 6th, and I didn't believe that at the time.

8    Q.  Okay.  Well, in fact, sir, your agents were specifically

9    investigating after -- after you interviewed Mr. Caldwell

10   whether he was on Zello; right?

11   A.  I think we looked to confirm that because we couldn't

12   really trust anything that Mr. Caldwell said necessarily, but

13   we -- we continued to look because we always look for

14   corroboration of facts.

15   Q.  I'm sorry.  You couldn't trust anything he said; is that

16   what you said?

17   A.  It's an overstatement.  I apologize.

18   Q.  Okay.

19   A.  Anything is a definitive term.  I wouldn't say that.  I

20   take that back.

21   Q.  All right.  Well, you trusted what he told you about not

22   going into the United States Capitol; right?

23   A.  We were able to confirm that later, yes.  We were able to

24   corroborate what he told us.

25   Q.  And you said you didn't believe he was on Zello.  So you

1    must have trusted him about Zello.

2    A.  Again, we went and we further corroborated.

3    Q.  Okay.  Well, sir, I'm trying to understand.  He sat -- in

4    fact, sir, do you agree with my characterization yesterday that

5    you and your colleague ended the interview?

6    A.  We ended the interview because Mr. Caldwell said he was

7    tired --

8    Q.  Sir, that's --

9    A.  -- after about three hours.  I think he said, "I'm getting

10   tired."  And I said, "Okay.  Well, we'll wrap this up soon."

11   Q.  Well, sir, certainly you would agree as a trained

12   investigator, when a suspect wants to talk with you without a

13   lawyer, you want to try to keep that conversation going as long

14   as possible; right?

15   A.  No, not as long as possible.  There's diminishing returns

16   in conversations, and at some point, you're becoming a little

17   coercive.  And we try to avoid that.

18   Q.  The FBI is trying to avoid being coercive; is that what you

19   said?

20   A.  My understanding is is that statements will get thrown out

21   in court if I have somebody interviewed for eight, nine,

22   ten hours.

23   Q.  Well, Mr. Caldwell waived his Miranda rights and spoke with

24   you; right?

25   A.  He did.

1    Q.  Okay.  He answered every single one of your questions;

2    correct?

3    A.  He avoided some, but, you know, for the most part, he

4    answered -- he gave answers to the questions.

5    Q.  He avoided some, kind of like what you're doing here

6    today?

7    A.  No, I don't --

8              THE COURT:  Mr. Fischer, I think we've trod this

9    ground already.  Can we move to a different topic.

10   BY MR. FISCHER:

11   Q.  Well, sir, what was the plan that Mr. Caldwell had that you

12   accused him on at the time of his arrest?  What was the plan he

13   was the commander of?

14             MS. RAKOCZY:  Objection.

15             THE COURT:  Overruled.

16   A.  He was at the minimum coordinating and, in my opinion,

17   leading the QRF.

18   BY MR. FISCHER:

19   Q.  Okay.  Well, in -- he was leading the QRF.  Which QRF?

20   A.  The QRF in Ballston, Virginia, on January 5th and 6th.

21   Q.  Well, sir, you didn't even mention anything in your QRF --

22   in your initial charging document against him; right?

23   A.  No.  I don't know that we had enough -- I don't know if I

24   would have said we had enough to charge that yet.

25   Q.  Okay.  And --

1  A.  We were still continuing to investigate and develop

2  information.

3  Q.  Okay.  Well, you would agree, sir -- I mean, first of all,

4  can I ask:  Was it your agency that tipped off the national

5  media, *The Washington Post*, so they would call the Caldwell

6  home when he was doing the interview with you?

7  A.  Did my agency do that?

8  Q.  Uh-huh.

9  A.  Not to my knowledge, no.

10  Q.  In fact, sir -- I mean, this was a pretty big case at the

11  time.

12  A.  Still is.

13  Q.  Okay.  Well, you certainly would agree, sir -- you

14  certainly would agree that the national media picked up the

15  case immediately upon his arrest; right?

16  A.  My understanding was the affidavit was released as soon as

17  Mr. Caldwell was in custody.

18  Q.  Okay.  Well, he was in custody at the time you, obviously,

19  went into his home; right?

20  A.  Correct.  He was taken into custody about 6:05 in the

21  morning.

22  Q.  Okay.  Sir, so one of the things you did not recover from

23  Mr. Caldwell's house was a crystal ball, I take it; right?

24          THE COURT:  Mr. Fischer, let's -- next question,

25  please.

1    BY MR. FISCHER:

2    Q.  Sir, the plan -- the guy from Serbia that you talked about

3    here, you didn't come across that information regarding the guy

4    from Serbia until months -- at least months later during your

5    investigation; is that right?

6    A.  That's right.

7    Q.  Okay.  And Mr. Caldwell was not on the Signal chat where

8    that Serbian whatever -- YouTube video got sent out; correct?

9    A.  No, he's not.

10   Q.  And he was not on the GoToMeeting that had Stewart Rhodes

11   talking about the Insurrection Act; is that correct?

12   A.  He was not.

13   Q.  Okay.  And --

14           MR. FISCHER:  Court's indulgence.

15   BY MR. FISCHER:

16   Q.  Sir, I'm going to go back to your interview.  In fact, the

17   FBI made a transcript of -- of the interview with Mr. Caldwell.

18   Do you remember that?

19   A.  We did.

20   Q.  Okay.  And would it surprise you if Mr. Caldwell during the

21   interview asked you, quote, What am I charged with?  What am I

22   charged with?  And your answer was, quote, Well, okay.  Your

23   charges are going to be trespassing.  Would that surprise you,

24   sir?

25   A.  Trespassing is one of the charges, yes.

```
 1    Q.  Well, sir, he was also the number one defendant in the
 2    January 6th case when you arrested him; right?
 3                MS. RAKOCZY:  Objection.
 4                THE COURT:  Sustained.
 5    BY MR. FISCHER:
 6    Q.  Sir, you charged him with obstructing -- conspiracy to
 7    obstruct an official proceeding, which at the time was the most
 8    serious charge of any January 6th defendant?
 9                MS. RAKOCZY:  Objection.
10                THE COURT:  Sustained.
11    BY MR. FISCHER:
12    Q.  You charged him -- sir, isn't it true, you charged him with
13    conspiracy to obstruct an official proceeding?  Is that
14    correct?
15                MS. RAKOCZY:  Objection.
16                THE COURT:  That's overruled.  I mean, technically,
17    he doesn't do the charging.
18                THE WITNESS:  I was just about to say that.
19                THE COURT:  I get the point.  But anyway.
20                MR. FISCHER:  Is that overruled or --
21                THE COURT:  It's overruled.
22    BY MR. FISCHER:
23    Q.  You can answer, sir.
24                THE COURT:  He doesn't do the charging.  I think
25    that's the basis for the objection.  So if you would just
```

1    rephrase the question.

2    BY MR. FISCHER:

3    Q.   Okay, sir.  The -- based on your affidavit, Mr. Caldwell,

4    you would agree, was charged with conspiracy to obstruct an

5    official proceeding; correct?

6    A.   Correct.

7    Q.   And you and your colleagues here at the table, that was the

8    charge that you requested of the magistrate -- of the court to

9    file; is that right?

10   A.   Yes.

11   Q.   Okay.  And you also requested them to file the charge of

12   destruction of government property; right?

13   A.   On the 19th, yes.

14   Q.   Yeah.  And so you also -- you also asked the charge -- you

15   also asked them -- Mr. Caldwell to be charged with violent

16   entry into the Capitol?

17   A.   No.

18   Q.   You didn't ask him -- well, in your second affidavit, sir,

19   your second criminal complaint, you asked for that?

20   A.   No, that's not the charge.

21   Q.   It's not?

22   A.   You misstated the charge.

23   Q.   I misstated the charge?

24   A.   The charge is violent entry or disorderly conduct on

25   Capitol Grounds.  Mr. Caldwell was clearly on Capitol Grounds.

1    Q.  And, sir, you understand that that charge requires one to

2    be inside the Capitol?

3    A.  I'm not a lawyer.

4    Q.  Okay.  Well, sir --

5    A.  Capitol Grounds, I thought, was decided that it was --

6    Q.  In fact, sir, you incorrectly charged Mr. Caldwell with

7    destruction of property and a charge that required entry into

8    the United States Capitol?

9             MS. RAKOCZY:  Objection, Your Honor, misstates the

10   law.

11            MR. FISCHER:  I believe it's correct.

12            THE COURT:  I think -- well, let's not ask him what

13   the elements are, essentially, of the offense.  I don't

14   remember if --

15            MR. FISCHER:  I'll withdraw it, Your Honor.  I'll

16   withdraw.

17            THE COURT:  If you would, please.  Thank you.

18   BY MR. FISCHER:

19   Q.  Sir, would you agree, on multiple occasions you and your

20   teammates over here at the Department of Justice alleged that

21   Mr. Caldwell was a leader of a January 6th operation that began

22   in November 3rd or around early November of 2020?

23   A.  We believe Mr. Caldwell is one of the leaders of the

24   conspiracy.  The conspiracy period does go from November 3rd to

25   January 20th.

1    Q.   Okay.  Well, you would also agree -- and also you allege he

2    had a specific plan to -- to attack the United States Capitol?

3    That's what you were alleging in multiple charging documents

4    and court filings?

5    A.   So I think he and his co-conspirators do.  I don't know if

6    I've alleged that Mr. Caldwell specifically had that.  I think

7    it was part of the conspiracy.

8    Q.   Well, sir, he was only charged with two other people when

9    you originally charged him:  Jessica Watkins and Donovan Crowl;

10   right?

11   A.   Yes.

12   Q.   Okay.  And you alleged he had a plan about attacking the

13   Capitol; right?

14   A.   Correct.

15   Q.   And, in fact, sir --

16   A.   I don't -- again, I need to look at what -- how it was

17   phrased.  May I look at the affidavit?

18   Q.   Fair enough.

19   A.   Okay.

20   Q.   While you're looking at it, sir, would you agree that in

21   that initial -- the affidavit that you filed, you allege that,

22   quote, Caldwell was involved in planning and coordinating the

23   January 6th breach of the United States Capitol?

24   A.   Can you point me to where that says that.

25   Q.   We've got -- which affidavit, sir?

1    A.  I have the one filed on the 19th.

2    Q.  Okay.  So we'll do the amended.

3        You would agree that in the amended affidavit, you

4    alleged -- it looks like paragraphs 13 and 14, quote, Caldwell

5    planned with Donovan Crowl, Jessica Watkins, and other unknown

6    and known -- those unknown and known to forcibly storm the

7    United States Capitol?

8    A.  Yes, it says that.

9    Q.  Okay.  So there was a plan that Mr. Caldwell was involved

10   in -- in and engaged with that you had alleged in January of

11   2021; right?  And, in fact, sir, you didn't get this

12   GoToMeeting evidence until much later after Caldwell was

13   arrested; right?

14   A.  That's also true.

15   Q.  And you also didn't have this Serbian guy on YouTube until

16   after Mr. Caldwell was arrested?

17   A.  Correct.

18   Q.  So by logic, sir, that means that you must have been

19   alleging a different plan than the Serbian plan?

20   A.  Yes.

21   Q.  Okay.  So, in other words, that would be something

22   different than what Mr. Caldwell or what Mr. Rhodes is alleged

23   to have led in this case.  That's what I'm saying; correct?

24   A.  I believe so.  I think that's fair.

25   Q.  You believe so.  Okay.

1    MR. FISCHER:  Court's indulgence.

2    BY MR. FISCHER:

3    Q.  Sir, one of the things you would look for to determine

4    whether -- one of the things you would look for in your

5    investigation was to determine whether there were any maps or

6    other indicia that Mr. Caldwell had a plot or anything to go to

7    the United States Capitol and do something untoward; right?

8    A.  Correct.

9    Q.  And while I did understand you did find a couple of tourist

10   maps, did you find any maps of the inside of the Capitol?

11   A.  The interior of the Capitol?

12   Q.  Correct.

13   A.  No.

14   Q.  And you didn't find any maps of the interior of the Capitol

15   on any of the defendants' cell phones or computers; correct?

16   A.  Not to my knowledge.

17   Q.  Okay.  You also agree you didn't find any maps that showed

18   directions to the Senate office building or the House office

19   building; right?

20   A.  No.  We found maps to the Capitol Building itself, between

21   the Capitol Building and the QRF hotel, but not to the office

22   buildings on the exterior.

23   Q.  I understand.  Fair enough.

24        But you also understand there was going to be a protest,

25   or at least a speech, on January 6th in 2021 in -- at the

1    United States Capitol, in the Ellipse; right?

2    A.  Yes.

3    Q.  Okay.  But did you find any maps that led people to

4    lawmakers' houses or residences?

5    A.  No.

6    Q.  Okay.  Did anybody ever actually -- did any member of the

7    Oath Keepers ever actually bring any guns, to your knowledge,

8    into D.C.?

9    A.  Yes.

10   Q.  And who did that?

11   A.  My understanding was Jonathan Walden did.

12   Q.  Jonathan who?

13   A.  Jonathan Walden.

14   Q.  Okay.  He brought a firearm?

15   A.  My understanding is, yes.

16   Q.  What about these defendants?  To your knowledge, did any of

17   them bring a firearm into the District of Columbia?

18   A.  No, not to my knowledge.

19   Q.  Okay.  And did Jonathan Walden use a firearm on January 6th

20   or he just carried it?

21   A.  I believe he just carried.  I mean, I don't have any

22   information it was discharged.

23   Q.  Okay.  And so -- and, in fact, sir, you do have information

24   there was one other member of the Oath Keepers that did bring

25   a -- a gun into -- to -- to the Capitol Grounds; is that

1    correct?

2    A.  I -- if we do, I'm not aware.  Could you help me with that?

3    Q.  Okay.  Are you familiar with a man named Jon Roeper?

4    A.  I know who Mr. Roeper is.  I've not interviewed him.

5    Q.  Okay.

6    A.  I'm aware of --

7    Q.  He certainly was interviewed by your teammates; correct?

8    A.  He was.

9    Q.  Okay.  And you can verify that he -- he had indicated he

10   brought --

11            MS. RAKOCZY:  Objection.  Hearsay.

12            THE COURT:  Sustained.

13   BY MR. FISCHER:

14   Q.  Sir, if you can remember -- I mean, I know -- Mr. Roeper

15   was -- spent 27 years in law enforcement, to your knowledge; is

16   that correct?

17   A.  From the interview, that's what I understand.  And I didn't

18   conduct that interview.

19   Q.  So he's retired.  If -- that's -- he is retired; right?

20   A.  Yes, he's older.

21   Q.  And I know -- if you can recall, what agency did Mr. Roeper

22   retire from?

23   A.  Mr. Roeper --

24            MS. RAKOCZY:  Objection.  Relevance.  Hearsay.

25            THE COURT:  I think we're going a little far afield

1   of direct examination as well here, Mr. Fischer.  I'm not sure

2   what the relevance of this is.

3              MR. FISCHER:  I'll withdraw it, Your Honor.

4              THE COURT:  Okay.

5   BY MR. FISCHER:

6   Q.  Sir, you talked about -- you talked about -- first of all,

7   you talked about --

8              MR. FISCHER:  If I can get the government, please --

9         Court's indulgence.  Court's indulgence.

10  BY MR. FISCHER:

11  Q.  Sir, I'm going to have -- the government's going to be kind

12  enough to pull up an exhibit that was shown as 1 -- 1.S.321.2,

13  which was a -- it was a Signal mess- -- or a message between

14  Thomas Caldwell and Stewart Rhodes that was on November 9th,

15  2021.  You remember seeing that -- what I'm referring to?

16  A.  Yes, I do.

17  Q.  Okay.  And, sir, before we broke for lunch, I provided you

18  with a number of exhibits for you to take your time and have

19  time to review; is that correct?

20  A.  Yes, you did.

21  Q.  And there were a number of photographs I asked you to

22  review and to confirm that those were photographs that were

23  obtained off of Mr. Caldwell's cell phone; is that right?

24  A.  Yes, you asked me to do that.

25  Q.  Okay.  Did you do that?

1    A.  So because these are printouts, I can't confirm that

2    they're the same.  They appear to be the same.  I mean, I'm not

3    going to say they're authentic, but they appear to be similar

4    photographs that were found on his phone.

5    Q.  Okay.  Well, you would agree that -- sir, the most

6    important part is you would agree that the photographs came off

7    his phone -- right? -- that you recovered; right?

8    A.  They appear to have come off the phone, yes.

9    Q.  Okay.

10   A.  I don't have access to Mr. Caldwell's phone right now to be

11   able to -- to compare.  But, yeah, they appear.

12   Q.  Well, obviously, you looked it up and you compared it to a

13   Cellebrite analysis or printout that you did from

14   Mr. Caldwell's phone and it had all his information; right?

15   A.  No, I wasn't able to do that.  I don't have access to that.

16   Q.  You don't have access to it today?

17   A.  I don't have access to Mr. Caldwell's -- I did not have

18   access to Mr. Caldwell's Cellebrite report between 12:30 and

19   1:30 today during lunch.

20   Q.  On November 9th -- one of the allegations, sir, in the

21   indictment -- one of the overt acts is that Mr. Caldwell had a

22   recce on November 9th --

23              MS. RAKOCZY:  Objection.

24              THE COURT:  On the phone, please.

25              (Bench conference on the record.)

1          MS. RAKOCZY:  Your Honor, I just wanted to flag that

2     Mr. Fischer is quoting from the indictment.  I thought the

3     Court had indicated it would not go -- we don't necessarily

4     oppose the indictment going back, but we will ask if

5     Mr. Fischer continues to quote from it --

6          MR. FISCHER:  Your Honor, I'll rephrase it.

7          THE COURT:  Okay.

8          (Proceedings held in open court.)

9          THE COURT:  All right.  Ladies and gentlemen, let's

10     take your afternoon break.  It's about 3 o'clock.  Let's plan

11     to resume at 3:15, and we'll go into the end of the day, and

12     we'll be done at least until Thursday.  Thank you.

13          (Proceedings held outside of the jury.)

14          THE COURT:  You can step down.

15          Mr. Fischer, just for timing purposes, do you have a

16     sense of how long your examination will be?

17          MR. FISCHER:  It's going to be probably an hour and

18     15 minutes.

19          THE COURT:  Okay.  So do you think -- well, I don't

20     know we'll be able to finish with him today given the redirect,

21     but okay.  Let's see where we are.  Thank you.

22          (Recess taken.)

23          (Proceedings held in the presence of the jury.)

24          THE COURT:  All right.  Please have a seat.

25          Ladies and gentlemen, welcome back for our last part of

1    the day.

2         Mr. Fischer.

3              MR. FISCHER:  Thank you, Your Honor.

4    BY MR. FISCHER:

5    Q.  Sir, we had talked -- we had talked before about some

6    photographs I had you look at over the lunch break; is that

7    correct?

8    A.  Yes, we did.

9    Q.  Okay.  You had a chance to look at them; right?

10   A.  I have.

11   Q.  And would you agree that those appear to be the photos that

12   were taken by Mr. Caldwell on November 9th of -- of 2020; is

13   that right?

14   A.  They appear to be.

15   Q.  Okay.

16              MR. FISCHER:  Your Honor, at this time I move into

17   evidence Caldwell Exhibit No. 5 -- 5 through -- 5-1 through

18   5-38.

19              THE COURT:  Any objection?

20              MS. RAKOCZY:  No objection, Your Honor.

21              THE COURT:  5-1 through 5-38 will be admitted.

22              (Defendant Caldwell Exhibit 5-1 through 5-38 admitted

23   into evidence.)

24   BY MR. FISCHER:

25   Q.  Sir, would you agree that one -- in a conspiracy there are

1674

```
1    things that are called overt acts; is that correct?

2            MS. RAKOCZY:  Objection, Your Honor.

3            MR. FISCHER:  I'll --

4    BY MR. FISCHER:

5    Q.  Sir, in order -- involved in a conspiracy are acts that the

6    conspirator is alleged to do in furtherance of the conspiracy;

7    would you agree with that?

8            MS. RAKOCZY:  Objection, Your Honor.  It's a legal

9    conclusion.

10           THE COURT:  Really?  You're asking him a legal

11   question?

12           MR. FISCHER:  I'll rephrase it, Your Honor.

13           THE COURT:  Can you just rephrase it, please.

14   BY MR. FISCHER:

15   Q.  Agent, within a conspiracy, you certainly look for actions

16   that the alleged conspirators take; is that correct?

17   A.  As an investigator, yes, not -- I -- I can't speak legally,

18   but, yes.

19   Q.  So, for example, if Mr. Caldwell let, for example,

20   Mr. Meggs use his restroom, that wouldn't be in furtherance of

21   the conspiracy; correct?  That's not something you're looking

22   for; right?

23   A.  I mean, probably not.

24   Q.  Okay.  In this case, sir -- well, sir, I'll backtrack a

25   little bit.  First of all, isn't it true, Mr. Caldwell -- to
```

1    your knowledge, Mr. Caldwell and Mr. Meggs have -- have no --

2    had no connection prior to this case?  Is that your

3    understanding?

4    A.  Prior to the time of the conspiracy?

5    Q.  Yes.

6    A.  Yes.  That's my understanding.

7    Q.  Well, certainly during the conspiracy, you have no evidence

8    that Mr. Caldwell ever met Mr. Meggs or Mr. Harrelson; correct?

9    A.  Mr. Meggs was here for the Million MAGA March on

10   November 14th.  I can't say whether they met that day in D.C.

11   Q.  And so you don't have any communications between

12   Mr. Caldwell and Mr. Meggs; right?

13   A.  Not that I'm recalling.

14   Q.  And you don't have any communications between Caldwell and

15   Harrelson; right?

16   A.  Again, not that I'm recalling, right now.

17   Q.  Okay.  So I'm going to show you -- I'm going to show you

18   what's been marked as Exhibit 5-1.  Excuse me.  Thank you.

19   A.  Is it easier for me just to show this?

20   Q.  Okay.  You have copies of it; right?

21   A.  I do.

22   Q.  So you see 5-1?

23        There we are.  I apologize I didn't bring a 10-year-old

24   kid to show me how to use the technology.

25        So you -- 5-1, does that -- what's depicted in that

1    picture?  Does that look familiar?

2    A.  Familiar to me?

3    Q.  Yes.

4    A.  I mean, it appears to be 6th Street.

5    Q.  In Washington, D.C.; right?

6    A.  I believe so.

7    Q.  Okay.  Well, first of all -- and I'll backtrack before I

8    show you the next set of photos, sir.

9         You would agree that the government has put forth before

10   you a -- an exhibit -- I'll take this off.  If I could have the

11   exhibit put up, Exhibit 6618.A, which appears to be from

12   CAG Spy, who you correctly identified as Mr. Caldwell, to

13   Stewart Rhodes, and it's a -- it's a -- it goes for more than

14   one page.  But if you want to read that out loud for the jury,

15   please.

16   A.  Read it again right now?

17   Q.  Yes.

18   A.  Oh.  "Stewart, this us Tom in Virginia."  I think it's

19   meant to be is.  "Checking in.  Weird vibe in the big city

20   today.  Practically a ghost town.  Lots of entrenched maggots.

21   Protests underway.  Lengthy recce.  No maps available I like so

22   cutting and pasting my own."

23   Q.  Okay.  Keep reading, please.

24   A.  "How many coming from your end?  I have climate controlled

25   building but you'll need bedrolls.  Circle back your

1    convenience in case additional support arrangements/actions

2    need accomished by me.  Will discuss declassification question

3    and have suggestions with a given being those requested FROM

4    are corrupt."

5    Q.  Okay.

6    A.  "I am not the first crusty intel guy to consider this

7    question.  Will explain.  What type op soonest?  When

8    pre-strike recce?  I will plan to drive/lead if desired for

9    latter.  Feelers out for range/additional space.  Know more

10   tomorrow."

11   Q.  So, sir, this Signal is sent on November -- November 9th,

12   2020, at 9:29 p.m.; right?

13   A.  Yes.

14   Q.  Okay.  And it references a prestrike recce that

15   Mr. Caldwell did earlier that day; right?

16   A.  Correct.

17   Q.  And it appears to be saying that he's in Washington, D.C.,

18   doing some type of reconnaissance; is that correct?

19   A.  Yes.

20   Q.  And in your investigation, you noted that this particular

21   Signal message caught your attention; right?

22   A.  Yes.

23   Q.  And I believe the suggestion is that the -- and would you

24   agree through your investigation, you've come to learn that the

25   word recce is basically a shorthand for reconnaissance;

1    correct?

2    A.  That's my understanding.

3    Q.  So it caught your attention -- when you saw restrike recce,

4    those words caught your attention; right?

5    A.  Yes, they did.

6    Q.  And also you said lengthy recce.  That caught your

7    attention as well; right?

8    A.  Correct.

9    Q.  And, sir, you would agree, obviously -- you know, your side

10   brought this up in this case.  I -- you would agree that you're

11   suggesting that what Mr. Caldwell is saying here is -- or what

12   you're suggesting is that Mr. Caldwell, at the direction of

13   Mr. Rhodes, went to Washington, D.C., to do a prestrike recce?

14   A.  I don't know if we're suggesting it's at the direction of

15   somebody.  I don't know if that's --

16   Q.  Okay.  Well, certainly it would be something -- something

17   that would further the process of trying to stop the election;

18   right?  Would you agree with that?

19   A.  That's why it's being brought up by your side.  I don't

20   decide what exhibits are brought up.  So I can't say why it's

21   being brought up.  I just read -- I just read the text

22   messages.

23   Q.  You're like Ron Burgundy?  You just read the script?

24   A.  In these cases, read evidence.  I don't create it.  I don't

25   interpret it.

1    Q.  Sir, let's cut to the chase.  You thought when Mr. Caldwell

2    was talking about a prestrike recce in Washington, D.C., you

3    thought he was doing reconnaissance on the Capitol Building;

4    correct.

5    A.  I believe this is for the November march.  I don't think we

6    were placing this in terms of the Capitol at that point for --

7    that we didn't believe they were planning for anything at the

8    Capitol for November.  So we weren't looking for that.  We were

9    just looking for reconnaissance heading in D.C., preplanning,

10   dry runs, things like that; not specific to the Capitol.

11   Q.  Well, you would agree your -- the prosecution here is about

12   proving that there was a plot to stop the election, if I'm not

13   mistaken; correct?

14   A.  The election had occurred.  I don't think they were

15   planning to stop the election.

16   Q.  All right, sir.  To stop the Electoral College

17   certification; correct?

18   A.  Correct.

19   Q.  Okay.  So you're also trying to find out whether people

20   took steps in furtherance of that plot to stop the Electoral

21   College certification?

22   A.  That's my understanding.

23   Q.  Okay.  We're not here today because people entered the

24   Department of Labor.  Would you agree that's correct; right?

25   A.  I would agree with that.

1    Q.  We're here today because of what happened at the

2    United States Capitol on January 6th, 2021; right?

3    A.  Correct.

4    Q.  Okay.  And the reason you and your team put this up before

5    the jury was to suggest that the words prestrike recce, the

6    reconnaissance going into D.C., had something to do with the

7    election.

8    A.  I don't put up.  That's not my job.  I gather facts.  I

9    don't place them in exhibits.

10   Q.  Sir, you work practically every single day with these

11   prosecutors; right?

12   A.  I do.

13   Q.  You're working on this case since you began this

14   investigation.  You haven't been working on any other case with

15   the FBI besides this?

16   A.  That's not true.

17   Q.  What have you been working on?

18   A.  I indicted a dog fighting case about two months ago.

19   Q.  Okay.  Were you the lead case agent on that?

20   A.  I was.

21   Q.  Okay.  What other cases?

22            MS. RAKOCZY:  Objection, Your Honor.

23            THE COURT REPORTER:  Your Honor, I need to stop.  I'm

24   having technical difficulties.

25            (Off the record.)

1    THE COURT:  Mr. Fischer.

2   BY MR. FISCHER:

3   Q.  So, Agent, we talked about the -- the set of photos I gave

4   you that are marked as Exhibit 5-1 through -38.

5        Sir, you've had a chance to look through those photos;

6   is that correct?

7   A.  Yes.

8   Q.  And so these were the only photographs that were

9   recovered -- that you -- that were recovered

10  from Mr. Caldwell's cell phone that he had in the FBI's

11  possession; is that correct?

12  A.  No.  We recovered a lot of stuff -- photographs from that

13  cell phone.

14  Q.  From November 9 -- I'm sorry, from November 9th of -- of

15  2020?

16  A.  Oh, I wasn't able to confirm that.

17  Q.  Okay.  Well, sir, you would agree -- so you already

18  indicated, though, these are photographs from November 9th of

19  2020?

20  A.  They appear to be.

21  Q.  Okay.  And so certainly, sir, during your investigation,

22  you obviously focused in on the communication regarding

23  prestrike recce; right?

24  A.  Yes.

25  Q.  And, certainly, you would have done further investigation

1  to determine whether -- what kind of reconnaissance

2  Mr. Caldwell was doing; is that correct?

3  A.  Yes.

4  Q.  Okay.  And so one of the things you, obviously, would do is

5  you would go into his cell phone to see if he took any pictures

6  as part of his reconnaissance; right?

7  A.  Correct.

8  Q.  And, again, the FBI has had his phone since his arrest; is

9  that correct?

10  A.  Yes, we have.

11  Q.  And I'm going to show you what's marked as Exhibit 5-35,

12  which is -- appears to be one part of the recce.

13          MR. FISCHER:  Court's indulgence.

14  BY MR. FISCHER:

15  Q.  All right.  Sir, do you recognize what's in that photo?

16  A.  A building called Camelot.  It looks like it's boarded up.

17  A liquor store.  I can't see the street signs down the way.

18  Q.  And you're familiar -- Camelot is -- is a gentleman's club

19  in Washington, D.C.; right?

20  A.  I don't know that.

21  Q.  I mean, this appears to be one of the objects of the recce

22  Mr. Caldwell was doing prestrike on; is that fair to say?

23  A.  He took a picture of it.

24  Q.  Well, you didn't find in your investigation, sir, any

25  pictures of any government buildings; right?

1    A.  From November 9th, specifically?

2    Q.  That's correct.

3    A.  No.

4    Q.  Okay.  And no -- certainly no pictures of the United States

5    Capitol; right?

6    A.  No.

7    Q.  So, in other words, sir, the 38 pictures from

8    Mr. Caldwell's phone from the day he did the prestrike recce in

9    Washington, D.C., seemed to be of things that have nothing to

10    do with the United States Capitol or any government building;

11    is that correct?

12    A.  These pictures don't have anything to do with the

13    United States Capitol or any government building.

14    Q.  And, certainly, sir, if you do have pictures that are

15    incriminating, that are other pictures that you have in your --

16    in your possession when you have time to see -- go through, you

17    will agree to come before the jury and show those with the

18    government's consent; right?

19            MS. RAKOCZY:  Objection.

20            THE COURT:  Objection sustained.

21    BY MR. FISCHER:

22    Q.  Sir, would you agree you got it wrong when you thought that

23    Mr. Caldwell -- his prestrike recce had something to do with

24    stopping an election?

25    A.  Well, I think what Mr. Caldwell did was talked about the

1    prestrike recce, and the overall November 14th operation as a

2    learning lesson.  So I don't know if I'd say there was nothing

3    to do with what happened on January 6th.  I believe that was

4    the term he used, was the -- you know, we need to take away

5    lessons learned from what we did in November and apply it going

6    down the road.

7    Q.  A learning lesson by taking a picture of a strip club?

8    A.  I don't know what he considers learning lessons and what he

9    doesn't.  I'm just telling you what he said in the message.

10   Q.  In fact, sir, you understand that the disagreement in court

11   seems to be the position the government has taken about a plot

12   to stop the election, and Mr. Caldwell and the defendants are

13   claiming Antifa -- concerned about Antifa was what was driving

14   the actions?  You'd agree that --

15              MS. RAKOCZY:  Objection.

16              THE COURT:  Just rephrase the question, please.

17   BY MR. FISCHER:

18   Q.  Sir, you would agree -- you obviously heard the defendants'

19   opening arguments where we referenced Antifa; right?

20   A.  You referenced Antifa in the opening arguments.

21   Q.  And would you agree that the bulk of those photos you have

22   in front of you were of an area that was known as BLM Plaza?

23   A.  I don't know where BLM Plaza is.  I know it's in

24   Washington, D.C.  I don't know specifically where it is so I

25   can't say that these photos are of BLM Plaza.

1    Q.  Well, certainly you recognize BLM Plaza was identified as

2    an area where there was some Antifa activity in 2020 going into

3    2021?

4              MS. RAKOCZY:  Objection.  Relevance.

5              THE COURT:  It's overruled.  To the extent he knows.

6    A.  Yeah, I don't know.

7    BY MR. FISCHER:

8    Q.  Okay.  So are you suggesting that Mr. Caldwell going into

9    Washington, D.C., on November 9th had something to do with a

10   larger plan regarding the election?

11   A.  I'm just telling you what Mr. Caldwell said.  I'm not

12   suggesting anything.  Mr. Caldwell said lessons learned.  We

13   need to learn what he learned from -- I'm paraphrasing, but

14   whatever it was, what he said, we need to learn from what we

15   did in November and apply it going forward.  That's what --

16   that's what I'm saying.  I'm not suggesting anything.

17   Q.  Okay.  Sir, you're familiar with an FBI agent named

18   Mark Esposito?

19   A.  Yes, I know Mark Esposito.

20   Q.  Okay.  Does he work with you on your investigations?

21   A.  He did in the past.

22   Q.  Okay.  So it seems to me what you're suggesting is the

23   reason why Mr. Caldwell went in there, into D.C., was he was

24   learning something from driving into D.C., something that

25   would -- would be for the future, used perhaps for stopping the

 1    election; right?

 2    A.   Again, I'm not suggest- -- I think I said this already.

 3    I'm not suggesting anything.  I'm just telling you what was

 4    said.

 5    Q.   Okay.  Do you -- do you agree -- do you agree with your

 6    colleague, Agent Esposito, that the -- the Million MAGA

 7    March --

 8              MS. RAKOCZY:  Objection.

 9              THE COURT:  Just allow him to ask the question, and

10    then I'll rule on it.

11    BY MR. FISCHER:

12    Q.   Sir, do you agree with your colleague, FBI Special Agent

13    Esposito, that the Oath Keepers and other individuals, when

14    they went to the Million MAGA March on November 14th and the

15    second protest on December 12th, didn't -- that he didn't have

16    any evidence that that was a dry run for January 6th?

17              THE COURT:  Objection.  Sustained.  The jury should

18    ignore the last question.

19              MR. FISCHER:  Withdrawn.

20              Court's indulgence.

21    BY MR. FISCHER:

22    Q.   Sir, we had talked about Zello before.  And -- and so you

23    could confirm that Mr. Caldwell was not utilizing Zello -- his

24    phone was not utilizing Zello on or about January 6th; correct?

25    A.   Yes, I can confirm that.

1    Q.  And, in fact, it hadn't been utilized on his phone since

2    mid-November according to your CART team?

3    A.  Yes.

4    Q.  And, sir, are you familiar with an agent named Special

5    Agent David Lochner?

6    A.  Yes, I know Agent Lochner.

7    Q.  Okay.  And Agent Lochner is part of your team as well; is

8    that correct?

9    A.  No, he's not anymore.  He was for a brief time.

10   Q.  And are you aware as part of the investigation that

11   Agent Lochner testified before --

12            THE COURT:  That's sustained.

13            MR. FISCHER:  Just as a --

14            THE COURT:  You can't ask him what somebody else

15   said.  You know that.

16            MR. FISCHER:  Your Honor, can we go on the phone for

17   a moment?

18            THE COURT:  Sure.

19            (Bench conference on the record.)

20            MR. FISCHER:  Your Honor, it's an 801 statement.

21   It's an adoptive statement.  It's -- it's a government agent

22   giving a statement before a federal grand jury.  It's -- it's a

23   statement adopted by the government.

24            MS. RAKOCZY:  Your Honor, this witness was not

25   present in the grand jury when that person testified.

1    If Mr. -- I'm also not sure it's a hundred percent clear that

2    that's a government admission, but I think if there's a time to

3    litigate that, it's not through the testimony of this witness.

4            THE COURT:  Yeah.  I mean, I think that's -- look, I

5    don't -- I'd reserve on the question of whether it's

6    independently admissible, but I don't think it's appropriate to

7    bring it through this witness.

8            MR. FISCHER:  I'll move -- I'll move along then,

9    Your Honor.

10           THE COURT:  Okay.  Thank you.

11           (Proceedings held in open court.)

12   BY MR. FISCHER:

13   Q.  Sir, you also -- in that same text or Signal message we

14   were just talking about, there's reference to an op in that

15   message; is that right?

16   A.  I'm sorry.  Is this the Signal message between Mr. Caldwell

17   and Mr. Rhodes?

18   Q.  Yes.  They reference an op; right?

19   A.  Yes.

20   Q.  And, in fact, you've referenced the word op or operation

21   numerous times during your testimony; is that correct?

22   A.  Yes.

23   Q.  Okay.  And, sir, you had a chance to go through

24   Mr. Caldwell's computer -- at least the FBI had a chance to go

25   through his computer at length and download it; right?

1    A.  Yes, we did.

2    Q.  Okay.  And you were able to -- you were able to recover

3    documents and other information that Mr. Caldwell had on his

4    computer; is that right?

5    A.  Correct.

6    Q.  Okay.  And one of those documents -- and one of those

7    documents -- sir, isn't it true you found evidence of an op

8    plan?

9    A.  Yes, we did.

10   Q.  Okay.  In fact, there were some notes the government put up

11   in an exhibit from a notepad that referenced an op plan as

12   well; is that right?

13   A.  Correct.

14   Q.  Sir, isn't it true the op plan that Mr. Caldwell was

15   referencing was an op plan to protect against violence by

16   Antifa?

17   A.  I'd like to give it a read before I say anything.  May I?

18   Q.  Sure.

19   A.  Is it Exhibit 14?

20   Q.  Exhibit 14, please.

21             THE COURT:  Sorry.  This is Exhibit 14?

22             MR. FISCHER:  14.

23             THE COURT:  Okay.  I'm sorry.  Was there a Caldwell

24   14 admitted?  Maybe I missed it.  I'm sorry.

25             MR. FISCHER:  Your Honor, this is what I am

1    referencing.  I haven't admitted it yet.

2              THE COURT:  Oh, I see.  Okay.  You-all are two steps

3    ahead of me.

4              THE WITNESS:  I'm sorry, Judge.  He gave it to me

5    previously.

6              THE COURT:  Gotcha.  All right.

7         So what the witness is looking at has been marked

8    Caldwell 14.

9              THE WITNESS:  I'm sorry.  Mr. Fischer, could you

10   point me to where it says Antifa in here.  I don't see it.  Can

11   you point me to a page.

12             MR. FISCHER:  Let me just -- if I may approach the

13   witness and see that we're talking about the same exhibit.

14        Court's indulgence.

15   BY MR. FISCHER:

16   Q.  So, sir, if you go to the first page of the op plan.

17   A.  Oh, yes.  The fifth word.

18   Q.  The fifth word.

19   A.  Thank you.

20   Q.  Could you read that paragraph.

21   A.  Sure.

22        "The mission is to confront Antifa and other criminal

23   elements operating" --

24             THE WITNESS:  I'm sorry.  I'll slow down.

25   A.  -- "other elements operating unrestrained in an urban

1    environment as they commit, attempt to commit, or engage in

2    marshaling forces in preparation to commit acts of violence

3    against innocent people and/or private property or publicly

4    owned property."

5    BY MR. FISCHER:

6    Q.  Okay.  Sir, at this time -- and also there's an email cover

7    to that where apparently Mr. Caldwell sent this -- this email

8    to someone named rangersmith483@yahoo.com as an attachment;

9    correct?

10   A.  Yes.

11          MR. FISCHER:  At this time I move in Defense Caldwell

12   Exhibit 14.

13          MS. RAKOCZY:  No objection.

14          THE COURT:  Caldwell 14 will be admitted.

15          (Defendant Caldwell Exhibit 14 admitted into

16   evidence.)

17   BY MR. FISCHER:

18   Q.  Sir, you've had a chance to read that over lunch.  You just

19   had the chance to read it again.  Can you tell the ladies and

20   gentlemen of the jury where in that op plan it says anything

21   about attacking the United States Capitol or stopping an

22   election?

23   A.  It does not.

24   Q.  Okay.  So the whole entire op plan you've been

25   referencing -- or the government's been bringing up regarding

1     Mr. Caldwell appears to be something regarding Antifa; correct?

2     A.  That's what it says in the mission definition, yes.

3     Q.  Okay.

4                 MR. FISCHER:  Court's indulgence.

5     BY MR. FISCHER:

6     Q.  Sir, as part of your investigation, you also sought a

7     search warrant to retrieve records from an app called Life360;

8     is that right?

9     A.  Yes, I did.

10    Q.  And in your search warrant affidavit, sir, you believe --

11    you alleged to a federal judge that Mr. Caldwell appeared to

12    have a Life360 circle with about 36 people.  Do you remember

13    that?  Does that sound familiar?

14    A.  I think it does.  But may I see the affidavit?  Are we

15    going to discuss it?

16    Q.  Well, that's fine, sir.  It sounds familiar is fine.

17                You sought -- and Life360, for -- for those of us who

18    are over the age of 50, Life360, sir, you would agree, is an

19    app that allows people to keep track of -- of friends, family,

20    associates on their phone; is that right?

21    A.  Yes.

22    Q.  Okay.  So, in other words, if I want to know where my kids

23    are at, I can make them part of my Life360 circle.  And I can

24    look and I can see if they're at home, at school, or somewhere

25    they shouldn't be.  Does that fairly characterize Life360?

1    A.  That's my understanding, yes.

2    Q.  And the reason why you submitted a -- a lengthy affidavit

3    seeking Life360 records was to determine whether Mr. Caldwell

4    was on a circle of friends with people who might be

5    conspirators or involved in the alleged conspiracy here today;

6    is that correct?

7    A.  The affidavit was related to the conspiracy.

8    Q.  And, in fact, you received records back, eventually, from

9    Life360; right?

10   A.  We did.

11   Q.  And you were -- and -- and, in fact, on Mr. Caldwell, you

12   received no records back on him; is that correct?

13   A.  I -- I think that's correct.

14   Q.  Okay.  Okay.

15          MR. FISCHER:  Court's indulgence.

16   BY MR. FISCHER:

17   Q.  Sir, the members of the stack you referenced earlier, I

18   want to just go and name some of the -- there's one individual

19   who's in the stack, his name was Bennie Parker; is that

20   correct?

21   A.  Yes.

22   Q.  And he was wearing a military uniform, and he's one of the

23   guys on there that's wearing a helmet; is that right?

24   A.  Yes.

25   Q.  And Mr. Parker is over 70 years old; is that right?

1    A.  I believe so.

2    Q.  And he wears hearing aids?

3    A.  I don't know if he wears hearing aids or not.

4    Q.  And his elderly wife is Sandra Parker.  She's one of the

5    people who's wearing a military uniform and a helmet; is that

6    correct?

7    A.  Yes.

8    Q.  Connie Meggs is one of those people as well?

9    A.  Yes.

10   Q.  She's a woman that's almost 60 years old; correct?

11   A.  Again, I don't know Ms. Meggs's age.

12   Q.  So this was the group that was -- you believe was going to

13   try to overtake the Capitol?

14   A.  I mean, I think it's clear they entered the Capitol.  I

15   don't know overtake -- I think the group -- I think

16   co-conspirators said we overran the Capitol.  So we're probably

17   just mincing words here.

18   Q.  Okay.  Sir, would you agree -- obviously, you understand

19   there's a First Amendment in this country; correct?

20          MS. RAKOCZY:  Objection.  Relevance.

21          THE COURT:  It's overruled.

22   A.  I understand there's a First Amendment.

23   BY MR. FISCHER:

24   Q.  Okay.  And, you know, offensive speech is protected by the

25   Constitution; right?

1    A.  Yes.

2    Q.  Even people who may sound loony like Alex Jones, their

3    speech is protected; right?

4    A.  Within -- within limits, my understanding is, but yes.

5    Q.  Fair enough.  Fair enough.

6         And you had some contacts here regarding Mr. Caldwell

7    and Stewart Rhodes.  What contacts do you have between the two

8    of them after -- after November -- after mid-November of 2020?

9    A.  I think we showed text messages that said Mr. Caldwell

10   was -- was annoyed that they hadn't had contact.  So my

11   understanding is they didn't.  We don't have anything.

12   Q.  Okay.  And --

13        MR. FISCHER:  Court's indulgence.

14   BY MR. FISCHER:

15   Q.  The --

16        MR. FISCHER:  Your Honor, I may only have a few more

17   questions.  I apologize.

18        THE COURT:  That's okay.

19   BY MR. FISCHER:

20   Q.  You referenced a -- an Ideal carry [sic] firearm that

21   was -- looks like a smartphone; is that correct?

22   A.  Yes.

23   Q.  Okay.  And, sir, you'd also agree -- you read the

24   manufacturer's website, I understand?

25   A.  I went to the manufacturer's website, yeah.

1    Q.  Sure.

2        And you also agree that the manufacturer markets the

3    firearm not for criminal purposes but so that people can carry

4    concealed legally without people knowing they're carrying.

5    That's the way it's marketed, isn't it?

6    A.  I don't know that any firearms manufacturer markets things

7    to be criminal.  So I don't know that anyone would do that.

8    I --

9    Q.  Well, sir, the order that Mr. Caldwell made for the -- for

10   the handgun happened in early November, I believe.

11   A.  I think so.

12   Q.  Okay.  So that's well before President Trump tweeted out

13   about a January 6th rally; correct?

14   A.  Correct.

15   Q.  So then I'm trying to -- I'm struggling here.  What does

16   the purchase of a firearm in early November have to do with a

17   breach of the United States Capitol on January 6th?

18   A.  Well, it seemed that Mr. Caldwell was trying to obtain a

19   weapon that he could bring into D.C. concealed.  There was the

20   Million MAGA March that happened on the 14th.  So I don't know

21   that it was specific to January 6th.

22   Q.  Uh-huh.  Okay.

23   A.  But I can say it occurred prior to the Million MAGA.  I --

24   I -- again, I don't know what was in Mr. Caldwell's head when

25   he was ordering that.

1    Q.  And, sir, you're aware there's -- there's a stipulation

2    between the government and defense regarding Mr. Caldwell being

3    a concealed carry permit holder in the state of Virginia?

4              MS. RAKOCZY:  Objection.  If he knows.  Foundation.

5              THE COURT:  If he knows.

6              MR. FISCHER:  If I may.

7              THE COURT:  That's all right.  I don't know if he

8    knows the answer or not.

9    A.  I don't know the answer.

10             MR. FISCHER:  Court's indulgence.

11         Your Honor, with the stipulations from the government,

12   I'm going to enter into evidence Exhibit No. 38 and Exhibit

13   No. 39, Caldwell Exhibit 38 and 39.

14             THE COURT:  38 and 39 will be admitted.

15             (Defendant Caldwell Exhibit 38 and 39 admitted into

16   evidence.)

17   BY MR. FISCHER:

18   Q.  Sir, I have in front of me concealed carry permits for

19   both -- for Mr. Caldwell and his wife, Sharon Caldwell, from

20   the state of Virginia.  Were you aware that they were concealed

21   carry permit holders at the time you initiated your

22   investigation?

23   A.  No, I was not.  At the time we initiated the investigation,

24   no.  We learned later.

25   Q.  So you would agree it's not exactly unusual for a concealed

1    permit holder to order a gun that's specifically designed for

2    conceal carry; right?

3    A.  I don't know how usual or unusual it is, but it's legal,

4    clearly.

5    Q.  Certainly.  I mean, in the FBI you carry firearms; right?

6    A.  I do.

7    Q.  Okay.  And it's even policy of the FBI, you're supposed to

8    try to conceal your firearm so that the public doesn't

9    either -- some Nervous Nellie out in the public doesn't call

10   911; right?

11   A.  No.  That's correct.

12   Q.  So that's a reason why the manufacturer markets a gun that

13   a person -- the public just doesn't see it and doesn't call 911

14   or, you know, get scared and have the police come.  Does that

15   sound right?

16   A.  Yeah, I would -- yes.

17   Q.  Okay.  Fair enough.

18   A.  I don't want to go -- go too far into somebody's thoughts.

19   But, yes, that's one of the reasons you have a concealed is so

20   that, as you said, Nervous Nellies don't call 911.

21   Q.  Fair enough.  All right.

22           MR. FISCHER:  Your Honor, I don't believe I have any

23   other questions.  Thank you.

24           THE COURT:  All right.  Thank you, Mr. Fischer.

25      Okay.  Mr. Woodward on behalf of Mr. Meggs.

1        CROSS-EXAMINATION

2   BY MR. WOODWARD:

3   Q.  Good afternoon, sir.

4   A.  Good afternoon, Mr. Woodward.

5   Q.  You -- you testified that you used Signal; correct?

6   A.  Yes.

7   Q.  So you are familiar with some of the features of Signal?

8   A.  Some, but not many.

9   Q.  You're familiar with the fact that in Signal, you can set

10  the app so that text messages received within the app

11  automatically delete or disappear?

12  A.  I know that from the investigation.

13  Q.  They call that the disappearing message feature?

14  A.  That's my understanding, yes.

15  Q.  And messages can be set to disappear automatically after

16  30 seconds, 5 minutes, 1 hour, 8 hours, a day, and so on?

17  A.  That's my understanding.

18  Q.  And if you have turned that feature on, those that send you

19  a message would not know that the message sent is going to

20  automatically be deleted?

21  A.  I -- I don't know if I know that.  I'm sorry.  Because I

22  know that it deletes on the user's phone, but I don't know if I

23  know it deletes on the other side of that too.  I'm not

24  positive about that.

25  Q.  Well, do you know --

1    A.  I'm not the person to ask about that.

2    Q.  Do you know that when a message is sent in Signal to a

3    group, you don't get notification that everyone in that group

4    received the message?

5    A.  I -- I do know that.

6    Q.  And so it is, of course, the case that when a message is

7    sent to a group, the sender would not have confirmation that

8    his or her messages were being received by those in the group?

9    A.  That's my understanding.

10   Q.  With respect to groups, you testified that you reviewed a

11   number of groups that were identified on Mr. Rhodes's phone?

12   A.  Yes.

13   Q.  Among those groups were a group titled Oath Keeper

14   Hurricane Relief?

15   A.  I believe so, but I don't -- I don't recall much from that.

16   Q.  You didn't review many of the chats in that group?

17   A.  It's not standing out to me.  It didn't seem like it was

18   part of the conspiracy.

19   Q.  But you did review a group called Old Leadership chat?

20   A.  Yes.

21   Q.  And you testified that you reviewed all of the messages in

22   that chat?

23   A.  Old Leadership had about 20- -- it was over 20,000

24   messages.  I believe I did.

25   Q.  I tried to print it.  There were nearly 5,000 pages of

1    messages in that chat.

2    A.   Right.

3    Q.   Do you have any reason to disagree with that?

4    A.   It's lengthy.

5    Q.   But with respect to the time period that Ms. Rakoczy asked

6    you about, roughly November 4th through November 7th, you --

7    you certainly reviewed all of those messages; correct?

8    A.   Yes.

9    Q.   And would you have any reason to dispute that the 200-ish

10   pages that I'm holding here constitute the messages that you

11   reviewed?

12   A.   I mean, I wouldn't.  I --

13   Q.   You don't have any reason to dispute that --

14   A.   I don't have any reason to believe that you forged those.

15   Q.   You -- you didn't see any discussion in these messages

16   about the Oath Keepers going to Washington, D.C., on

17   January 6th, did you?

18   A.   Not that I'm recalling right now.

19   Q.   You certainly didn't read any messages to the jury today

20   about the Oath Keepers going to Washington, D.C., on

21   January 6th?

22   A.   I didn't read any, no.

23   Q.   And you didn't see any messages about the Oath Keepers

24   going to the Capitol Building on January 6th or any other day?

25   A.   Not from that leadership.  Not from that chat, no.

1   Q.  And not in that time period?

2   A.  Not in that time period.

3   Q.  You testified that you created a macro to help display

4   Signal messages to the jury?

5   A.  Correct.

6   Q.  And this macro that you created allowed the extraction of

7   information from the Signal messages to the exhibits that were

8   displayed earlier today?

9   A.  So technically what it does is it extracts it out of Excel.

10  But, yes, that Excel came from the Signal messages, which came

11  from the Cellebrite.  So yes.

12  Q.  So that process is -- is an automatic process?

13  A.  It's an automated process.

14  Q.  Which has caused some of the messages to be cut off in

15  places?

16  A.  Yes.

17  Q.  You -- it also caused some of the messages to go on to a

18  second page, if you will?

19  A.  Yes.  And if I can elaborate for a second.  One of the

20  reasons we did that is so that the font was large enough so

21  that the jury could see it.  If we shrunk the font small

22  enough, it could fit all on one page, but we didn't think that

23  was helpful.

24  Q.  And when you say "we," whom are you referring to?

25  A.  The prosecutors and I.

1    Q.  So did -- did -- who exactly created the macro?

2    A.  I did.

3    Q.  And you did that with computer code?

4    A.  I mean, it was mail merge within Microsoft Word, so I

5    didn't code, but -- I don't know -- are you familiar with mail

6    merge in Microsoft Word?

7    Q.  I am.  I am.

8         So the mail merge was within Microsoft Word, taking data

9    out of Excel, that came out of Cellebrite?

10   A.  Correct.

11   Q.  All right.  And did you go through and verify that the

12   information that ended up in the exhibits was a hundred percent

13   consistent with the information contained on Mr. Rhodes's

14   phone?

15   A.  So we tried to spot-check.  We did the best we could.  We

16   did, I believe, 100 percent verify on things that were brought

17   into court.  But I'm not -- we did the best we could with that.

18   There were 20,000 messages.  We weren't able to go through

19   every single one.

20   Q.  There were certainly messages on the phone that you didn't

21   read to the jury today.  I think you've testified to that.

22   A.  Correct.

23   Q.  One of them -- if I may approach -- is the following.

24   A.  Thank you.

25   Q.  You see the message from Mr. Rhodes?

```
1              THE COURT:  Do you have an exhibit number for this,

2     Mr. Woodward?

3              MR. WOODWARD:  We will make that Exhibit KM.01.

4     BY MR. WOODWARD:

5     Q.  Do you see the message sent by Mr. Rhodes on that exhibit?

6     A.  I do.

7     Q.  Could you read that to the jury, please.

8     A.  "I need an intel to" --

9              THE COURT:  Hang on.  Are you seeking to admit it?

10             MR. WOODWARD:  I will seek to admit it.

11             THE COURT:  All right.  I will accept it.

12             MS. RAKOCZY:  No objection.

13             THE COURT:  Okay.  So it's now admitted, and he can

14    now read it.

15             (Defendant Meggs Exhibit KM.01 admitted into

16    evidence.)

17             MR. WOODWARD:  Thank you.

18             THE COURT:  Go ahead.

19    A.  "I need an intel team call ASAP.  Like an within hour.  All

20    dedicated intel team" --

21             THE COURT REPORTER:  Hold on.

22             THE WITNESS:  I'm sorry.

23             THE COURT REPORTER:  All dedicated intel team --

24    A.  -- "members please sound off and standby for call info.

25    Focus will be:  1.  How the left is STEALING the election and
```

1    how we can help fight it (including supporting a whistle blower

2    poll watcher in Detroit).  2.  Intel support for potential op

3    to rescue White House on worst case scenario of a [quote]

4    'Benghazi' style storming of the White House with a treasonist

5    stand-down by Military generals (our posture will be we are on

6    standby outside DC awaiting order of the President to call

7    is" -- I think he meant us -- "into service as the militia,

8    which will protect us from prosecution under DC's absurd gun

9    laws if we must enter DC to save the White House.)"

10   BY MR. WOODWARD:

11   Q.  Thank you, sir.

12        So of the thousands -- hundreds, if not thousands, of

13   messages exchanged on this chat between January 4th and

14   January 7th, would you disagree that there are hundreds about

15   whether or not there had been election fraud in the 2020

16   election?

17   A.  I don't know the exact number, but I wouldn't --

18   generically -- generically, I wouldn't disagree with that.

19   Q.  You wouldn't disagree?

20   A.  I wouldn't put a number on it, but I wouldn't disagree with

21   that.

22   Q.  And would you disagree that there are messages sent from

23   dozens of different people about a belief that there had been

24   election fraud?

25   A.  Probably.

1    Q.  Would you also agree that Mr. Rhodes didn't respond to all

2    of those messages?

3    A.  He clearly didn't respond to all, but I --

4    Q.  Excuse me.  I didn't mean to talk over you.

5    A.  No, no.  That's fine.  I don't know what percentage he

6    responded to or didn't respond, but your question was:  Did he

7    respond to them all?  I would say no.

8    Q.  But today you haven't read -- other than the -- the message

9    I just provided you, any messages by Mr. Rhodes dealing with

10   election fraud?

11               THE COURT:  Can you rephrase the question.

12   BY MR. WOODWARD:

13   Q.  Before just now, you haven't read any text messages to the

14   jury today dealing with election fraud?

15               THE COURT:  It's -- ask another question, please.

16               MR. WOODWARD:  Now presenting the witness what will

17   be marked as KM.03 [sic].

18   BY MR. WOODWARD:

19   Q.  And, Agent Palian, if you could direct your attention on

20   the first page --

21   A.  Thank you.

22   Q.  -- to a message from Chris.

23               MR. WOODWARD:  We seek to admit KM.02.

24               THE COURT:  Is there any objection?

25               MS. RAKOCZY:  No, Your Honor.

```
 1              THE COURT:  All right.  So KM.02 will be admitted.
 2    And did we admit KM.01?  Okay.  KM.01 and KM.02, but I may not
 3    have said that on the record, but, yes, please go ahead.
 4              (Defendant Meggs Exhibit KM.02 admitted into
 5    evidence.)
 6    BY MR. WOODWARD:
 7    Q.  So if I could direct your attention to the message sent
 8    from someone named Chris on the first page.  Could you read
 9    that for us, please.
10    A.  Sure.  "Stewart, for clarification should [the]
11    Insurrection Act be utilized by Trump, could that protect
12    El Paso OK from putting down any tyranny leftists in El Paso?"
13    Q.  On the second page, there's a message from Mr. Rhodes.
14    Could you read that for us, too, please.
15    A.  Mr. Rhodes said, "Only if he calls us into service as the
16    militia."
17    Q.  The "he" he's referring to -- would you disagree that he's
18    referring to the President of the United States?
19    A.  No, I wouldn't disagree with that.
20    Q.  Thank you, sir.
21              MR. WOODWARD:  Your Honor, I'm approaching the
22    witness with what's been marked as KM.03.
23              THE COURT:  Do you mean KM.04?
24              MR. WOODWARD:  I don't.
25              THE COURT:  Okay.
```

1    MR. WOODWARD:  But you're right.  I wrote 03 on the

2    last one.  It should have been 2.

3    BY MR. WOODWARD:

4    Q.  And if I could direct your attention to the message from

5    Mr. Rhodes again.

6    A.  Thank you.

7    MR. WOODWARD:  Your Honor, I would seek to admit

8    KM.03.

9    THE COURT:  Any objection?

10    MS. RAKOCZY:  No objection to submit to an ongoing

11    conversation that the parties are having with the court outside

12    of the court.

13    THE COURT:  Okay.

14    BY MR. WOODWARD:

15    Q.  Could you read Mr. Rhodes's messages there, please.

16    A.  Of course.

17    "Thanks for posting this.  Damn Skippy.  And Trump needs

18    to do it.  Long overdue.

19    "'Legal experts say the election may complicate the

20    response because the president has broad discretion to sidestep

21    legal restrictions by declaring an insurrection, which would

22    allow him not only to take control of the state National Guard

23    troops, but also to deploy the Army or Marines.

24    "If the president decides unrest, rises to the level of

25    insurrection, there is little Congress or the courts can"

1    stop -- can "do to stop him, legal experts say.

2         "'The law is so broadly written that the president gets

3    to decide" what -- "what's an insurrection, and there's not

4    much local authorities or anyone else can do to stop it,' said

5    Rachel VanLandingham, a retired Air Force lieutenant colonel

6    who now teaches national security law at Southwestern Law

7    School in Los Angeles."

8    Q.  Thank you, sir.

9         And this message -- I'm sorry -- was sent on what day?

10   A.  And that message was sent on November 4th, 2020.

11   Q.  Thank you, sir.

12        Now, you also testified about a GoToMeeting call on

13   November 9th, did you not?

14   A.  Yes, I did.

15   Q.  And you testified that there was a transcript of that call;

16   is that correct?

17   A.  My understanding was there was a transcript, yes.

18   Q.  Have you ever reviewed the transcript?

19   A.  No.

20   Q.  You -- are you familiar with the speakers on that call?

21   A.  Some of them.

22   Q.  And are you aware that on that call there's a speaker by

23   the name of Kellye SoRelle?

24   A.  Yes, I'm aware of Ms. SoRelle on that call.

25   Q.  You did not include Ms. SoRelle in the summary exhibit that

```
1    you created and presented to the jury earlier today?
2    A.  No, we didn't.
3    Q.  But you did include her on the poster board that you
4    created of all of the key players in this investigation?
5    A.  Yes; that's correct.
6              MR. WOODWARD:  Court's indulgence.
7         Actually, I think that's probably good enough for today.
8    No further questions from us, Your Honor.
9              THE COURT:  All right.  Thank you.
10        All right.  Mr. Geyer on behalf of Mr. Harrelson.
11        Mr. Geyer.
12             MR. GEYER:  May it please the Court.
13                       CROSS-EXAMINATION
14   BY MR. GEYER:
15   Q.  Special Agent Palian.
16   A.  Good afternoon, Mr. Geyer.
17   Q.  Good to be with you today.
18   A.  Thanks for having me.
19   Q.  You're aware that Ken Harrelson does not have a Facebook
20   account and has never had a Facebook account?
21   A.  We did not recover a Facebook account.  I couldn't speak to
22   whether he's ever had one or not, but we didn't recover one.
23   They didn't have any records of one.
24   Q.  So, as far as you know, he doesn't have a Facebook account?
25   A.  As far as we know, yes.
```

1    Q.  Are you aware that he's never had a Twitter account either?

2    A.  I don't know if I knew that or not.

3    Q.  But you accept that representation now?

4    A.  I will say that we don't have Twitter records for him.

5    Q.  Okay.  Would you accept my representation that he's never

6    had any?

7              MS. RAKOCZY:  Objection as to form.

8              THE COURT:  Rephrase the question, if you would,

9    please, Mr. Geyer.

10   BY MR. GEYER:

11   Q.  He's really never had any social media accounts, has he?

12   A.  I don't believe he has.  That's where I would -- I don't

13   believe he has.

14   Q.  Is your understanding that Mr. Harrelson and Mr. Caldwell

15   ever communicated or knew each other prior to being charged in

16   this matter?

17   A.  I don't believe they had communications.  I can't say

18   whether they knew each other or not, but we don't have

19   communications between the two of them that I can recall.

20   Q.  Okay.  No evidence of that either.  Thank you.

21         Regarding the Friends of Stone chat that you referenced,

22   it's also the case that he's not a member of that chat group

23   either; isn't that true?

24   A.  I don't recall that.  I'd have to look at the records.

25   Q.  Okay.  Regarding -- I forget the name of it.  The

1    North Carolina Ops chat you testified about, Ken Harrelson

2    wasn't on that chat either?

3    A.  I don't believe he was, but, again, I'd like to look at the

4    records before --

5    Q.  Okay.

6    A.  -- before I give a definitive answer.  I don't believe he

7    was.

8    Q.  Okay.  Thank you.  I can accept that.

9         Regarding the November 9th meeting, the Zello chat, you

10   don't have any comments from him on that chat either; is that

11   correct?

12   A.  I'm sorry.  When you say the "November 9th meeting," did

13   you mean the GoToMeeting?

14   Q.  Yes.  I'm sorry.  Yes, the GoToMeeting from November 9th,

15   2020, also no commentary from Ken Harrelson?

16   A.  Again, not that I can recall.

17   Q.  Okay.  Would it surprise you to learn that his birthday --

18   his 40th birthday was on November 9th, 2020?

19   A.  I don't know if I knew that or not.

20   Q.  Periodically you fill out forms, fill out, you know,

21   criminal records check and things like that?

22   A.  We do.

23   Q.  At some point you might have come across that?

24   A.  I'm sure I did.  I just don't recall it at this point.

25   Q.  You mentioned before about -- did you -- did you put

1    together any exhibits for today's opening?

2    A.  Do you mean for the opening statements or for today's

3    testimony?

4    Q.  Yes, for the opening statements.

5    A.  I believe we showed some of the things from the -- the

6    macro that we just previously discussed.  Those --

7    Q.  Okay.  How about the display?  Specifically, were you shown

8    the opening statement, the PowerPoint, the opening statement?

9    A.  Not the final version.

10   Q.  Any version?

11   A.  Yeah, I believe I saw -- yes, I saw a previous version.

12   Q.  So the -- specifically --

13           MR. GEYER:  Your Honor, may I borrow the government's

14   exhibit they previously introduced?

15           MS. RAKOCZY:  We just object to the foundation.

16   We're happy to put it out.

17           THE COURT:  Sure.  Whatever the exhibit is.  If it's

18   in, if the government would kindly pull it up.  What's the

19   exhibit number?

20           MS. RAKOCZY:  It's not -- it -- the opening

21   exhibit PowerPoint is not an exhibit.

22           THE COURT:  Are you referring to the PowerPoint, or

23   are you referring to an exhibit that was shown in the

24   PowerPoint?

25           MR. GEYER:  The exhibit right there.  The picture of

1    the Capitol so we can --

2              THE COURT:  Sure.  Okay.

3          What's the number of the exhibit again, the Capitol map?

4              MS. RAKOCZY:  It's Exhibit 263, Your Honor.

5              THE COURT:  Okay.

6              MS. RAKOCZY:  I'm sorry.  I misspoke.  It's 1563 --

7    Your Honor, 1653.

8              THE COURT REPORTER:  16, 1-6?

9              MS. RAKOCZY:  1653.  Sorry, Your Honor.

10             THE COURT:  That's all right.

11   BY MR. GEYER:

12   Q.  The part of the opening that showed Ken Harrelson and

13   Jason Dolan from the beginning part of their participation in

14   this day, began in the east of the Capitol; is that correct?

15   A.  Are we talking about the video with the Oath Keepers

16   ascending the eastside steps and then meeting Mr. Harrelson and

17   Mr. Dolan up there?

18   Q.  I believe it started earlier than that when he was walking

19   from his security detail.  Do you recall that?

20   A.  I recall seeing those videos.  I don't recall them coming

21   out in the opening.

22   Q.  Okay.  Maybe we can do it this way.  So at 1:57 or

23   thereabouts, do you know where Ken and Jason Dolan were

24   standing?

25             MS. RAKOCZY:  Objection.  Beyond the scope of direct.

1    THE COURT:  I'll give a little bit of rope, but go

2    ahead, Mr. Geyer.

3    MR. GEYER:  Thank you, Your Honor.

4    BY MR. GEYER:

5    Q.  You can answer.

6    A.  Yeah, I believe at about that time Mr. Dolan and

7    Mr. Harrelson were by themselves and they were walking across

8    the green area on -- in the Capitol Grounds or just entering

9    the Capitol Grounds, I believe.  I'm not positive.  I'd need --

10   I'd need to see a video, but that's -- they were separated from

11   the other Oath Keepers at that point, I believe.

12   Q.  Okay.  Would you agree that President Trump started

13   speaking at about noon?  Does that sound right?

14   A.  I think so.

15   Q.  Do you know where the Oath Keepers were around that time?

16   A.  Many of the Oath Keepers were at the rally listening

17   to President Trump.  They left the rally at approximately

18   12:53.

19   Q.  Were they on what they would consider to be on duty?

20   A.  I don't know what they --

21   MS. RAKOCZY:  Objection.

22   THE COURT:  Sustained.

23   BY MR. GEYER:

24   Q.  Were you aware that Ken Harrelson was on a security detail

25   that brought him to the east side of the Capitol at

 1   approximately, give or take, 1:50, 1:52, in that time -- that

 2   that time frame?

 3               MS. RAKOCZY:  Objection.

 4               THE COURT:  It's overruled.

 5   A.  So I -- I know that the Oath Keepers had discussed security

 6   details.  I know that the individuals they were supposed to be

 7   protecting didn't show up and they really didn't have anybody

 8   to protect.

 9         So I don't know if Mr. Harrelson was on a security

10   detail at that time or not, if -- if he would consider he was

11   on a security detail or not.

12   BY MR. GEYER:

13   Q.  I'd like to play you something that referred to the

14   Oath Keepers walking up the east steps.  I believe it's

15   exhibit --

16               MS. RAKOCZY:  Your Honor, Mr. Geyer is referring to

17   Government Exhibit 1050.1.

18               THE COURT:  Thank you.

19               (An audio-visual recording was played.)

20               THE WITNESS:  I'm sorry.  It's a little laggy on my

21   screen.

22               MR. GEYER:  It's laggy here too.

23         Actually, if you stop it right there.  If you rewind it

24   just a bit.

25               (An audio-visual recording was played.)

```
 1    BY MR. GEYER:
 2    Q.  Was that -- was that video edited at all, as far as you
 3    know?
 4    A.  No.  I believe the video is authentic, not edited.
 5    Q.  It seems like it's really focused in.  Have you seen other
 6    videos of the Oath Keepers walking up those steps?
 7    A.  Yes.
 8              THE COURT:  Mr. Geyer, is this a different video?
 9              MR. GEYER:  Excuse me?
10              THE COURT:  Is this a different video?
11              MR. GEYER:  Yes, it is.  And I think I'm not going to
12    have the exhibits ready for this witness.  So we'll just
13    reserve for later.  It's okay.
14              THE COURT:  Okay.  So this isn't to be shown to the
15    jury; correct?  You're not admitting this?
16              MR. GEYER:  No.  No, Your Honor.  Thank you.
17              THE COURT:  Okay.
18              MR. GEYER:  No more questions.  Thank you.
19              THE COURT:  All right.  Thank you, Mr. Geyer.
20         All right.  Mr. Crisp.
21              MR. CRISP:  Thank you, Your Honor.
22                        CROSS-EXAMINATION
23    BY MR. CRISP:
24    Q.  Good afternoon, Special Agent Palian.
25    A.  Good afternoon, Mr. Crisp.
```

1    Q.  So I want to talk about some of the things discussed on

2    direct.  To be clear, the GoToMeeting started at around 2030

3    hours?

4    A.  I'm sorry.  Did you say 2030?

5    Q.  Yes.

6    A.  Yes.

7    Q.  At 8:30 at night?

8    A.  Yes.

9    Q.  And the entire meeting went for about an hour and a half?

10   A.  I think -- yes.  Do I recall 128 minutes, is what it

11   said.

12   Q.  Okay.  So give or take a few minutes.

13   A.  Sure.

14   Q.  And you talked about her communications both before and

15   after -- and by "her," I mean Jessica Watkins.  I'm sorry.  Her

16   communications before the GoToMeeting; correct?

17   A.  Yes.

18   Q.  Do you remember discussing that?

19        And she was talking with a gentleman -- an individual by

20   the name of Whip; right?

21   A.  Yes.

22   Q.  Those conversations started about 30 minutes before the

23   GoToMeeting?

24   A.  I think that's correct.

25   Q.  Okay.  So she's discussing with him the concept of -- I

1    think you had it up on Exhibit 6617 -- or 6617 bravo -- this

2    training event that is supposed to take place?

3    A.  Yes.

4    Q.  And I'm sorry.

5    A.  I'm sorry.  I should have --

6    Q.  I need an audible response.

7    A.  Pardon me.

8    Q.  So that would have been -- and they discussed it in the

9    first week of January.  So the 3rd to the 9th; right?

10   A.  Yes, that is what they said.

11   Q.  All right.  And you're aware that that training did not

12   take place, ultimately?

13   A.  That's correct.

14   Q.  Okay.  But it was discussed in that time frame of the 9th

15   of November as we're planning this?

16   A.  During the 9th of November, they talked about that they

17   were planning the 3rd to the 9th training, yes.

18   Q.  And you were able to learn this, in part, because of the

19   forensic analysis you did on her phone?

20   A.  Yes, in part.  I think that message did come from her

21   phone.

22   Q.  All right.  And you didn't conduct the forensic dumps;

23   somebody else did in the FBI?

24   A.  Correct.

25   Q.  But you reviewed them as part of your investigation?

1    A.  Yes.

2    Q.  And her phone was one that was analyzed, I think you just

3    said.  Yes?

4    A.  I'm sorry.  Could you repeat the question, sir.

5    Q.  Her phone was one that was forensically analyzed?

6    A.  Yes.

7    Q.  And there were about 2,000 pages or so of instant messages

8    and other social media-type Facebook messages, things like

9    that, at least in that range?

10   A.  I don't remember the number, but it was a lot.

11   Q.  There was -- yeah.  We'll just say a lot.

12          So I want to talk about the training event as -- as

13   well.  So as part of those discussions, about four hours

14   earlier, around the 1600, 1530 time frame, there would have

15   been additional discussions with potential recruits about this

16   training; right?

17   A.  Yes.

18   Q.  So she's talking about it in the context of people wanting

19   to join the OSRM?

20   A.  Yes.

21   Q.  And, in fact, one of the individuals was asking:  Well,

22   what happens if I join?  Do I get training?

23          Do you remember that?

24   A.  Is that Recruit Leah that you're referring to?

25   Q.  Leah, yes.

1    A.  Yes.

2    Q.  Okay.  And as part of that conversation, she explains --

3    and she being -- and I apologize -- Ms. Watkins explains the

4    purpose behind the training?

5    A.  Yes.  Can we put something up, though?

6    Q.  Absolutely.

7    A.  I'd like to take a look at it.

8              MR. CRISP:  Your Honor, I've discussed with

9    government counsel.  I don't intend to admit this, but for

10   purposes of refreshing his recollection, I intended to show it

11   to the witness in that capacity.  I can print it out as an

12   exhibit, then I have portions of them later if the Court

13   requires.  But, again, I'm not putting it in as an exhibit

14   per se.

15             THE COURT:  So are you asking -- do you have a hard

16   copy, or are you asking the government to bring it up for the

17   witness to look at?

18             MR. CRISP:  Neither.  What I'm asking is to show

19   the -- the forensic download to the witness to refresh his

20   memory.

21             THE COURT:  Right.

22             MR. CRISP:  If I need to, I can print out those

23   relevant sections at a later time and supplement the record.

24             THE COURT:  Okay.  So -- okay.  So show him what you

25   want to show him on the screen and try to refresh his

1   recollection.  If you wanted to -- is there an exhibit number

2   attached to it?  If not, I guess that's okay.

3              MR. CRISP:  Yes, sir.

4              THE WITNESS:  15- -- 15- -- which -- where am I

5   starting?

6   BY MR. CRISP:

7   Q.  1512 would orient you in terms of the discussions and then

8   going further down in numbering.  And that's going to be

9   Row 1512.

10  A.  Where would you like me to go to?

11  Q.  To approximately 1508.  1508.

12  A.  Oh, 1508.  Okay.

13  Q.  Have you had a chance to read those documents -- or the

14  communications?

15  A.  1508 to 1512?

16  Q.  Check.

17             Does that refresh your memory?

18  A.  Yes, it does.

19  Q.  Okay.

20             MR. CRISP:  Retrieving my laptop, if I may, Judge.

21  BY MR. CRISP:

22  Q.  And as part of that discussion, what I had asked earlier

23  was that Recruit Leah was trying to find out what was covered

24  in training; right?

25  A.  Yes.

1    Q.  And the purpose of the training?

2    A.  Yes.

3    Q.  And in an effort to convince her to participate,

4    Ms. Watkins explained what the purpose of that was?

5    A.  Yes.

6    Q.  And it was to make sure she didn't go out into a civilian

7    environment untrained; right?

8    A.  Yes.

9    Q.  And interact professionally with civilians?

10   A.  Yes.

11   Q.  And there was also earlier discussions that I didn't show

12   you -- and I certainly can refresh your memory as well, if

13   you'd like -- but if you recall, about the culture of the unit.

14   Do you remember that discussion as well?

15   A.  Vaguely.

16   Q.  Okay.  The concept that she didn't tolerate bigotry?

17   A.  Yes.

18   Q.  And that she wants no divisiveness in the unit; correct?

19   A.  I do recall that.

20   Q.  And that was in an effort to convince Recruit Leah to

21   join?

22   A.  Yes.

23   Q.  And there --

24   A.  I take that back.  I believe so.  I don't know what was in

25   Ms. Watkins's head at the time.

1   Q.  Okay.  Ostensibly, at least as it appears on its face;

2   correct?

3   A.  Sure.

4   Q.  Okay.  And to be clear, this occurred about -- these

5   conversations with Recruit Leah happened at about 1545

6   initially; right?  About 4 hours 15 minutes before the actual

7   GoToMeeting?

8   A.  I don't recall that I looked at the date, but, I mean, it

9   sounds approximately right.

10  Q.  All right.  And --

11  A.  Or I'm sorry.  The time.  I apologize.

12  Q.  That's fine.  And, again, if you have questions about that,

13  I can certainly show you again.

14  A.  No.  I think that's fine.

15  Q.  So the -- the discussions about having this occurred before

16  she was ever on that GoToMeeting call; would you agree?

17  A.  Yes.

18  Q.  Also want to talk about her -- Ms. Watkins's questions

19  about the less than lethal.  Do you know what that means in --

20  in law enforcement parlance?

21  A.  I have an understanding of it, yes.

22  Q.  And what would that be?

23  A.  Less than lethal is a weapon that can be used that is not

24  necessarily lethal to a person but can be; whereas, a firearm

25  is generally meant to be lethal all the time.  A baton or

1    pepper spray is not meant to be lethal.

2    Q.  Or a shotgun with beanbags?

3    A.  Correct.

4    Q.  Okay.  So things like that that are not designed to kill,

5    but just to stun or immobilize?

6    A.  Sure.  And accidentally they can, which is why they're

7    treated with respect, obviously, and we don't deploy them any

8    time, but yes.

9    Q.  Would you agree with me a pen actually can be lethal?

10   A.  Sure.

11   Q.  Okay.  So she was trying to clarify what can be done within

12   the bounds of what she understood to be appropriate in that

13   event?

14   A.  Yes.

15   Q.  And fast-forwarding to about the 17th of January of 2021,

16   were you one of the individuals who -- well, there was an

17   arrest warrant for her at around that time; correct?

18   A.  There was.

19   Q.  And that arrest warrant was -- while you didn't go to the

20   residence -- her residence, other agents did; is that fair to

21   say?

22   A.  Correct.

23   Q.  And at that point they did not discover her location at her

24   residence?

25   A.  We did not know her location at the time.

1    Q.  But word was left she was wanted?

2    A.  I believe Mr. Siniff informed her of that.

3    Q.  To be clear, Mr. Siniff is her boyfriend?

4    A.  Correct.

5    Q.  And he was made aware that she is a wanted person?

6    A.  I believe so.  Again, I wasn't there.

7    Q.  All right.  Do you know whether or not he was told to reach

8    out to her?

9              MS. RAKOCZY:  Objection.

10              THE COURT:  It's overruled.

11    A.  No, I don't know that.

12    BY MR. CRISP:

13    Q.  Okay.  Do you know whether or not he ultimately did reach

14    out to her?

15    A.  I believe she did -- he did.

16    Q.  He did.  Okay.

17              As a result of that, she turned herself in?

18    A.  I can't say if it was a result of that, but, logically

19    speaking, that would make sense.

20    Q.  Very soon after you arrived at her residence, she made

21    herself available to local law enforcement where she was?

22    A.  Yes.

23    Q.  Okay.  And she turned herself in to, I believe it was, a

24    sheriff's department or something?

25    A.  I think so.

1    Q.  All right.  Voluntarily?

2    A.  Yes.

3    Q.  And at that point, she was arrested?

4    A.  Yes, she was taken into custody.

5    Q.  And during the period of her arrest, for the next three to

6    four months, she appeared voluntarily with you and others to

7    engage in discussions; correct?

8    A.  Ms. Watkins granted us several interviews.

9    Q.  All right.  And she was advised of her rights during those

10   interviews?

11   A.  She had an attorney present.

12   Q.  My question is a little bit different.  She was advised of

13   her rights not to speak and incriminate herself; right?

14   A.  I don't recall.

15   Q.  Okay.  So you don't know if she was given any documentation

16   from any U.S. Attorney's Office that's considered a proffer

17   letter?

18   A.  Oh, no.  She was given a proffer letter, yes.

19   Q.  And proffer letters typically consist of an explanation of

20   what is covered?  Yes?

21   A.  Yes.

22   Q.  Okay.  Fair to say she was advised of her rights by virtue

23   of that?

24   A.  Yes.  I apologize.  Yes, she was.

25   Q.  Now, during those four discussions, you spoke with her at

1    least four hours or so per interview, roughly?

2    A.  I don't -- I don't know if it was that long, but it was

3    multi-hour.

4    Q.  Okay.  And she was -- you didn't indicate any deception in

5    your 302s with her?

6    A.  We don't indicate deception in our 302s.

7    Q.  You didn't indicate that there were things that she

8    appeared to be withholding?

9    A.  Again, we don't -- that would be my opinion.

10   Q.  Okay.

11   A.  We wouldn't do that in a 302.

12   Q.  You didn't document inconsistencies in things she was

13   saying?

14   A.  Again, that's not appropriate for a 302.

15   Q.  In any part of the investigation, did you document -- it's

16   fair to say you didn't document inconsistencies in the

17   statements that she made?

18   A.  No, I don't think we did document any inconsistencies.

19   Q.  Okay.  And --

20        MR. CRISP:  Court's indulgence.  I'm sorry.  One

21   moment, please.

22        Your Honor, I have no additional questions at this time.

23        THE COURT:  Okay.  Thank you, Mr. Crisp.

24        Okay.  Any redirect examination, Ms. Rakoczy?

25        MS. RAKOCZY:  Yes, Your Honor.  Thank you.

1    REDIRECT EXAMINATION

2    BY MS. RAKOCZY:

3    Q.  Good afternoon -- good afternoon again, Special Agent

4    Palian.

5    A.  Good afternoon, Ms. Rakoczy.

6    Q.  I'd like to begin by directing your attention to some

7    questions that Mr. Linder asked you, I believe, this morning,

8    if that's all right.

9    A.  Of course.

10   Q.  Mr. Linder asked you some questions about the messages that

11   you read to the jury from Mr. Rhodes's phone to the Old

12   Leadership chat.  Do you recall being asked some of those

13   questions?

14   A.  Yes.

15   Q.  And, specifically, Mr. Linder directed your attention to

16   the messages between that November 3rd and November 9th period,

17   including the November 9th GoToMeeting recording.  Do you

18   recall being asked about those?

19   A.  Yes.

20   Q.  And I believe in directing you to those, Mr. Linder asked

21   you whether the statements made by Mr. Rhodes in those messages

22   had to do solely with the November 14th event or whether they

23   were -- those statements were addressed more broadly.  Do you

24   recall being asked that question?

25   A.  I do.

1   Q.  I believe I recall you saying something to the effect of

2   you thought that -- that those messages might have been

3   directed solely at the November 14th event.  Is that what you

4   remember saying?

5   A.  I think that was my impression, yes.

6   Q.  Okay.  Let me ask you this -- I'm going to bring up on the

7   screen some of those messages.

8         MS. RAKOCZY:  If I could have the Court's indulgence

9   for one moment.

10        Bringing up on the screen, Your Honor, what's been moved

11   into evidence as Government's Exhibit 6615.A.

12   BY MS. RAKOCZY:

13   Q.  Special Agent Palian, this exhibit begins with someone

14   asking to the Old Leadership chat, "What is the game plan?"

15   Correct?

16   A.  Yes.

17   Q.  Now, when was this message sent?

18   A.  November 4th, 2020.

19   Q.  And this is the early morning hours of that day; right?

20   A.  Yes, it is.

21   Q.  So is it fair to say that this is right after the election?

22   A.  Yes.  I mean, the polls had closed by this point.

23   Q.  And at this point in time -- so far as you know, was there

24   a Million MAGA March even planned?

25   A.  No.

1    Q.  So when Mr. Rhodes then states on the next message --

2    Message 12107 -- to remain calm and to not give legitimacy to

3    an illegitimate regime, are those messages directed at

4    November 14th, 2020?

5                MR. WOODWARD:  Object to leading.

6                THE COURT REPORTER:  I'm sorry.  Who was that?

7                THE COURT:  It's overruled.  It's okay.  Go ahead.

8          You can answer the question or brief -- restate the

9    question.

10   BY MS. RAKOCZY:

11   Q.  Do you remember the question?

12   A.  Yeah, I do.

13         Based on that context and the fact that the text

14   messages occurred on November 4th and the Million MAGA March

15   hadn't been set yet, it appears that, no, those were not

16   directed towards November 14th.

17   Q.  When Mr. Rhodes then goes on to say that "If the system

18   declares Biden the winner, I won't ever recognize him as

19   legitimate president because of that fraud," is Mr. Rhodes

20   there limiting that statement of intent to November 4th -- or

21   14th of 2020?

22   A.  No, it doesn't appear so.

23   Q.  When Mr. Rhodes continues, on the next slide at the end of

24   that message, and Point 5, that he recommends that the plan be

25   to continue to plan to defeat the domestic enemies of the

1   Constitution, is there any end date on that message?

2   A.  No, there is not.

3   Q.  Turning then to the end of this exhibit, which is

4   Message 12491 in the Old Leadership chat, when Mr. Rhodes said

5   on November 5th "We must refuse to accept Biden as a legitimate

6   winner," did he limit that recommendation to the time period

7   between November 5th and November 14th?

8   A.  No.

9   Q.  When he said at the end of that message on the next page,

10  "We aren't getting through this without a civil war.  Too late

11  for that.  Prepare your mind, body, and spirit," did he put an

12  end date on that recommendation?

13  A.  No, he did not.

14          MS. RAKOCZY:  If we can take down the exhibit now.

15          THE COURT:  Ms. Rakoczy, can you just mention that

16  exhibit number again.  I didn't catch that fully.

17          MS. RAKOCZY:  Yes, Your Honor, that was from the

18  compilation of messages that was 6615.A.  And specifically

19  there I was reading from a message that's been labeled

20  1.S.696.12491.

21          THE COURT:  Okay.  Thank you.

22          MS. RAKOCZY:  Thank you, Your Honor.

23  BY MS. RAKOCZY:

24  Q.  Special Agent Palian, you were asked questions about that

25  November 9th GoToMeeting that we heard Mr. Rhodes speaking on

1    this morning.  Do you recall that?

2    A.  I do.

3    Q.  Okay.  In that GoToMeeting when Mr. Rhodes quoted Founding

4    Fathers and discussed the -- the need for a fight, did he put

5    an end date on those -- that statement?

6    A.  No, he did not.

7    Q.  Did he specifically reference in that part of the statement

8    November 14th, 2020?

9    A.  No.

10   Q.  If I could shift now to some of the questions that you were

11   asked by Mr. Fischer on behalf of Mr. Caldwell.

12        Mr. Fischer brought out that you reviewed a lot of

13   messages in this case.  Do you recall those questions?

14   A.  I do.

15   Q.  Were there messages that you were not able to review?

16   A.  Yes.

17   Q.  And specifically in Mr. Caldwell's Facebook account, did

18   the records suggest that messages had been unsent by user?

19   A.  Yes.

20   Q.  And in Mr. Harrelson's phone, were there some Signal

21   messages -- were there -- a period of time that there was an

22   absence of Signal messages?

23   A.  Yes.

24   Q.  Was there a period of time in Mr. Meggs's phone where there

25   was an absence of Signal messages?

1    A.   Yes.

2    Q.   From Ms. Watkins's phone, did you recover any Signal

3    messages?

4    A.   None.

5    Q.   Did you find, though, that she had sent Signal messages

6    that were still present in other people's phones?

7                MR. CRISP:   Your Honor, I would object.   This is

8    outside the scope of my cross.

9                THE COURT:   I would agree with that.   I'll sustain

10   the objection.

11   BY MS. RAKOCZY:

12   Q.   Special Agent Caldwell -- Special Agent Palian, you were

13   asked by Mr. Fischer a series of questions that -- basically

14   the question was did any of the witnesses who you interviewed

15   tell you that they had heard Mr. Caldwell express or articulate

16   a plan to storm the Capitol on January 6th.

17   A.   Yes.   I remember that question.

18   Q.   And I believe your response was no, no witness said that?

19   A.   Correct.

20   Q.   You emphasized the word "witness."   Was there something

21   else that was responsive to the question?

22   A.   Yeah, one of the things was the map that was --

23   Mr. Caldwell had going from the Capitol to the QRF hotel that

24   he made on January 5th.

25   Q.   Could you talk a little bit more about that.

```
 1    A.  Sure.

 2         After -- around the time of the recce, Mr. Caldwell had

 3    a map that went from -- in between the U.S. Capitol and the QRF

 4    hotel.  We found that odd since nobody at that time claimed

 5    they knew that they were going to the Capitol that day yet.

 6    There was a map going from where the guns were to the Capitol.

 7    Q.  Let me ask you this:  Special Agent Cald- -- Special Agent

 8    Palian, you were asked questions about your affidavit in

 9    support of Mr. Caldwell's arrest back in January 2021.  Do you

10    remember those questions?

11    A.  Yes, I do.

12    Q.  Okay.  As early as that time period, had you obtained some

13    Facebook records that reflected messages between Mr. Caldwell

14    and Ms. Watkins?

15    A.  Yes.

16    Q.  And in those messages, were there any references to a QRF

17    or a quick reaction force?

18    A.  Yes, there were.

19    Q.  So as early as January of 2021, you were aware that

20    Mr. Caldwell had sent such messages?

21    A.  Yes, I was.

22    Q.  And, in fact, in one of those messages, did Mr. Caldwell

23    reference the role that the North Carolina gentleman named

24    Paul Stamey would play in the quick reaction force?

25    A.  Yes, he did.
```

1    Q.  And do you recall, as you stand here today, what

2    Mr. Caldwell said about what Mr. Stamey would be doing in the

3    quick reaction force?

4    A.  Yes.  I believe Mr. Caldwell said that Mr. Stamey had,

5    quote, committed to being the QRF.

6    Q.  Did he make any reference to the -- any reference to

7    weapons in those messages?

8    A.  Yes.  They -- they talked about not having to schlep the

9    weps up and that's why they wanted a hotel.

10   Q.  Did Mr. Caldwell play any role in selecting the location of

11   the hotel for the quick reaction force?

12   A.  Yes, Mr. Caldwell did select that location.

13   Q.  And that was a quick reaction force for the January 6th

14   event; is that right?

15   A.  Correct, for Jan 6.

16   Q.  Did you find any messages in Mr. Caldwell's phone in which

17   he discussed trying to find a boat to facilitate the quick

18   reaction force?

19   A.  Several.

20          MS. RAKOCZY:  If I could show an exhibit just to the

21   special agent.  I'd like to bring up on the screen now what's

22   been marked for identification purposes as Government's

23   Exhibit 22.T.15.26.

24   BY MS. RAKOCZY:

25   Q.  Special Agent, do you see a message on your screen right

1    now?

2    A.  Yes, I see the message.

3    Q.  Does this message seem familiar to you?

4    A.  Yes, I've seen this.

5    Q.  Is this a message that was a -- a text message that was

6    extracted from Defendant Caldwell's phone?

7    A.  Yes.

8    Q.  And what's the date on it?

9    A.  The date is January 2nd, 2021.

10   Q.  Does this one message span four different pages in the

11   blown-up version that you created -- helped create for the

12   jury?

13   A.  Yeah.  Yes, it does.

14   Q.  Does this appear to be a fair and accurate copy of that

15   message from Defendant Caldwell's phone?

16   A.  It is fair and accurate.

17        MS. RAKOCZY:  At this point in time the government

18   would seek to admit Exhibit 22.T.15.26 into evidence.

19        THE COURT:  Just ask, Ms. Rakoczy, is this the

20   exhibit number or just what's on the page?  Is there a --

21        MS. RAKOCZY:  So, Your Honor, we have marked every --

22   or many individual messages with an exhibit number.  We've also

23   compiled some of them into --

24        THE COURT:  Okay.  Got it.

25        MS. RAKOCZY:  -- larger PDF exhibits to assist in

1738

1    speed in showing them to witnesses, but we do have them

2    individually marked for circumstances like this.

3              THE COURT:  Okay.  So -- all right.

4         So any objection to 22.T.15.26?

5              MR. WOODWARD:  No, Your Honor.

6              THE COURT:  So 22.T.15.26 will be admitted and can be

7    shown to the jury.

8              (Government Exhibit 22.T.15.26 admitted into

9    evidence.)

10   BY MS. RAKOCZY:

11   Q.  Special Agent Palian, this message from January 2nd at

12   10:36 p.m., who is it from?

13   A.  It was from Defendant Caldwell.

14   Q.  And the name of the person in Mr. Caldwell's contacts, who

15   is he sending it to?

16   A.  To TREE Shaw Pugh.

17   Q.  And what does the message read?

18   A.  The message reads, "Shawn!  Can't believe I just thought

19   of this:  how many people either in the militia or not (who

20   are still supportive of our efforts to save the Republic)

21   have a boat on a trailer that could handle a Potomac

22   crossing?  If we had someone standing by at a dock ramp

23   (one near the Pentagon for sure) we could have our Quick

24   Response."

25   Q.  Could you continue, please.

1   A.  There we go.

2        "Team with the heavy weapons standing by, quickly load

3   them and ferry them across the river to our waiting arms.  I'm

4   not talking about a bass boat.  Anyone who would be interested

5   in supporting the team this way?  I will buy the fuel.  More or

6   less be hanging around sipping coffee and maybe scooting on the

7   river a bit and pretending to fish, then if it all went to

8   shit, our guys [would] load our weps AND Blue Ridge Militia

9   weps and ferries them across.  Dude!  If we had 2 boats, we

10  could ferry across and never drive into D.C. at all!!!!  Then

11  get picked up.  Is there a way to PLEASE pass the word among

12  folks you know and see if someone would jump in to the middle

13  of this to help.  I am spreading the word, too.  Genius if

14  someone is willing and hasn't put their boat away for the

15  winter."

16  Q.  Special Agent Palian, did you find any information -- any

17  messages in Mr. Caldwell's phone to suggest that he coordinated

18  these plans for the boat and the QRF with defendant -- I'm

19  sorry -- with the gentleman from North Carolina named

20  Paul Stamey?

21  A.  Yes, we do have those messages.

22  Q.  Okay.

23        MS. RAKOCZY:  And let me bring up just for the

24  Special Agent now what will be marked for identification as

25  Government's Exhibit 1.S.159.524 through 526.

1    BY MS. RAKOCZY:

2    Q.  Special Agent Palian, I'm going to show you three messages,

3    Messages 524 through 526, but are these Signal messages

4    extracted from Defendant Stewart Rhodes's cell phone?

5    A.  Yes, they are.

6    Q.  And are these from a chat that's named DC OP:  Jan 6 21?

7    A.  Yes.

8    Q.  And I'm not sure that we've talked about this chat before.

9    Was there a chat in Mr. Rhodes's phone by this name?

10   A.  Yes, there was.

11   Q.  Okay.  And so showing you Exhibit 524 -- and I'll also

12   bring up to 525.  Take a look at that.  Also bring up 526.

13        Are these three messages all messages that were

14   recovered from Mr. Rhodes's phone?

15   A.  Yes, all of them were recovered from Mr. Rhodes's phone.

16        MS. RAKOCZY:  At this point in time, Your Honor, the

17   government would seek to move into evidence Exhibit 1.S.159.524

18   through 526 into evidence.

19        THE COURT:  Any objection?

20        MR. WOODWARD:  No objection.

21        THE COURT REPORTER:  I'm sorry.  Was that Mr. --

22   thank you.

23        THE COURT:  You weren't here yesterday.  I think the

24   rule of thumb is if you don't know who it is, it's

25   Mr. Woodward.

```
 1              So 1.S.159.524 will be admitted.

 2                   MS. RAKOCZY:  And through 526, Your Honor.

 3                   THE COURT:  And, yes, through 526.  Correct.  Thank

 4       you.

 5                   (Government Exhibit 1.S.159.524 through 1.S.159.526

 6       admitted into evidence.)

 7                   MS. RAKOCZY:  If we can publish to the jury.

 8       BY MS. RAKOCZY:

 9       Q.  Special Agent Palian, this is a message to -- the chat you

10       said was DC OP:  Jan 6 21; is that right?

11       A.  That's correct.

12       Q.  And was Defendant Stewart Rhodes on this chat?

13       A.  He was.

14       Q.  Was Defendant Kelly Meggs on this chat?

15       A.  Yes, he was, and he sent this message.

16       Q.  Was Defendant Kenneth Harrelson on this chat?

17       A.  He was.

18       Q.  Was Defendant Jessica Watkins on this chat?

19       A.  Yes, she was.

20       Q.  Was Mr. Caldwell?

21       A.  No, I don't believe he was.

22       Q.  Okay.  Was Paul Stamey on this chat?  Let's get back to

23       that question.

24              Let's look at this message from OK Gator 1.  What did

25       Mr. Meggs send January 2nd at 5:43 p.m.?
```

```
1    A.   January --
2              MR. WOODWARD:  Objection.
3              THE COURT:  It's already admitted.
4              MR. WOODWARD:  We're not objecting to the exhibit.
5    I'm objecting to the scope of examination being beyond what we
6    crossed.
7              THE COURT:  Well, it's overruled.  Go ahead.
8    BY MS. RAKOCZY:
9    Q.   Special Agent, could you read the message, please.
10   A.   Sure.
11        "1 if by land.  North side of Lincoln Memorial.  2 if by
12   Sea.  Corner of west basin and Ohio is a water transport
13   landing!!"
14   Q.   And then on Message 525, did Mr. Meggs continue in the next
15   message?
16   A.   He did.  He said, "QRF Rally Points.  Water of the bridges
17   get closed."  I believe he meant water if the bridges get
18   closed.
19   Q.   Did Mr. Meggs also send maps with these messages when he
20   sent them in the phone?
21   A.   He did.
22   Q.   Did he -- were you able to locate what was depicted on
23   those maps?  Were you able to tell what was depicted on those
24   maps?
25   A.   Yes, we were.
```

1    Q.   What was depicted?

2    A.   It was what was said in the previous message.  There was --

3    I believe it was the Lincoln Memorial that was in the picture.

4    Q.   As -- as a QRF rally point?

5    A.   Yes.

6    Q.   Now, in Message 526, the next message, who is that message

7    from?

8    A.   Western State Leader who was Paul Stamey.

9    Q.   That's the North Carolina person, Paul Stamey?

10   A.   Yes.

11   Q.   And what did he say to the DC OP:  Jan 6 21 chat?

12   A.   "My sources DC Working on procuring Boat transport as we

13   speak."

14   Q.   And this is the evening of January 2nd at about 5:45 p.m.;

15   is that right?

16   A.   Yes.

17   Q.   Have you recovered messages from Mr. Caldwell's phone in

18   which he and Mr. Stamey communicate about Mr. Caldwell's effort

19   to get a boat?

20   A.   Yes.

21   Q.   And are they from generally around this time period,

22   January 2nd to 3rd of 2021?

23   A.   Yes, they are.

24   Q.   Okay.  You were asked questions by Mr. Fischer about

25   whether Mr. Caldwell was a member of the Oath Keepers, and you

1    said he was not a dues-paying member; is that correct?

2    A.  That's right.  I said that.

3    Q.  But you testified that based on your review of the

4    evidence, you thought it was fair to consider him a member.  Is

5    that what you said?

6    A.  I would call him a member of the group, yes.

7    Q.  Why do you say that?

8    A.  Mr. Caldwell talked about his affiliation with the group.

9    He had frequent contact with at least two different state

10   groups of Oath Keepers.  He also said in one message that he

11   had been on the Oath Keepers intel net for months now.

12   Q.  Let's return to these messages in this topic in a second,

13   but I want to talk briefly about a series of questions that

14   Mr. Fischer asked you about Mr. Caldwell's arrest.  Do you

15   recall those questions from cross-examination?

16            THE COURT:  Ms. Rakoczy, I'm sorry to interrupt you,

17   but just for timing purposes, do you have a sense of what the

18   length of the redirect is you're intending?

19            MS. RAKOCZY:  I think probably another 15 minutes,

20   not long, but it is five to five, Your Honor, but probably more

21   than five minutes.

22            THE COURT:  Ladies and gentlemen, can all of you stay

23   until, say, on the safe side 5:30?  Would that be --

24            UNIDENTIFIED JUROR:  I'm going to be cutting it

25   close, sir, because I have to go back and pick up my kids

1    before 6:00.

2            THE COURT:  Okay.  All right.  Well, let's -- let's

3    go -- what's the latest time you would need to leave?

4            UNIDENTIFIED JUROR:  I mean, the problem is we have

5    the bus.

6            THE COURT:  Right.  Okay.  So -- we'll end at 5, and

7    we'll have to just pick up on Thursday.

8    BY MS. RAKOCZY:

9    Q.  Special Agent Palian, at the time of Mr. Caldwell's arrest,

10   you wrote in the arrest warrant affidavit that you had evidence

11   suggesting that Mr. Caldwell entered the building; is that

12   right?

13   A.  Yes, I did say that.

14   Q.  Do you recall what that was based on?

15   A.  It was based on two things.  It was based on the photograph

16   that we've looked at, and it was also based on Mr. Caldwell's

17   own statements.

18   Q.  And were -- what sources were those statements from?

19   A.  From Facebook.

20   Q.  And I'm going to bring up just on the screen for the

21   special agent a series of messages labeled Government's

22   Exhibit 1 -- I'm sorry -- 2001.T.129, just for the special

23   agent.  And I'm going to scroll through this series of

24   messages.

25            MS. RAKOCZY:  Your Honor, I realize that it may take

1    me more than two minutes to get through these notes.  So I

2    don't -- I don't want to keep anyone longer than we should.  It

3    may be appropriate to break.

4         THE COURT:  All right why don't we go ahead and do

5    that.  Let's break for the day.

6         All right.  Ladies and gentlemen, thank you for your

7    time and attention.  It's somewhat of a milestone, first full

8    day of testimony in evidence.  So thank you.  We will -- as a

9    reminder, we are not sitting tomorrow.  We'll ask you to return

10   on Thursday, and we'll have another full day of testimony on

11   Thursday.

12        Just a friendly reminder not to discuss the case with

13   anyone.  Please avoid the media attention that may be on this

14   case, and no independent research.  We look forward to seeing

15   you on Thursday.  Be well.

16             (Proceedings held outside the presence of the jury.)

17        THE COURT:  You may step down, Special Agent Palian.

18        Special Agent Palian, I'll just instruct you that

19   because you remain on the witness stand from today to Thursday,

20   do not discuss your testimony with anyone during that period of

21   time.

22        THE WITNESS:  Will do -- won't do.

23        THE COURT:  Please be seated, everyone.

24        Okay.  So we're back Thursday morning.  Government will

25   be prepared, presumably, with its next set of witnesses.

1    Mr. Crisp, it looks like you would like to add

2    something.

3    MR. CRISP:  Something, but --

4    THE COURT:  No.  That's okay.  Go ahead.

5    MR. CRISP:  Question about dailies, Judge, in terms

6    of ordering them.  I know my client had qualified as in forma

7    pauperis earlier.  It's a funding issue.  I'm not familiar with

8    how to do that in this district.  So to whom would I make that

9    request and funding, and how does -- can I have an order that

10   would cover that?

11   THE COURT:  So the short answer is I'm not sure.

12   MR. CRISP:  Okay.

13   THE COURT:  However, I think you can email

14   Mr. Cramer, and he will certainly direct you how to do it.

15   Obviously, multiple defendants here.  I believe the government

16   is already asking for daily, which is actually why we have two

17   court reporters instead of one.

18   MR. CRISP:  Okay.

19   THE COURT:  So it should not be difficult to generate

20   an extra set for the defense.

21   MR. CRISP:  Okay.  So Mr. Cramer will guide me to how

22   I get it in my hands without having to pay costs and stuff?

23   THE COURT:  I think the -- what I'm suggesting is

24   just email him on what you need to do and whether that --

25   submit a separate voucher, et cetera.  I don't know.  You

1    know --

2              MR. CRISP:  That's what I was driving at.

3              THE COURT:  He'll have a sense of how to do that.

4              MR. CRISP:  Thanks.

5              THE COURT:  Okay.  Is there anything we should

6    discuss before we adjourn for the day and before tomorrow?

7              MR. NESTLER:  Yes, Your Honor.  We do have one

8    privilege issue I think I flagged earlier we need to address at

9    some point.  I can flag it now, if Your Honor would like.

10              THE COURT:  Sure.

11              MR. NESTLER:  Our filter team reviewed messages from

12    Mr. Rhodes's phone and had withheld from the prosecution team a

13    message that Mr. Rhodes sent on December 10th.  In light of

14    some filings that the defense made over the past few weeks

15    about advice of counsel, Insurrection Act, our filter team went

16    back and reviewed their messages they withheld from the

17    prosecution team and identified a message that they believe

18    should not be withheld.

19         They provided it directly to Mr. Linder, and Mr. Linder

20    has reviewed it, and -- I don't have a copy for the prosecution

21    team.  Mr. Linder has it here.  I'm -- I'm reporting to the

22    Court what my filter AUSA, who's actually based in Texas, tells

23    us they don't believe it's privileged.  On further review,

24    Mr. Linder does believe it's privileged.

25         So we wanted to flag for the Court and provide a copy of

```
1    the message -- or have Mr. Linder provide a copy of the message

2    to the Court and indicate the basis for the privilege.  There

3    are four other people on the message, in addition to Mr. Rhodes

4    and Ms. SoRelle.

5              THE COURT:  Okay.

6              MR. LINDER:  Just -- do you want me to send a copy

7    for you to review first?

8              THE COURT:  Well, why don't you hand it up.  I think

9    the other -- I think really the --

10             MR. LINDER:  It's an email, but I'll let you look at

11   it.

12             THE COURT:  Look, I think the threshold question

13   is -- and continues to be -- and I don't know whether there's

14   been any change in the defense's position -- is whether you are

15   intending to argue and request any kind of advice of counsel

16   defense at the end of this case, in which case that makes all

17   of this very easy.  You've got to disclose this.

18        So what's the answer to that threshold question?

19             MR. LINDER:  I believe our answer right now would

20   still be we would like to have that option to argue there's

21   advice of counsel defense.

22             THE COURT:  Here's -- I mean, okay.  Which means --

23             MR. LINDER:  We're one witness in.  So things may

24   change.

25             THE COURT:  Sure.  In which case if you're prepared
```

1    to say we might reserve on that, then should we not disclose

2    this to the government consistent with what -- I mean, if --

3    look, you haven't affirmatively said you're going to do it.  On

4    the other hand, what?  Am I supposed to wait -- I can't wait

5    until we instruct.

6                MR. LINDER:  I understand.

7                THE COURT:  So at some point, if you're going to

8    assert the defense, have a strong suspicion you will, that

9    means you've waived the privilege, if there was one in the

10   first place, and that would short-circuit any conversation

11   about whether this is privileged to begin with.

12               MR. LINDER:  Correct.  This -- and just so you'll be

13   aware, this was just turned over to us Friday night.  I mean,

14   we -- I don't think they had any reason -- they didn't have it

15   either.  I mean, their team just turned it over to us and gave

16   it to us Friday night.  So we were not aware of it.  It was not

17   a -- yeah.

18          And our group can meet about it, and we can review it --

19   our team will meet before Thursday, and we can decide Thursday

20   what we're going to do, but this is something that just came

21   across, you know, two days ago -- a few days ago.

22               THE COURT:  Okay.

23               MR. NESTLER:  Can I just -- for the record,

24   Your Honor, just to be clear, Mr. Linder has had Mr. Rhodes's

25   entire unfiltered phone for many months.  This message was

1    flagged for him, but he's had access to all of the messages,

2    including the privileged -- or allegedly privileged messages.

3            MR. LINDER:  But if you'll notice from the email --

4    he's correct, but if you'll notice from the email, they didn't

5    catch it either because it's not in a Signal chat.  It's a

6    native text message that doesn't search the same way Signal

7    does on Cellebrite.  Their CART team didn't even catch it until

8    much later, until we -- so we didn't catch it either.

9            THE COURT:  Okay.  I mean, I -- look, everybody is

10   operating in good faith.  I don't -- I'm not suggesting

11   otherwise.  Just hang on for one second.  Let me take a look at

12   this.

13       All right.  Go ahead and talk to your team about this.

14   I don't know if it's useful to give my initial impressions

15   before I hear your argument, but --

16           MR. LINDER:  I'd love to hear it.

17           THE COURT:  Well, I mean, first of all, it's not a

18   communication from Ms. SoRelle to Mr. Rhodes.  It's a

19   communication from Mr. Rhodes to Ms. SoRelle and then two

20   others, it looks like.  And I don't know who those two others

21   are.

22       But in the first instance, it doesn't appear to me --

23   first of all, it's not a communication from a lawyer to a

24   client, and to the extent that this is a client communication

25   to a lawyer, to the extent that's being asserted, it does not

 1    appear to be eliciting or seeking to elicit legal advice, one,

 2    or, two, sharing facts with a lawyer who would then rely on

 3    those facts to provide legal advice.  At least that's my

 4    impression of the email just upon first read.

 5              MR. LINDER:  Understood.  We just don't know what's

 6    in front or behind that email.  It's obviously not an

 7    isolated --

 8              THE COURT:  Right?

 9              MR. LINDER:  -- sentence.

10              THE COURT:  So can you get the full context either

11    from your own discovery or --

12              MR. LINDER:  Our expert is here.  He got here today.

13              MS. HALLER:  He didn't sit in the courtroom, but he's

14    here.

15              MR. LINDER:  We've got someone who can now do that.

16              THE COURT:  All right.  All right.  So, look, I'll

17    reserve on the issue, and we'll see where we stand on -- on

18    Thursday.

19              MR. LINDER:  Sure.  Thank you.

20              THE COURTROOM DEPUTY:  All right.

21              THE COURT:  Okay.  Hang on before you-all rise.  Is

22    there anything else -- don't be so quick to rise, people.

23              MR. BRIGHT:  Your Honor, if I may --

24              THE COURT:  Well, hang on.  Hang on.  Because you're

25    not at the mic.  So I want to -- Mr. Fischer?

1    MR. FISCHER:  Your Honor, very quickly.  I noticed --

2  and we noticed it -- during my cross-examination of

3  Agent Palian, there were a few people that were -- decided to

4  laugh and chuckle back over in that direction over there.  I

5  don't know who was doing it, but I don't know if they got the

6  Court's admonition or not, but I thought it was poor form, so

7  to speak.

8    Thank you.

9    THE COURT:  You know, there were some moments of

10  levity in your cross-examination, Mr. Fischer.  So you're not

11  giving yourself enough comedic credit.

12    MR. FISCHER:  That's not what I'm talking about.

13    THE COURT:  I know.

14    MS. RAKOCZY:  Just for the record, Your Honor, from

15  this table it sounded a little bit like it came from the jury,

16  just for the record.  Who knows.  Sounds travel.

17    THE COURT:  I thought I heard a few jurors snicker

18  along the way too.

19    Look, I'll remind -- it's probably a useful reminder to

20  at least just make an announcement, as a matter of course,

21  every morning to remind people not to -- in the gallery or in

22  the well to react to testimony or questioning.

23    Mr. Bright, did you wish to add anything?

24    MR. BRIGHT:  No, Your Honor.

25    There was one matter --

1           THE COURT:  I need you to come to a microphone so our

2    court reporter -- maybe we can ask Mr. Cramer to add a second

3    mic at that table.  I don't know where we are on --

4           MR. BRIGHT:  I'm happy to --

5           THE COURT:  -- getting another table.

6           THE COURTROOM DEPUTY:  It's right there.

7           THE COURT:  Oh, it's already there.  There's already

8    a third table.

9           MR. BRIGHT:  It doesn't have electricity.

10          THE COURT:  Let JC know what the issues are and we

11   can talk to Mr. Cramer and get it fixed tomorrow.

12          MR. BRIGHT:  This just had to do with the discussions

13   we started out with this morning regarding what had started out

14   a few weeks ago as the government's proposed stipulation on the

15   language of the Insurrection Act.  As the Court had asked, and

16   as I had done, I've -- I had prepared a counter to their --

17   what they had said.  And we've gone back and forth with the

18   government.  I think it's something that we would like to table

19   until Thursday morning and have it resolved at that time.

20          THE COURT:  That's fine.

21          MR. BRIGHT:  The government has communicated a bit

22   with me about it.  I responded to them.

23          THE COURT:  Okay.

24          MR. BRIGHT:  Once we can get there, other than what

25   the Court may end up advising, but I just figured it would be

1    best to wait until Thursday.

2            THE COURT:  Sure.  Yeah, no.  Look, I'm happy to give

3    you-all whatever time you need to resolve the issue, and it's

4    okay by me.

5            MR. BRIGHT:  Thank you, Judge.

6            THE COURT:  Okay.

7            MS. RAKOCZY:  One more thing, Your Honor.

8        Your Honor, Mr. Fischer's cross of the special agent

9    went pretty deep into questions of whether the FBI reacted

10   properly to its impressions of Mr. Caldwell's dangerousness.  I

11   believe there was also a line of questioning about whether

12   there was any reason to believe Mr. Caldwell had committed any

13   other offenses or whether there's anything further to

14   investigate for the FBI.  It's the government's position this

15   has reopened the door into the issue we litigated with 404(b).

16           MR. FISCHER:  Your Honor, I'm going to object.  This

17   is going in the news media.  This is --

18           MS. RAKOCZY:  I think we discussed this in an open

19   hearing over the summer, 404(b) evidence having to do with the

20   piece of paper Mr. Caldwell wrote.

21           THE COURT:  Do you think you now -- oh.

22           MS. RAKOCZY:  We do think he opened the door, and we

23   would, obviously, not want to cross on that without raising it

24   with the Court, and so we don't have to address and argue it

25   now, but we're happy to, or we could make a little time to come

 1    back Thursday morning or tomorrow.

 2              THE COURT:  Because that document was recovered

 3    during the search; right?

 4              MS. RAKOCZY:  Correct, Your Honor.

 5              THE COURT:  And then -- is the document then referred

 6    to in any of the affidavits in support of the arrest warrant.

 7              MS. RAKOCZY:  No, because the arrest was simultaneous

 8    with the search.

 9              THE COURT:  Right.  But I thought there was an

10    amended affidavit.  At least Mr. Fischer suggested that there

11    was an amended affidavit that may have postdated the arrest.

12              MS. RAKOCZY:  My memory is that the affidavit was

13    sworn out around the same time as the arrests warrants for

14    Ms. Watkins and Mr. Caldwell but not executed before some

15    subsequent evidence was learned and that there was an amended

16    complaint --

17              THE COURT:  I'm sorry.  Give me the chronology again?

18              MS. RAKOCZY:  -- before the arrest.

19         I think that's -- I'll have to go back and refresh my

20    recollection, but I think the amended complaint actually joined

21    all three defendants together, if I remember correctly.  So I

22    don't -- I don't think that that amended complaint was prior to

23    the arrest as well, and prior to the search warrant in which

24    that document was recovered.

25              THE COURT:  Okay.  Okay.

1    MS. RAKOCZY:  We also will take a look at the

2    transcript, and that may shed a little bit more light on what

3    exactly was elicited on cross.

4    THE COURT:  Yeah, we'll do the same.  I mean, I

5    think -- certainly Mr. Fischer's questioning touched on the

6    reasons for the arrest warrant and the timing of the arrest

7    warrant.  I guess the question is whether he -- his examination

8    touched on the FBI's thinking in conduct with respect to

9    Mr. Caldwell after the search.

10    MS. RAKOCZY:  There were also some very broad

11    questions, Your Honor, about what the evidence does or does not

12    show about Mr. Caldwell's intent.  And so we would also point

13    to those questions as potentially opening the door to this

14    evidence.

15    THE COURT:  Right.  All right.  We'll take a look at

16    it.  You-all should take a look, and then let's talk before

17    court starts on Thursday morning.

18    MS. RAKOCZY:  Thank you, Your Honor.

19    THE COURT:  All right.  Okay.  Any last matters

20    before we adjourn for the day?

21    Mr. Linder?

22    MR. LINDER:  No.  We're trying to coordinate maybe

23    meeting tomorrow.

24    THE COURT:  Okay.

25    MR. LINDER:  I'm suggesting it anyway.

1           THE COURT:  All right.  Good.  Good.  There shouldn't

2    be a day you-all aren't meeting from here on out.

3           Thank you, all.  For those of you celebrating the

4    holiday, have a nice holiday.  Do not wait for me.

5           Thank you, everyone.

6           (Proceedings were concluded at 5:12 p.m.)

1    <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3         I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                   Dated this 5th day of October, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**$**

**$25** [2] - 1620:19,
1620:22
**$50** [3] - 1620:9,
1620:14, 1620:17

**'**

**'Benghazi'** [1] -
1705:4
**'Legal** [1] - 1708:19
**'The** [1] - 1709:2

**0**

**0** [1] - 1620:23
**03** [1] - 1708:1

**1**

**1** [6] - 1670:12,
1699:16, 1704:25,
1741:24, 1742:11,
1745:22
**1-6** [1] - 1714:8
**1.S.159.524** [4] -
1739:25, 1740:17,
1741:1, 1741:5
**1.S.159.524..............
...** [1] - 1596:10
**1.S.159.525..............
...** [1] - 1596:11
**1.S.159.526** [1] -
1741:5
**1.S.159.526..............
...** [1] - 1596:11
**1.S.321.2** [1] - 1670:12
**1.S.696.12491** [1] -
1732:20
**10-year-old** [1] -
1675:23
**100** [1] - 1703:16
**1050.1** [1] - 1716:17
**107** [2] - 1630:14,
1630:16
**108** [2] - 1641:10,
1641:22
**1083** [3] - 1601:5,
1601:21, 1602:2
**109** [2] - 1646:2,
1647:19
**10:36** [1] - 1738:12
**10th** [1] - 1748:13
**110** [2] - 1647:20,
1647:21
**12107** [1] - 1731:2
**12491** [1] - 1732:4
**128** [1] - 1718:10
**12:30** [2] - 1610:5,
1671:18

**12:53** [1] - 1715:18
**12th** [4] - 1612:1,
1612:4, 1612:5,
1686:15
**13** [2] - 1642:8, 1666:4
**13th** [1] - 1654:14
**14** [11] - 1642:9,
1666:4, 1689:19,
1689:20, 1689:21,
1689:22, 1689:24,
1690:8, 1691:12,
1691:14, 1691:15
**14...................** [1] -
1597:9
**14th** [7] - 1611:8,
1611:11, 1611:24,
1612:9, 1626:19,
1627:10, 1675:10,
1684:1, 1686:14,
1696:20, 1729:22,
1730:3, 1731:4,
1731:16, 1731:21,
1732:7, 1733:8
**15** [6] - 1623:15,
1672:18, 1722:4,
1724:6, 1744:19
**1508** [4] - 1722:11,
1722:12, 1722:15
**1512** [3] - 1722:7,
1722:9, 1722:15
**1530** [1] - 1720:14
**1545** [1] - 1724:5
**1563** [1] - 1714:6
**15:42** [1] - 1640:2
**16** [1] - 1714:8
**1600** [1] - 1720:14
**1610** [1] - 1596:5
**1613** [1] - 1596:5
**1653** [2] - 1714:7,
1714:9
**1673** [38] - 1596:13,
1596:14, 1596:14,
1596:15, 1596:15,
1596:16, 1596:16,
1596:17, 1596:17,
1596:18, 1596:18,
1596:19, 1596:19,
1596:20, 1596:20,
1596:21, 1596:21,
1596:22, 1596:23,
1596:23, 1596:23,
1596:24, 1596:24,
1596:25, 1596:25,
1597:3, 1597:3,
1597:4, 1597:4,
1597:5, 1597:5,
1597:6, 1597:6,
1597:7, 1597:7,
1597:8, 1597:8,
1597:9

**1691** [1] - 1597:9
**1697** [2] - 1597:10,
1597:10
**1699** [1] - 1596:6
**1704** [1] - 1597:12
**1707** [1] - 1597:12
**1710** [1] - 1596:6
**1717** [1] - 1596:7
**1729** [1] - 1596:7
**1738** [1] - 1596:12
**1741** [3] - 1596:10,
1596:11, 1596:11
**17th** [8] - 1628:4,
1639:19, 1640:2,
1641:25, 1642:11,
1642:25, 1643:12,
1725:15
**1960** [4] - 1652:20,
1652:21, 1652:25,
1653:3
**1960s** [1] - 1652:12
**1975** [1] - 1605:16
**19th** [7] - 1632:10,
1633:22, 1645:22,
1646:17, 1654:18,
1663:13, 1666:1
**1:30** [1] - 1671:19
**1:50** [1] - 1716:1
**1:52** [1] - 1716:1
**1:57** [1] - 1714:22

**2**

**2** [4] - 1705:2, 1708:2,
1739:9, 1742:11
**2,000** [1] - 1720:7
**20** [3] - 1633:20,
1646:23, 1700:23
**20,000** [2] - 1700:23,
1703:18
**200-ish** [1] - 1701:9
**2001.T.129** [1] -
1745:22
**2020** [16] - 1654:14,
1664:22, 1673:12,
1677:12, 1681:15,
1681:19, 1685:2,
1695:8, 1705:15,
1709:10, 1712:15,
1712:18, 1730:18,
1731:4, 1731:21,
1733:8
**2021** [24] - 1626:19,
1629:5, 1632:11,
1639:19, 1640:2,
1641:25, 1642:11,
1642:25, 1644:2,
1645:22, 1646:18,
1654:18, 1655:11,
1655:14, 1666:11,

**1667:25**, 1670:15,
1680:2, 1685:3,
1725:15, 1735:9,
1735:19, 1737:9,
1743:22
**2030** [2] - 1718:2,
1718:4
**20th** [1] - 1664:25
**21** [3] - 1740:6,
1741:10, 1743:11
**22.T.15.26** [5] -
1736:23, 1737:18,
1738:4, 1738:6,
1738:8
**22.T.15.26................
. .** [1] - 1596:12
**25** [1] - 1633:20
**25-minute-or-so** [1] -
1610:24
**251** [2] - 1606:2,
1606:7
**263** [1] - 1714:4
**27** [1] - 1669:15
**2nd** [5] - 1737:9,
1738:11, 1741:25,
1743:14, 1743:22

**3**

**3** [1] - 1672:10
**30** [2] - 1699:16,
1718:22
**30-acre** [1] - 1634:13
**30-day** [1] - 1623:21
**302** [2] - 1728:11,
1728:14
**302s** [2] - 1728:5,
1728:6
**36** [1] - 1692:12
**38** [6] - 1681:4,
1683:7, 1697:12,
1697:13, 1697:14,
1697:15
**38...................** [1] -
1597:10
**39** [4] - 1697:13,
1697:14, 1697:15
**39...................** [1] -
1597:10
**3:05** [1] - 1649:5
**3:15** [1] - 1672:11
**3:42** [3] - 1640:2,
1641:25, 1642:16
**3:52** [1] - 1640:9
**3rd** [7] - 1611:7,
1664:22, 1664:24,
1719:9, 1719:17,
1729:16, 1743:22

**4**

**4** [1] - 1724:6
**40** [1] - 1647:5
**404(b** [1] - 1755:19
**404(b)** [1] - 1755:15
**40th** [1] - 1712:18
**4th** [6] - 1701:6,
1705:13, 1709:10,
1730:18, 1731:14,
1731:20

**5**

**5** [5] - 1673:17,
1699:16, 1731:24,
1745:6
**5,000** [1] - 1700:25
**5-1** [7] - 1673:17,
1673:21, 1673:22,
1675:18, 1675:22,
1675:25, 1681:4
**5-1...................** [1] -
1596:13
**5-10...................** [1] -
1596:18
**5-11...................** [1] -
1596:18
**5-12...................** [1] -
1596:19
**5-13...................** [1] -
1596:19
**5-14...................** [1] -
1596:20
**5-15...................** [1] -
1596:20
**5-16...................** [1] -
1596:21
**5-17...................** [1] -
1596:21
**5-18...................** [1] -
1596:22
**5-19...................** [1] -
1596:22
**5-2...................** [1] -
1596:14
**5-20...................** [1] -
1596:23
**5-21...................** [2] -
1596:23, 1596:24
**5-23...................** [1] -
1596:24
**5-24...................** [1] -
1596:25
**5-25...................** [1] -
1596:25
**5-26...................** [1] -
1597:3
**5-27...................** [1] -
1597:3

**5-28**................. [1] - 1597:4

**5-29**................. [1] - 1597:4

**5-3**................. [1] - 1596:14

**5-30**................. [1] - 1597:5

**5-31**................. [1] - 1597:5

**5-32**................. [1] - 1597:6

**5-33**................. [1] - 1597:6

**5-34**................. [1] - 1597:7

**5-35** [1] - 1682:11

**5-35**................. [1] - 1597:7

**5-36**................. [1] - 1597:8

**5-37**................. [1] - 1597:8

**5-38** [3] - 1673:18, 1673:21, 1673:22

**5-38**................. [1] - 1597:9

**5-4**................. [1] - 1596:15

**5-5**................. [1] - 1596:15

**5-6**................. [1] - 1596:16

**5-7**................. [1] - 1596:16

**5-8**................. [1] - 1596:17

**5-9**................. [1] - 1596:17

**50** [1] - 1692:18

**5014(e)(2** [1] - 1647:5

**521** [1] - 1605:18

**524** [2] - 1740:3, 1740:11

**525** [2] - 1740:12, 1742:14

**526** [7] - 1739:25, 1740:3, 1740:12, 1740:18, 1741:2, 1741:3, 1743:6

**5:00** [1] - 1610:2

**5:12** [1] - 1758:6

**5:30** [1] - 1744:23

**5:43** [1] - 1741:25

**5:45** [1] - 1743:14

**5th** [4] - 1659:20, 1732:5, 1732:7, 1734:24

# 6

**6** [5] - 1611:25, 1736:15, 1740:6, 1741:10, 1743:11

**60** [1] - 1694:10

**6615.A** [2] - 1730:11, 1732:18

**6617** [2] - 1719:1

**6618.A** [1] - 1676:11

**6:00** [1] - 1745:1

**6:05** [1] - 1660:20

**6th** [48] - 1601:18, 1611:14, 1611:16, 1611:18, 1613:8, 1615:24, 1624:24, 1626:2, 1626:7, 1626:16, 1626:22, 1627:7, 1629:5, 1629:24, 1632:6, 1639:2, 1643:17, 1644:2, 1646:22, 1648:5, 1649:5, 1654:3, 1655:11, 1655:14, 1655:18, 1656:13, 1656:17, 1657:7, 1659:20, 1662:2, 1662:8, 1664:21, 1665:23, 1667:25, 1668:19, 1676:4, 1680:2, 1684:3, 1686:16, 1686:24, 1696:13, 1696:17, 1696:21, 1701:17, 1701:21, 1701:24, 1734:16, 1736:13

# 7

**70** [1] - 1693:25

**7th** [4] - 1601:18, 1627:7, 1701:6, 1705:14

# 8

**8** [1] - 1699:16

**801** [1] - 1687:20

**816** [1] - 1607:9

**865** [1] - 1607:9

**8:30** [1] - 1718:7

# 9

**9** [2] - 1611:7, 1681:14

**911** [5] - 1615:8, 1615:9, 1698:10, 1698:13, 1698:20

**957** [1] - 1605:18

**9:29** [1] - 1677:12

**9:30** [2] - 1610:2, 1610:3

**9th** [22] - 1610:22, 1670:14, 1671:20, 1671:22, 1673:12, 1677:11, 1681:14, 1681:18, 1683:1, 1685:9, 1709:13, 1712:9, 1712:12, 1712:14, 1712:18, 1719:9, 1719:14, 1719:16, 1719:17, 1729:16, 1729:17, 1732:25

# A

**ability** [4] - 1614:6, 1621:22, 1621:23, 1631:23

**able** [29] - 1620:6, 1622:2, 1622:5, 1622:24, 1622:25, 1623:24, 1624:2, 1624:5, 1624:7, 1624:11, 1633:4, 1633:13, 1636:5, 1645:18, 1649:23, 1653:6, 1657:23, 1671:11, 1671:15, 1672:20, 1681:16, 1689:2, 1703:18, 1719:18, 1733:15, 1742:22, 1742:23

**absence** [4] - 1625:5, 1625:7, 1733:22, 1733:25

**absolutely** [5] - 1599:17, 1650:8, 1653:12, 1656:9, 1721:6

**absurd** [1] - 1705:8

**accept** [6] - 1600:7, 1704:11, 1711:3, 1711:5, 1712:8, 1732:5

**access** [6] - 1671:10, 1671:15, 1671:16, 1671:17, 1671:18, 1751:1

**accidentally** [1] - 1725:6

**accomished** [1] - 1677:2

**accorded** [1] - 1606:14

**according** [2] - 1628:18, 1687:2

**account** [6] - 1710:20, 1710:21, 1710:24, 1711:1, 1733:17

**accounts** [1] - 1711:11

**accuracy** [6] - 1617:25, 1618:1, 1618:3, 1619:1, 1619:4, 1619:5

**accurate** [4] - 1618:2, 1638:22, 1737:14, 1737:16

**accuse** [1] - 1631:13

**accused** [3] - 1647:13, 1647:15, 1659:12

**Act** [5] - 1605:24, 1661:11, 1707:11, 1748:15, 1754:15

**acted** [1] - 1652:16

**action** [1] - 1603:21

**actions** [3] - 1648:24, 1674:15, 1684:14

**activity** [2] - 1615:14, 1685:2

**actor** [2] - 1622:15, 1652:15

**actress** [1] - 1653:6

**acts** [4] - 1671:21, 1674:1, 1674:5, 1691:2

**actual** [1] - 1724:6

**Adams** [1] - 1652:12

**add** [4] - 1622:9, 1747:1, 1753:23, 1754:2

**addition** [1] - 1749:3

**additional** [4] - 1605:5, 1677:1, 1720:15, 1728:22

**address** [3] - 1617:20, 1748:8, 1755:24

**addressed** [1] - 1729:23

**adjourn** [2] - 1748:6, 1757:20

**admissible** [6] - 1601:7, 1604:5, 1606:4, 1606:7, 1606:21, 1688:6

**admission** [1] - 1688:2

**admit** [9] - 1599:19, 1606:23, 1704:9, 1704:10, 1706:23, 1707:2, 1708:7, 1721:9, 1737:18

**admitted** [18] - 1605:22, 1673:21, 1673:22, 1689:24, 1690:1, 1691:14, 1691:15, 1697:14, 1697:15, 1704:13, 1704:15, 1707:1,

1707:4, 1738:6, 1738:8, 1741:1, 1741:6, 1742:3

**Admitted** [1] - 1596:9

**admitting** [1] - 1717:15

**admonishment** [1] - 1598:8

**admonition** [2] - 1625:13, 1753:6

**adopt** [1] - 1605:21

**adopted** [1] - 1687:23

**adoptive** [1] - 1687:21

**advance** [1] - 1607:11

**advice** [5] - 1748:15, 1749:15, 1749:21, 1752:1, 1752:3

**advised** [5] - 1598:13, 1632:22, 1727:9, 1727:12, 1727:22

**advising** [1] - 1754:25

**affected** [1] - 1619:2

**affidavit** [27] - 1640:12, 1640:18, 1641:6, 1642:5, 1642:8, 1645:20, 1646:7, 1646:25, 1647:2, 1647:16, 1647:19, 1660:16, 1663:3, 1663:18, 1665:17, 1665:21, 1665:25, 1666:3, 1692:10, 1692:14, 1693:2, 1693:7, 1735:8, 1745:10, 1756:10, 1756:11, 1756:12

**affidavits** [1] - 1756:6

**affiliated** [1] - 1620:10

**affiliates** [1] - 1619:22

**affiliation** [1] - 1744:8

**affirmatively** [1] - 1750:3

**afield** [1] - 1669:25

**afternoon** [17] - 1602:10, 1602:11, 1610:16, 1610:17, 1613:4, 1613:5, 1640:9, 1642:16, 1672:10, 1699:3, 1699:4, 1710:16, 1717:24, 1717:25, 1729:3, 1729:5

**age** [2] - 1692:18, 1694:11

**agencies** [1] - 1614:24

**agency** [6] - 1615:1, 1615:2, 1631:22, 1660:4, 1660:7, 1669:21

**agent** [16] - 1608:9, 1608:18, 1613:7, 1613:12, 1613:13, 1613:18, 1641:7, 1674:15, 1680:19, 1685:17, 1687:4, 1687:21, 1736:21, 1745:21, 1745:23, 1755:8

**Agent** [34] - 1608:18, 1610:16, 1613:4, 1630:8, 1632:14, 1648:3, 1681:3, 1686:6, 1686:12, 1687:5, 1687:6, 1687:7, 1687:11, 1706:19, 1710:15, 1717:24, 1729:3, 1730:13, 1732:24, 1734:12, 1735:7, 1736:25, 1738:11, 1739:16, 1739:24, 1740:2, 1741:9, 1742:9, 1745:9, 1746:17, 1746:18, 1753:3

**agents** [19] - 1613:9, 1613:10, 1613:24, 1613:25, 1614:2, 1614:4, 1624:14, 1627:23, 1628:6, 1631:23, 1633:20, 1633:24, 1636:17, 1636:18, 1642:12, 1642:23, 1655:25, 1657:8, 1725:20

**ago** [5] - 1622:12, 1680:18, 1750:21, 1754:14

**agree** [90] - 1600:17, 1603:23, 1611:9, 1614:9, 1615:3, 1615:7, 1616:4, 1616:9, 1616:15, 1617:5, 1617:10, 1617:14, 1617:15, 1617:16, 1617:25, 1618:4, 1618:22, 1619:17, 1620:4, 1620:8, 1620:11, 1622:23, 1626:10, 1626:19, 1627:13, 1632:1, 1632:5, 1632:7, 1632:21, 1632:22, 1634:21, 1636:5, 1638:9, 1638:25, 1639:2, 1641:25, 1644:4, 1644:6, 1646:17, 1649:13, 1649:15,

1649:23, 1650:2, 1655:13, 1655:24, 1657:1, 1657:2, 1658:4, 1658:11, 1660:3, 1660:13, 1660:14, 1663:4, 1664:19, 1665:1, 1665:20, 1666:3, 1667:17, 1671:5, 1671:6, 1673:11, 1673:25, 1674:7, 1676:9, 1677:24, 1678:9, 1678:10, 1678:18, 1679:11, 1679:24, 1679:25, 1681:17, 1683:17, 1683:22, 1684:14, 1684:18, 1684:21, 1686:5, 1686:12, 1692:18, 1694:18, 1695:23, 1696:2, 1697:25, 1706:1, 1715:12, 1724:16, 1725:9, 1734:9

**agreed** [1] - 1611:2

**agreement** [1] - 1601:11

**agrees** [1] - 1605:11

**ahead** [10] - 1602:21, 1690:3, 1704:18, 1707:3, 1715:2, 1731:7, 1742:7, 1746:4, 1747:4, 1751:13

**aids** [2] - 1694:2, 1694:3

**Air** [1] - 1709:5

**Alex** [1] - 1695:2

**Alexandria** [1] - 1615:3

**allegations** [2] - 1615:13, 1671:20

**allege** [3] - 1646:25, 1665:1, 1665:21

**alleged** [12] - 1620:16, 1623:2, 1664:20, 1665:6, 1665:12, 1666:4, 1666:10, 1666:22, 1674:6, 1674:16, 1692:11, 1693:5

**allegedly** [1] - 1751:2

**alleging** [2] - 1665:3, 1666:19

**allow** [2] - 1686:9, 1708:22

**allowed** [1] - 1702:6

**allows** [1] - 1692:19

**alluded** [1] - 1651:21

**almost** [2] - 1633:2,

1694:10

**alternate** [1] - 1603:21

**amended** [8] - 1645:21, 1666:2, 1666:3, 1756:10, 1756:11, 1756:15, 1756:20, 1756:22

**Amendment** [8] - 1598:15, 1602:6, 1603:8, 1603:9, 1603:25, 1604:19, 1694:19, 1694:22

**amount** [1] - 1619:2

**analysis** [3] - 1655:7, 1671:13, 1719:19

**analyzed** [2] - 1720:2, 1720:5

**AND** [1] - 1739:8

**Angeles** [1] - 1709:7

**announcement** [1] - 1753:20

**annoyed** [1] - 1695:10

**answer** [17] - 1615:8, 1615:9, 1623:5, 1625:19, 1640:5, 1646:10, 1651:10, 1661:22, 1662:23, 1697:8, 1697:9, 1712:6, 1715:5, 1731:8, 1747:11, 1749:18, 1749:19

**answered** [5] - 1633:1, 1633:3, 1643:22, 1659:1, 1659:4

**answers** [1] - 1659:4

**Antifa** [9] - 1684:13, 1684:19, 1684:20, 1685:2, 1689:16, 1690:10, 1690:22, 1692:1

**anyway** [3] - 1605:3, 1662:19, 1757:25

**apologize** [10] - 1630:14, 1647:3, 1647:21, 1650:22, 1657:17, 1675:23, 1695:17, 1721:3, 1724:11, 1727:24

**app** [7] - 1653:19, 1654:6, 1654:16, 1692:7, 1692:19, 1699:10

**appear** [11] - 1671:2, 1671:3, 1671:8, 1671:11, 1673:11, 1673:14, 1681:20, 1731:22, 1737:14, 1751:22, 1752:1

**appeared** [3] -

1692:11, 1727:6, 1728:8

**apply** [2] - 1684:5, 1685:15

**approach** [9] - 1605:21, 1616:24, 1630:12, 1630:20, 1641:11, 1645:25, 1647:22, 1690:12, 1703:23

**approaching** [1] - 1707:21

**appropriate** [4] - 1688:6, 1725:12, 1728:14, 1746:3

**area** [5] - 1634:4, 1634:17, 1684:22, 1685:2, 1715:8

**argue** [5] - 1600:14, 1600:16, 1749:15, 1749:20, 1755:24

**argument** [4] - 1635:16, 1635:18, 1637:13, 1751:15

**argumentative** [1] - 1649:17

**arguments** [2] - 1684:19, 1684:20

**armored** [1] - 1633:25

**arms** [1] - 1739:3

**Army** [1] - 1708:23

**arrangements/ actions** [1] - 1677:1

**arrest** [26] - 1620:6, 1632:9, 1633:23, 1641:5, 1644:11, 1644:24, 1649:24, 1650:18, 1651:7, 1659:12, 1660:15, 1682:8, 1725:17, 1725:19, 1727:5, 1735:9, 1744:14, 1745:9, 1745:10, 1756:6, 1756:7, 1756:11, 1756:18, 1756:23, 1757:6

**arrested** [11] - 1632:10, 1633:21, 1636:4, 1636:6, 1639:13, 1651:6, 1655:24, 1662:2, 1666:13, 1666:16, 1727:3

**arresting** [2] - 1615:10

**arrests** [2] - 1644:7, 1756:13

**arrived** [1] - 1726:20

**article** [10] - 1626:20, 1626:23, 1627:4, 1627:9, 1627:10,

1627:11, 1627:12, 1627:14, 1627:17, 1627:21

**articulate** [1] - 1734:15

**ASAP** [1] - 1704:19

**ascending** [1] - 1714:16

**aside** [1] - 1612:17

**assert** [1] - 1750:8

**asserted** [1] - 1751:25

**assist** [1] - 1737:25

**associates** [1] - 1692:20

**assume** [1] - 1608:13

**attached** [1] - 1722:2

**attachment** [1] - 1691:8

**attack** [5] - 1624:23, 1626:1, 1626:8, 1626:12, 1665:2

**attacking** [2] - 1665:12, 1691:21

**attempt** [1] - 1691:1

**attention** [12] - 1645:6, 1677:21, 1678:3, 1678:4, 1678:7, 1706:19, 1707:7, 1708:4, 1729:6, 1729:15, 1746:7, 1746:13

**attorney** [1] - 1727:11

**Attorney's** [4] - 1613:19, 1613:20, 1616:10, 1727:16

**audible** [1] - 1719:6

**audio** [4] - 1602:5, 1603:1, 1716:19, 1716:25

**audio-visual** [2] - 1716:19, 1716:25

**AUSA** [1] - 1748:22

**authentic** [2] - 1671:3, 1717:4

**authenticate** [1] - 1602:7

**authentication** [1] - 1602:17

**authenticity** [5] - 1599:6, 1599:9, 1600:2, 1602:25, 1603:19

**authorities** [1] - 1709:4

**authority** [1] - 1633:5

**authorize** [1] - 1629:19

**automated** [1] - 1702:13

**automatic** [2] -

1763

1634:7, 1702:12
**automatically** [3] -
1699:11, 1699:15,
1699:20
**available** [2] -
1676:21, 1726:21
**avoid** [3] - 1658:17,
1658:18, 1746:13
**avoided** [2] - 1659:3,
1659:5
**awaiting** [1] - 1705:6
**aware** [26] - 1601:22,
1607:6, 1612:1,
1612:3, 1612:5,
1612:6, 1628:8,
1628:10, 1648:4,
1649:7, 1651:25,
1669:2, 1669:6,
1687:10, 1697:1,
1697:20, 1709:22,
1709:24, 1710:19,
1711:1, 1715:24,
1719:11, 1726:5,
1735:19, 1750:13,
1750:16

## B

**backtrack** [2] -
1674:24, 1676:7
**balance** [1] - 1599:25
**ball** [1] - 1660:23
**Ballston** [1] - 1659:20
**bar** [1] - 1615:11
**Barbara** [2] - 1653:7,
1653:11
**barbwire** [2] - 1635:3,
1635:5
**bare** [1] - 1618:22
**barn** [1] - 1633:5
**based** [19] - 1608:24,
1620:5, 1624:13,
1624:21, 1625:22,
1625:23, 1629:22,
1637:17, 1638:6,
1649:11, 1650:3,
1663:3, 1731:13,
1744:3, 1745:14,
1745:15, 1745:16,
1748:22
**bases** [1] - 1631:22
**basin** [1] - 1742:12
**basis** [2] - 1662:25,
1749:2
**bass** [1] - 1739:4
**baton** [1] - 1724:25
**battering** [1] - 1634:1
**beanbags** [1] - 1725:2
**became** [1] - 1628:10
**becoming** [1] -

1658:16
**bedrolls** [1] - 1676:25
**began** [3] - 1664:21,
1680:13, 1714:14
**begin** [2] - 1729:6,
1750:11
**beginning** [1] -
1714:13
**begins** [1] - 1730:13
**behalf** [5] - 1599:18,
1613:1, 1698:25,
1710:10, 1733:11
**behind** [2] - 1721:4,
1752:6
**belief** [1] - 1705:23
**Bench** [3] - 1625:3,
1671:25, 1687:19
**Bennie** [1] - 1693:19
**best** [7] - 1617:10,
1617:16, 1618:2,
1618:21, 1703:15,
1703:17, 1755:1
**better** [1] - 1618:4
**between** [19] -
1611:24, 1623:1,
1623:15, 1623:22,
1633:20, 1667:20,
1670:13, 1671:18,
1675:11, 1675:14,
1688:16, 1695:7,
1697:2, 1705:13,
1711:19, 1729:16,
1732:7, 1735:3,
1735:13
**beyond** [3] - 1618:17,
1714:25, 1742:5
**Biden** [2] - 1731:18,
1732:5
**Big** [1] - 1622:14
**big** [2] - 1660:10,
1676:19
**bigotry** [1] - 1723:16
**birthday** [2] - 1712:17,
1712:18
**bit** [13] - 1598:9,
1607:22, 1608:7,
1608:8, 1674:25,
1715:1, 1716:24,
1727:12, 1734:25,
1739:7, 1753:15,
1754:21, 1757:2
**blessed** [2] - 1631:22,
1631:23
**BLM** [4] - 1684:22,
1684:23, 1684:25,
1685:1
**blower** [1] - 1705:1
**blown** [2] - 1631:24,
1737:11
**blown-up** [1] -

1737:11
**Blue** [1] - 1739:8
**board** [1] - 1710:3
**boarded** [1] - 1682:16
**Boat** [1] - 1743:12
**boat** [6] - 1736:17,
1738:21, 1739:4,
1739:14, 1739:18,
1743:19
**boats** [1] - 1739:9
**body** [1] - 1732:11
**borrow** [1] - 1713:13
**bottom** [4] - 1619:8,
1623:24, 1639:7,
1653:10
**bounds** [1] - 1725:12
**boyfriend** [1] - 1726:3
**bravo** [1] - 1719:1
**breach** [4] - 1624:23,
1626:1, 1665:23,
1696:17
**breached** [2] -
1648:19, 1648:21
**break** [7] - 1598:12,
1609:21, 1610:4,
1672:10, 1673:6,
1746:3, 1746:5
**Brian** [1] - 1602:1
**Bride** [1] - 1645:7
**bridges** [2] - 1742:16,
1742:17
**brief** [2] - 1687:9,
1731:8
**briefly** [1] - 1744:13
**BRIGHT** [8] - 1752:23,
1753:24, 1754:4,
1754:9, 1754:12,
1754:21, 1754:24,
1755:5
**bright** [1] - 1753:23
**bring** [17] - 1602:12,
1602:14, 1602:18,
1604:2, 1668:7,
1668:17, 1668:24,
1675:23, 1688:7,
1696:19, 1721:16,
1730:6, 1736:21,
1739:23, 1740:12,
1745:20
**bringing** [1] - 1691:25,
1730:10
**broad** [4] - 1613:13,
1623:6, 1708:20,
1757:10
**broadcast** [1] - 1606:3
**broadly** [2] - 1709:2,
1729:23
**broke** [1] - 1670:17
**Brother** [1] - 1622:14
**brought** [11] -

1615:14, 1645:5,
1668:14, 1669:10,
1678:10, 1678:19,
1678:20, 1678:21,
1703:16, 1715:25,
1733:12
**build** [2] - 1615:21,
1615:22
**Building** [5] - 1632:6,
1667:20, 1667:21,
1679:3, 1701:24
**building** [7] - 1667:18,
1667:19, 1676:25,
1682:16, 1683:10,
1683:13, 1745:11
**buildings** [2] -
1667:22, 1682:25
**bulk** [1] - 1684:21
**burden** [1] - 1600:4
**Bureau** [1] - 1614:16
**Burgundy** [1] -
1678:23
**bus** [1] - 1745:5
**business** [5] -
1605:15, 1606:1,
1606:4, 1606:13,
1606:14
**Business** [1] -
1605:23
**buy** [1] - 1739:5

## C

**CAG** [2] - 1654:13,
1676:12
**Cald** [1] - 1735:7
**Caldwell** [207] -
1596:13, 1596:14,
1596:14, 1596:15,
1596:15, 1596:16,
1596:16, 1596:17,
1596:17, 1596:18,
1596:18, 1596:19,
1596:19, 1596:20,
1596:20, 1596:21,
1596:21, 1596:22,
1596:22, 1596:23,
1596:23, 1596:24,
1596:24, 1596:25,
1596:25, 1597:3,
1597:3, 1597:4,
1597:4, 1597:5,
1597:5, 1597:6,
1597:6, 1597:7,
1597:7, 1597:8,
1597:8, 1597:9,
1597:9, 1597:10,
1597:10, 1609:11,
1613:1, 1620:5,
1620:9, 1620:14,
1621:8, 1622:1,

1623:25, 1624:23,
1626:1, 1628:23,
1629:1, 1629:4,
1629:23, 1629:25,
1630:16, 1631:5,
1631:14, 1632:2,
1632:5, 1632:10,
1632:13, 1632:22,
1633:22, 1634:11,
1635:8, 1636:4,
1637:15, 1638:3,
1639:1, 1639:13,
1641:5, 1641:10,
1642:1, 1642:17,
1643:7, 1643:11,
1643:16, 1644:1,
1644:16, 1644:17,
1644:25, 1645:4,
1646:14, 1646:18,
1647:13, 1648:13,
1648:17, 1649:1,
1649:5, 1649:7,
1649:24, 1650:3,
1650:4, 1651:2,
1651:6, 1651:7,
1651:18, 1651:23,
1651:25, 1652:3,
1652:22, 1653:6,
1653:13, 1654:12,
1655:10, 1655:18,
1655:22, 1655:24,
1655:25, 1656:16,
1656:22, 1657:9,
1657:12, 1658:6,
1658:23, 1659:11,
1660:5, 1660:17,
1661:7, 1661:17,
1661:20, 1663:3,
1663:15, 1663:25,
1664:6, 1664:21,
1664:23, 1665:6,
1665:22, 1666:4,
1666:9, 1666:12,
1666:16, 1666:22,
1667:6, 1670:14,
1671:21, 1673:12,
1673:17, 1673:22,
1674:19, 1674:25,
1675:1, 1675:8,
1675:12, 1675:14,
1676:12, 1677:15,
1678:11, 1678:12,
1679:1, 1682:2,
1682:22, 1683:23,
1683:25, 1684:12,
1685:8, 1685:11,
1685:12, 1685:23,
1686:23, 1688:16,
1689:3, 1689:14,
1689:23, 1690:8,
1691:7, 1691:11,

1691:14, 1691:15, 1692:1, 1692:11, 1693:3, 1693:11, 1695:6, 1695:9, 1696:9, 1696:18, 1697:2, 1697:13, 1697:15, 1697:19, 1711:14, 1733:11, 1734:12, 1734:15, 1734:23, 1735:2, 1735:13, 1735:20, 1735:22, 1736:2, 1736:4, 1736:10, 1736:12, 1738:13, 1741:20, 1743:25, 1744:8, 1745:11, 1755:12, 1755:20, 1756:14, 1757:9
**Caldwell's** [32] - 1620:6, 1626:14, 1635:18, 1635:20, 1635:23, 1648:9, 1648:23, 1654:16, 1660:23, 1670:23, 1671:10, 1671:14, 1671:17, 1671:18, 1681:10, 1683:8, 1688:24, 1696:24, 1733:17, 1735:9, 1736:16, 1737:6, 1737:15, 1738:14, 1739:17, 1743:17, 1743:18, 1744:14, 1745:9, 1745:16, 1755:10, 1757:12
**California** [1] - 1604:18
**calm** [1] - 1731:2
**Camelot** [2] - 1682:16, 1682:18
**camera** [1] - 1603:9
**cannot** [2] - 1619:2, 1622:15
**capacity** [1] - 1721:11
**Capitol** [76] - 1598:17, 1624:24, 1626:2, 1626:8, 1626:12, 1626:22, 1629:24, 1631:7, 1632:6, 1637:11, 1637:16, 1638:5, 1638:11, 1638:16, 1638:23, 1639:2, 1639:5, 1639:6, 1639:7, 1644:20, 1646:15, 1646:22, 1646:24, 1647:1, 1647:4, 1647:14, 1647:25, 1648:4, 1648:11, 1648:17, 1649:8,

1649:11, 1657:22, 1663:16, 1663:25, 1664:2, 1664:5, 1664:8, 1665:2, 1665:13, 1665:23, 1666:7, 1667:7, 1667:10, 1667:11, 1667:14, 1667:20, 1667:21, 1668:1, 1668:25, 1679:3, 1679:6, 1679:8, 1679:10, 1680:2, 1683:5, 1683:10, 1683:13, 1691:21, 1694:13, 1694:14, 1694:16, 1696:17, 1701:24, 1714:1, 1714:3, 1714:14, 1715:8, 1715:9, 1715:25, 1734:16, 1734:23, 1735:3, 1735:5, 1735:6
**capitol** [1] - 1648:6
**capitols** [2] - 1644:18
**care** [2] - 1615:25, 1616:21
**Carolina** [4] - 1712:1, 1735:23, 1739:19, 1743:9
**carried** [2] - 1668:20, 1668:21
**carry** [8] - 1634:9, 1695:20, 1696:3, 1697:3, 1697:18, 1697:21, 1698:2, 1698:5
**carrying** [1] - 1696:4
**CART** [3] - 1655:7, 1687:2, 1751:7
**case** [45] - 1602:5, 1605:2, 1605:16, 1607:23, 1613:7, 1613:9, 1613:10, 1613:12, 1613:13, 1613:18, 1613:24, 1614:9, 1614:10, 1615:21, 1615:25, 1616:10, 1616:22, 1622:4, 1622:22, 1622:25, 1629:21, 1629:22, 1637:3, 1644:7, 1660:10, 1660:15, 1662:2, 1666:23, 1674:24, 1675:2, 1677:1, 1678:10, 1680:13, 1680:14, 1680:18, 1680:19, 1700:6, 1705:3, 1711:22, 1733:13, 1746:12,

1746:14, 1749:16, 1749:25
**cases** [10] - 1598:20, 1599:1, 1607:9, 1607:10, 1615:23, 1616:4, 1616:9, 1617:3, 1678:24, 1680:21
**casting** [1] - 1631:12
**castle** [2] - 1645:1, 1645:9
**casts** [1] - 1626:10
**catch** [4] - 1732:16, 1751:5, 1751:7, 1751:8
**caught** [4] - 1677:21, 1678:3, 1678:4, 1678:6
**caused** [2] - 1702:14, 1702:17
**celebrating** [1] - 1758:3
**cell** [9] - 1621:22, 1633:9, 1655:19, 1667:15, 1670:23, 1681:10, 1681:13, 1682:5, 1740:4
**Cellebrite** [5] - 1671:13, 1671:18, 1702:11, 1703:9, 1751:7
**certain** [1] - 1643:13
**certainly** [31] - 1599:11, 1619:9, 1621:8, 1623:20, 1627:5, 1629:4, 1635:7, 1635:9, 1647:13, 1652:10, 1652:22, 1658:11, 1660:13, 1660:14, 1669:7, 1674:15, 1675:7, 1678:16, 1681:21, 1681:25, 1683:4, 1683:14, 1685:1, 1698:5, 1701:7, 1701:19, 1703:20, 1723:12, 1724:13, 1747:14, 1757:5
**certification** [5] - 1606:17, 1606:25, 1611:18, 1679:17, 1679:21
**cetera** [2] - 1606:20, 1747:25
**chained** [1] - 1636:10
**chance** [8] - 1641:16, 1673:9, 1685:1, 1688:23, 1688:24, 1691:18, 1691:19,

1722:13
**change** [2] - 1749:14, 1749:24
**changed** [1] - 1629:1
**characterization** [1] - 1658:4
**characterize** [2] - 1653:21, 1692:25
**charge** [20] - 1612:17, 1617:13, 1617:18, 1618:2, 1618:20, 1618:22, 1619:9, 1619:11, 1647:6, 1659:24, 1662:8, 1663:8, 1663:11, 1663:14, 1663:20, 1663:22, 1663:23, 1663:24, 1664:1, 1664:7
**charged** [18] - 1637:3, 1637:5, 1639:13, 1644:5, 1646:18, 1647:4, 1651:14, 1661:21, 1661:22, 1662:6, 1662:12, 1663:4, 1663:15, 1664:6, 1665:8, 1665:9, 1711:15
**charges** [6] - 1612:11, 1612:14, 1616:11, 1616:14, 1661:23, 1661:25
**charging** [7] - 1618:3, 1639:14, 1642:17, 1659:22, 1662:17, 1662:24, 1665:3
**chase** [1] - 1679:1
**chat** [28] - 1611:4, 1623:22, 1661:7, 1700:19, 1700:22, 1701:1, 1701:25, 1705:13, 1711:21, 1711:22, 1712:1, 1712:2, 1712:9, 1712:10, 1729:12, 1730:14, 1732:4, 1740:6, 1740:8, 1740:9, 1741:9, 1741:12, 1741:14, 1741:16, 1741:18, 1741:22, 1743:11, 1751:5
**chats** [1] - 1700:16
**check** [3] - 1703:15, 1712:21, 1722:16
**checked** [1] - 1631:19
**checking** [1] - 1676:19
**choice** [1] - 1638:19
**chomping** [1] - 1608:7

**Chomping** [1] - 1608:7
**chosen** [1] - 1599:6
**Chris** [2] - 1706:22, 1707:8
**chronology** [1] - 1756:17
**chuckle** [1] - 1753:4
**circle** [4] - 1676:25, 1692:12, 1692:23, 1693:4
**circuit** [3] - 1605:16, 1607:1, 1750:10
**circuit's** [1] - 1607:6
**circuits** [1] - 1605:22
**circumstances** [2] - 1629:14, 1738:2
**citizen** [1] - 1629:15
**city** [1] - 1676:19
**civil** [1] - 1732:10
**civilian** [1] - 1723:6
**civilians** [1] - 1723:9
**claimed** [2] - 1624:22, 1735:4
**claiming** [1] - 1684:13
**clarification** [1] - 1707:10
**clarify** [2] - 1601:20, 1725:11
**clear** [17] - 1606:16, 1607:14, 1610:10, 1619:6, 1621:20, 1622:10, 1637:3, 1642:11, 1650:22, 1653:12, 1657:6, 1688:1, 1694:14, 1718:2, 1724:4, 1726:3, 1750:24
**clearly** [6] - 1606:21, 1620:10, 1625:11, 1663:25, 1698:4, 1706:3
**client** [4] - 1599:18, 1747:6, 1751:24
**client's** [1] - 1600:1
**clients** [3] - 1599:7, 1599:16, 1608:21
**climate** [1] - 1676:24
**clips** [1] - 1601:6
**close** [2] - 1608:25, 1744:25
**closed** [3] - 1730:22, 1742:17, 1742:18
**closely** [2] - 1613:18, 1613:20
**club** [2] - 1682:18, 1684:7
**co** [4] - 1600:9, 1628:6, 1665:5, 1694:16

1765

co-conspirators [2] - 1665:5, 1694:16
co-counsel [1] - 1600:9
co-workers [1] - 1628:6
code [2] - 1703:3, 1703:5
coercive [2] - 1658:17, 1658:18
coffee [1] - 1739:6
collaborate [1] - 1614:1
collar [1] - 1616:22
colleague [4] - 1622:10, 1658:5, 1686:6, 1686:12
colleagues [3] - 1619:15, 1654:8, 1663:7
College [2] - 1679:16, 1679:21
colonel [1] - 1709:5
Columbia [1] - 1668:17
Columbus [1] - 1610:6
comedic [1] - 1753:11
coming [4] - 1625:12, 1656:22, 1676:24, 1714:20
Commander [5] - 1628:20, 1642:13, 1643:4, 1643:6, 1643:20
commander [5] - 1649:25, 1650:5, 1650:12, 1656:1, 1659:13
commanding [1] - 1656:12
comment [1] - 1647:24
commentary [1] - 1712:15
comments [1] - 1712:10
commit [3] - 1691:1, 1691:2
committed [2] - 1736:5, 1755:12
communicate [2] - 1654:6, 1743:18
communicated [2] - 1711:15, 1754:21
communicating [1] - 1654:2
communication [3] - 1611:15, 1625:24, 1681:22, 1751:18,

1751:19, 1751:23, 1751:24
communications [9] - 1623:22, 1624:9, 1675:11, 1675:14, 1711:17, 1711:19, 1718:14, 1718:16, 1722:14
compare [1] - 1671:11
compared [1] - 1671:12
compilation [1] - 1732:18
complaining [1] - 1606:10
complaint [15] - 1639:14, 1639:17, 1639:22, 1641:4, 1642:1, 1642:4, 1642:17, 1642:21, 1642:22, 1645:21, 1663:19, 1756:16, 1756:20, 1756:22
completely [1] - 1601:23
complicate [1] - 1708:19
complimenting [1] - 1635:17
computer [6] - 1633:8, 1648:9, 1688:24, 1688:25, 1689:4, 1703:3
computers [2] - 1621:21, 1667:15
conceal [2] - 1698:2, 1698:8
concealed [7] - 1696:4, 1696:19, 1697:3, 1697:18, 1697:20, 1697:25, 1698:19
concept [3] - 1599:2, 1718:25, 1723:16
concern [1] - 1598:14
concerned [1] - 1684:13
concerns [1] - 1604:16
conclude [2] - 1603:9, 1617:6
concluded [1] - 1758:6
conclusion [3] - 1623:19, 1638:13, 1699:9
conduct [4] - 1663:24, 1669:18, 1719:22,

1757:8
conference [3] - 1625:3, 1671:25, 1687:19
confirm [9] - 1598:24, 1648:23, 1657:11, 1657:23, 1670:22, 1671:1, 1681:16, 1686:23, 1686:25
confirmation [1] - 1700:7
confirmed [1] - 1598:11
confront [1] - 1690:22
Congress [1] - 1708:25
connected [1] - 1619:21
connection [2] - 1624:17, 1675:2
Connie [1] - 1694:8
consent [4] - 1624:10, 1633:4, 1633:13, 1683:18
consented [1] - 1632:20
consider [4] - 1677:6, 1715:19, 1716:10, 1744:4
consideration [2] - 1644:21, 1644:23
considered [4] - 1612:16, 1613:7, 1613:14, 1727:16
considers [1] - 1684:8
consist [1] - 1727:19
consistent [2] - 1703:13, 1750:2
conspiracy [20] - 1612:16, 1612:17, 1623:2, 1623:3, 1662:6, 1662:13, 1663:4, 1664:24, 1665:7, 1673:25, 1674:5, 1674:6, 1674:15, 1674:21, 1675:4, 1675:7, 1693:5, 1693:7, 1700:18
conspirator [1] - 1674:6
conspirators [4] - 1665:5, 1674:16, 1693:5, 1694:16
constitute [1] - 1701:10
Constitution [2] - 1694:25, 1732:1
contact [3] - 1614:10, 1695:10, 1744:9

contacts [3] - 1695:6, 1695:7, 1738:14
contained [1] - 1703:13
contempt [2] - 1603:14, 1604:21
content [1] - 1606:21
context [7] - 1652:4, 1652:6, 1652:8, 1653:16, 1720:18, 1731:13, 1752:10
continue [5] - 1636:23, 1644:18, 1731:25, 1738:25, 1742:14
continued [2] - 1597:1, 1657:13
continues [3] - 1672:5, 1731:23, 1749:13
continuing [4] - 1596:5, 1610:14, 1644:17, 1660:1
control [1] - 1708:22
controlled [1] - 1676:24
controversy [1] - 1600:5
convenience [1] - 1677:1
conversation [4] - 1658:13, 1708:11, 1721:2, 1750:10
conversations [3] - 1658:16, 1718:22, 1724:5
conveyed [1] - 1606:21
convince [2] - 1723:3, 1723:20
cooperative [2] - 1632:23, 1632:25
coordinate [1] - 1757:22
coordinated [1] - 1739:17
coordinating [2] - 1659:16, 1665:22
coordination [1] - 1650:10
copies [1] - 1675:20
copy [7] - 1621:24, 1721:16, 1737:14, 1748:20, 1748:25, 1749:1, 1749:6
corner [1] - 1742:12
correct [199] - 1600:24, 1611:1, 1611:17, 1611:19, 1612:10, 1613:8,

1613:19, 1613:23, 1614:7, 1614:8, 1614:11, 1614:13, 1614:17, 1614:18, 1614:23, 1615:8, 1615:11, 1615:15, 1615:21, 1616:1, 1618:14, 1618:16, 1618:18, 1618:19, 1619:24, 1619:25, 1620:7, 1621:3, 1621:9, 1621:15, 1621:17, 1621:18, 1622:2, 1622:7, 1622:16, 1623:3, 1623:13, 1623:16, 1624:3, 1624:9, 1624:19, 1626:4, 1626:8, 1626:9, 1626:17, 1626:18, 1627:3, 1627:8, 1627:16, 1627:24, 1628:2, 1628:3, 1628:7, 1628:13, 1628:21, 1628:24, 1629:20, 1630:1, 1631:3, 1631:16, 1631:25, 1632:14, 1632:15, 1632:24, 1633:2, 1633:7, 1633:14, 1634:12, 1635:13, 1635:19, 1636:19, 1636:20, 1637:9, 1639:4, 1639:9, 1639:16, 1640:8, 1641:5, 1642:3, 1642:6, 1642:15, 1643:7, 1643:8, 1643:20, 1644:3, 1645:14, 1645:22, 1645:23, 1646:15, 1646:16, 1646:19, 1648:22, 1648:25, 1649:2, 1649:6, 1649:25, 1650:1, 1650:5, 1650:18, 1650:25, 1651:8, 1652:1, 1652:14, 1653:2, 1653:25, 1654:7, 1654:15, 1654:19, 1655:12, 1655:16, 1659:2, 1660:20, 1661:8, 1661:11, 1662:14, 1663:5, 1663:6, 1664:11, 1665:14, 1666:17, 1666:23, 1667:8, 1667:12, 1667:15, 1669:1, 1669:7, 1669:16, 1670:19,

1673:7, 1674:1,
1674:16, 1674:21,
1675:8, 1677:16,
1677:18, 1678:1,
1678:8, 1679:4,
1679:13, 1679:17,
1679:18, 1679:24,
1680:3, 1681:6,
1681:11, 1682:2,
1682:7, 1682:9,
1683:2, 1683:11,
1686:24, 1687:8,
1688:21, 1689:5,
1689:13, 1691:9,
1692:1, 1693:6,
1693:12, 1693:13,
1693:20, 1694:6,
1694:10, 1694:19,
1695:21, 1696:13,
1696:14, 1698:11,
1699:5, 1701:7,
1702:5, 1703:10,
1703:22, 1709:16,
1710:5, 1712:11,
1714:14, 1717:15,
1718:16, 1718:24,
1719:13, 1719:24,
1723:18, 1724:2,
1725:3, 1725:17,
1725:22, 1726:4,
1727:7, 1730:15,
1734:19, 1736:15,
1741:3, 1741:11,
1744:1, 1750:12,
1751:4, 1756:4
**correctly** [2] -
1676:12, 1756:21
**correspondence** [3] -
1624:3, 1624:7,
1648:9
**corroborate** [1] -
1657:24
**corroborated** [1] -
1658:2
**corroboration** [1] -
1657:14
**corrupt** [1] - 1677:4
**costs** [4] - 1599:21,
1620:19, 1620:23,
1747:22
**counsel** [10] - 1600:9,
1600:19, 1603:18,
1605:5, 1608:17,
1649:14, 1721:9,
1748:15, 1749:15,
1749:21
**counsel's** [1] -
1599:15
**counter** [1] - 1754:16
**country** [3] - 1619:21,

1624:16, 1694:19
**couple** [9] - 1605:13,
1622:11, 1636:15,
1636:23, 1637:12,
1644:25, 1648:18,
1653:20, 1667:9
**course** [13] - 1598:15,
1603:15, 1603:21,
1605:23, 1605:25,
1606:1, 1606:12,
1619:11, 1619:18,
1700:6, 1708:16,
1729:9, 1753:20
**court** [19] - 1605:21,
1606:6, 1618:17,
1625:6, 1625:7,
1625:16, 1639:18,
1658:21, 1663:8,
1665:4, 1672:8,
1684:10, 1688:11,
1703:17, 1708:11,
1708:12, 1747:17,
1754:2, 1757:17
**COURT** [212] - 1598:5,
1598:22, 1599:13,
1600:16, 1600:22,
1600:25, 1601:9,
1601:15, 1601:25,
1602:8, 1602:11,
1602:19, 1602:22,
1602:24, 1603:4,
1603:7, 1603:13,
1604:7, 1604:15,
1605:1, 1605:6,
1605:9, 1605:13,
1607:18, 1607:21,
1607:25, 1608:7,
1608:12, 1608:20,
1609:2, 1609:17,
1609:19, 1611:20,
1612:24, 1623:5,
1625:1, 1625:4,
1625:15, 1625:17,
1630:13, 1630:15,
1630:17, 1630:21,
1631:1, 1635:25,
1636:2, 1637:20,
1637:25, 1640:5,
1640:11, 1640:15,
1640:19, 1640:22,
1640:24, 1641:12,
1641:18, 1641:21,
1643:22, 1646:1,
1647:8, 1649:18,
1655:2, 1659:8,
1659:15, 1660:24,
1662:4, 1662:10,
1662:16, 1662:19,
1662:21, 1662:24,
1664:12, 1664:17,
1669:12, 1669:25,

1670:4, 1671:24,
1672:7, 1672:9,
1672:14, 1672:19,
1672:24, 1673:19,
1673:21, 1674:10,
1674:13, 1680:23,
1681:1, 1683:20,
1684:16, 1685:5,
1686:9, 1686:17,
1687:12, 1687:14,
1687:18, 1688:4,
1688:10, 1689:21,
1689:23, 1690:2,
1690:6, 1691:14,
1694:21, 1695:18,
1697:5, 1697:7,
1697:14, 1698:24,
1704:1, 1704:9,
1704:11, 1704:13,
1704:18, 1704:21,
1704:23, 1706:11,
1706:15, 1706:24,
1707:1, 1707:23,
1707:25, 1708:9,
1708:13, 1710:9,
1711:8, 1713:17,
1713:22, 1714:2,
1714:5, 1714:8,
1714:10, 1715:1,
1715:22, 1716:4,
1716:18, 1717:8,
1717:10, 1717:14,
1717:17, 1717:19,
1721:15, 1721:21,
1721:24, 1726:10,
1728:23, 1731:6,
1731:7, 1732:15,
1732:21, 1734:9,
1737:19, 1737:24,
1738:3, 1738:6,
1740:19, 1740:21,
1740:23, 1741:3,
1742:3, 1742:7,
1744:16, 1744:22,
1745:2, 1745:6,
1746:4, 1746:17,
1746:23, 1747:4,
1747:11, 1747:13,
1747:19, 1747:23,
1748:3, 1748:5,
1748:10, 1749:5,
1749:8, 1749:12,
1749:22, 1749:25,
1750:7, 1750:22,
1751:9, 1751:17,
1752:8, 1752:10,
1752:16, 1752:21,
1752:24, 1753:9,
1753:13, 1753:17,
1754:1, 1754:5,
1754:7, 1754:10,

1754:20, 1754:23,
1755:2, 1755:6,
1755:21, 1756:2,
1756:5, 1756:9,
1756:17, 1756:25,
1757:4, 1757:15,
1757:19, 1757:24,
1758:1
**Court** [15] - 1598:8,
1598:9, 1600:14,
1604:1, 1605:18,
1608:15, 1672:3,
1710:12, 1717:12,
1748:22, 1748:25,
1749:2, 1754:15,
1754:25, 1755:24
**Court's** [19] - 1630:6,
1638:1, 1639:25,
1649:21, 1661:14,
1667:1, 1670:9,
1682:13, 1686:20,
1690:14, 1692:4,
1693:15, 1695:13,
1697:10, 1710:6,
1728:20, 1730:8,
1753:6
**courtroom** [1] -
1752:13
**COURTROOM** [3] -
1647:20, 1752:20,
1754:6
**courts** [1] - 1708:25
**Couy** [1] - 1599:1
**cover** [3] - 1608:25,
1691:6, 1747:10
**covered** [2] - 1722:23,
1727:20
**Cramer** [4] - 1747:14,
1747:21, 1754:2,
1754:11
**create** [3] - 1631:11,
1678:24, 1737:11
**created** [7] - 1598:20,
1702:3, 1702:6,
1703:1, 1710:1,
1710:4, 1737:11
**creator** [1] - 1598:13
**credit** [1] - 1753:11
**crime** [5] - 1606:8,
1606:11, 1617:11,
1618:15, 1637:8
**crimes** [1] - 1642:18
**criminal** [16] -
1615:13, 1618:1,
1639:14, 1639:17,
1639:22, 1641:4,
1642:1, 1642:4,
1642:16, 1645:20,
1645:21, 1663:19,
1690:22, 1696:3,

1696:7, 1712:21
**CRISP** [32] - 1602:10,
1602:12, 1602:20,
1602:23, 1603:3,
1603:6, 1603:12,
1603:20, 1604:14,
1604:25, 1605:4,
1605:7, 1605:11,
1717:21, 1717:23,
1721:8, 1721:18,
1721:22, 1722:3,
1722:6, 1722:20,
1722:21, 1726:12,
1728:20, 1734:7,
1747:3, 1747:5,
1747:12, 1747:18,
1747:21, 1748:2,
1748:4
**crisp** [5] - 1601:14,
1717:20, 1717:25,
1728:23, 1747:1
**Crisp** [2] - 1601:16,
1601:19
**Crisp...................** [1] -
1596:7
**CROSS** [5] - 1610:14,
1613:2, 1699:1,
1710:13, 1717:22
**Cross** [5] - 1596:5,
1596:5, 1596:6,
1596:6, 1596:7
**cross** [11] - 1608:5,
1608:17, 1608:25,
1609:9, 1734:8,
1744:15, 1753:2,
1753:10, 1755:8,
1755:23, 1757:3
**CROSS-
EXAMINATION** [5] -
1610:14, 1613:2,
1699:1, 1710:13,
1717:22
**cross-examination** [4]
- 1608:5, 1744:15,
1753:2, 1753:10
**Cross-Examination**
[5] - 1596:5, 1596:5,
1596:6, 1596:6,
1596:7
**cross-examining** [1] -
1608:17
**crossed** [1] - 1742:6
**crossing** [1] - 1738:22
**Crowl** [8] - 1626:21,
1627:2, 1627:15,
1627:24, 1628:1,
1645:12, 1665:9,
1666:5
**crusty** [1] - 1677:6
**crystal** [1] - 1660:23

**culture** [1] - 1723:13
**custody** [4] - 1660:17, 1660:18, 1660:20, 1727:4
**cut** [2] - 1679:1, 1702:14
**cutting** [1] - 1676:22, 1744:24

# D

**D.C** [25] - 1606:2, 1611:8, 1611:24, 1612:15, 1615:3, 1624:17, 1626:7, 1668:8, 1675:10, 1676:5, 1677:17, 1678:13, 1679:2, 1679:9, 1680:6, 1682:19, 1683:9, 1684:24, 1685:9, 1685:23, 1685:24, 1696:19, 1701:16, 1701:20, 1739:10
**dailies** [1] - 1747:5
**daily** [1] - 1747:16
**damage** [2] - 1638:16, 1639:3
**damaged** [1] - 1639:8
**damn** [1] - 1708:17
**danger** [3] - 1616:16, 1617:20, 1617:21
**dangerousness** [1] - 1755:10
**data** [1] - 1703:8
**date** [13] - 1606:8, 1606:20, 1611:18, 1612:2, 1626:23, 1632:10, 1632:12, 1724:8, 1732:1, 1732:12, 1733:5, 1737:8, 1737:9
**dates** [2] - 1612:3, 1623:11
**David** [1] - 1687:5
**days** [6] - 1610:2, 1610:9, 1623:15, 1628:4, 1750:21
**DC** [6] - 1705:6, 1705:9, 1740:6, 1741:10, 1743:11, 1743:12
**DC's** [1] - 1705:8
**deal** [3] - 1618:9, 1618:10, 1618:17
**dealing** [2] - 1706:9, 1706:14
**December** [9] - 1611:25, 1612:1, 1612:3, 1612:4,

1612:5, 1612:15, 1686:15, 1748:13
**deception** [2] - 1728:4, 1728:6
**decide** [4] - 1604:20, 1678:20, 1709:3, 1750:19
**decided** [3] - 1628:19, 1664:5, 1753:3
**decides** [1] - 1708:24
**decision** [1] - 1617:13
**declares** [1] - 1731:18
**declaring** [1] - 1708:21
**declassification** [1] - 1677:2
**dedicated** [2] - 1704:20, 1704:23
**deep** [1] - 1755:9
**defeat** [1] - 1731:25
**defendant** [3] - 1662:1, 1662:8, 1739:18
**Defendant** [56] - 1596:13, 1596:14, 1596:14, 1596:15, 1596:15, 1596:16, 1596:16, 1596:17, 1596:17, 1596:18, 1596:18, 1596:19, 1596:19, 1596:20, 1596:20, 1596:21, 1596:21, 1596:22, 1596:22, 1596:23, 1596:23, 1596:24, 1596:24, 1596:25, 1596:25, 1597:3, 1597:3, 1597:4, 1597:4, 1597:5, 1597:5, 1597:6, 1597:6, 1597:7, 1597:7, 1597:8, 1597:8, 1597:9, 1597:9, 1597:10, 1597:10, 1597:12, 1597:12, 1673:22, 1691:15, 1697:15, 1704:15, 1707:4, 1737:6, 1737:15, 1738:13, 1740:4, 1741:12, 1741:14, 1741:16, 1741:18
**defendants** [8] - 1622:4, 1622:5, 1624:1, 1628:2, 1668:16, 1684:12, 1747:15, 1756:21
**defendants'** [2] - 1667:15, 1684:18
**defense** [13] -

1599:15, 1600:19, 1603:17, 1603:22, 1608:17, 1649:14, 1654:23, 1697:2, 1747:20, 1748:14, 1749:16, 1749:21, 1750:8
**Defense** [1] - 1691:11
**defense's** [1] - 1749:14
**define** [1] - 1619:5
**definition** [2] - 1598:16, 1692:2
**definitive** [1] - 1657:19, 1712:6
**delay** [1] - 1636:12
**delete** [3] - 1622:19, 1622:20, 1699:11
**deleted** [5] - 1622:23, 1623:9, 1623:17, 1623:21, 1699:20
**deletes** [2] - 1699:22, 1699:23
**demonstration** [2] - 1648:4, 1648:7
**department** [1] - 1726:24
**Department** [2] - 1664:20, 1679:24
**depicted** [4] - 1675:25, 1742:22, 1742:23, 1743:1
**deploy** [2] - 1708:23, 1725:7
**DEPUTY** [3] - 1647:20, 1752:20, 1754:6
**describe** [1] - 1613:11
**description** [2] - 1606:11, 1635:13
**deserve** [1] - 1606:13
**designed** [2] - 1698:1, 1725:4
**desired** [1] - 1677:8
**destroyed** [1] - 1646:14
**destruction** [3] - 1646:18, 1663:12, 1664:7
**detail** [4] - 1714:19, 1715:24, 1716:10, 1716:11
**details** [1] - 1716:6
**determination** [1] - 1617:18
**determine** [7] - 1620:6, 1649:23, 1654:24, 1667:3, 1667:5, 1682:1, 1693:3
**determines** [1] -

1620:17
**Detroit** [1] - 1705:2
**develop** [2] - 1617:22, 1660:1
**devices** [5] - 1619:17, 1621:21, 1621:24, 1622:2, 1625:24
**differences** [1] - 1615:5
**different** [11] - 1615:2, 1642:18, 1659:9, 1666:19, 1666:22, 1705:23, 1717:8, 1717:10, 1727:12, 1737:10, 1744:9
**differently** [1] - 1655:4
**difficult** [1] - 1747:19
**difficulties** [1] - 1680:24
**difficulty** [3] - 1602:24, 1636:5, 1636:9
**digital** [2] - 1619:17, 1621:20
**diminishing** [1] - 1658:15
**direct** [8] - 1630:18, 1670:1, 1706:19, 1707:7, 1708:4, 1714:25, 1718:2, 1747:14
**directed** [4] - 1729:15, 1730:3, 1731:3, 1731:16
**directing** [2] - 1729:6, 1729:20
**direction** [3] - 1678:12, 1678:14, 1753:4
**directions** [2] - 1634:19, 1667:18
**directly** [1] - 1748:19
**director** [2] - 1644:10, 1644:12
**disagree** [9] - 1600:17, 1701:3, 1705:14, 1705:18, 1705:19, 1705:20, 1705:22, 1707:17, 1707:19
**disagreement** [1] - 1684:10
**disappear** [2] - 1699:11, 1699:15
**disappearing** [1] - 1699:13
**discharged** [1] - 1668:22
**disclose** [2] - 1749:17, 1750:1

**discover** [1] - 1725:23
**discovery** [2] - 1598:11, 1752:11
**discretion** [1] - 1708:20
**discuss** [6] - 1604:9, 1677:2, 1692:15, 1746:12, 1746:20, 1748:6
**discussed** [12] - 1604:17, 1609:4, 1635:20, 1713:6, 1716:5, 1718:1, 1719:8, 1719:14, 1721:8, 1733:4, 1736:17, 1755:18
**discussing** [2] - 1718:18, 1718:25
**discussion** [5] - 1605:5, 1651:20, 1701:15, 1722:22, 1723:14
**discussions** [8] - 1720:13, 1720:15, 1722:7, 1723:11, 1724:15, 1727:7, 1727:25, 1754:12
**disorderly** [1] - 1663:24
**display** [2] - 1702:3, 1713:7
**displayed** [1] - 1702:8
**dispute** [3] - 1603:19, 1701:9, 1701:13
**disputes** [1] - 1600:2
**disservice** [1] - 1599:7
**distinction** [1] - 1607:23
**district** [1] - 1747:8
**District** [1] - 1668:17
**divisiveness** [1] - 1723:18
**dock** [1] - 1738:22
**document** [19] - 1606:16, 1607:1, 1616:4, 1630:4, 1631:8, 1631:19, 1639:14, 1641:15, 1646:5, 1647:9, 1659:22, 1728:12, 1728:15, 1728:16, 1728:18, 1756:2, 1756:5, 1756:24
**documentation** [2] - 1633:10, 1727:15
**documents** [8] - 1607:16, 1608:3, 1616:6, 1665:3, 1689:3, 1689:6, 1689:7, 1722:13

1768

**dog** [2] - 1602:15, 1680:18
**dog-and-pony** [1] - 1602:15
**Dolan** [4] - 1714:13, 1714:17, 1714:23, 1715:6
**domestic** [1] - 1731:25
**Don** [1] - 1652:12
**done** [12] - 1598:19, 1599:13, 1602:3, 1616:3, 1624:14, 1625:22, 1630:25, 1635:17, 1672:12, 1681:25, 1725:11, 1754:16
**Donovan** [7] - 1626:21, 1627:2, 1627:15, 1627:24, 1628:1, 1665:9, 1666:5
**door** [3] - 1755:15, 1755:22, 1757:13
**doors** [1] - 1648:19
**Doors** [1] - 1648:21
**doubt** [2] - 1618:18, 1626:10
**Douyon** [1] - 1610:10
**down** [15] - 1608:12, 1608:14, 1608:19, 1609:10, 1627:18, 1632:13, 1672:14, 1682:17, 1684:6, 1690:24, 1705:5, 1707:12, 1722:8, 1732:14, 1746:17
**download** [2] - 1688:25, 1721:19
**dozens** [1] - 1705:23
**dramatic** [1] - 1604:22
**drawn** [1] - 1638:12
**drive** [1] - 1739:10
**drive/lead** [1] - 1677:8
**drivers** [1] - 1615:10
**drives** [2] - 1621:21
**driving** [3] - 1684:13, 1685:24, 1748:2
**drone** [1] - 1634:3
**drunk** [1] - 1615:10
**dry** [2] - 1679:10, 1686:16
**dude** [1] - 1739:9
**dues** [3] - 1632:2, 1632:4, 1744:1
**dues-paying** [3] - 1632:2, 1632:4, 1744:1
**dumps** [1] - 1719:22
**during** [18] - 1637:6,

1638:3, 1645:4, 1648:14, 1650:24, 1661:4, 1661:20, 1671:19, 1675:7, 1681:21, 1688:21, 1719:16, 1727:5, 1727:9, 1727:25, 1746:20, 1753:2, 1756:3
**duty** [1] - 1715:19

## E

**early** [6] - 1664:22, 1696:10, 1696:16, 1730:19, 1735:12, 1735:19
**earth** [1] - 1634:20
**easier** [1] - 1675:19
**east** [3] - 1714:14, 1715:25, 1716:14
**eastside** [1] - 1714:16
**easy** [1] - 1749:17
**edited** [2] - 1717:2, 1717:4
**effect** [4] - 1604:2, 1606:18, 1645:15, 1730:1
**effort** [3] - 1723:3, 1723:20, 1743:18
**efforts** [1] - 1738:20
**eight** [1] - 1658:21
**either** [22] - 1603:14, 1604:15, 1606:25, 1619:22, 1620:11, 1624:10, 1624:16, 1628:5, 1639:11, 1653:3, 1657:3, 1698:9, 1711:1, 1711:20, 1711:23, 1712:2, 1712:10, 1738:19, 1750:15, 1751:5, 1751:8, 1752:10
**El** [2] - 1707:12
**elaborate** [1] - 1702:19
**elderly** [1] - 1694:4
**election** [18] - 1678:17, 1679:12, 1679:14, 1679:15, 1680:7, 1683:24, 1684:12, 1685:10, 1686:1, 1691:22, 1704:25, 1705:15, 1705:16, 1705:24, 1706:10, 1706:14, 1708:19, 1730:21
**Electoral** [2] - 1679:16, 1679:20

**electricity** [1] - 1754:9
**elements** [3] - 1664:13, 1690:23, 1690:25
**elicit** [2] - 1625:5, 1752:1
**elicited** [1] - 1757:3
**eliciting** [1] - 1752:1
**Ellipse** [1] - 1668:1
**email** [9] - 1691:6, 1691:7, 1747:13, 1747:24, 1749:10, 1751:3, 1751:4, 1752:4, 1752:6
**emails** [2] - 1621:18, 1624:8
**emphasized** [1] - 1734:20
**end** [13] - 1632:21, 1634:20, 1672:11, 1676:24, 1731:23, 1732:1, 1732:3, 1732:9, 1732:12, 1733:5, 1745:6, 1749:16, 1754:25
**ended** [3] - 1658:5, 1658:6, 1703:12
**ends** [1] - 1605:13
**enemies** [1] - 1731:25
**enforce** [1] - 1614:24
**enforcement** [5] - 1615:1, 1615:2, 1669:15, 1724:20, 1726:21
**enforces** [1] - 1614:23
**engage** [3] - 1615:19, 1691:1, 1727:7
**engaged** [1] - 1666:10
**engaging** [1] - 1635:8
**enter** [3] - 1632:6, 1697:12, 1705:9
**entered** [3] - 1679:23, 1694:14, 1745:11
**entering** [1] - 1715:8
**entire** [4] - 1632:21, 1691:24, 1718:9, 1750:25
**entrenched** [1] - 1676:20
**entry** [6] - 1647:1, 1647:4, 1647:13, 1663:16, 1663:24, 1664:7
**environment** [2] - 1691:1, 1723:7
**Esposito** [4] - 1685:18, 1685:19, 1686:6, 1686:13
**essentially** [2] - 1631:3, 1664:13

**et** [2] - 1606:20, 1747:25
**evening** [1] - 1743:14
**event** [7] - 1606:23, 1719:2, 1720:12, 1725:13, 1729:22, 1730:3, 1736:14
**events** [1] - 1598:10
**eventually** [1] - 1693:8
**Evidence** [1] - 1605:20
**evidence** [51] - 1599:8, 1599:20, 1600:1, 1603:19, 1606:7, 1614:6, 1616:25, 1617:13, 1617:17, 1618:5, 1627:21, 1634:24, 1639:8, 1639:10, 1639:12, 1646:13, 1646:21, 1648:8, 1648:10, 1650:6, 1650:9, 1650:10, 1650:11, 1654:20, 1655:18, 1666:12, 1673:17, 1673:23, 1675:7, 1678:24, 1686:16, 1689:7, 1691:16, 1697:12, 1697:16, 1704:16, 1707:5, 1711:20, 1730:11, 1737:18, 1738:9, 1740:17, 1740:18, 1741:6, 1744:4, 1745:10, 1746:8, 1755:19, 1756:15, 1757:11, 1757:14
**exact** [1] - 1705:17
**exactly** [5] - 1645:19, 1651:17, 1697:25, 1703:1, 1757:3
**Examination** [6] - 1596:5, 1596:5, 1596:6, 1596:6, 1596:7, 1596:7
**EXAMINATION** [6] - 1610:14, 1613:2, 1699:1, 1710:13, 1717:22, 1729:1
**examination** [9] - 1608:5, 1670:1, 1672:16, 1728:24, 1742:5, 1744:15, 1753:2, 1753:10, 1757:7
**examine** [1] - 1623:25
**examiners** [1] - 1621:22
**examining** [1] -

1608:17
**example** [5] - 1620:19, 1623:14, 1623:21, 1674:19
**Excel** [3] - 1702:9, 1702:10, 1703:9
**except** [1] - 1613:15
**exception** [1] - 1644:16
**exceptions** [1] - 1644:15
**exchanged** [1] - 1705:13
**exclamation** [1] - 1645:16
**exclude** [1] - 1605:25
**excuse** [3] - 1675:18, 1706:4, 1717:9
**execute** [1] - 1614:5
**executed** [3] - 1628:6, 1633:21, 1756:14
**exhibit** [31] - 1630:13, 1641:18, 1641:21, 1670:12, 1676:10, 1676:11, 1689:11, 1690:13, 1704:1, 1704:5, 1709:25, 1713:14, 1713:17, 1713:19, 1713:21, 1713:23, 1713:25, 1714:3, 1716:15, 1721:12, 1721:13, 1722:1, 1730:13, 1732:3, 1732:14, 1732:16, 1736:20, 1737:20, 1737:22, 1742:4
**Exhibit** [79] - 1596:10, 1596:11, 1596:11, 1596:12, 1596:13, 1596:14, 1596:14, 1596:15, 1596:15, 1596:16, 1596:16, 1596:17, 1596:17, 1596:18, 1596:18, 1596:19, 1596:19, 1596:20, 1596:20, 1596:21, 1596:21, 1596:22, 1596:22, 1596:23, 1596:23, 1596:24, 1596:24, 1596:25, 1596:25, 1597:3, 1597:3, 1597:4, 1597:4, 1597:5, 1597:5, 1597:6, 1597:6, 1597:7, 1597:7, 1597:8, 1597:8, 1597:9, 1597:9, 1597:10, 1597:10,

1769

1597:12, 1597:12,
1601:5, 1602:2,
1673:17, 1673:22,
1675:18, 1676:11,
1681:4, 1682:11,
1689:19, 1689:20,
1689:21, 1691:12,
1691:15, 1697:12,
1697:13, 1697:15,
1704:3, 1704:15,
1707:4, 1714:4,
1716:17, 1719:1,
1730:11, 1736:23,
1737:18, 1738:8,
1739:25, 1740:11,
1740:17, 1741:5,
1745:22
**exhibits** [12] -
1600:20, 1601:21,
1607:16, 1637:23,
1670:18, 1678:20,
1680:9, 1702:7,
1703:12, 1713:1,
1717:12, 1737:25
**Exhibits** [1] - 1596:9
**exist** [1] - 1617:4
**existence** [1] -
1605:20
**expected** [2] - 1604:2,
1608:20
**experience** [1] -
1616:8
**expert** [1] - 1752:12
**experts** [2] - 1708:19,
1709:1
**explain** [1] - 1677:7
**explained** [1] - 1723:4
**explains** [2] - 1721:2,
1721:3
**explanation** [1] -
1727:19
**express** [1] - 1734:15
**extend** [1] - 1599:22
**extent** [3] - 1685:5,
1751:24, 1751:25
**exterior** [3] - 1639:5,
1639:10, 1667:22
**external** [1] - 1621:21
**extra** [1] - 1747:20
**extracted** [2] - 1737:6,
1740:4
**extraction** [1] - 1702:6
**extracts** [1] - 1702:9
**eye** [1] - 1608:1

## F

**F.2d** [1] - 1605:18
**F.3d** [1] - 1607:9
**face** [2] - 1604:21,

1724:1
**Facebook** [17] -
1621:2, 1621:4,
1621:5, 1621:7,
1621:8, 1624:8,
1643:13, 1643:25,
1648:18, 1710:19,
1710:20, 1710:21,
1710:24, 1720:8,
1733:17, 1735:13,
1745:19
**facilitate** [1] - 1736:17
**fact** [35] - 1598:14,
1606:8, 1614:23,
1615:19, 1616:8,
1628:4, 1636:12,
1637:6, 1639:22,
1646:25, 1649:10,
1650:22, 1652:3,
1652:10, 1654:8,
1654:23, 1655:17,
1657:8, 1658:4,
1660:10, 1661:16,
1664:6, 1665:15,
1666:11, 1668:23,
1684:10, 1687:1,
1688:20, 1689:10,
1693:8, 1693:11,
1699:9, 1720:21,
1731:13, 1735:22
**facts** [5] - 1629:14,
1657:14, 1680:8,
1752:2, 1752:3
**fair** [52] - 1613:17,
1613:25, 1614:3,
1614:21, 1614:22,
1614:25, 1616:6,
1616:11, 1616:20,
1617:1, 1617:7,
1617:9, 1617:24,
1618:6, 1618:13,
1621:1, 1621:5,
1621:14, 1621:24,
1622:6, 1622:8,
1622:20, 1623:19,
1624:12, 1624:20,
1625:9, 1626:25,
1628:9, 1629:3,
1629:9, 1629:19,
1632:17, 1633:12,
1635:21, 1638:24,
1642:9, 1647:18,
1665:18, 1666:24,
1667:23, 1682:22,
1695:5, 1698:17,
1698:21, 1725:20,
1727:22, 1728:16,
1730:21, 1737:14,
1737:16, 1744:4
**fairly** [3] - 1614:10,

1643:13, 1692:25
**faith** [1] - 1751:10
**familiar** [15] - 1652:22,
1669:3, 1676:1,
1676:2, 1682:18,
1685:17, 1687:4,
1692:13, 1692:16,
1699:7, 1699:9,
1703:5, 1709:20,
1737:3, 1747:7
**family** [1] - 1692:19
**far** [10] - 1599:23,
1618:1, 1618:3,
1634:21, 1669:25,
1698:18, 1710:24,
1710:25, 1717:2,
1730:23
**farm** [2] - 1634:13,
1634:25
**fashion** [2] - 1609:6,
1635:4
**fast** [3] - 1609:14,
1616:18, 1725:15
**fast-forwarding** [1] -
1725:15
**Fathers** [1] - 1733:4
**FBI** [39] - 1605:14,
1606:19, 1612:19,
1614:13, 1614:19,
1614:23, 1615:8,
1616:21, 1616:24,
1619:14, 1621:20,
1622:24, 1629:15,
1632:23, 1633:4,
1633:5, 1633:16,
1633:20, 1634:6,
1636:18, 1637:8,
1644:10, 1644:12,
1654:23, 1655:7,
1656:16, 1656:18,
1658:18, 1661:17,
1680:15, 1682:8,
1685:17, 1686:12,
1688:24, 1698:5,
1698:7, 1719:23,
1755:9, 1755:14
**FBI's** [3] - 1654:17,
1681:10, 1757:8
**FD-1057** [1] - 1630:9
**feature** [2] - 1699:13,
1699:18
**features** [1] - 1699:7
**federal** [9] - 1605:19,
1612:20, 1612:21,
1614:23, 1614:24,
1616:14, 1639:18,
1687:22, 1692:11
**Federal** [2] - 1605:20,
1614:16
**feelers** [1] - 1677:9

**Feldon** [2] - 1653:7,
1653:11
**felony** [1] - 1646:18
**ferries** [1] - 1739:9
**ferry** [2] - 1739:3,
1739:10
**few** [10] - 1601:6,
1608:19, 1616:3,
1695:16, 1718:12,
1748:14, 1750:21,
1753:3, 1753:17,
1754:14
**Fifth** [8] - 1598:15,
1602:6, 1603:2,
1603:8, 1603:9,
1603:25, 1604:19
**fifth** [2] - 1690:17,
1690:18
**fight** [2] - 1705:1,
1733:4
**fighting** [1] - 1680:18
**fights** [1] - 1615:11
**figured** [1] - 1754:25
**file** [6] - 1602:7,
1612:14, 1616:14,
1642:5, 1663:9,
1663:11
**filed** [4] - 1612:11,
1616:11, 1665:21,
1666:1
**filings** [2] - 1665:4,
1748:14
**fill** [2] - 1712:20
**filter** [3] - 1748:11,
1748:15, 1748:22
**final** [1] - 1713:9
**fine** [10] - 1601:4,
1603:14, 1633:10,
1640:19, 1692:16,
1706:5, 1724:12,
1724:14, 1754:20
**finish** [2] - 1608:10,
1672:20
**firearm** [8] - 1668:14,
1668:17, 1668:19,
1695:20, 1696:3,
1696:16, 1698:8,
1724:24
**firearms** [1] - 1696:6,
1698:5
**first** [27] - 1598:12,
1608:13, 1609:9,
1613:6, 1628:25,
1632:9, 1635:25,
1638:17, 1650:20,
1655:2, 1655:3,
1660:3, 1670:6,
1674:25, 1676:7,
1677:6, 1690:16,
1706:20, 1707:8,

1719:9, 1746:7,
1749:7, 1750:10,
1751:17, 1751:22,
1751:23, 1752:4
**First** [2] - 1694:19,
1694:22
**Fischer** [26] - 1608:10,
1608:24, 1609:1,
1609:7, 1612:25,
1613:1, 1641:19,
1655:3, 1659:8,
1660:24, 1670:1,
1672:2, 1672:5,
1672:15, 1673:2,
1681:1, 1690:9,
1698:24, 1733:11,
1733:12, 1734:13,
1743:24, 1744:14,
1752:25, 1753:10,
1756:10
**FISCHER** [108] -
1613:3, 1623:10,
1625:14, 1625:20,
1630:6, 1630:7,
1630:12, 1630:14,
1630:16, 1630:19,
1631:2, 1636:1,
1636:3, 1638:1,
1638:2, 1639:25,
1640:1, 1640:6,
1640:14, 1640:16,
1641:3, 1641:9,
1641:14, 1641:20,
1641:22, 1641:24,
1643:24, 1645:25,
1646:2, 1646:4,
1647:11, 1647:12,
1647:18, 1647:21,
1648:1, 1649:19,
1649:21, 1649:22,
1655:1, 1655:4,
1655:5, 1659:10,
1659:18, 1661:1,
1661:14, 1661:15,
1662:5, 1662:11,
1662:20, 1662:22,
1663:2, 1664:11,
1664:15, 1664:18,
1667:1, 1667:2,
1669:13, 1670:3,
1670:5, 1670:8,
1670:10, 1672:6,
1672:17, 1673:3,
1673:4, 1673:16,
1673:24, 1674:3,
1674:4, 1674:12,
1674:14, 1681:2,
1682:13, 1682:14,
1683:21, 1684:17,
1685:7, 1686:11,
1686:19, 1686:21,

1687:13, 1687:16,
1687:20, 1688:8,
1688:12, 1689:22,
1689:25, 1690:12,
1690:15, 1691:5,
1691:11, 1691:17,
1692:4, 1692:5,
1693:15, 1693:16,
1694:23, 1695:13,
1695:14, 1695:16,
1695:19, 1697:6,
1697:10, 1697:17,
1698:22, 1753:1,
1753:12, 1755:16
**Fischer's** [2] - 1755:8,
1757:5
**Fischer**.................. [1] -
1596:5
**fish** [1] - 1739:7
**fit** [1] - 1702:22
**five** [6] - 1604:11,
1604:13, 1610:9,
1744:20, 1744:21
**fixed** [1] - 1754:11
**flag** [3] - 1672:1,
1748:9, 1748:25
**flagged** [2] - 1748:8,
1751:1
**fly** [1] - 1604:17
**focal** [1] - 1656:8
**focus** [1] - 1704:25
**focused** [2] - 1681:22,
1717:5
**folks** [1] - 1739:12
**follow** [1] - 1604:7
**following** [1] -
1703:23
**font** [2] - 1702:20,
1702:21
**football** [1] - 1613:14
**Force** [1] - 1709:5
**force** [9] - 1599:11,
1600:7, 1604:16,
1735:17, 1735:24,
1736:3, 1736:11,
1736:13, 1736:18
**forces** [1] - 1691:2
**forcibly** [1] - 1666:6
**foreign** [1] - 1599:2
**forensic** [4] - 1655:7,
1719:19, 1719:22,
1721:19
**forensically** [1] -
1720:5
**forged** [1] - 1701:14
**forget** [1] - 1711:25
**forgetting** [1] - 1605:1
**Form** [2] - 1606:2,
1606:7
**form** [4] - 1606:3,

1633:4, 1711:7,
1753:6
**forma** [1] - 1747:6
**forms** [2] - 1624:9,
1712:20
**forth** [2] - 1676:9,
1754:17
**forward** [5] - 1609:23,
1617:23, 1648:22,
1685:15, 1746:14
**forwarding** [1] -
1725:15
**foundation** [6] -
1599:19, 1600:4,
1606:16, 1606:25,
1607:4, 1713:15
**foundational** [1] -
1604:16
**Founding** [1] - 1733:3
**four** [10] - 1610:8,
1613:15, 1642:17,
1642:18, 1720:13,
1727:6, 1727:25,
1728:1, 1737:10,
1749:3
**frame** [1] - 1716:2,
1719:14, 1720:14
**frankly** [1] - 1650:24
**fraud** [8] - 1615:25,
1616:21, 1616:22,
1705:15, 1705:24,
1706:10, 1706:14,
1731:19
**frequent** [1] - 1744:9
**Friday** [3] - 1610:3,
1750:13, 1750:16
**Fridays** [1] - 1610:2
**friendly** [1] - 1746:12
**friends** [2] - 1692:19,
1693:4
**Friends** [1] - 1711:21
**FROM** [1] - 1677:3
**front** [5] - 1642:21,
1642:22, 1684:22,
1697:18, 1752:6
**fuel** [1] - 1739:5
**full** [8] - 1627:23,
1631:24, 1638:13,
1648:21, 1650:21,
1746:7, 1746:10,
1752:10
**full-blown** [1] -
1631:24
**fully** [2] - 1632:23,
1732:16
**funding** [2] - 1747:7,
1747:9
**furtherance** [3] -
1674:6, 1674:20,
1679:20

**future** [1] - 1685:25

## G

**gallery** [1] - 1753:21
**game** [2] - 1625:9,
1730:14
**gang** [2] - 1620:24
**gap** [2] - 1623:15,
1623:18
**gather** [3] - 1614:5,
1616:25, 1680:8
**Gator** [1] - 1741:24
**gear** [1] - 1634:8
**general** [1] - 1619:14
**generally** [2] -
1724:25, 1743:21
**generals** [1] - 1705:5
**generate** [1] - 1747:19
**generically** [2] -
1705:18
**genius** [1] - 1739:13
**gentleman** [5] -
1603:1, 1604:18,
1718:19, 1735:23,
1739:19
**gentleman's** [1] -
1682:18
**gentlemen** [9] -
1609:20, 1613:11,
1629:10, 1643:9,
1672:9, 1672:25,
1691:20, 1744:22,
1746:6
**genuine** [4] - 1602:1,
1602:25, 1603:19,
1604:19
**Geyer** [8] - 1710:10,
1710:11, 1710:16,
1711:9, 1715:2,
1716:16, 1717:8,
1717:19
**GEYER** [15] - 1710:12,
1710:14, 1711:10,
1713:13, 1713:25,
1714:11, 1715:3,
1715:4, 1715:23,
1716:12, 1716:22,
1717:1, 1717:9,
1717:11, 1717:16,
1717:18
**Geyer**.................. [1] -
1596:6
**ghost** [1] - 1676:20
**given** [7] - 1598:15,
1598:19, 1636:13,
1672:20, 1677:3,
1727:15, 1727:18
**gotcha** [1] - 1690:6
**GoToMeeting** [16] -

1610:21, 1611:4,
1611:5, 1661:10,
1666:12, 1709:12,
1712:13, 1712:14,
1718:2, 1718:16,
1718:23, 1724:7,
1724:16, 1729:17,
1732:25, 1733:3
**government** [36] -
1599:2, 1599:11,
1599:18, 1600:3,
1600:20, 1602:6,
1602:12, 1603:22,
1607:4, 1612:20,
1612:21, 1626:11,
1646:19, 1663:12,
1670:8, 1676:9,
1682:25, 1683:10,
1683:13, 1684:11,
1687:21, 1687:23,
1688:2, 1689:10,
1697:2, 1697:11,
1713:18, 1721:9,
1721:16, 1737:17,
1740:17, 1746:24,
1747:15, 1750:2,
1754:18, 1754:21
**Government** [8] -
1596:10, 1596:11,
1596:11, 1596:12,
1602:2, 1716:17,
1738:8, 1741:5
**Government's** [4] -
1730:11, 1736:22,
1739:25, 1745:21
**government's** [8] -
1598:18, 1606:22,
1670:11, 1683:18,
1691:25, 1713:13,
1754:14, 1755:14
**grand** [2] - 1687:22,
1687:25
**granted** [2] - 1642:1,
1727:8
**great** [1] - 1631:1
**greater** [1] - 1607:25
**green** [1] - 1715:8
**Griffin** [1] - 1599:1
**ground** [4] - 1615:21,
1615:23, 1634:25,
1659:9
**Grounds** [7] - 1649:8,
1663:25, 1664:5,
1668:25, 1715:8,
1715:9
**group** [14] - 1623:22,
1694:12, 1694:15,
1700:3, 1700:7,
1700:8, 1700:13,
1700:16, 1700:19,

1711:22, 1744:6,
1744:8, 1750:18
**groups** [4] - 1700:10,
1700:11, 1700:13,
1744:10
**Guard** [2] - 1708:22
**guess** [9] - 1604:7,
1614:19, 1615:6,
1630:5, 1632:8,
1632:14, 1634:19,
1722:2, 1757:7
**guide** [1] - 1747:21
**guilty** [5] - 1618:3,
1618:7, 1618:8,
1618:9, 1618:13
**gun** [4] - 1668:25,
1698:1, 1698:12,
1705:8
**guns** [1] - 1668:7,
1735:6
**guy** [6] - 1642:13,
1652:12, 1661:2,
1661:3, 1666:15,
1677:6
**guys** [5] - 1610:24,
1614:20, 1633:16,
1693:23, 1739:8

## H

**half** [2] - 1610:2,
1718:9
**HALLER** [1] - 1752:13
**Hancock** [1] - 1601:19
**hand** [3] - 1606:10,
1749:8, 1750:4
**handgun** [1] - 1696:10
**handle** [1] - 1738:21
**handling** [1] - 1616:8
**hands** [1] - 1747:22
**handy** [1] - 1637:25
**hang** [5] - 1704:9,
1751:11, 1752:21,
1752:24
**hanging** [1] - 1739:6
**happy** [6] - 1599:24,
1609:7, 1713:16,
1754:4, 1755:2,
1755:25
**hard** [3] - 1609:14,
1621:21, 1721:15
**Harrelson** [15] -
1609:11, 1624:2,
1675:8, 1675:15,
1710:10, 1710:19,
1711:14, 1712:1,
1712:15, 1714:12,
1714:16, 1715:7,
1715:24, 1716:9,
1741:16

**Harrelson's** [1] -
1733:20
**head** [2] - 1696:24,
1723:25
**heading** [1] - 1679:9
**health** [3] - 1615:25,
1616:21, 1636:6
**hear** [7] - 1603:1,
1603:7, 1604:18,
1655:2, 1655:3,
1751:15, 1751:16
**heard** [9] - 1598:22,
1603:22, 1615:22,
1635:16, 1635:17,
1684:18, 1732:25,
1734:15, 1753:17
**hearing** [4] - 1611:20,
1694:2, 1694:3,
1755:19
**hearsay** [5] - 1624:25,
1625:4, 1625:12,
1669:11, 1669:24
**heavy** [1] - 1739:2
**held** [8] - 1609:18,
1625:16, 1650:3,
1672:8, 1672:13,
1672:23, 1688:11,
1746:16
**helmet** [2] - 1693:23,
1694:5
**help** [5] - 1615:7,
1669:2, 1702:3,
1705:1, 1739:13
**helped** [1] - 1737:11
**helpful** [2] - 1630:22,
1702:23
**herself** [4] - 1726:17,
1726:21, 1726:23,
1727:13
**hold** [2] - 1603:13,
1704:21
**holder** [2] - 1697:3,
1698:1
**holders** [1] - 1697:21
**holding** [2] - 1627:11,
1701:10
**holiday** [3] - 1609:24,
1758:4
**home** [5] - 1628:7,
1628:11, 1660:6,
1660:19, 1692:24
**Honor** [75] - 1601:4,
1601:20, 1602:3,
1602:10, 1602:15,
1602:18, 1603:23,
1604:4, 1607:14,
1625:14, 1630:12,
1630:14, 1630:19,
1637:18, 1637:22,
1641:11, 1664:9,

1664:15, 1670:3,
1672:1, 1672:6,
1673:3, 1673:16,
1673:20, 1674:2,
1674:8, 1674:12,
1680:22, 1680:23,
1687:16, 1687:20,
1687:24, 1688:9,
1689:25, 1695:16,
1697:11, 1698:22,
1706:25, 1707:21,
1708:7, 1710:8,
1713:13, 1714:4,
1714:7, 1714:9,
1715:3, 1716:16,
1717:16, 1717:21,
1721:8, 1728:22,
1728:25, 1730:10,
1732:17, 1732:22,
1734:7, 1737:21,
1738:5, 1740:16,
1741:2, 1744:20,
1745:25, 1748:7,
1748:9, 1750:24,
1752:23, 1753:1,
1753:14, 1753:24,
1755:7, 1755:8,
1755:16, 1756:4,
1757:11, 1757:18
**hopping** [1] - 1609:4
**hotel** [5] - 1667:21,
1734:23, 1735:4,
1736:9, 1736:11
**hour** [6] - 1637:1,
1672:17, 1699:16,
1704:19, 1718:9,
1728:3
**hours** [13] - 1624:15,
1633:2, 1636:15,
1636:23, 1640:2,
1658:9, 1658:22,
1699:16, 1718:3,
1720:13, 1724:6,
1728:1, 1730:19
**House** [4] - 1667:18,
1705:3, 1705:4,
1705:9
**house** [9] - 1628:20,
1633:17, 1636:4,
1636:18, 1642:14,
1643:3, 1643:4,
1643:20, 1660:23
**houses** [2] - 1619:16,
1668:4
**human** [2] - 1625:25,
1626:6
**hundred** [2] - 1688:1,
1703:12
**hundreds** [9] - 1616:5,
1619:20, 1621:5,

1621:6, 1623:25,
1624:13, 1624:15,
1705:12, 1705:14
**Hurricane** [1] -
1700:14
**hypothetical** [1] -
1618:24
**hypotheticals** [1] -
1617:3

**I**

**idea** [1] - 1639:6
**Ideal** [1] - 1695:20
**identification** [2] -
1736:22, 1739:24
**identified** [5] -
1626:21, 1676:12,
1685:1, 1700:11,
1748:17
**identify** [1] - 1643:7
**ignore** [1] - 1686:18
**illegitimate** [1] -
1731:3
**immediately** [2] -
1617:20, 1660:15
**imminency** [1] -
1616:16
**imminent** [2] -
1617:20, 1617:21
**immobilize** [1] -
1725:5
**immunity** [4] -
1598:19, 1598:25,
1599:4, 1599:7
**important** [2] -
1617:6, 1671:6
**impression** [2] -
1730:5, 1752:4
**impressions** [2] -
1751:14, 1755:10
**incidents** [1] - 1612:8
**include** [2] - 1709:25,
1710:3
**including** [3] - 1705:1,
1729:17, 1751:2
**inconsistencies** [3] -
1728:12, 1728:16,
1728:18
**incorrectly** [1] -
1664:6
**incriminate** [1] -
1727:13
**incriminating** [2] -
1635:7, 1683:15
**inculpatory** [1] -
1599:10
**independent** [1] -
1746:14
**independently** [1] -

1688:6
**indicate** [4] - 1728:4,
1728:6, 1728:7,
1749:2
**indicated** [14] -
1602:5, 1613:6,
1614:16, 1632:1,
1639:1, 1643:19,
1644:14, 1645:12,
1645:15, 1646:21,
1654:12, 1669:9,
1672:3, 1681:18
**indicating** [2] -
1602:3, 1631:13
**indicia** [1] - 1667:6
**indicted** [1] - 1680:18
**indictment** [3] -
1671:21, 1672:2,
1672:4
**Indigenous** [1] -
1610:6
**individual** [4] -
1643:16, 1693:18,
1718:19, 1737:22
**individual's** [1] -
1601:1
**individually** [1] -
1738:2
**individuals** [5] -
1621:3, 1686:13,
1716:6, 1720:21,
1725:16
**indulgence** [18] -
1630:6, 1638:1,
1639:25, 1649:21,
1661:14, 1667:1,
1670:9, 1682:13,
1686:20, 1690:14,
1692:4, 1693:15,
1695:13, 1697:10,
1710:6, 1728:20,
1730:8
**info** [1] - 1704:24
**inform** [1] - 1608:15
**information** [20] -
1601:17, 1619:23,
1621:23, 1624:18,
1628:10, 1628:14,
1628:17, 1634:5,
1643:3, 1643:16,
1660:2, 1661:3,
1668:22, 1668:23,
1671:14, 1689:3,
1702:7, 1703:12,
1703:13, 1739:16
**informed** [1] - 1726:2
**initial** [3] - 1659:22,
1665:21, 1751:14
**initiated** [3] - 1631:20,
1697:21, 1697:23

**innocent** [7] - 1618:4,
1618:7, 1618:8,
1618:10, 1619:9,
1619:11, 1691:3
**inside** [13] - 1629:23,
1637:11, 1637:15,
1638:5, 1638:16,
1646:14, 1648:17,
1648:19, 1649:3,
1649:6, 1649:11,
1664:2, 1667:10
**insomuch** [1] -
1632:25
**instance** [3] - 1606:7,
1622:1, 1751:22
**instances** [1] -
1621:25
**instant** [1] - 1720:7
**instead** [1] - 1747:17
**instigator** [2] - 1645:1,
1645:2
**instruct** [2] - 1746:18,
1750:5
**instruction** [1] -
1607:8
**insurrection** [3] -
1708:21, 1708:25,
1709:3
**Insurrection** [4] -
1661:11, 1707:11,
1748:15, 1754:15
**intel** [7] - 1677:6,
1704:8, 1704:19,
1704:20, 1704:23,
1705:2, 1744:11
**intend** [2] - 1607:5,
1721:9
**intended** [1] - 1721:10
**intending** [4] -
1598:14, 1607:16,
1744:18, 1749:15
**intends** [1] - 1603:2
**intensive** [1] - 1616:4
**intent** [4] - 1602:5,
1602:16, 1731:20,
1757:12
**interact** [2] - 1636:5,
1723:9
**interest** [3] - 1622:24,
1627:22, 1629:2
**interested** [1] - 1739:4
**interests** [2] -
1599:25, 1600:1
**interior** [4] - 1639:5,
1639:7, 1667:11,
1667:14
**internal** [1] - 1629:17
**interpret** [2] - 1653:16,
1678:25
**interrupt** [2] -

1640:11, 1744:16
**interview** [31] -
1617:12, 1617:17,
1618:5, 1632:17,
1632:20, 1636:12,
1636:16, 1636:19,
1636:22, 1636:23,
1637:6, 1638:3,
1643:15, 1645:4,
1648:14, 1650:24,
1650:25, 1652:22,
1656:4, 1656:8,
1658:5, 1658:6,
1660:6, 1661:16,
1661:17, 1661:21,
1669:17, 1669:18,
1728:1
**interviewed** [9] -
1619:20, 1624:6,
1636:13, 1643:18,
1657:9, 1658:21,
1669:4, 1669:7,
1734:14
**interviewing** [1] -
1624:15
**interviews** [4] -
1624:14, 1625:22,
1727:8, 1727:10
**introduced** [1] -
1713:14
**introduction** [1] -
1600:20
**investigate** [5] -
1615:14, 1617:17,
1617:22, 1660:1,
1755:14
**investigated** [1] -
1624:6
**investigating** [3] -
1626:16, 1627:6,
1657:9
**investigation** [53] -
1613:7, 1613:13,
1614:19, 1617:6,
1617:11, 1619:2,
1619:3, 1619:14,
1619:18, 1620:5,
1621:14, 1622:9,
1624:18, 1626:15,
1627:1, 1627:14,
1627:15, 1627:25,
1628:23, 1629:8,
1629:12, 1629:13,
1629:15, 1629:18,
1629:22, 1631:4,
1631:9, 1631:14,
1631:20, 1631:24,
1643:10, 1644:5,
1644:15, 1655:10,
1656:25, 1657:2,

1661:5, 1667:5,
1677:20, 1677:24,
1680:14, 1681:21,
1681:25, 1682:24,
1687:10, 1692:6,
1697:22, 1697:23,
1699:12, 1710:4,
1719:25, 1728:15
**Investigation** [1] -
1614:16
**investigations** [4] -
1614:20, 1615:25,
1616:13, 1685:20
**investigative** [2] -
1627:18, 1629:2
**investigator** [2] -
1658:12, 1674:17
**investigators** [2] -
1625:25, 1627:2
**invocation** [1] -
1603:24
**invoke** [9] - 1598:14,
1599:7, 1602:6,
1602:13, 1603:2,
1603:24, 1603:25,
1604:11, 1604:13
**involved** [6] - 1629:8,
1643:17, 1665:22,
1666:9, 1674:5,
1693:5
**involving** [5] - 1612:8,
1616:22, 1616:23,
1623:25, 1624:1
**isolated** [1] - 1752:7
**issue** [15] - 1598:5,
1599:3, 1599:9,
1602:2, 1602:4,
1602:9, 1605:16,
1606:2, 1618:9,
1625:9, 1747:7,
1748:8, 1752:17,
1755:3, 1755:15
**issued** [1] - 1619:15
**issues** [6] - 1607:12,
1616:18, 1635:18,
1635:20, 1636:7,
1754:10
**itself** [1] - 1667:20

## J

**jail** [1] - 1605:3
**Jan** [4] - 1736:15,
1740:6, 1741:10,
1743:11
**January** [81] -
1601:18, 1611:14,
1611:16, 1611:18,
1611:25, 1613:8,
1615:24, 1624:24,

1626:2, 1626:7,
1626:16, 1626:19,
1626:22, 1627:7,
1627:10, 1628:4,
1629:5, 1629:24,
1632:6, 1632:10,
1633:22, 1639:2,
1639:19, 1640:2,
1640:7, 1641:25,
1642:11, 1642:25,
1643:12, 1643:17,
1644:2, 1645:22,
1646:17, 1646:22,
1646:24, 1648:5,
1649:5, 1654:3,
1654:18, 1655:11,
1655:14, 1655:18,
1656:13, 1656:17,
1657:7, 1659:20,
1662:2, 1662:8,
1664:21, 1664:25,
1665:23, 1666:10,
1667:25, 1668:19,
1680:2, 1684:3,
1686:16, 1686:24,
1696:13, 1696:17,
1696:21, 1701:17,
1701:21, 1701:24,
1705:13, 1705:14,
1719:9, 1725:15,
1734:16, 1734:24,
1735:9, 1735:19,
1736:13, 1737:9,
1738:11, 1741:25,
1742:1, 1743:14,
1743:22
**Jason** [2] - 1714:13,
1714:23
**jaundiced** [1] - 1608:1
**JC** [1] - 1754:10
**Jessica** [13] - 1624:2,
1626:20, 1626:21,
1627:3, 1627:15,
1627:24, 1628:7,
1642:12, 1643:3,
1665:9, 1666:5,
1718:15, 1741:18
**Jewish** [1] - 1609:23
**job** [4] - 1599:12,
1599:14, 1600:16,
1680:8
**join** [8] - 1620:9,
1620:14, 1620:19,
1620:22, 1620:24,
1720:19, 1720:22,
1723:21
**joined** [1] - 1756:20
**Jon** [1] - 1669:3
**Jonathan** [4] -
1668:11, 1668:12,

1668:13, 1668:19
**Jones** [1] - 1695:2
**journalist** [1] - 1605:2
**Judge** [9] - 1599:1,
1605:3, 1609:13,
1639:23, 1690:4,
1722:20, 1747:5,
1755:5
**judge** [3] - 1639:18,
1642:5, 1692:11
**jump** [2] - 1609:12,
1739:12
**jumped** [1] - 1608:13
**JUROR** [2] - 1744:24,
1745:4
**jurors** [1] - 1753:17
**jury** [34] - 1598:2,
1604:11, 1609:4,
1609:18, 1610:25,
1613:12, 1626:11,
1629:11, 1634:19,
1635:10, 1643:10,
1672:13, 1672:23,
1676:14, 1680:5,
1683:17, 1686:17,
1687:22, 1687:25,
1691:20, 1701:19,
1702:4, 1702:21,
1703:21, 1704:7,
1706:14, 1710:1,
1717:15, 1729:11,
1737:12, 1738:7,
1741:7, 1746:16,
1753:15
**jury's** [1] - 1618:10
**Justice** [1] - 1664:20
**justify** [1] - 1629:14

## K

**keep** [6] - 1601:2,
1619:4, 1658:13,
1676:23, 1692:19,
1746:2
**Keeper** [1] - 1700:13
**Keepers** [33] -
1611:23, 1612:9,
1619:22, 1619:23,
1620:1, 1620:7,
1620:12, 1620:15,
1623:2, 1624:17,
1626:7, 1629:25,
1631:6, 1632:3,
1650:3, 1656:1,
1656:13, 1668:7,
1668:24, 1686:13,
1701:16, 1701:20,
1701:23, 1714:15,
1715:11, 1715:15,
1715:16, 1716:5,
1716:14, 1717:6,

1743:25, 1744:10,
1744:11
**Kelly** [2] - 1624:2,
1741:14
**Kellye** [1] - 1709:23
**Ken** [7] - 1624:2,
1710:19, 1712:1,
1712:15, 1714:12,
1714:23, 1715:24
**Kenneth** [1] - 1741:16
**key** [2] - 1607:9,
1710:4
**keyword** [1] - 1614:19
**kid** [1] - 1675:24
**kids** [2] - 1692:22,
1744:25
**kill** [1] - 1725:4
**killing** [1] - 1644:19
**kind** [5] - 1606:18,
1659:5, 1670:11,
1682:1, 1749:15
**kindly** [1] - 1713:18
**kinds** [2] - 1607:16,
1611:11
**KM.01** [4] - 1704:3,
1704:15, 1707:2
**KM.01**.................. [1]
- 1597:12
**KM.02** [4] - 1706:23,
1707:1, 1707:2,
1707:4
**KM.02**.................. [1]
- 1597:12
**KM.03** [3] - 1706:17,
1707:22, 1708:8
**KM.04** [1] - 1707:23
**knowing** [1] - 1696:4
**knowledge** [13] -
1612:21, 1629:6,
1633:18, 1649:12,
1656:15, 1656:19,
1660:9, 1667:16,
1668:7, 1668:16,
1668:18, 1669:15,
1675:1
**known** [4] - 1653:11,
1666:6, 1684:22
**knows** [5] - 1685:5,
1697:4, 1697:5,
1697:8, 1753:16

## L

**labeled** [2] - 1732:19,
1745:21
**Labor** [1] - 1679:24
**ladies** [9] - 1609:20,
1613:11, 1629:10,
1643:9, 1672:9,
1672:25, 1691:19,

1773

1744:22, 1746:6
**laggy** [2] - 1716:20, 1716:22
**laid** [1] - 1606:16
**land** [1] - 1742:11
**landing** [1] - 1742:13
**language** [1] - 1754:15
**laptop** [1] - 1722:20
**large** [2] - 1625:22, 1702:20
**larger** [2] - 1685:10, 1737:25
**last** [4] - 1672:25, 1686:18, 1708:2, 1757:19
**late** [1] - 1732:10
**latest** [1] - 1745:3
**latter** [1] - 1677:9
**laugh** [1] - 1753:4
**Law** [1] - 1709:6
**law** [12] - 1607:23, 1614:23, 1614:24, 1615:1, 1615:2, 1647:7, 1664:10, 1669:15, 1709:2, 1709:6, 1724:20, 1726:21
**lawmakers'** [1] - 1668:4
**laws** [3] - 1612:12, 1612:18, 1705:9
**lawyer** [5] - 1658:13, 1664:3, 1751:23, 1751:25, 1752:2
**lay** [2] - 1599:19, 1600:4
**laying** [1] - 1606:24
**layman's** [1] - 1618:12
**lead** [6] - 1607:10, 1608:13, 1608:18, 1609:9, 1623:19, 1680:19
**Leader** [1] - 1743:8
**leader** [2] - 1629:25, 1664:21
**leaders** [1] - 1664:23
**Leadership** [5] - 1700:19, 1700:23, 1729:12, 1730:14, 1732:4
**leadership** [3] - 1631:5, 1650:3, 1701:25
**leading** [3] - 1659:17, 1659:19, 1731:5
**leads** [2] - 1627:4, 1627:17
**Leah** [5] - 1720:24, 1720:25, 1722:23,

1723:20, 1724:5
**learn** [5] - 1677:24, 1685:13, 1685:14, 1712:17, 1719:18
**learned** [5] - 1684:5, 1685:12, 1685:13, 1697:24, 1756:15
**learning** [4] - 1684:2, 1684:7, 1684:8, 1685:24
**least** [13] - 1627:5, 1642:18, 1661:4, 1667:25, 1672:12, 1688:24, 1720:9, 1724:1, 1728:1, 1744:9, 1752:3, 1753:20, 1756:10
**leave** [1] - 1745:3
**led** [3] - 1598:10, 1666:23, 1668:3
**Lee** [1] - 1602:1
**left** [5] - 1613:21, 1634:21, 1704:25, 1715:17, 1726:1
**leftists** [1] - 1707:12
**legal** [7] - 1674:8, 1674:10, 1698:3, 1708:21, 1709:1, 1752:1, 1752:3
**legally** [2] - 1674:17, 1696:4
**legitimacy** [1] - 1731:2
**legitimate** [2] - 1731:19, 1732:5
**length** [3] - 1599:22, 1688:25, 1744:18
**lengthy** [5] - 1644:14, 1676:21, 1678:6, 1693:2, 1701:4
**less** [3] - 1724:19, 1724:23, 1739:6
**lesson** [2] - 1684:2, 1684:7
**lessons** [3] - 1684:5, 1684:8, 1685:12
**lethal** [6] - 1724:19, 1724:23, 1724:24, 1724:25, 1725:1, 1725:9
**letter** [2] - 1727:17, 1727:18
**letters** [1] - 1727:19
**level** [1] - 1708:24
**levity** [1] - 1753:10
**Libby** [1] - 1605:2
**lie** [1] - 1637:8
**lied** [2] - 1651:3, 1653:12
**lieutenant** [3] - 1649:24, 1650:12,

1709:5
**life** [1] - 1616:18
**Life360** [8] - 1692:7, 1692:12, 1692:17, 1692:18, 1692:23, 1692:25, 1693:3, 1693:9
**light** [3] - 1600:9, 1748:13, 1757:2
**lightly** [1] - 1598:8
**limit** [1] - 1732:6
**limiting** [2] - 1607:8, 1731:20
**limits** [1] - 1695:4
**Lincoln** [2] - 1742:11, 1743:3
**Linder** [14] - 1608:4, 1610:12, 1612:24, 1729:7, 1729:10, 1729:15, 1729:20, 1748:19, 1748:21, 1748:24, 1749:1, 1750:24, 1757:21
**LINDER** [22] - 1608:6, 1608:10, 1608:15, 1610:13, 1610:15, 1611:22, 1612:23, 1749:6, 1749:10, 1749:19, 1749:23, 1750:6, 1750:12, 1751:3, 1751:16, 1752:5, 1752:9, 1752:12, 1752:15, 1752:19, 1757:22, 1757:25
**Linder....** [1] - 1596:5
**line** [7] - 1608:13, 1611:15, 1619:8, 1623:24, 1639:7, 1653:10, 1755:11
**lines** [2] - 1645:6, 1645:8
**liquor** [1] - 1682:17
**list** [1] - 1608:14
**listened** [1] - 1610:25
**listening** [1] - 1715:16
**lists** [1] - 1620:1
**literally** [2] - 1619:20, 1624:15
**litigate** [1] - 1688:3
**litigated** [1] - 1755:15
**live** [1] - 1604:12
**load** [2] - 1739:2, 1739:8
**local** [3] - 1615:2, 1709:4, 1726:21
**locate** [1] - 1742:22
**location** [4] - 1725:23, 1725:25, 1736:10, 1736:12

**Lochner** [4] - 1687:5, 1687:6, 1687:7, 1687:11
**lock** [1] - 1603:14
**locker** [1] - 1654:20
**log** [1] - 1606:20
**logging** [1] - 1606:18
**logic** [1] - 1666:18
**logically** [1] - 1726:18
**look** [34] - 1609:2, 1641:15, 1656:23, 1657:13, 1665:16, 1665:17, 1667:3, 1667:4, 1673:6, 1673:9, 1674:15, 1676:1, 1681:5, 1688:4, 1692:24, 1711:24, 1712:3, 1721:7, 1721:17, 1740:12, 1741:24, 1746:14, 1749:10, 1749:12, 1750:3, 1751:9, 1751:11, 1752:16, 1753:19, 1755:2, 1757:1, 1757:15, 1757:16
**looked** [8] - 1608:1, 1635:3, 1638:12, 1643:25, 1657:11, 1671:12, 1724:8, 1745:16
**looking** [12] - 1627:2, 1627:23, 1628:23, 1629:1, 1629:4, 1638:20, 1665:20, 1674:21, 1679:8, 1679:9, 1690:7
**looks** [6] - 1642:17, 1666:4, 1682:16, 1695:21, 1747:1, 1751:20
**loony** [1] - 1695:2
**loose** [1] - 1605:13
**Los** [1] - 1709:7
**losing** [1] - 1618:7
**lost** [1] - 1650:11
**loud** [1] - 1676:14
**love** [1] - 1751:16
**lunch** [1] - 1609:20, 1670:17, 1671:19, 1673:6, 1691:18
**lunchtime** [1] - 1610:3
**lying** [1] - 1637:4

# M

**macro** [3] - 1702:3, 1702:6, 1703:1, 1713:6
**MAGA** [9] - 1611:12,

1612:9, 1675:9, 1686:6, 1686:14, 1696:20, 1696:23, 1730:24, 1731:14
**maggots** [1] - 1676:20
**magistrate** [3] - 1639:18, 1642:5, 1663:8
**Magistrate** [1] - 1639:23
**mail** [3] - 1703:4, 1703:5, 1703:8
**man** [1] - 1669:3
**management** [1] - 1631:19
**Manassas** [1] - 1654:21
**manufacturer** [3] - 1696:2, 1696:6, 1698:12
**manufacturer's** [2] - 1695:24, 1695:25
**map** [4] - 1714:3, 1734:22, 1735:3, 1735:6
**maps** [11] - 1667:5, 1667:10, 1667:14, 1667:17, 1667:20, 1668:3, 1676:21, 1742:19, 1742:23, 1742:24
**march** [1] - 1679:5
**March** [8] - 1611:12, 1612:9, 1675:9, 1686:7, 1686:14, 1696:20, 1730:24, 1731:14
**Marines** [1] - 1708:23
**Mark** [2] - 1685:18, 1685:19
**mark** [2] - 1630:5, 1641:10
**marked** [10] - 1675:18, 1681:4, 1682:11, 1690:7, 1706:17, 1707:22, 1736:22, 1737:21, 1738:2, 1739:24
**marketed** [1] - 1696:5
**markets** [3] - 1696:2, 1696:6, 1698:12
**marshaling** [1] - 1691:2
**Martha** [1] - 1637:7
**match** [2] - 1635:12, 1648:24
**material** [1] - 1599:9
**matter** [7] - 1603:25, 1608:24, 1609:3, 1616:14, 1711:16,

1753:20, 1753:25
**matters** [1] - 1757:19
**McFadden** [1] -
1599:1
**mean** [48] - 1601:1,
1604:10, 1604:21,
1605:17, 1607:25,
1608:20, 1609:2,
1612:19, 1615:5,
1618:21, 1619:5,
1620:11, 1625:12,
1627:21, 1629:11,
1631:10, 1634:16,
1635:1, 1640:18,
1660:3, 1660:10,
1662:16, 1668:21,
1669:14, 1671:2,
1674:23, 1676:4,
1682:21, 1688:4,
1694:14, 1698:5,
1701:12, 1703:4,
1706:4, 1707:23,
1712:13, 1713:2,
1718:15, 1724:8,
1730:22, 1745:4,
1749:22, 1750:2,
1750:13, 1750:15,
1751:9, 1751:17,
1757:4
**means** [9] - 1606:15,
1613:12, 1615:20,
1618:12, 1622:13,
1666:18, 1724:19,
1749:22, 1750:9
**meant** [6] - 1598:16,
1676:19, 1705:7,
1724:25, 1725:1,
1742:17
**measured** [1] -
1599:17
**media** [8] - 1625:23,
1650:4, 1660:5,
1660:14, 1711:11,
1720:8, 1746:13,
1755:17
**media-type** [1] -
1720:8
**medical** [3] - 1635:18,
1635:20, 1635:23
**medication** [2] -
1636:13, 1636:15
**medications** [1] -
1636:22
**meet** [3] - 1605:23,
1750:18, 1750:19
**meeting** [7] - 1610:24,
1712:9, 1712:12,
1714:16, 1718:9,
1757:23, 1758:2
**Meggs** [17] - 1597:12,

1597:12, 1609:10,
1624:2, 1674:20,
1675:1, 1675:8,
1675:9, 1675:12,
1694:8, 1698:25,
1704:15, 1707:4,
1741:14, 1741:25,
1742:14, 1742:19
**Meggs's** [2] - 1694:11,
1733:24
**member** [19] - 1620:7,
1620:12, 1620:13,
1620:15, 1620:18,
1620:21, 1620:24,
1624:16, 1632:2,
1632:4, 1668:6,
1668:24, 1711:22,
1743:25, 1744:1,
1744:4, 1744:6
**members** [6] -
1619:22, 1623:1,
1634:6, 1656:1,
1693:17, 1704:24
**Memorial** [2] -
1742:11, 1743:3
**memory** [7] - 1630:10,
1649:14, 1651:16,
1721:20, 1722:17,
1723:12, 1756:12
**mention** [4] - 1607:3,
1611:14, 1659:21,
1732:15
**mentioned** [4] -
1608:16, 1612:7,
1622:10, 1712:25
**merge** [3] - 1703:4,
1703:6, 1703:8
**Meriweather** [1] -
1639:23
**mess** [1] - 1670:13
**Message** [4] - 1731:2,
1732:4, 1742:14,
1743:6
**message** [60] -
1622:14, 1622:18,
1622:19, 1649:6,
1650:4, 1670:13,
1677:21, 1684:9,
1688:13, 1688:15,
1688:16, 1699:13,
1699:19, 1700:2,
1700:4, 1700:6,
1703:25, 1704:5,
1706:8, 1706:22,
1707:7, 1707:13,
1708:4, 1709:9,
1709:10, 1719:20,
1730:17, 1731:1,
1731:24, 1732:1,
1732:9, 1732:19,

1736:25, 1737:2,
1737:3, 1737:5,
1737:10, 1737:15,
1738:11, 1738:17,
1738:18, 1741:9,
1741:15, 1741:24,
1742:9, 1742:15,
1743:2, 1743:6,
1744:10, 1748:13,
1748:17, 1749:1,
1749:3, 1750:25,
1751:6
**Messages** [1] - 1740:3
**messages** [82] -
1611:5, 1621:13,
1621:16, 1622:23,
1623:1, 1623:7,
1623:11, 1623:15,
1623:20, 1623:25,
1624:8, 1645:10,
1648:18, 1648:24,
1649:3, 1649:4,
1678:22, 1695:9,
1699:10, 1699:15,
1700:8, 1700:21,
1700:24, 1701:1,
1701:7, 1701:10,
1701:15, 1701:19,
1701:23, 1702:4,
1702:7, 1702:10,
1702:14, 1702:17,
1703:18, 1703:20,
1705:13, 1705:22,
1706:2, 1706:9,
1706:13, 1708:15,
1720:7, 1720:8,
1729:10, 1729:16,
1729:21, 1730:2,
1730:7, 1731:3,
1731:14, 1732:18,
1733:13, 1733:15,
1733:18, 1733:21,
1733:22, 1733:25,
1734:3, 1734:5,
1735:13, 1735:16,
1735:20, 1735:22,
1736:7, 1736:16,
1737:22, 1739:17,
1739:21, 1740:2,
1740:3, 1740:13,
1742:19, 1743:17,
1744:12, 1745:21,
1745:24, 1748:11,
1748:16, 1751:1,
1751:2
**met** [2] - 1675:8,
1675:10
**methodical** [2] -
1616:24, 1617:12
**methodically** [2] -

1617:17, 1618:6
**Metro** [1] - 1615:3
**mic** [3] - 1601:19,
1752:25, 1754:3
**Michael** [1] - 1596:4
**microphone** [2] -
1611:21, 1754:1
**Microsoft** [3] - 1703:4,
1703:6, 1703:8
**mid** [4] - 1610:4,
1655:17, 1687:2,
1695:8
**mid-November** [3] -
1655:17, 1687:2,
1695:8
**middle** [1] - 1739:12
**might** [5] - 1601:14,
1693:4, 1712:23,
1730:2, 1750:1
**milestone** [1] - 1746:7
**Military** [1] - 1705:5
**military** [7] - 1634:8,
1634:24, 1635:4,
1635:8, 1650:14,
1693:22, 1694:5
**military-style** [3] -
1634:8, 1634:24,
1635:4
**Militia** [1] - 1739:8
**militia** [3] - 1705:7,
1707:16, 1738:19
**Million** [9] - 1611:12,
1612:9, 1675:9,
1686:6, 1686:14,
1696:20, 1696:23,
1730:24, 1731:14
**mincing** [1] - 1694:17
**mind** [2] - 1625:10,
1732:11
**minimum** [1] -
1659:16
**minutes** [9] - 1672:18,
1699:16, 1718:10,
1718:12, 1718:22,
1724:6, 1744:19,
1744:21, 1746:1
**Miranda** [1] - 1658:23
**mirrored** [1] - 1621:24
**missed** [4] - 1640:12,
1640:20, 1642:20,
1689:24
**missing** [1] - 1623:21
**mission** [2] - 1690:22,
1692:2
**misspoke** [1] - 1714:6
**misstated** [2] -
1663:22, 1663:23
**misstates** [1] - 1664:9
**mistaken** [2] - 1638:9,
1679:13

**Mitchell** [1] - 1607:9
**mobility** [1] - 1636:9
**moment** [3] - 1687:17,
1728:21, 1730:9
**moments** [2] - 1753:9
**Monday** [1] - 1610:5
**money** [1] - 1620:25
**Montana** [1] - 1628:15
**month** [1] - 1611:25
**months** [8] - 1616:9,
1616:25, 1661:4,
1680:18, 1727:6,
1744:11, 1750:25
**morning** [13] - 1598:2,
1598:12, 1642:11,
1660:21, 1729:7,
1730:19, 1733:1,
1746:24, 1753:21,
1754:13, 1754:19,
1756:1, 1757:17
**most** [4] - 1621:25,
1659:3, 1662:7,
1671:5
**move** [9] - 1616:18,
1617:23, 1619:6,
1659:9, 1673:16,
1688:8, 1691:11,
1740:17
**moved** [2] - 1656:7,
1730:10
**movie** [2] - 1645:6,
1645:9
**multi** [1] - 1728:3
**multi-hour** [1] -
1728:3
**multiple** [3] - 1664:19,
1665:3, 1747:15
**must** [6] - 1605:22,
1605:23, 1658:1,
1666:18, 1705:9,
1732:5

**N**

**name** [9] - 1601:18,
1605:1, 1693:18,
1693:19, 1709:23,
1711:25, 1718:20,
1738:14, 1740:9
**named** [11] - 1628:14,
1642:13, 1652:12,
1669:3, 1685:17,
1687:4, 1691:8,
1707:8, 1735:23,
1739:19, 1740:6
**narcotics** [1] -
1616:23
**national** [3] - 1660:4,
1660:14, 1709:6
**National** [1] - 1708:22

**native** [1] - 1751:6
**Navy** [3] - 1649:25, 1650:13, 1650:21
**near** [1] - 1738:23
**nearly** [1] - 1700:25
**necessarily** [3] - 1657:12, 1672:3, 1724:24
**need** [31] - 1600:25, 1601:1, 1602:14, 1603:15, 1603:18, 1604:4, 1604:9, 1607:7, 1609:24, 1617:20, 1629:14, 1641:12, 1665:16, 1676:25, 1677:2, 1680:23, 1684:4, 1685:13, 1685:14, 1704:8, 1704:19, 1715:9, 1715:10, 1719:6, 1721:22, 1733:4, 1745:3, 1747:24, 1748:8, 1754:1, 1755:3
**needed** [1] - 1636:11
**needs** [1] - 1708:17
**Nellie** [1] - 1698:9
**Nellies** [1] - 1698:20
**Nervous** [2] - 1698:9, 1698:20
**NESTLER** [11] - 1601:4, 1601:14, 1601:16, 1601:23, 1602:1, 1607:14, 1607:19, 1607:22, 1748:7, 1748:11, 1750:23
**net** [1] - 1744:11
**never** [11] - 1615:22, 1620:6, 1620:22, 1644:12, 1648:13, 1656:3, 1710:20, 1711:1, 1711:5, 1711:11, 1739:10
**New** [3] - 1626:19, 1627:9, 1627:10
**news** [4] - 1598:22, 1627:14, 1649:11, 1755:17
**next** [14] - 1608:11, 1608:24, 1609:7, 1610:5, 1610:8, 1660:24, 1676:8, 1727:5, 1731:1, 1731:23, 1732:9, 1742:14, 1743:6, 1746:25
**nice** [1] - 1758:4
**night** [3] - 1718:7, 1750:13, 1750:16

**nine** [1] - 1658:21
**nobody** [1] - 1735:4
**none** [2] - 1644:9, 1734:4
**noon** [1] - 1715:13
**normal** [1] - 1610:1
**normally** [1] - 1644:14
**North** [5] - 1712:1, 1735:23, 1739:19, 1742:11, 1743:9
**note** [1] - 1631:8
**NOTE** [1] - 1598:2
**noted** [2] - 1626:20, 1677:20
**notepad** [1] - 1689:11
**notes** [2] - 1689:10, 1746:1
**nothing** [2] - 1683:9, 1684:2
**notice** [3] - 1623:14, 1751:3, 1751:4
**noticed** [2] - 1753:1, 1753:2
**notification** [1] - 1700:3
**November** [61] - 1610:22, 1611:7, 1611:8, 1611:11, 1611:24, 1612:9, 1654:14, 1655:17, 1656:7, 1664:22, 1664:24, 1670:14, 1671:20, 1671:22, 1673:12, 1675:10, 1677:11, 1679:5, 1679:8, 1681:14, 1681:18, 1683:1, 1684:1, 1684:5, 1685:9, 1685:15, 1686:14, 1687:2, 1695:8, 1696:10, 1696:16, 1701:6, 1709:10, 1709:13, 1712:9, 1712:12, 1712:14, 1712:18, 1719:15, 1719:16, 1729:16, 1729:17, 1729:22, 1730:3, 1730:18, 1731:4, 1731:14, 1731:16, 1731:20, 1732:5, 1732:7, 1732:25, 1733:8
**NRA** [2] - 1620:19, 1620:21
**number** [28] - 1607:5, 1622:2, 1623:7, 1625:22, 1629:23, 1629:24, 1630:13, 1631:5, 1631:6,

1636:25, 1637:10, 1641:18, 1641:21, 1644:20, 1662:1, 1670:18, 1670:21, 1700:11, 1704:1, 1705:17, 1705:20, 1713:19, 1714:3, 1720:10, 1722:1, 1732:16, 1737:20, 1737:22
**numbering** [1] - 1722:8
**numerous** [1] - 1688:21

## O

**o'clock** [1] - 1672:10
**Oath** [34] - 1611:23, 1612:9, 1619:22, 1619:23, 1620:1, 1620:7, 1620:12, 1620:15, 1623:2, 1624:17, 1626:7, 1629:25, 1631:6, 1632:3, 1650:3, 1656:1, 1656:13, 1668:7, 1668:24, 1686:13, 1700:13, 1701:16, 1701:20, 1701:23, 1714:15, 1715:11, 1715:15, 1715:16, 1716:5, 1716:14, 1717:6, 1743:25, 1744:10, 1744:11
**oath** [1] - 1610:19
**object** [6] - 1600:20, 1600:23, 1713:15, 1731:5, 1734:7, 1755:16
**objecting** [2] - 1742:4, 1742:5
**objection** [49] - 1602:16, 1623:4, 1624:25, 1625:17, 1635:24, 1637:18, 1637:22, 1640:4, 1643:21, 1647:6, 1649:17, 1654:25, 1659:14, 1662:3, 1662:9, 1662:15, 1662:25, 1664:9, 1669:11, 1669:24, 1671:23, 1673:19, 1673:20, 1674:2, 1674:8, 1680:22, 1683:19, 1683:20, 1684:15, 1685:4, 1686:8, 1686:17, 1691:13, 1694:20,

1697:4, 1704:12, 1706:24, 1708:9, 1708:10, 1711:7, 1714:25, 1715:21, 1716:3, 1726:9, 1734:10, 1738:4, 1740:19, 1740:20, 1742:2
**objects** [1] - 1682:21
**obligation** [2] - 1599:5, 1599:15
**obstruct** [2] - 1662:7, 1662:13, 1663:4
**obstructing** [1] - 1662:6
**obtain** [2] - 1642:4, 1696:18
**obtained** [7] - 1619:15, 1620:1, 1643:13, 1650:14, 1650:21, 1670:23, 1735:12
**obviate** [1] - 1604:4
**obviously** [18] - 1614:13, 1617:7, 1626:15, 1627:6, 1629:1, 1634:16, 1636:17, 1660:18, 1671:12, 1678:9, 1681:22, 1682:4, 1684:18, 1694:18, 1725:7, 1747:15, 1752:6, 1755:23
**occasions** [1] - 1664:19
**occurred** [5] - 1679:14, 1696:23, 1724:4, 1724:15, 1731:14
**odd** [1] - 1735:4
**offense** [1] - 1664:13
**offenses** [1] - 1755:13
**offensive** [1] - 1694:24
**offered** [1] - 1625:6
**Office** [4] - 1613:19, 1613:20, 1616:10, 1727:16
**office** [3] - 1667:18, 1667:21
**officer** [2] - 1606:9, 1606:12
**official** [3] - 1662:7, 1662:13, 1663:5
**often** [1] - 1616:9
**Ohio** [10] - 1628:7, 1628:16, 1642:12, 1643:1, 1645:13, 1645:16, 1647:25, 1648:4, 1648:11,

1742:12
**OK** [2] - 1707:12, 1741:24
**Old** [5] - 1700:19, 1700:23, 1729:11, 1730:14, 1732:4
**old** [3] - 1605:19, 1693:25, 1694:10
**older** [2] - 1607:10, 1669:20
**once** [1] - 1754:24
**one** [76] - 1599:22, 1599:23, 1600:22, 1607:3, 1607:9, 1608:16, 1608:19, 1612:6, 1613:9, 1613:10, 1613:24, 1614:24, 1624:22, 1625:24, 1626:5, 1628:2, 1629:8, 1629:23, 1631:5, 1636:21, 1648:16, 1649:3, 1649:4, 1655:9, 1656:5, 1659:1, 1660:22, 1661:25, 1662:1, 1664:1, 1664:23, 1666:1, 1667:3, 1667:4, 1668:24, 1671:20, 1671:21, 1673:25, 1676:14, 1682:4, 1682:12, 1682:21, 1689:6, 1693:18, 1693:22, 1694:4, 1694:8, 1698:19, 1702:19, 1702:22, 1703:19, 1703:23, 1708:2, 1710:22, 1710:23, 1720:2, 1720:5, 1720:21, 1725:16, 1728:20, 1730:9, 1734:22, 1735:22, 1737:10, 1738:23, 1744:10, 1747:17, 1748:7, 1749:23, 1750:9, 1751:11, 1752:1, 1753:25, 1755:7
**ongoing** [1] - 1708:10
**OP** [3] - 1740:6, 1741:10, 1743:11
**op** [12] - 1677:7, 1688:14, 1688:18, 1688:20, 1689:7, 1689:11, 1689:14, 1689:15, 1690:16, 1691:20, 1691:24, 1705:2
**open** [7] - 1625:16,

1629:18, 1629:22,
1631:4, 1672:8,
1688:11, 1755:18
**opened** [1] - 1755:22
**opening** [17] - 1607:4,
1629:15, 1635:16,
1635:18, 1637:13,
1651:21, 1684:19,
1684:20, 1713:1,
1713:2, 1713:4,
1713:8, 1713:20,
1714:12, 1714:21,
1757:13
**operating** [3] -
1690:23, 1690:25,
1751:10
**operation** [3] -
1664:21, 1684:1,
1688:20
**operations** [1] -
1644:17
**opine** [1] - 1618:25
**opinion** [2] - 1659:16,
1728:9
**oppose** [1] - 1672:4
**opposed** [2] - 1608:2,
1609:4
**Ops** [1] - 1712:1
**option** [1] - 1749:20
**oral** [1] - 1607:19
**order** [8] - 1609:11,
1629:18, 1642:4,
1674:5, 1696:9,
1698:1, 1705:6,
1747:9
**ordering** [2] -
1696:25, 1747:6
**orderly** [1] - 1609:6
**orders** [1] - 1656:1
**organization** [3] -
1620:9, 1620:14,
1620:18
**organized** [1] -
1609:12
**orient** [1] - 1722:7
**originally** [2] -
1620:16, 1665:9
**OSRM** [1] - 1720:19
**ostensibly** [1] -
1724:1
**otherwise** [3] -
1600:5, 1630:22,
1751:11
**out-of-court** [2] -
1625:6, 1625:7
**outbuildings** [1] -
1619:16
**outdoor** [1] - 1635:2
**outside** [6] - 1646:14,
1672:13, 1705:6,

1708:11, 1734:8,
1746:16
**overall** [1] - 1684:1
**overdue** [1] - 1708:18
**overhead** [1] - 1634:3
**overran** [1] - 1694:16
**overruled** [15] -
1623:5, 1625:1,
1625:17, 1640:5,
1643:22, 1659:15,
1662:16, 1662:20,
1662:21, 1685:5,
1694:21, 1716:4,
1726:10, 1731:7,
1742:7
**overseas** [1] - 1629:16
**overstatement** [1] -
1657:17
**overt** [2] - 1671:21,
1674:1
**overtake** [2] -
1694:13, 1694:15
**overview** [1] - 1613:13
**own** [4] - 1638:6,
1676:22, 1745:17,
1752:11
**owned** [1] - 1691:4

## P

**p.m** [9] - 1640:2,
1641:25, 1642:16,
1649:5, 1677:12,
1738:12, 1741:25,
1743:14, 1758:6
**page** [13] - 1609:10,
1630:18, 1646:12,
1676:14, 1690:11,
1690:16, 1702:18,
1702:22, 1706:20,
1707:8, 1707:13,
1732:9, 1737:20
**PAGE** [2] - 1596:2,
1597:2
**pages** [6] - 1621:2,
1642:9, 1700:25,
1701:10, 1720:7,
1737:10
**paid** [1] - 1620:22
**Palian** [22] - 1596:4,
1608:18, 1610:16,
1613:4, 1630:8,
1648:3, 1706:19,
1710:15, 1717:24,
1729:4, 1730:13,
1732:24, 1734:12,
1735:8, 1738:11,
1739:16, 1740:2,
1741:9, 1745:9,
1746:17, 1746:18,

1753:3
**paper** [1] - 1755:20
**paragraph** [1] -
1690:20
**paragraphs** [1] -
1666:4
**paraphrasing** [1] -
1685:13
**pardon** [1] - 1719:7
**Parker** [2] - 1693:19,
1694:4
**parker** [1] - 1693:25
**parlance** [1] - 1724:20
**part** [27] - 1612:16,
1618:8, 1627:25,
1628:8, 1631:9,
1652:15, 1659:3,
1665:7, 1671:6,
1672:25, 1682:6,
1682:12, 1687:7,
1687:10, 1692:6,
1692:23, 1700:18,
1714:12, 1714:13,
1719:18, 1719:20,
1719:25, 1720:13,
1721:2, 1722:22,
1728:15, 1733:7
**participate** [1] -
1723:3
**participation** [1] -
1714:13
**particular** [5] -
1601:21, 1606:15,
1630:18, 1630:21,
1677:20
**parties** [1] - 1708:11
**Paso** [2] - 1707:12
**pass** [2] - 1601:19,
1739:11
**passage** [1] - 1630:21
**passwords** [1] -
1633:8
**past** [2] - 1685:21,
1748:14
**pasting** [1] - 1676:22
**paths** [1] - 1627:18
**Paul** [5] - 1735:24,
1739:20, 1741:22,
1743:8, 1743:9
**pauperis** [1] - 1747:7
**pay** [3] - 1620:9,
1620:14, 1747:22
**paying** [4] - 1620:25,
1632:2, 1632:4,
1744:1
**PDF** [1] - 1737:25
**pen** [1] - 1725:9
**Pentagon** [1] -
1738:23
**people** [31] - 1615:11,

1617:17, 1619:22,
1621:5, 1624:5,
1624:6, 1624:15,
1629:18, 1639:3,
1644:11, 1656:12,
1665:8, 1668:3,
1679:19, 1679:23,
1691:3, 1692:12,
1692:19, 1693:4,
1694:5, 1694:8,
1695:2, 1696:3,
1696:4, 1705:23,
1720:18, 1738:19,
1749:3, 1752:22,
1753:3, 1753:21
**people's** [2] - 1621:7,
1734:6
**Peoples** [1] - 1610:6
**pepper** [1] - 1725:1
**per** [2] - 1721:14,
1728:1
**percent** [3] - 1688:1,
1703:12, 1703:16
**percentage** [1] -
1706:5
**perhaps** [3] - 1600:14,
1626:10, 1685:25
**period** [6] - 1604:6,
1623:21, 1633:2,
1643:11, 1664:24,
1701:5, 1702:1,
1702:2, 1727:5,
1729:16, 1732:6,
1733:21, 1733:24,
1735:12, 1743:21,
1746:20
**periodically** [1] -
1712:20
**permit** [3] - 1697:3,
1697:21, 1698:1
**permits** [1] - 1697:18
**person** [14] - 1619:9,
1619:12, 1626:3,
1628:14, 1628:19,
1629:16, 1643:6,
1687:25, 1698:13,
1700:1, 1724:24,
1726:5, 1738:14,
1743:9
**personal** [1] - 1624:13
**personally** [2] -
1622:20, 1624:14
**personnel** [2] -
1633:21, 1636:18
**persons** [1] - 1622:24
**phone** [62] - 1622:13,
1622:18, 1622:19,
1625:2, 1633:9,
1633:13, 1652:3,
1652:5, 1652:10,

1652:11, 1652:15,
1652:16, 1652:18,
1652:19, 1654:16,
1655:6, 1655:14,
1655:19, 1656:6,
1670:23, 1671:4,
1671:7, 1671:8,
1671:10, 1671:14,
1671:24, 1681:10,
1681:13, 1682:5,
1682:8, 1683:8,
1686:24, 1687:1,
1687:16, 1692:20,
1699:22, 1700:11,
1703:14, 1703:20,
1719:19, 1719:21,
1720:2, 1720:5,
1729:11, 1733:20,
1733:24, 1734:2,
1736:16, 1737:6,
1737:15, 1739:17,
1740:4, 1740:9,
1740:14, 1740:15,
1742:20, 1743:17,
1748:12, 1750:25
**phones** [7] - 1619:16,
1621:22, 1622:24,
1648:9, 1651:21,
1667:15, 1734:6
**photo** [1] - 1682:15
**photograph** [4] -
1638:4, 1638:5,
1638:6, 1745:15
**photographs** [8] -
1670:21, 1670:22,
1671:4, 1671:6,
1673:6, 1681:8,
1681:12, 1681:18
**photos** [7] - 1634:3,
1673:11, 1676:8,
1681:3, 1681:5,
1684:21, 1684:25
**phrase** [1] - 1627:18
**phrased** [1] - 1665:17
**pick** [2] - 1744:25,
1745:7
**picked** [2] - 1660:14,
1739:11
**picture** [7] - 1637:13,
1637:14, 1676:1,
1682:23, 1684:7,
1713:25, 1743:3
**pictures** [7] - 1682:5,
1682:25, 1683:4,
1683:7, 1683:12,
1683:14, 1683:15
**piece** [3] - 1599:20,
1627:22, 1755:20
**pieces** [2] - 1599:8,
1600:1

**piqued** [1] - 1627:22
**place** [7] - 1623:1, 1628:11, 1648:5, 1680:9, 1719:2, 1719:12, 1750:10
**places** [1] - 1702:15
**placing** [1] - 1679:6
**plan** [24] - 1624:23, 1626:12, 1659:11, 1659:12, 1661:2, 1665:2, 1665:12, 1666:9, 1666:19, 1672:10, 1677:8, 1685:10, 1689:8, 1689:11, 1689:14, 1689:15, 1690:16, 1691:20, 1691:24, 1730:14, 1731:24, 1731:25, 1734:16
**planned** [3] - 1626:1, 1666:5, 1730:24
**planning** [7] - 1648:10, 1648:12, 1665:22, 1679:7, 1679:15, 1719:15, 1719:17
**plans** [2] - 1611:11, 1739:18
**play** [6] - 1601:6, 1649:10, 1716:13, 1735:24, 1736:10
**play-by-play** [1] - 1649:10
**played** [2] - 1716:19, 1716:25
**players** [1] - 1710:4
**plays** [2] - 1603:16, 1607:24
**Plaza** [4] - 1684:22, 1684:23, 1684:25, 1685:1
**PLEASE** [1] - 1739:11
**plenty** [1] - 1599:14
**plot** [4] - 1667:6, 1679:12, 1679:20, 1684:11
**podcast** [3] - 1601:12, 1601:18, 1603:5
**Point** [1] - 1731:24
**point** [25] - 1604:23, 1607:4, 1636:21, 1636:24, 1645:16, 1656:8, 1658:16, 1662:19, 1665:24, 1679:6, 1690:10, 1690:11, 1712:23, 1712:24, 1715:11, 1725:23, 1727:3, 1730:22, 1730:23, 1737:17, 1740:16,

1743:4, 1748:9, 1750:7, 1757:12
**Points** [1] - 1742:16
**police** [6] - 1605:25, 1606:1, 1606:3, 1606:6, 1606:11, 1698:14
**Police** [2] - 1615:3
**policy** [1] - 1698:7
**politicians** [1] - 1644:19
**poll** [1] - 1705:2
**polls** [1] - 1730:22
**pony** [1] - 1602:15
**poor** [2] - 1638:19, 1753:6
**portion** [1] - 1656:4
**portions** [1] - 1721:12
**position** [5] - 1598:21, 1600:12, 1684:11, 1749:14, 1755:14
**positive** [2] - 1699:24, 1715:9
**possession** [3] - 1654:17, 1681:11, 1683:16
**possible** [2] - 1658:14, 1658:15
**Post** [1] - 1660:5
**postdated** [1] - 1756:11
**poster** [1] - 1710:3
**posting** [1] - 1708:17
**posture** [1] - 1705:5
**potential** [2] - 1705:2, 1720:15
**potentially** [2] - 1599:7, 1757:13
**Potomac** [1] - 1738:21
**PowerPoint** [4] - 1713:8, 1713:21, 1713:22, 1713:24
**practically** [2] - 1676:20, 1680:10
**practice** [4] - 1616:24, 1617:10, 1617:16, 1618:21
**pre** [1] - 1677:8
**pre-strike** [1] - 1677:8
**precedent** [1] - 1607:2
**predawn** [1] - 1642:25
**predecessor** [1] - 1605:24
**predication** [7] - 1629:11, 1629:13, 1629:22, 1630:2, 1630:9, 1631:4, 1631:14
**preference** [1] - 1608:23

**preparation** [1] - 1691:2
**prepare** [1] - 1732:11
**prepared** [5] - 1598:3, 1604:21, 1746:25, 1749:25, 1754:16
**preplanning** [1] - 1679:9
**prepping** [1] - 1611:10
**prerequisite** [1] - 1648:6
**presence** [3] - 1609:18, 1672:23, 1746:16
**present** [6] - 1601:10, 1633:23, 1638:4, 1687:25, 1727:11, 1734:6
**presentation** [1] - 1654:9
**presented** [2] - 1637:24, 1710:1
**presenting** [1] - 1706:16
**preserve** [1] - 1602:16
**president** [4] - 1708:20, 1708:24, 1709:2, 1731:19
**President** [5] - 1696:12, 1705:6, 1707:18, 1715:12, 1715:17
**pressure** [2] - 1644:7, 1644:10
**prestrike** [9] - 1677:14, 1678:13, 1679:2, 1680:5, 1681:23, 1682:22, 1683:8, 1683:23, 1684:1
**presumably** [1] - 1746:25
**presumption** [1] - 1606:13
**pretending** [1] - 1739:7
**pretty** [6] - 1634:16, 1634:21, 1656:7, 1657:6, 1660:10, 1755:9
**previous** [2] - 1713:11, 1743:2
**previously** [3] - 1690:5, 1713:6, 1713:14
**Princess** [1] - 1645:6
**principle** [1] - 1600:8
**print** [3] - 1700:25, 1721:11, 1721:22
**printout** [1] - 1671:13

**printouts** [1] - 1671:1
**private** [4] - 1622:14, 1624:3, 1624:7, 1691:3
**privilege** [7] - 1602:6, 1603:8, 1603:10, 1604:19, 1748:8, 1749:2, 1750:9
**privileged** [5] - 1748:23, 1748:24, 1750:11, 1751:2
**probability** [1] - 1618:13
**probable** [6] - 1617:22, 1618:8, 1618:10, 1618:12, 1618:21, 1618:22
**problem** [3] - 1598:18, 1602:22, 1745:4
**problems** [1] - 1600:6
**proceeding** [3] - 1662:7, 1662:13, 1663:5
**Proceedings** [8] - 1609:18, 1625:16, 1672:8, 1672:13, 1672:23, 1688:11, 1746:16, 1758:6
**process** [6] - 1599:6, 1632:21, 1678:17, 1702:12, 1702:13
**procuring** [1] - 1743:12
**professionally** [1] - 1723:9
**proffer** [3] - 1727:16, 1727:18, 1727:19
**proffered** [1] - 1600:21
**properly** [3] - 1606:4, 1625:19, 1755:10
**properties** [1] - 1619:16
**property** [13] - 1634:11, 1634:24, 1635:4, 1635:9, 1638:15, 1639:3, 1639:8, 1646:14, 1646:19, 1663:12, 1664:7, 1691:3, 1691:4
**proposed** [1] - 1754:14
**prosecution** [6] - 1615:20, 1679:11, 1705:8, 1748:12, 1748:17, 1748:20
**prosecutor** [1] - 1611:6
**prosecutors** [5] -

1613:21, 1614:10, 1615:21, 1680:11, 1702:25
**protect** [4] - 1689:15, 1705:8, 1707:11, 1716:8
**protected** [2] - 1694:24, 1695:3
**protecting** [2] - 1599:25, 1716:7
**protest** [2] - 1667:24, 1686:15
**protests** [1] - 1676:21
**provide** [4] - 1647:16, 1748:25, 1749:1, 1752:3
**provided** [5] - 1627:17, 1643:16, 1670:17, 1706:9, 1748:19
**providing** [3] - 1599:3, 1607:8, 1647:17
**proving** [1] - 1679:12
**prudent** [1] - 1605:5
**public** [3] - 1698:8, 1698:9, 1698:13
**publicly** [1] - 1691:3
**publish** [1] - 1741:7
**published** [1] - 1626:20
**Pugh** [1] - 1738:16
**pull** [2] - 1670:12, 1713:18
**purchase** [1] - 1696:16
**purpose** [4] - 1626:6, 1721:4, 1723:1, 1723:4
**purposes** [5] - 1672:15, 1696:3, 1721:10, 1736:22, 1744:17
**putting** [3] - 1644:10, 1707:12, 1721:13

## Q

**QRF** [14] - 1650:10, 1659:17, 1659:19, 1659:20, 1659:21, 1667:21, 1734:23, 1735:3, 1735:16, 1736:5, 1739:18, 1742:16, 1743:4
**QRFs** [1] - 1626:7
**qualified** [1] - 1747:6
**quarterback** [1] - 1613:15
**quarterbacks** [1] - 1613:16

**questioned** [1] - 1637:23
**questioning** [3] - 1753:22, 1755:11, 1757:5
**questions** [36] - 1602:25, 1610:9, 1610:10, 1612:23, 1633:1, 1633:3, 1636:25, 1646:10, 1646:11, 1649:15, 1650:20, 1656:5, 1659:1, 1695:4, 1695:17, 1698:23, 1710:8, 1717:18, 1724:12, 1724:18, 1728:22, 1729:7, 1729:10, 1729:13, 1732:24, 1733:10, 1733:13, 1734:13, 1735:8, 1735:10, 1743:24, 1744:13, 1744:15, 1755:9, 1757:11, 1757:13
**quibble** [1] - 1638:21
**Quick** [1] - 1738:23
**quick** [8] - 1644:7, 1735:17, 1735:24, 1736:3, 1736:11, 1736:13, 1736:17, 1752:22
**quickly** [7] - 1607:9, 1609:22, 1643:14, 1644:11, 1656:7, 1739:2, 1753:1
**quite** [4] - 1604:7, 1604:22, 1622:11, 1650:24
**quote** [11] - 1648:18, 1648:19, 1648:21, 1648:22, 1661:21, 1661:22, 1665:22, 1666:4, 1672:5, 1705:3, 1736:5
**quoted** [1] - 1733:3
**quoting** [1] - 1672:2

**R**

**Rachel** [1] - 1709:5
**radio** [3] - 1606:3, 1653:23, 1654:2
**raid** [2] - 1628:11, 1642:25
**raiding** [1] - 1644:18
**raise** [1] - 1608:4
**raising** [2] - 1602:8, 1755:23
**Rakoczy** [8] - 1606:25, 1614:15, 1701:5,

1728:24, 1729:5, 1732:15, 1737:19, 1744:16
**RAKOCZY** [82] - 1623:4, 1624:25, 1635:24, 1637:18, 1637:22, 1640:4, 1643:21, 1647:6, 1649:17, 1654:25, 1659:14, 1662:3, 1662:9, 1662:15, 1664:9, 1669:11, 1669:24, 1671:23, 1672:1, 1673:20, 1674:2, 1674:8, 1680:22, 1683:19, 1684:15, 1685:4, 1686:8, 1687:24, 1691:13, 1694:20, 1697:4, 1704:12, 1706:25, 1708:10, 1711:7, 1713:15, 1713:20, 1714:4, 1714:6, 1714:9, 1714:25, 1715:21, 1716:3, 1716:16, 1726:9, 1728:25, 1729:2, 1730:8, 1730:12, 1731:10, 1732:14, 1732:17, 1732:22, 1732:23, 1734:11, 1736:20, 1736:24, 1737:17, 1737:21, 1737:25, 1738:10, 1739:23, 1740:1, 1740:16, 1741:2, 1741:7, 1741:8, 1742:8, 1744:19, 1745:8, 1745:25, 1753:14, 1755:7, 1755:18, 1755:22, 1756:4, 1756:7, 1756:12, 1756:18, 1757:1, 1757:10, 1757:18
**Rakoczy.............** [1] - 1596:7
**Rally** [1] - 1742:16
**rally** [4] - 1696:13, 1715:16, 1715:17, 1743:4
**ram** [1] - 1634:1
**ramp** [1] - 1738:22
**range** [1] - 1720:9
**range/additional** [1] - 1677:9
**rangersmith483@ yahoo.com** [1] - 1691:8
**rarely** [1] - 1616:13

**rather** [1] - 1604:23
**re** [1] - 1640:24
**re-ask** [1] - 1640:24
**reach** [2] - 1726:7, 1726:13
**reached** [1] - 1601:11
**react** [1] - 1753:22
**reacted** [1] - 1755:9
**reaction** [6] - 1735:17, 1735:24, 1736:3, 1736:11, 1736:13, 1736:18
**read** [35] - 1621:8, 1624:7, 1627:9, 1627:11, 1627:12, 1630:23, 1644:23, 1647:9, 1676:14, 1676:16, 1678:21, 1678:23, 1678:24, 1689:17, 1690:20, 1691:18, 1691:19, 1695:23, 1701:19, 1701:22, 1703:21, 1704:7, 1704:14, 1706:8, 1706:13, 1707:8, 1707:14, 1708:15, 1722:13, 1729:11, 1738:17, 1742:9, 1752:4
**reading** [2] - 1676:23, 1732:19
**reads** [1] - 1738:18
**ready** [5] - 1608:5, 1608:6, 1609:17, 1641:17, 1717:12
**real** [1] - 1622:15
**realize** [1] - 1745:25
**really** [9] - 1603:18, 1644:4, 1656:11, 1657:12, 1674:10, 1711:11, 1716:7, 1717:5, 1749:9
**reason** [15] - 1602:20, 1605:25, 1609:8, 1635:22, 1644:24, 1680:4, 1685:23, 1693:2, 1698:12, 1701:3, 1701:9, 1701:13, 1701:14, 1750:14, 1755:12
**reasonable** [2] - 1598:15, 1618:17
**reasons** [6] - 1629:23, 1631:4, 1648:16, 1698:19, 1702:20, 1757:6
**recalling** [4] - 1636:8, 1675:13, 1675:16, 1701:18
**recce** [17] - 1671:22,

1676:21, 1677:8, 1677:14, 1677:25, 1678:3, 1678:6, 1678:13, 1679:2, 1680:5, 1681:23, 1682:12, 1682:21, 1683:8, 1683:23, 1684:1, 1735:2
**received** [7] - 1598:11, 1598:25, 1693:8, 1693:12, 1699:10, 1700:4, 1700:8
**Recess** [1] - 1672:22
**recognize** [3] - 1682:15, 1685:1, 1731:18
**recognized** [1] - 1645:6
**recollection** [5] - 1641:16, 1646:6, 1721:10, 1722:1, 1756:20
**recommendation** [2] - 1732:6, 1732:12
**recommends** [1] - 1731:24
**reconnaissance** [7] - 1677:18, 1677:25, 1679:3, 1679:9, 1680:6, 1682:1, 1682:6
**reconvene** [1] - 1610:1
**Record** [1] - 1605:24
**record** [21] - 1600:12, 1605:14, 1605:15, 1605:22, 1605:25, 1606:2, 1606:6, 1606:14, 1610:18, 1625:3, 1641:19, 1641:21, 1651:23, 1671:25, 1680:25, 1687:19, 1707:3, 1721:23, 1750:23, 1753:14, 1753:16
**recorded** [6] - 1601:17, 1602:2, 1603:4, 1606:11, 1607:20, 1650:25
**recorder** [3] - 1606:9, 1652:17, 1652:19
**recording** [13] - 1598:16, 1601:11, 1602:5, 1610:22, 1651:19, 1651:22, 1651:25, 1652:5, 1652:6, 1653:14, 1716:19, 1716:25, 1729:17
**recordings** [2] -

1656:20, 1656:21
**records** [22] - 1606:4, 1607:15, 1621:4, 1621:5, 1621:7, 1621:8, 1635:23, 1643:13, 1645:18, 1650:14, 1650:22, 1692:7, 1693:3, 1693:8, 1693:12, 1710:23, 1711:4, 1711:24, 1712:4, 1712:21, 1733:18, 1735:13
**recourse** [1] - 1603:13
**recover** [9] - 1622:24, 1622:25, 1623:7, 1623:9, 1660:22, 1689:2, 1710:21, 1710:22, 1734:2
**recovered** [10] - 1655:6, 1671:7, 1681:9, 1681:12, 1740:14, 1740:15, 1743:17, 1756:2, 1756:24
**Recruit** [4] - 1720:24, 1722:23, 1723:20, 1724:5
**recruits** [1] - 1720:15
**Redirect** [1] - 1596:7
**redirect** [3] - 1672:20, 1728:24, 1744:18
**REDIRECT** [1] - 1729:1
**reference** [7] - 1656:22, 1688:14, 1688:18, 1733:7, 1735:23, 1736:6
**referenced** [8] - 1602:15, 1684:19, 1684:20, 1688:20, 1689:11, 1693:17, 1695:20, 1711:21
**references** [2] - 1677:14, 1735:16
**referencing** [3] - 1689:15, 1690:1, 1691:25
**referred** [3] - 1645:10, 1716:13, 1756:5
**referring** [9] - 1612:2, 1670:15, 1702:24, 1707:17, 1707:18, 1713:22, 1713:23, 1716:16, 1720:24
**reflected** [1] - 1735:13
**refresh** [9] - 1630:9, 1641:16, 1646:5, 1651:16, 1721:19, 1721:25, 1722:17,

1779

1723:12, 1756:19
**refreshing** [1] -
1721:10
**refuse** [1] - 1732:5
**regarding** [16] -
1612:14, 1619:23,
1626:20, 1630:9,
1646:12, 1661:3,
1681:22, 1685:10,
1691:25, 1692:1,
1695:6, 1697:2,
1711:21, 1711:25,
1712:9, 1754:13
**regime** [1] - 1731:3
**regular** [4] - 1606:1,
1606:12, 1614:10
**regularity** [1] -
1606:14
**related** [2] - 1611:8,
1693:7
**relay** [1] - 1601:17
**release** [1] - 1601:2
**released** [2] - 1601:5,
1660:16
**relevance** [4] -
1669:24, 1670:2,
1685:4, 1694:20
**relevant** [5] - 1611:5,
1619:23, 1623:2,
1624:18, 1721:23
**Relief** [1] - 1700:14
**rely** [1] - 1752:2
**relying** [1] - 1627:20
**remain** [2] - 1731:2,
1746:19
**remember** [22] -
1630:2, 1637:16,
1645:4, 1645:5,
1648:20, 1650:17,
1654:10, 1656:21,
1661:18, 1664:14,
1669:14, 1670:15,
1692:12, 1718:18,
1720:10, 1720:23,
1723:14, 1730:4,
1731:11, 1734:17,
1735:10, 1756:21
**remind** [2] - 1753:19,
1753:21
**reminder** [3] - 1746:9,
1746:12, 1753:19
**remote** [1] - 1634:16
**reopened** [1] -
1755:15
**repeat** [1] - 1720:4
**rephrase** [7] - 1663:1,
1672:6, 1674:12,
1674:13, 1684:16,
1706:11, 1711:8
**report** [3] - 1606:10,

1606:12, 1671:18
**reported** [3] - 1598:3,
1606:8, 1606:9
**reporter** [1] - 1754:2
**REPORTER** [10] -
1601:15, 1605:9,
1611:20, 1637:20,
1680:23, 1704:21,
1704:23, 1714:8,
1731:6, 1740:21
**REPORTER'S** [1] -
1598:2
**reporters** [1] -
1747:17
**reporting** [1] -
1748:21
**reports** [1] - 1649:11
**represent** [1] -
1599:16
**representation** [2] -
1711:3, 1711:5
**represented** [2] -
1598:25, 1637:14
**representing** [1] -
1609:5
**Republic** [1] - 1738:20
**request** [2] - 1747:9,
1749:15
**requested** [4] -
1654:23, 1663:8,
1663:11, 1677:3
**required** [2] - 1629:17,
1664:7
**requires** [1] - 1664:1,
1721:13
**reruns** [3] - 1652:24,
1653:1, 1653:4
**rescue** [1] - 1705:3
**research** [1] - 1746:14
**reserve** [4] - 1688:5,
1717:13, 1750:1,
1752:17
**residence** [5] -
1642:12, 1725:20,
1725:24, 1726:20
**residences** [1] -
1668:4
**resolve** [2] - 1599:3,
1755:3
**resolved** [2] -
1598:18, 1754:19
**respect** [4] - 1700:10,
1701:5, 1725:7,
1757:8
**respond** [4] - 1706:1,
1706:3, 1706:6,
1706:7
**responded** [2] -
1706:6, 1754:22
**Response** [1] -

1738:24
**response** [3] -
1708:20, 1719:6,
1734:18
**responsive** [1] -
1734:21
**restate** [1] - 1731:8
**restrictions** [2] -
1607:7, 1708:21
**restrike** [1] - 1678:3
**restroom** [1] - 1674:20
**result** [5] - 1627:1,
1627:13, 1628:10,
1726:17, 1726:18
**results** [1] - 1655:13
**resume** [1] - 1672:11
**retained** [1] - 1619:18
**retire** [1] - 1669:22
**retired** [5] - 1649:24,
1650:12, 1669:19,
1709:5
**retrieve** [1] - 1692:7
**retrieving** [1] -
1722:20
**return** [2] - 1744:12,
1746:9
**returns** [1] - 1658:15
**review** [16] - 1616:6,
1617:17, 1618:5,
1624:3, 1624:5,
1624:11, 1625:23,
1670:19, 1670:22,
1700:16, 1700:19,
1733:15, 1744:3,
1748:23, 1749:7,
1750:18
**reviewed** [13] -
1621:4, 1621:6,
1621:13, 1700:10,
1700:21, 1701:7,
1701:11, 1709:18,
1719:25, 1733:12,
1748:11, 1748:16,
1748:20
**reviewing** [1] - 1646:5
**rewind** [1] - 1716:23
**Rhodes** [33] -
1609:10, 1611:4,
1611:23, 1612:8,
1622:4, 1624:1,
1661:10, 1666:22,
1670:14, 1676:13,
1678:13, 1688:17,
1695:7, 1703:25,
1704:5, 1706:1,
1706:9, 1707:13,
1707:15, 1708:5,
1729:21, 1731:1,
1731:17, 1731:19,
1731:23, 1732:4,

1732:25, 1733:3,
1741:12, 1748:13,
1749:3, 1751:18,
1751:19
**Rhodes's** [10] -
1700:11, 1703:13,
1708:15, 1729:11,
1740:4, 1740:9,
1740:14, 1740:15,
1748:12, 1750:24
**Ridge** [1] - 1739:8
**rifles** [1] - 1634:9
**rights** [4] - 1658:23,
1727:9, 1727:13,
1727:22
**rise** [2] - 1752:21,
1752:22
**rises** [1] - 1708:24
**river** [2] - 1739:3,
1739:7
**road** [1] - 1684:6
**Robinson** [1] -
1632:14
**Roeper** [5] - 1669:3,
1669:4, 1669:14,
1669:21, 1669:23
**role** [5] - 1607:23,
1631:5, 1650:3,
1735:23, 1736:10
**Ron** [1] - 1678:23
**roommate** [1] -
1628:15
**rope** [1] - 1715:1
**roughly** [2] - 1701:6,
1728:1
**routine** [2] - 1606:19,
1609:3
**Row** [1] - 1722:9
**rule** [5] - 1605:19,
1605:24, 1629:17,
1686:10, 1740:24
**Rule** [1] - 1605:20
**ruling** [2] - 1604:1,
1604:5
**run** [2] - 1633:16,
1686:16
**running** [2] - 1656:25,
1657:2
**runs** [1] - 1679:10
**rural** [1] - 1634:17

---

## S

**safe** [1] - 1744:23
**sake** [1] - 1600:3
**Sandra** [1] - 1694:4
**sat** [2] - 1632:13,
1658:3
**save** [2] - 1705:9,
1738:20

**saw** [7] - 1610:22,
1641:7, 1652:25,
1653:3, 1678:3,
1713:11
**scale** [1] - 1608:19
**scared** [1] - 1698:14
**scenario** [1] - 1705:3
**schedule** [2] -
1609:22, 1610:8
**schlep** [1] - 1736:8
**school** [1] - 1692:24
**School** [1] - 1709:7
**Scooter** [1] - 1605:2
**scooting** [1] - 1739:6
**scope** [5] - 1607:12,
1623:7, 1714:25,
1734:8, 1742:5
**screen** [7] - 1716:21,
1721:25, 1730:7,
1730:10, 1736:13,
1736:25, 1745:20
**script** [1] - 1678:23
**scroll** [1] - 1745:23
**se** [1] - 1721:14
**Sea** [1] - 1742:12
**search** [18] - 1614:5,
1619:15, 1619:19,
1624:10, 1628:6,
1632:9, 1633:13,
1633:21, 1634:7,
1634:8, 1634:11,
1692:7, 1692:10,
1751:6, 1756:3,
1756:8, 1756:23,
1757:9
**searched** [1] -
1634:23
**searching** [1] -
1636:18
**seat** [2] - 1609:19,
1672:24
**seated** [1] - 1746:23
**second** [12] - 1609:14,
1640:11, 1663:18,
1663:19, 1686:15,
1702:18, 1702:19,
1707:13, 1744:12,
1751:11, 1754:2
**seconds** [1] - 1699:16
**sections** [1] - 1721:23
**security** [6] - 1709:6,
1714:19, 1715:24,
1716:5, 1716:9,
1716:11
**see** [34] - 1602:14,
1605:25, 1622:15,
1640:18, 1641:1,
1645:18, 1645:23,
1646:7, 1647:2,
1648:10, 1652:8,

1653:8, 1672:21, 1675:22, 1682:5, 1682:17, 1683:16, 1690:2, 1690:10, 1690:13, 1692:14, 1692:24, 1698:13, 1701:15, 1701:23, 1702:21, 1703:25, 1704:5, 1715:10, 1736:25, 1737:2, 1739:12, 1752:17

**seeing** [4] - 1637:16, 1670:15, 1714:20, 1746:14

**seek** [5] - 1704:10, 1706:23, 1708:7, 1737:18, 1740:17

**seeking** [3] - 1693:3, 1704:9, 1752:1

**seeks** [1] - 1602:7

**seem** [4] - 1623:15, 1649:1, 1700:17, 1737:3

**seized** [1] - 1654:18

**seizes** [1] - 1621:20

**select** [1] - 1736:12

**selecting** [1] - 1736:10

**selective** [1] - 1649:13

**Senate** [1] - 1667:18

**send** [4] - 1699:18, 1741:25, 1742:19, 1749:6

**sender** [1] - 1700:7

**sending** [2] - 1622:15, 1738:15

**sense** [6] - 1609:5, 1634:19, 1672:16, 1726:19, 1744:17, 1748:3

**sent** [21] - 1648:18, 1649:4, 1649:5, 1655:6, 1661:8, 1677:11, 1691:7, 1699:19, 1700:2, 1700:7, 1704:5, 1705:22, 1707:7, 1709:9, 1709:10, 1730:17, 1734:5, 1735:20, 1741:15, 1742:20, 1748:13

**sentence** [1] - 1752:9

**separate** [4] - 1601:23, 1603:24, 1650:20, 1747:25

**separated** [1] - 1715:10

**Serbia** [2] - 1661:2, 1661:4

**Serbian** [3] - 1661:8,

1666:15, 1666:19

**series** [5] - 1598:10, 1734:13, 1744:13, 1745:21, 1745:23

**serious** [1] - 1662:8

**serve** [1] - 1614:5

**service** [2] - 1705:7, 1707:15

**session** [1] - 1598:2

**set** [7] - 1676:8, 1681:3, 1699:9, 1699:15, 1731:15, 1746:25, 1747:20

**several** [4] - 1651:9, 1656:5, 1727:8, 1736:19

**sharing** [1] - 1752:2

**Sharon** [1] - 1697:19

**Shaw** [1] - 1738:16

**Shawn** [1] - 1738:18

**shed** [1] - 1757:2

**Shenandoah** [2] - 1634:13, 1642:14

**sheriff's** [1] - 1726:24

**shift** [1] - 1733:10

**shit** [1] - 1739:8

**shoe** [7] - 1651:21, 1652:3, 1652:5, 1652:10, 1652:11, 1652:16, 1652:19

**short** [3] - 1643:11, 1747:11, 1750:10

**short-circuit** [1] - 1750:10

**shorthand** [1] - 1677:25

**shortly** [2] - 1626:16, 1626:18

**shotgun** [1] - 1725:2

**show** [29] - 1602:16, 1606:8, 1630:4, 1630:8, 1635:9, 1651:11, 1651:16, 1652:23, 1653:7, 1653:15, 1656:23, 1675:17, 1675:19, 1675:24, 1676:8, 1682:11, 1683:17, 1716:7, 1721:10, 1721:18, 1721:24, 1721:25, 1723:11, 1724:13, 1736:20, 1740:2, 1757:12

**showed** [6] - 1637:13, 1637:14, 1667:17, 1695:9, 1713:5, 1714:12

**showing** [3] - 1606:4, 1738:1, 1740:11

**shown** [7] - 1605:23,

1635:8, 1670:12, 1713:7, 1713:23, 1717:14, 1738:7

**shrunk** [1] - 1702:21

**sic** [3] - 1640:9, 1643:19, 1695:20

**sic]** [1] - 1706:17

**side** [7] - 1616:3, 1678:9, 1678:19, 1699:23, 1715:25, 1742:11, 1744:23

**sidestep** [1] - 1708:20

**Signal** [27] - 1621:16, 1622:9, 1622:10, 1622:25, 1623:22, 1624:8, 1661:7, 1670:13, 1677:11, 1677:21, 1688:13, 1688:16, 1699:5, 1699:7, 1699:9, 1700:2, 1702:4, 1702:7, 1702:10, 1733:20, 1733:22, 1733:25, 1734:2, 1734:5, 1740:3, 1751:5, 1751:6

**signal** [1] - 1622:13

**signed** [7] - 1633:4, 1633:13, 1639:18, 1639:19, 1639:24, 1641:6, 1654:13

**significantly** [2] - 1599:10, 1615:1

**signing** [1] - 1641:7

**signs** [1] - 1682:17

**similar** [2] - 1602:4, 1671:3

**simply** [6] - 1599:3, 1599:6, 1600:3, 1602:6, 1603:4, 1606:18

**simultaneous** [1] - 1756:7

**single** [8] - 1599:19, 1599:20, 1624:22, 1625:24, 1626:5, 1659:1, 1680:10, 1703:19

**Siniff** [6] - 1628:15, 1628:18, 1643:18, 1643:19, 1726:2, 1726:3

**siphon** [1] - 1621:23

**sipping** [1] - 1739:6

**sit** [2] - 1610:3, 1752:13

**sitcom** [1] - 1652:12

**sitting** [2] - 1609:24, 1746:9

**situation** [1] - 1617:2

**Skippy** [1] - 1708:17

**slide** [1] - 1731:23

**slow** [1] - 1690:24

**small** [5] - 1604:23, 1607:4, 1642:25, 1657:3, 1702:21

**Smart** [1] - 1652:12

**smartphone** [1] - 1695:21

**Smith** [1] - 1605:18

**snicker** [1] - 1753:17

**social** [4] - 1625:23, 1650:4, 1711:11, 1720:8

**solely** [2] - 1729:22, 1730:3

**solitary** [3] - 1624:22, 1625:25, 1626:6

**someone** [7] - 1691:8, 1707:8, 1730:13, 1738:22, 1739:12, 1739:14, 1752:15

**sometimes** [3] - 1600:17, 1613:14, 1617:4

**somewhat** [1] - 1746:7

**somewhere** [2] - 1633:19, 1692:24

**soon** [3] - 1658:10, 1660:16, 1726:20

**soonest** [1] - 1677:7

**SoRelle** [6] - 1709:23, 1709:24, 1709:25, 1749:4, 1751:18, 1751:19

**sorry** [45] - 1600:22, 1601:15, 1601:23, 1602:21, 1602:22, 1605:9, 1605:12, 1618:7, 1625:18, 1637:20, 1641:20, 1642:19, 1646:24, 1647:3, 1650:11, 1657:15, 1681:14, 1688:16, 1689:21, 1689:23, 1689:24, 1690:4, 1690:9, 1690:24, 1699:21, 1704:22, 1709:9, 1712:12, 1712:14, 1714:6, 1714:9, 1716:20, 1718:4, 1718:15, 1719:4, 1719:5, 1720:4, 1724:11, 1728:20, 1731:6, 1739:19, 1740:21, 1744:16, 1745:22, 1756:17

**Sorry** [1] - 1601:20

**sort** [5] - 1606:19, 1609:4, 1630:19, 1643:11, 1649:13

**sought** [7] - 1605:22, 1629:21, 1641:4, 1644:24, 1645:21, 1692:6, 1692:17

**sound** [9] - 1631:3, 1639:19, 1640:7, 1648:22, 1692:13, 1695:2, 1698:15, 1704:24, 1715:13

**sounded** [1] - 1753:15

**sounds** [5] - 1639:21, 1645:23, 1692:16, 1724:9, 1753:16

**sources** [2] - 1743:12, 1745:18

**Southwestern** [1] - 1709:6

**space** [1] - 1677:9

**span** [1] - 1737:10

**speaker** [1] - 1709:22

**speakers** [1] - 1709:20

**speaking** [3] - 1715:13, 1726:19, 1732:25

**Special** [20] - 1610:16, 1686:12, 1687:4, 1717:24, 1729:3, 1730:13, 1732:24, 1734:12, 1735:7, 1738:11, 1739:16, 1739:24, 1740:2, 1741:9, 1742:9, 1745:9, 1746:17, 1746:18

**special** [6] - 1710:15, 1736:21, 1736:25, 1745:21, 1745:22, 1755:8

**specialize** [1] - 1614:20

**specific** [6] - 1626:14, 1636:8, 1651:22, 1665:2, 1679:10, 1696:21

**specifically** [15] - 1611:16, 1639:23, 1645:11, 1651:14, 1657:8, 1665:6, 1683:1, 1684:24, 1698:1, 1713:7, 1713:12, 1729:15, 1732:18, 1733:7, 1733:17

**speculate** [1] - 1617:3

**speech** [4] - 1611:5, 1667:25, 1694:24, 1695:3

**speed** [3] - 1627:23, 1630:22, 1738:1
**spent** [3] - 1605:2, 1624:15, 1669:15
**spirit** [1] - 1732:11
**spoken** [2] - 1632:25, 1644:12
**spot** [1] - 1703:15
**spot-check** [1] - 1703:15
**spray** [1] - 1725:1
**spreading** [1] - 1739:13
**spy** [1] - 1652:16
**Spy** [2] - 1654:13, 1676:12
**stack** [2] - 1693:17, 1693:19
**Stamey** [8] - 1735:24, 1736:2, 1736:4, 1739:20, 1741:22, 1743:8, 1743:9, 1743:18
**stand** [5] - 1654:10, 1705:5, 1736:1, 1746:19, 1752:17
**stand-down** [1] - 1705:5
**standard** [1] - 1629:13
**standards** [1] - 1605:23
**standby** [2] - 1704:24, 1705:6
**standing** [4] - 1700:17, 1714:24, 1738:22, 1739:2
**standpoint** [1] - 1602:17
**stands** [1] - 1614:16
**started** [12] - 1626:15, 1627:2, 1627:6, 1628:22, 1628:23, 1628:25, 1714:18, 1715:12, 1718:2, 1718:22, 1754:13
**starting** [1] - 1722:5
**starts** [2] - 1625:10, 1757:17
**state** [6] - 1644:18, 1697:3, 1697:20, 1708:22, 1744:9
**State** [1] - 1743:8
**statement** [13] - 1625:5, 1625:6, 1625:8, 1687:20, 1687:21, 1687:22, 1687:23, 1713:8, 1731:20, 1733:5, 1733:7
**statements** [15] -

1607:19, 1638:6, 1644:19, 1644:25, 1645:3, 1648:12, 1658:20, 1713:2, 1713:4, 1728:17, 1729:21, 1729:23, 1745:17, 1745:18
**states** [3] - 1620:2, 1645:12, 1731:1
**States** [28] - 1624:24, 1626:1, 1626:8, 1626:22, 1629:24, 1631:7, 1632:6, 1637:11, 1637:16, 1638:5, 1638:16, 1639:1, 1646:22, 1647:14, 1657:22, 1664:8, 1665:2, 1665:23, 1666:7, 1667:7, 1668:1, 1680:2, 1683:4, 1683:10, 1683:13, 1691:21, 1696:17, 1707:18
**stating** [1] - 1647:6
**stay** [1] - 1744:22
**STEALING** [1] - 1704:25
**step** [3] - 1619:13, 1672:14, 1746:17
**steps** [6] - 1604:17, 1679:20, 1690:2, 1714:16, 1716:14, 1717:6
**Steve** [1] - 1632:14
**Stewart** [13] - 1611:23, 1612:8, 1622:4, 1624:1, 1637:7, 1661:10, 1670:14, 1676:13, 1676:18, 1695:7, 1707:10, 1740:4, 1741:12
**sticker** [1] - 1641:9
**still** [12] - 1601:2, 1603:10, 1604:5, 1610:18, 1622:18, 1622:19, 1654:20, 1660:1, 1660:12, 1734:6, 1738:20, 1749:20
**stipulate** [3] - 1603:21, 1603:22, 1604:16
**stipulation** [4] - 1604:2, 1604:10, 1697:1, 1754:14
**stipulations** [2] - 1604:13, 1697:11
**Stone** [1] - 1711:21
**stop** [12] - 1648:3,

1678:17, 1679:12, 1679:15, 1679:16, 1679:20, 1680:23, 1684:12, 1709:1, 1709:4, 1716:23
**stopping** [3] - 1683:24, 1685:25, 1691:21
**store** [1] - 1682:17
**storm** [4] - 1647:24, 1648:6, 1666:6, 1734:16
**stormed** [2] - 1629:23, 1631:6
**storming** [5] - 1644:20, 1644:25, 1645:9, 1648:21, 1705:4
**straight** [1] - 1608:14
**Street** [1] - 1676:4
**street** [1] - 1682:17
**strike** [1] - 1677:8
**strip** [1] - 1684:7
**strong** [1] - 1750:8
**struggling** [1] - 1696:15
**stuff** [2] - 1681:12, 1747:22
**stun** [1] - 1725:5
**style** [4] - 1634:8, 1634:24, 1635:4, 1705:4
**subject** [2] - 1606:24, 1608:24
**submit** [2] - 1708:10, 1747:25
**submitted** [2] - 1640:13, 1693:2
**subpoena** [1] - 1601:3
**subpoenas** [1] - 1614:5
**subsequent** [4] - 1645:20, 1650:16, 1650:18, 1756:15
**substantive** [1] - 1606:7
**suggest** [5] - 1620:23, 1680:5, 1686:2, 1733:18, 1739:17
**suggested** [2] - 1653:13, 1756:10
**suggesting** [16] - 1604:8, 1604:10, 1619:1, 1620:21, 1678:11, 1678:12, 1678:14, 1685:8, 1685:12, 1685:16, 1685:22, 1686:3, 1745:11, 1747:23, 1751:10, 1757:25

**suggestion** [1] - 1677:23
**suggestions** [1] - 1677:3
**summarize** [2] - 1607:15, 1607:17
**summary** [10] - 1607:5, 1607:7, 1607:8, 1607:11, 1607:12, 1607:15, 1607:17, 1607:23, 1608:1, 1709:25
**summer** [1] - 1755:19
**supervise** [1] - 1614:2
**supervision** [1] - 1613:25
**supplement** [1] - 1721:23
**support** [4] - 1677:1, 1705:2, 1735:9, 1756:6
**supporting** [2] - 1705:1, 1739:5
**supportive** [1] - 1738:20
**supposed** [4] - 1698:7, 1716:6, 1719:2, 1750:4
**surprise** [6] - 1608:22, 1633:25, 1634:2, 1661:20, 1661:23, 1712:17
**suspect** [2] - 1628:24, 1658:12
**suspected** [1] - 1615:13
**suspicion** [2] - 1623:20, 1750:8
**sustain** [1] - 1734:9
**sustained** [8] - 1649:18, 1664:4, 1662:10, 1669:12, 1683:20, 1686:17, 1687:12, 1715:22
**sworn** [1] - 1756:13
**system** [1] - 1731:17

**T**

**table** [7] - 1613:21, 1663:7, 1753:15, 1754:3, 1754:5, 1754:8, 1754:18
**talkie** [2] - 1653:19, 1654:6
**tape** [3] - 1652:17, 1653:8, 1653:15
**teaches** [1] - 1709:6
**Team** [2] - 1655:7, 1739:2

**team** [16] - 1680:4, 1687:2, 1687:7, 1704:19, 1704:20, 1704:23, 1739:5, 1748:11, 1748:12, 1748:15, 1748:17, 1748:21, 1750:15, 1750:19, 1751:7, 1751:13
**teammates** [2] - 1664:20, 1669:7
**technical** [1] - 1680:24
**technically** [2] - 1662:16, 1702:9
**technology** [1] - 1675:24
**ten** [1] - 1658:22
**tens** [2] - 1616:5, 1621:13
**term** [4] - 1615:22, 1619:4, 1657:19, 1684:4
**terms** [7] - 1609:22, 1613:14, 1618:12, 1623:6, 1679:6, 1722:7, 1747:5
**terrorism** [1] - 1616:23
**testified** [14] - 1608:21, 1638:15, 1646:13, 1687:11, 1687:25, 1699:5, 1700:10, 1700:21, 1702:3, 1703:21, 1709:12, 1709:15, 1712:1, 1744:3
**testify** [5] - 1598:25, 1603:11, 1603:15, 1604:21, 1608:2
**testimony** [14] - 1601:1, 1604:2, 1604:12, 1607:1, 1607:12, 1607:17, 1608:2, 1688:3, 1688:21, 1713:3, 1746:8, 1746:10, 1746:20, 1753:22
**Texas** [1] - 1748:22
**text** [12] - 1611:5, 1621:13, 1622:13, 1624:8, 1678:21, 1688:13, 1695:9, 1699:10, 1706:13, 1731:13, 1737:5, 1751:6
**that'll** [1] - 1610:8
**themselves** [1] - 1715:7
**theory** [1] - 1626:11

1782

**there're** [1] - 1600:1
**thereabouts** [1] - 1714:23
**thereafter** [2] - 1626:16, 1626:18
**they've** [2] - 1599:6, 1625:11
**thinking** [1] - 1757:8
**third** [1] - 1754:8
**Thomas** [3] - 1624:23, 1643:7, 1670:14
**thoughts** [1] - 1698:18
**thousands** [6] - 1616:5, 1621:13, 1623:25, 1705:12
**threat** [1] - 1616:18
**threat-to-life** [1] - 1616:18
**three** [9] - 1613:15, 1628:4, 1633:2, 1637:1, 1658:9, 1727:5, 1740:2, 1740:13, 1756:21
**three-hour** [1] - 1637:1
**threshold** [2] - 1749:12, 1749:18
**throughout** [1] - 1621:14
**thrown** [1] - 1658:20
**thumb** [2] - 1621:21, 1740:24
**Thursday** [15] - 1610:1, 1672:12, 1745:7, 1746:10, 1746:11, 1746:15, 1746:19, 1746:24, 1750:19, 1752:18, 1754:19, 1755:1, 1756:1, 1757:17
**timing** [3] - 1672:15, 1744:17, 1757:6
**tip** [1] - 1606:20
**tipped** [1] - 1660:4
**tips** [1] - 1606:18
**tipster** [1] - 1606:22
**tired** [2] - 1658:7, 1658:10
**title** [1] - 1609:10
**titled** [1] - 1700:13
**today** [27] - 1611:1, 1624:6, 1628:1, 1628:3, 1632:1, 1637:3, 1638:9, 1649:14, 1659:6, 1671:16, 1671:19, 1672:20, 1676:20, 1679:23, 1680:1, 1693:5, 1701:19, 1702:8, 1703:21,

**1706**:8, 1706:14, 1710:1, 1710:7, 1710:17, 1736:1, 1746:19, 1752:12
**today's** [3] - 1602:1, 1713:1, 1713:2
**together** [2] - 1713:1, 1756:21
**tolerate** [1] - 1723:16
**Tom** [2] - 1643:6, 1676:18
**Tom's** [4] - 1628:20, 1642:13, 1643:4, 1643:20
**tomorrow** [8] - 1609:23, 1609:24, 1677:10, 1746:9, 1748:6, 1754:11, 1756:1, 1757:23
**took** [8] - 1627:17, 1628:11, 1639:17, 1644:21, 1644:22, 1679:20, 1682:5, 1682:23
**topic** [3] - 1604:9, 1659:9, 1744:12
**touched** [2] - 1757:5, 1757:8
**tour** [1] - 1638:22
**toured** [2] - 1638:17, 1638:18
**tourist** [1] - 1667:9
**towards** [2] - 1627:23, 1731:16
**town** [2] - 1642:25, 1676:20
**track** [1] - 1692:19
**trailer** [1] - 1738:21
**trained** [1] - 1658:11
**training** [13] - 1634:24, 1635:2, 1635:3, 1635:9, 1719:2, 1719:11, 1719:17, 1720:12, 1720:16, 1720:22, 1721:4, 1722:24, 1723:1
**tran** [1] - 1610:21
**transcribed** [1] - 1610:25
**transcript** [9] - 1598:4, 1606:3, 1610:22, 1651:13, 1661:17, 1709:15, 1709:17, 1709:18, 1757:2
**transport** [2] - 1742:12, 1743:12
**travel** [1] - 1753:16
**treasonist** [1] - 1705:4
**treated** [1] - 1725:7

**TREE** [1] - 1738:16
**trespassed** [1] - 1598:17
**trespassing** [4] - 1651:10, 1651:15, 1661:23, 1661:25
**trial** [6] - 1598:3, 1599:1, 1599:22, 1601:7, 1628:1, 1628:3
**tried** [2] - 1700:25, 1703:15
**trod** [1] - 1659:8
**troops** [1] - 1708:23
**true** [16] - 1611:3, 1611:7, 1611:23, 1624:21, 1629:21, 1633:22, 1651:6, 1651:14, 1653:14, 1662:12, 1666:14, 1674:25, 1680:16, 1689:7, 1689:14, 1711:23
**Trump** [5] - 1696:12, 1707:11, 1708:17, 1715:12, 1715:17
**trust** [2] - 1657:12, 1657:15
**trusted** [2] - 1657:21, 1658:1
**trustworthiness** [1] - 1606:5
**truth** [1] - 1625:7
**truthful** [1] - 1649:1
**try** [7] - 1633:16, 1644:11, 1658:13, 1658:17, 1694:13, 1698:8, 1721:25
**trying** [14] - 1606:23, 1631:12, 1638:21, 1656:12, 1658:3, 1658:18, 1678:17, 1679:19, 1696:15, 1696:18, 1722:23, 1725:11, 1736:17, 1757:22
**turned** [6] - 1633:8, 1699:18, 1726:17, 1726:23, 1750:13, 1750:15
**turning** [1] - 1732:3
**tweeted** [1] - 1696:12
**Twitter** [2] - 1711:1, 1711:4
**two** [25] - 1599:20, 1599:23, 1601:23, 1611:24, 1612:3, 1616:14, 1629:23, 1629:24, 1631:4, 1631:6, 1637:1,

**1650**:20, 1665:8, 1680:18, 1690:2, 1695:7, 1711:19, 1744:9, 1745:15, 1746:1, 1747:16, 1750:21, 1751:19, 1751:20, 1752:2
**type** [5] - 1616:23, 1643:17, 1677:7, 1677:18, 1720:8
**typed** [1] - 1642:8
**typical** [1] - 1616:24
**typically** [2] - 1609:7, 1727:19
**tyranny** [1] - 1707:12

**U**

**U.S** [8] - 1605:18, 1607:9, 1613:19, 1613:20, 1616:10, 1629:15, 1727:16, 1735:3
**U.S.C** [1] - 1647:5
**ultimately** [2] - 1719:12, 1726:13
**under** [10] - 1601:2, 1605:19, 1607:1, 1610:18, 1613:25, 1644:7, 1647:5, 1647:7, 1651:7, 1705:8
**understood** [6] - 1625:14, 1634:10, 1638:7, 1638:14, 1725:12, 1752:5
**underway** [1] - 1676:21
**unfiltered** [1] - 1750:25
**UNIDENTIFIED** [2] - 1744:24, 1745:4
**uniform** [3] - 1615:18, 1693:22, 1694:5
**uniforms** [1] - 1615:17
**unit** [2] - 1723:13, 1723:18
**United** [28] - 1624:24, 1626:1, 1626:8, 1626:22, 1629:24, 1631:7, 1632:6, 1637:11, 1637:16, 1638:5, 1638:16, 1639:1, 1646:22, 1647:14, 1657:22, 1664:8, 1665:2, 1665:23, 1666:7, 1667:7, 1668:1, 1680:2, 1683:4, 1683:10, 1683:13,

**1691**:21, 1696:17, 1707:18
**unknown** [2] - 1666:5, 1666:6
**unless** [2] - 1609:8, 1622:19
**unlikely** [1] - 1604:11
**unquote** [3] - 1648:19
**unrest** [1] - 1708:24
**unrestrained** [1] - 1690:25
**unsent** [1] - 1733:18
**untoward** [1] - 1667:7
**untrained** [1] - 1723:7
**unusual** [3] - 1623:16, 1697:25, 1698:3
**unwilling** [1] - 1603:10
**up** [58] - 1599:9, 1600:12, 1603:14, 1604:3, 1605:8, 1605:10, 1608:9, 1608:13, 1609:9, 1609:12, 1610:10, 1615:21, 1615:23, 1630:23, 1635:4, 1636:10, 1642:8, 1648:24, 1654:8, 1654:13, 1656:22, 1658:10, 1660:14, 1670:12, 1671:12, 1676:11, 1678:10, 1678:19, 1678:20, 1678:21, 1680:4, 1680:8, 1682:16, 1689:10, 1691:25, 1703:12, 1713:18, 1714:17, 1716:7, 1716:14, 1717:6, 1719:1, 1721:5, 1721:16, 1730:6, 1730:10, 1736:9, 1736:21, 1737:11, 1739:11, 1739:23, 1740:12, 1744:25, 1745:7, 1745:20, 1749:8, 1754:25
**urban** [1] - 1690:25
**urge** [1] - 1600:8
**useful** [2] - 1751:14, 1753:19
**user** [1] - 1733:18
**user's** [1] - 1699:22
**usual** [1] - 1698:3
**utilized** [2] - 1687:1, 1707:11
**utilizing** [3] - 1655:10, 1686:23, 1686:24

## V

**vague** [1] - 1651:20
**vaguely** [1] - 1723:15
**valid** [1] - 1603:24
**Valley** [2] - 1634:14, 1642:14
**VanLandingham** [1] - 1709:5
**various** [2] - 1620:1, 1621:2
**vehicle** [1] - 1633:25
**verify** [3] - 1669:9, 1703:11, 1703:16
**version** [4] - 1713:9, 1713:10, 1713:11, 1737:11
**versus** [2] - 1618:7, 1618:8
**vertical** [1] - 1615:20
**vibe** [1] - 1676:19
**video** [16] - 1598:5, 1598:11, 1598:13, 1598:16, 1599:10, 1602:25, 1634:3, 1651:11, 1652:8, 1661:8, 1714:15, 1715:10, 1717:2, 1717:4, 1717:8, 1717:10
**videos** [3] - 1598:20, 1714:20, 1717:6
**view** [1] - 1607:6
**violating** [1] - 1612:12
**violation** [1] - 1629:16
**violations** [1] - 1612:18
**violence** [2] - 1689:15, 1691:2
**violent** [6] - 1644:19, 1647:1, 1647:4, 1647:13, 1663:15, 1663:24
**Virginia** [9] - 1628:20, 1642:14, 1643:4, 1643:20, 1654:21, 1659:20, 1676:18, 1697:3, 1697:20
**virtually** [1] - 1622:25
**virtue** [1] - 1727:22
**visual** [2] - 1716:19, 1716:25
**voluminous** [1] - 1608:2
**voluntarily** [2] - 1727:1, 1727:6
**voucher** [1] - 1747:25

## W

**wait** [4] - 1750:4, 1755:1, 1758:4
**waiting** [1] - 1739:3
**waive** [1] - 1599:11
**waived** [2] - 1658:23, 1750:9
**waiving** [1] - 1599:5
**Walden** [3] - 1668:11, 1668:13, 1668:19
**walkie** [2] - 1653:19, 1654:6
**walkie-talkie** [2] - 1653:19, 1654:6
**walking** [4] - 1714:18, 1715:7, 1716:14, 1717:6
**Walton** [1] - 1605:3
**wants** [2] - 1658:12, 1723:18
**war** [1] - 1732:10
**warned** [1] - 1637:7
**warning** [1] - 1637:7
**warrant** [15] - 1624:10, 1628:6, 1632:9, 1633:21, 1644:24, 1692:7, 1692:10, 1725:17, 1725:19, 1745:10, 1756:6, 1756:23, 1757:6, 1757:7
**warrants** [4] - 1614:5, 1619:16, 1619:19, 1756:13
**Washington** [11] - 1660:5, 1676:5, 1677:17, 1678:13, 1679:2, 1682:19, 1683:9, 1684:24, 1685:9, 1701:16, 1701:20
**watcher** [1] - 1705:2
**water** [3] - 1742:12, 1742:16, 1742:17
**Watkins** [22] - 1609:11, 1621:11, 1624:2, 1626:21, 1627:3, 1627:15, 1627:24, 1628:7, 1628:11, 1628:18, 1642:13, 1645:13, 1656:21, 1665:9, 1666:5, 1718:15, 1721:3, 1723:4, 1727:8, 1735:14, 1741:18, 1756:14
**Watkins's** [5] - 1642:12, 1643:3, 1723:25, 1724:18,

1734:2
**watkins's** [1] - 1628:15
**ways** [2] - 1620:23, 1634:22
**weapon** [2] - 1696:19, 1724:23
**weapons** [3] - 1634:7, 1736:7, 1739:2
**wear** [1] - 1615:17
**wearing** [4] - 1634:8, 1693:22, 1693:23, 1694:5
**wears** [2] - 1694:2, 1694:3
**website** [2] - 1695:24, 1695:25
**week** [2] - 1616:14, 1719:9
**weeks** [2] - 1748:14, 1754:14
**weird** [1] - 1676:19
**welcome** [2] - 1609:20, 1672:25
**weps** [3] - 1736:9, 1739:8, 1739:9
**west** [1] - 1742:12
**Western** [1] - 1743:8
**whereas** [1] - 1724:24
**Whip** [1] - 1718:20
**whistle** [1] - 1705:1
**white** [1] - 1616:22
**White** [3] - 1705:3, 1705:4, 1705:9
**whole** [4] - 1598:18, 1630:23, 1630:24, 1691:24
**wife** [4] - 1633:13, 1636:21, 1694:4, 1697:19
**William** [1] - 1598:3
**willing** [3] - 1600:14, 1603:14, 1739:14
**winner** [2] - 1731:18, 1732:6
**winter** [1] - 1739:15
**wish** [1] - 1753:23
**withdraw** [7] - 1636:1, 1647:11, 1655:4, 1655:23, 1664:15, 1664:16, 1670:3
**withdrawn** [1] - 1686:19
**withheld** [3] - 1748:12, 1748:16, 1748:18
**withholding** [1] - 1728:8
**witness** [35] - 1598:19, 1599:3,

1601:10, 1601:17, 1601:22, 1602:1, 1602:4, 1602:13, 1604:11, 1606:22, 1607:23, 1608:1, 1624:22, 1630:12, 1630:20, 1637:22, 1641:11, 1645:25, 1647:22, 1654:9, 1687:24, 1688:3, 1688:7, 1690:7, 1690:13, 1706:16, 1707:22, 1717:12, 1721:11, 1721:17, 1721:19, 1734:18, 1734:20, 1746:19, 1749:23
**WITNESS** [15] - 1630:25, 1640:21, 1640:23, 1641:1, 1641:13, 1646:3, 1647:23, 1662:18, 1690:4, 1690:9, 1690:24, 1704:22, 1716:20, 1722:4, 1746:22
**witness'** [2] - 1606:11, 1606:13
**witnessed** [1] - 1638:16
**Witnesses** [1] - 1596:3
**witnesses** [16] - 1598:25, 1601:24, 1604:12, 1607:5, 1607:7, 1607:8, 1607:11, 1607:15, 1607:17, 1608:17, 1617:12, 1618:5, 1619:21, 1734:14, 1738:1, 1746:25
**woman** [1] - 1694:10
**Woodward** [7] - 1598:6, 1599:13, 1601:10, 1698:25, 1699:4, 1704:2, 1740:25
**WOODWARD** [32] - 1598:7, 1598:24, 1600:11, 1600:19, 1600:24, 1601:13, 1601:20, 1608:23, 1609:16, 1699:2, 1704:3, 1704:4, 1704:10, 1704:17, 1705:10, 1706:12, 1706:16, 1706:18, 1706:23, 1707:6, 1707:21, 1707:24, 1708:1, 1708:3,

1708:7, 1708:14, 1710:6, 1731:5, 1738:5, 1740:20, 1742:2, 1742:4
**Woodward..............** [1] - 1596:6
**Word** [3] - 1703:4, 1703:6, 1703:8
**word** [8] - 1677:25, 1688:20, 1690:17, 1690:18, 1726:1, 1734:20, 1739:11, 1739:13
**words** [12] - 1620:15, 1632:2, 1638:19, 1638:21, 1648:23, 1655:21, 1666:21, 1678:4, 1680:5, 1683:7, 1692:22, 1694:17
**workers** [1] - 1628:6
**worst** [1] - 1705:3
**would've** [1] - 1635:8
**wrap** [1] - 1658:10
**writes** [1] - 1605:21
**written** [1] - 1709:2
**wrote** [3] - 1708:1, 1745:10, 1755:20

## Y

**y'all** [1] - 1612:14
**years** [7] - 1599:14, 1616:10, 1616:25, 1622:12, 1669:15, 1693:25, 1694:10
**yesterday** [11] - 1613:6, 1614:15, 1626:11, 1635:16, 1635:17, 1635:23, 1637:13, 1637:16, 1638:15, 1658:4, 1740:23
**Yorker** [3] - 1626:19, 1627:9, 1627:10
**you-all** [7] - 1609:12, 1625:2, 1690:2, 1752:21, 1755:3, 1757:16, 1758:2
**yourself** [1] - 1753:11
**YouTube** [2] - 1661:8, 1666:15

## Z

**Zaremba** [1] - 1598:3
**zealously** [1] - 1599:15
**Zello** [22] - 1654:9, 1654:13, 1654:16, 1655:10, 1655:14,

1655:18, 1655:25,
1656:6, 1656:12,
1656:16, 1656:20,
1656:21, 1657:4,
1657:6, 1657:10,
1657:25, 1658:1,
1686:22, 1686:23,
1686:24, 1712:9